## Exhibits to the Plan

| Exhibit No. | Description |
|:---:|:---:|
| 1.1.5 | Acquisition Agreement |
| 1.1.32 | Form of Amended and Restated Organizational Documents of HoldCo, IntermediateCo, and the Reorganized Debtors |
| 1.1.48 | Amendment to the Claims Settlement Guidelines |
| 1.1.55 | Contribution Agreement |
| 1.1.84 | Equity Commitment Agreement |
| 1.1.112 | Form of IntermediateCo Note Indenture |
| 1.1.114 | Terms of the IntermediateCo Preferred Stock |
| 1.1.151 | Form of Registration Rights Agreement |
| 1.1.176 | Form of Stockholders Agreement |
| 7.10 | Terms of the Amendment to European Term Loan Facility |

# Exhibit 1.1.5

# Acquisition Agreement

ACQUISITION AGREEMENT

THIS ACQUISITION AGREEMENT (this "Agreement"), dated February 5, 2010, by and among ALERIS INTERNATIONAL, INC., a Delaware corporation ("Aleris International"), the Selling Subsidiaries (as defined below), and RLD Acquisition Co, a Delaware corporation ("RLD"), RCY ACQUISITION CO., a Delaware corporation ("RCY"), SPEC A ACQUISITION CO., a Delaware corporation ("Spec A"), SPEC P ACQUISITION CO., a Delaware corporation ("Spec P"), HQ1 ACQUISITION CO., a Delaware corporation ("HQCO"), INTL ACQUISITION CO., a Delaware corporation ("InternationalCo"), UWA ACQUISITION CO., a Delaware corporation ("UWA"), and NAME ACQUISITION CO., a Delaware corporation ("NAMECO," and together with RLD, RCY, Spec A, Spec P, HQCO, InternationalCo and UWA, the "Operating Companies").

W I T N E S S E T H :

WHEREAS, Aleris International and its subsidiaries are engaged in the production and sale of aluminum rolled and extruded products, recycled aluminum, specification alloy production and other specialty products (the "Business"), domestically and internationally; and

WHEREAS, on February 12, 2009, Aleris International and its affiliated U.S. debtors and, on February 5, 2010, Aleris Deutschland Holding GmbH (collectively, the "Debtors") commenced voluntary cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and

WHEREAS, concurrent herewith, the Operating Companies, AHC1 Holding Co. ("HoldCo"), a Delaware corporation and the indirect parent of each Operating Company, and AHC Intermediate Co. ("IntermediateCo"), a Delaware corporation and the direct or indirect parent of each Operating Company, have entered into that certain Contribution Agreement (the "Contribution Agreement"), dated as of the date hereof; and

WHEREAS, in connection with the Operating Companies' acquisition of the Business and the Plan (as defined herein), and subject to the terms of the Equity Commitment Agreement (as defined in the Plan), certain affiliated investment funds and accounts managed by Oaktree Capital Management, L.P., have committed to buy (either alone or together with one or more of the other Backstop Parties), and IntermediateCo has committed to issue and sell, for $5 million in cash (the "Cash Proceeds"), 5,000 shares of exchangeable preferred stock of IntermediateCo (the "Preferred Stock"), which have a stated value equal to $5 million and terms substantially as set forth in Annex A; and

WHEREAS, pursuant to the Contribution Agreement, HoldCo and IntermediateCo have agreed to contribute, or cause to be contributed, upon the satisfaction of certain conditions, to each Operating Company its proportional share of (i)

shares of common stock (the "<u>New Common Stock</u>"), par value $0.01 per share, of HoldCo, (ii) subordinated, unsecured exchangeable notes due 2020 issued pursuant to the IntermediateCo Note Indenture between IntermediateCo and an indenture trustee to be named, in an aggregate principal amount equal to $45 million, with terms substantially as set forth in <u>Annex B</u> (the "<u>IntermediateCo Notes</u>") and (iii) the Cash Proceeds; and

WHEREAS, Aleris International wishes to sell, assign and transfer to each of the Operating Companies, and each Operating Company wishes to purchase and acquire from Aleris International, the respective assets (including the assets of the Selling Subsidiaries and stock of subsidiaries of Aleris International) relating to a separate division or certain intangibles of the Business, which, in the aggregate, comprises substantially all of Aleris International's assets, free and clear of all liens, claims, encumbrances and interests other than as expressly permitted hereunder and, in connection therewith, each Operating Company is willing to pay the Purchase Price, including the assumption of the Liabilities, all upon the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, it is contemplated that the Debtors may, in accordance with the terms of this Agreement, prior to the Closing, engage in one or more related transactions generally designed to simplify and consolidate the organizational structure of the Debtors, consistent with the acquisition of the divisions hereunder, by merging, dissolving or otherwise consolidating one or more of the Debtors;

NOW, THEREFORE, in consideration of the premises and the representations, warranties, agreements and covenants hereinafter set forth, and intending to be legally bound, Aleris International and each Operating Company hereby agree as follows:

1. <u>Definitions</u>. For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1 (capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan):

"<u>Affiliate</u>" of any particular person means any other person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such person. For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct the management and policies of a person whether through the ownership of voting securities, contract or otherwise.

"<u>Allocation</u>" has the meaning set forth in Section 5.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware.

"<u>Business</u>" has the meaning set forth in the recitals.

"Cash Proceeds" has the meaning set forth in the recitals.

"Chapter 11 Cases" has the meaning set forth in the recitals.

"Closing" means the closing of the transactions contemplated by this Agreement.

"Closing Date" means the Effective Date.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contribution Agreement" has the meaning set forth in the recitals.

"Debtors" has the meaning set forth in the recitals.

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governmental Authority" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether federal, state, local or foreign, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private), including any taxing authority.

"HoldCo" has the meaning set forth in the recitals.

"IntermediateCo" has the meaning set forth in the recitals.

"IntermediateCo Notes" has the meaning set forth in the recitals.

"Law" means any foreign, federal, state, local law, statute, code, ordinance, rule or regulation.

"Liabilities" has the meaning set forth in Section 3(c).

"New Common Stock" has the meaning set forth in the recitals.

"Plan" means the Joint Plan of Reorganization of the Debtors, dated the date hereof (as may be modified, amended or supplemented).

"Preferred Stock" has the meaning set forth in the recitals.

"Purchased Assets" has the meaning set forth in Section 2.

"Purchase Price" has the meaning set forth in Section 3.

"Seller Tax Return" has the meaning set forth in Section 6(d).

"Selling Subsidiaries" means the direct and indirect U.S. subsidiaries of Aleris International as set forth on Schedule 1, which shall be completed and attached hereto by Aleris International in time to be included in the filing of the Plan Supplement.

"Tax" or "Taxes" means (i) all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all income, gross receipts, capital, sales, use, *ad valorem*, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax authority in connection with any item described in clause (i) and (iii) any liability in respect of any items described in clauses (i) or (ii) payable by reason of contract, assumption, transferee liability, operation of law, Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law) or otherwise.

"Tax Return" means any return, report, information return or other document (including schedules or any related or supporting information) filed or required to be filed with any governmental entity or other authority in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Transfer Taxes" has the meaning set forth in Section 6.

2.  Purchase of Purchased Assets.

On the terms and subject to the conditions of this Agreement, on the Closing Date, (a) each Operating Company shall purchase a portion of Aleris International's assets (including the assets of the Selling Subsidiaries) as set forth in Schedule 2, which shall be completed and attached hereto by the Operating Companies and Aleris International in time to be included in the filing of the Plan Supplement, and shall be amended as necessary by any Operating Company with the consent of Aleris International prior to the Closing Date, such that the Operating Companies shall, in the aggregate, purchase all of Aleris International's and the Selling Subsidiaries' right, title and interest in and to all of Aleris International's and the Selling Subsidiaries' assets, properties, business and goodwill of every kind, character and description, whether tangible or intangible, whether real, personal or mixed, and wherever located, and in existence on the Closing Date after taking into account all distributions pursuant to the Plan (such assets being purchased are hereinafter collectively referred to as the "Purchased Assets"), and (b) the Purchase Price shall be paid as set forth in Section 3.

3.  Purchase Price.

In accordance with Schedule 2, each Operating Company shall pay its respective portion of the purchase price (in the aggregate, the "Purchase Price") to Aleris International in consideration for the sale, transfer, assignment, conveyance and delivery

by Aleris International to each of the Operating Companies of its respective portion of the Purchased Assets. The Purchase Price shall be the aggregate of the following:

(a) up to approximately 36.5 million shares of the New Common Stock, which shall equal 100% of the outstanding shares of New Common Stock on the Closing Date;

(b) the IntermediateCo Notes; and

(c) the obligations and liabilities that remain outstanding after giving effect to the Plan (including, without limitation, any amounts payable by the Debtors under the Plan with respect to Administrative Claims and Disputed Claims) (the "Liabilities") of Aleris International and the Selling Subsidiaries.

4. Assumption of Liabilities.

NAMECO agrees to assume and to perform and discharge, except as provided for in Section 6(b) and as set forth on Schedule 2, the Liabilities of Aleris International.

5. Purchase Price Allocation.

Each Operating Company's respective portion of the Purchase Price shall be allocated for U.S. federal income tax purposes among the Purchased Assets as of the Closing Date in accordance with Schedule 2 and in a manner consistent with Section 1060 of the Code and the Treasury Regulations, which allocations will be set out in separate schedules to be prepared by each Operating Company as soon as reasonably practicable after the Closing Date (each an "Allocation"). The parties hereto agree that (i) for U.S. federal income tax purposes, the transfer of the Purchased Assets pursuant hereto shall be treated as a taxable transaction, and (ii) for all Tax purposes, the transactions contemplated by this Agreement shall be reported in a manner consistent with the terms of this Agreement, including the Allocation. No party will take any position inconsistent with the preceding sentence in any Tax Return, in any refund claim, in any litigation, or otherwise, except as otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code or analogous provision of state, local or foreign Tax law. The parties also agree to cooperate in preparing IRS Form 8594 (including any subsequent adjustments required thereto). If any such Allocation is disputed by any Governmental Authority, the party receiving notice of such dispute will promptly notify the other parties and the parties will use their reasonable best efforts to sustain the final allocation. The parties will share information and cooperate in good faith to permit the transactions contemplated by this Agreement to be properly, timely and consistently reported.

6. Tax Matters.

(a) <u>Transfer Taxes</u>.  (i)  NAMECO shall be responsible for (and shall indemnify and hold harmless the other and their respective directors, officers, employees, Affiliates, agents, successors and permitted assigns against) any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the transactions contemplated by this Agreement ("<u>Transfer Taxes</u>").  Aleris International shall, however, seek to include in the Plan a provision that provides that the transfer of the Purchased Assets shall be free and clear of any Transfer Taxes under Bankruptcy Code Section 1146(a).  Aleris International and the Operating Companies shall cooperate and consult with each other prior to filing any Tax Returns in respect of Transfer Taxes; <u>provided</u>, <u>however</u>, Aleris International may initially pay any Transfer Taxes (for which the applicable Operating Company shall promptly reimburse Aleris International) and, thereafter, in reliance on Section 1146(a) of the Bankruptcy Code (if applicable) apply for a refund (which refund shall be remitted to the applicable Operating Company to the extent such Transfer Taxes were previously reimbursed by such Operating Company).  Aleris International and the Operating Companies shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes.

(ii) To the extent that any Transfer Taxes are required to be paid by NAMECO relating to the assets acquired by an Operating Company other than NAMECO, the applicable Operating Company shall promptly reimburse NAMECO for such Transfer Taxes.

(b) <u>Real and Personal Property Taxes</u>.  All real and personal property Taxes or similar *ad valorem* obligations levied with respect to the Purchased Assets, whether imposed or assessed before or after the Closing Date, shall be borne by the Operating Companies, but only as to those taxes or obligations that are due and payable after the Closing Date without penalty.

(c) <u>Section 338 Election</u>.  The Operating Companies shall be permitted, but are not required, to make an election under Section 338 of the Code (or any comparable state, local, or foreign Law) with respect to the purchase of the equity interests of any subsidiary of Aleris International or any Selling Subsidiary, if applicable, that is treated as a corporation for U.S. federal income tax purposes, and Aleris International shall use its best efforts to timely make, or cause to be timely made, any joint election under such section as requested by the Operating Companies.

(d) <u>Delegation of Authority</u>.  As of the Closing Date, HQCO shall hereby be delegated and have full responsibility for all Tax matters with respect to Aleris International and the Selling Subsidiaries for all taxable periods of Aleris International and the Selling Subsidiaries ending on or prior to, or including, the Closing Date.  In furtherance thereof, and without limitation, HQCO shall (i) prepare and file (or cause to be prepared and filed) all Federal, state, local and foreign tax returns, reports, certificates, forms or similar statements or documents (collectively, "<u>Seller Tax Returns</u>") that Aleris International or any Selling Subsidiary is required to file or that HQCO otherwise deems

appropriate (including the filing of amended Seller Tax Returns or requests for refunds), and (ii) control any inquiry, contest, audit or administrative or court proceeding relating to any such Tax matters. Neither Aleris International nor any Selling Subsidiary shall file or amend after the Closing Date any Seller Tax Return for any taxable periods (or portions thereof) described in the first sentence of this subsection (d) without HQCO's prior written consent.

7. <u>Instruments of Conveyance; Further Assurances; Power of Attorney</u>.

(a) Attached to this Agreement as <u>Exhibit A</u> is a form of the bill of sale pursuant to which all right, title and interest of Aleris International and the Selling Subsidiaries in and to the Purchased Assets will be hereby transferred, assigned and conveyed on the Closing Date to the Operating Companies, their successors and assigns, forever, in accordance with the Plan. Aleris International, the Selling Subsidiaries and the Operating Companies each agree, from time to time after the Closing Date, upon the request of the other and without further consideration, to do, execute, acknowledge and deliver, or to cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney, consents and assurances as might be required to, or to more effectively, convey, assign, transfer, set over and deliver to, and to vest, perfect and confirm in each Operating Company all of Aleris International's and the Selling Subsidiaries' right, title and interest in and to such Operating Company's respective portion of the Purchased Assets.

(b) Effective as of the Closing Date, Aleris International hereby irrevocably constitutes and appoints each Operating Company, its successors and assigns, its true and lawful attorney, with full power of substitution, in the name, place and stead of Aleris International, to take all action which such Operating Company may deem proper in order to vest, perfect or confirm of record or otherwise in such Operating Company the title of any of the Purchased Assets, or otherwise to carry out the provisions of this Agreement (including, without limitation, the handling of all Tax matters and any governmental filings of Aleris International). Aleris International acknowledges that the foregoing powers are coupled with an interest and are and shall be irrevocable in any manner and for any reason.

(c) Effective as of the Closing Date, each Selling Subsidiary hereby irrevocably constitutes and appoints each Operating Company, its successors and assigns, its true and lawful attorney, with full power of substitution, in the name, place and stead of such Selling Subsidiary, to take all action which such Operating Company may deem proper in order to vest, perfect or confirm of record or otherwise in such Operating Company the title of any of the Purchased Assets, or otherwise to carry out the provisions of this Agreement (including, without limitation, the handling of all Tax matters and any governmental filings of such Selling Subsidiary). Each Selling Subsidiary acknowledges that the foregoing powers are coupled with an interest and are and shall be irrevocable in any manner and for any reason.

8. <u>Covenant and Agreement of Aleris International</u>.

Aleris International covenants and agrees to file the Plan and the related Disclosure Statement of the Debtors with the Bankruptcy Court on behalf of the Debtors, which Plan shall be reasonably acceptable in form and substance to each of the Operating Companies, and will not make any revision, modification, supplement or amendment that would adversely affect the Operating Companies without the consent of the Operating Companies (such consent not to be unreasonably withheld). Aleris International shall use commercial best efforts to obtain confirmation of the Plan.

9. Covenant and Agreement of the Operating Companies.

(a) The Operating Companies covenant and agree to cause IntermediateCo to issue and sell the Preferred Stock to the Backstop Parties pursuant to that certain Equity Commitment Agreement.

(b) The Operating Companies covenant and agree to cause HoldCo to enter into (i) a registration rights agreement with substantially the same terms as set forth in Exhibit F to the Equity Commitment Agreement and (ii) a stockholders' agreement with substantially the same terms as set forth in Exhibit G to the Equity Commitment Agreement.

10. Conditions to Obligations of the Operating Companies.

The respective obligations of the Operating Companies to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any one or more of which may be waived (but only in writing) by each Operating Company (provided that no such waiver shall be deemed to have cured any breach of any representation, warranty or covenant made in this Agreement):

(a) Confirmation Order. The Bankruptcy Court shall have entered the Confirmation Order in a form reasonably acceptable to the Operating Companies.

(b) Contribution Agreement. The transactions contemplated by the Contribution Agreement shall have been consummated.

(c) Conditions to Confirmation. The conditions to confirmation and the conditions to the Effective Date shall have been satisfied (or waived by the Debtors and a Majority in Interest) in accordance with the Plan.

(d) Purchase of Preferred Stock. The Backstop Parties shall concurrently purchase the Preferred Stock from IntermediateCo.

11. Disclaimer.

Aleris International, the Selling Subsidiaries and the Operating Companies hereby agree that the Purchased Assets are being transferred AS IS and WITHOUT ANY WARRANTY OR REPRESENTATION WHATSOEVER, WHETHER EXPRESS OR

IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, except as may otherwise be provided in any deeds executed by Aleris International and the Selling Subsidiaries for the purpose of effecting the transfer of record ownership of real estate to the Operating Companies.

12. <u>Notices</u>.

Any notices or communications required or permitted hereunder shall be in writing and shall be deemed to have been given or made when personally delivered or when mailed by registered or certified mail, postage prepaid, return receipt requested or sent by telecopy, addressed as follows or to such other address as the party to whom the same is intended shall have specified in conformity with the foregoing:

If to Aleris International or any Selling Subsidiary:

Aleris International, Inc.
25825 Science Park Dr., Suite 400
Beachwood, Ohio 44122
Attention:  Christopher R. Clegg, Esq.
Telecopy No.:  (216) 910-3654

If to the Operating Companies:

c/o Aleris International, Inc.
25825 Science Park Dr., Suite 400
Beachwood, Ohio 44122
Attention:  Christopher R. Clegg, Esq.
Telecopy No.:  (216) 910-3654

13. <u>Successors</u>.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.  Each Operating Company may, in accordance with the terms of this Agreement, direct the transfer of the Purchased Assets on its behalf by assigning its rights to purchase, accept and acquire the Purchased Assets and its obligations to assume and thereafter pay or perform as and when due, or otherwise discharge, the Liabilities, to any affiliate of any Operating Company.

14. <u>Paragraph Headings</u>.

The paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

15. <u>Severability</u>.

If at any time subsequent to the date hereof, any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement.

16. <u>Applicable Law</u>.

This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York, without regard to the conflict of laws principles thereof.

17. <u>Entire Agreement</u>.

This Agreement represents the entire understanding and agreement among the parties hereto with respect to the subject matter hereof and can be amended, supplemented or changed, and any provision thereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

18. <u>Counterparts</u>.

This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the date first above written.

ALERIS INTERNATIONAL, INC.

By_____
    Sean M. Stack
    Exec.VP & CFO

WABASH ALLOYS, L.L.C.

By_____
    Sean M. Stack
    President

ALERIS ALUMINUM U.S. SALES INC.

By_____
    Sean M. Stack
    President

RLD ACQUISITION CO.

By_____
    Sean M. Stack
    President

RCY ACQUISITION CO.

By_____
    Sean M. Stack
    President

SPEC A ACQUISITION CO.

By_____
    Sean M. Stack
    President

SPEC P ACQUISITION CO.

By_____

     Sean M. Stack
     President

HQ1 ACQUISITION CO.

By_____

     Sean M. Stack   President
INTL ACQUISITION CO.

By_____

     Sean M. Stack
     President

UWA ACQUISITION CO.

By_____

     Sean M. Stack
     President

NAME ACQUISITION CO.

By_____

     Sean M. Stack
     President

**Selling Subsidiaries**

1.      Wabash Alloys, L.L.C.

2.      Aleris Aluminum U.S. Sales Inc.

**Distribution of Purchased Assets**

[see attached]

## **Preferred Stock Term Sheet**

| | |
|---|---|
| *Liquidation Preference:* | $5 million (in the aggregate), plus accrued and unpaid dividends, to be paid upon the liquidation of IntermediateCo prior to any payment on the common stock of IntermediateCo. |
| *Dividends:* | Payable at 8% per annum multiplied by the liquidation preference, compounded semiannually on each dividend payment date. IntermediateCo's board of directors may declare and pay dividends; if undeclared, dividends will accumulate to the extent they are not paid on the dividend payment date for the semiannual period to which they relate. |
| *Voting Rights:* | Holders of the IntermediateCo Preferred Stock will have the right to elect one director if IntermediateCo fails to pay in full and in Cash six consecutive semiannual dividends or the mandatory redemption payment. At such time, IntermediateCo's board of directors must be comprised of at least five members. |
| *Amendments and Waivers:* | The affirmative vote of the holders of 80% of the IntermediateCo Preferred Stock is necessary for amendments of the IntermediateCo Preferred Stock that (i) change the stated redemption date of the IntermediateCo Preferred Stock; (ii) reduce the liquidation preference of, or dividend rate on, the IntermediateCo Preferred Stock; (iii) adversely affect the right to exchange the IntermediateCo Preferred Stock, or (iv) reduce the percentage of outstanding IntermediateCo Preferred Stock necessary to amend the terms thereof or to grant waivers. |
| *Registration Rights:* | New Common Stock that may be issued upon exchange of the IntermediateCo Preferred Stock will be offered customary registration rights. |
| *Redemption:* | Subject to mandatory redemption on the fifth anniversary of the Effective Date at a redemption price equal to the liquidation preference, plus any accrued and unpaid dividends. There will be no optional redemption rights. |
| *Holder's Option to Exchange:* | At the holder's option, at any time prior to redemption but after the third anniversary of the Effective Date, the IntermediateCo Preferred Stock will be exchangeable into New Common Stock on a per share dollar exchange ratio to be determined at the time of issuance based upon 110% of the Plan Value Share Price (as defined in the Plan). |

Notwithstanding anything to the contrary contained herein, after the first anniversary of the Effective Date, the holder shall have the right to exchange the IntermediateCo Preferred Stock into New Common Stock under the following circumstances:

> ➢ immediately prior to an IPO *or*

> ➢ upon the occurrence of a Fundamental Change (as defined in the IntermediateCo Note Indenture) of HoldCo.

| | |
|---|---|
| *Anti-Dilution Provisions:* | Exchange ratio will be adjusted to provide anti-dilution protection for recapitalizations, below-market issuances, or subdivisions or combinations. |
| *Transfer Restrictions:* | Any transfer restrictions will be described in the Plan Supplement. |

# **IntermediateCo Exchangeable Notes Term Sheet**

*Principal Amounts:*   $45,000,000.

*Maturity:*   Ten years.

*Issue Price:*   100% of the principal amount on the Effective Date.

*Interest:*   Interest rate will be equal to 6% per annum, at the discretion of IntermediateCo's board of directors, in cash or by accretion to the face value of the IntermediateCo Notes, semiannually in arrears on March 31 and September 30 of each year, beginning on March 31, 2011. Stated interest will be treated as Original Issue Discount for tax purposes due to the ability to defer payment.

*Exchange Rights:*   At the holder's option, after the third anniversary of the Effective Date, exchangeable for New Common Stock on a per share dollar exchange ratio to be determined at the time of issuance based upon 100% of the Plan Value Share Price (as defined in the Plan), subject to adjustment for dilution.

*Anti-Dilution Provisions:*   Exchange ratio will be adjusted to provide anti-dilution protection for recapitalizations, below-market issuances, subdivisions or combinations.

*Fundamental Change:*   Notwithstanding anything to the contrary contained herein, after the date that occurs six (6) months after the Effective Date, the holder shall have the right to exchange the IntermediateCo Notes for New Common Stock immediately prior to an initial public offering (an "***IPO***") of HoldCo at face value plus any accrued but unpaid interest divided by the IPO price or upon the occurrence of a fundamental change (as defined in the IntermediateCo Notes Indenture) of HoldCo.

*Optional Redemption:*   On or after the third anniversary of the Effective Date upon not less than 30 nor more than 60 days' notice, at the following redemption prices (expressed as a percentage of the principal amount) plus accrued and unpaid interest, if any, to the applicable redemption date (subject to the right of the holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the twelve-month period beginning on the date of the anniversary of the issuance of the IntermediateCo Notes of the years indicated below:

| Year | Percentage |
|---|---|
| 2013................................................... | 102% |
| 2014................................................... | 101% |
| 2015 and thereafter........................................... | 100% |

On or after the later of the six month anniversary of the Effective Date and January 1, 2011, and only upon the occurrence of a fundamental change of HoldCo, at the following redemption prices (expressed as a percentage of the principal amount) plus accrued and unpaid interest, if any, to the applicable redemption date (subject to the right of the holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the twelve-month period beginning on the date of the anniversary of the issuance of the IntermediateCo Notes of the years indicated below:

| Year | Percentage |
|---|---|
| 2011................................................... | 104% |
| 2012 and thereafter........................................... | 103% |

| | |
|---|---|
| *Covenants:* | None. |
| *Events of Default:* | • Default due to non-payment of the Notes upon maturity<br><br>• Customary default due to bankruptcy or receivership |
| *Registration Rights:* | New Common Stock that may be issued upon exchange of the IntermediateCo Notes will be offered rights, if any, pursuant to the Registration Rights Agreement. |
| *Transfer Restrictions:* | As provided for in Section IX to the Disclosure Statement. |
| *Ranking:* | IntermediateCo shall have the full and absolute discretion to subordinate the debt represented by the IntermediateCo Notes to any debt or other borrowing of money designated by IntermediateCo to be senior in ranking. |
| *Governing Law:* | New York. |

# BILL OF SALE[1]

This **BILL OF SALE** (this "**Bill of Sale**") is made and delivered this [＿＿] day of [＿＿＿＿], 2010, by Aleris International, Inc., a Delaware corporation ("**Seller**"), for the benefit of [＿＿＿＿], a Delaware corporation ("**Purchaser**"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement (as hereinafter defined).

**WHEREAS**, Seller and the Operating Companies have entered into that certain Acquisition Agreement dated as of February 5, 2010 (the "**Agreement**"), the terms of which are incorporated herein by reference, which provides, among other things, for the sale and assignment by Seller to the Operating Companies of the Purchased Assets.

**NOW, THEREFORE,** in consideration of the mutual promises contained in the Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Seller, and subject to the terms and conditions of the Agreement:

1.      Effective as of [   ], Seller does hereby bargain, sell, grant, assign, transfer, convey and deliver unto Purchaser, and its successors and assigns, forever, all of Seller's right, title and interest in and to the Purchaser's respective Purchased Assets (as set forth under Purchaser's name in Schedule 2 to the Agreement, as amended) **TO HAVE AND TO HOLD** such Purchased Assets with all appurtenances thereto, unto Purchaser, and its successors and assigns, for its use forever.

2.      This Bill of Sale shall inure to the benefit of and be binding upon the parties thereto and their respective successors and assigns.

3.      Nothing in this Bill of Sale, express or implied, is intended to or shall be construed to modify, expand or limit in any way the terms of the Agreement.  To the extent that any provision of this Bill of Sale conflicts or is inconsistent with the terms of the terms of the Agreement, the Agreement shall govern.

4.      This Bill of Sale is executed and delivered pursuant to the Agreement.

5.      This Bill of Sale shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to the conflict of laws principles thereof.

---

[1] This form should be used for each Operating Company.

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, Seller has caused this Bill of Sale to be executed and delivered as of the day and year first above written.

ALERIS INTERNATIONAL, INC.

By:_____

Name:_____

Title:_____

**Exhibit 1.1.32**

**Form of Amended and Restated Organizational Documents
of HoldCo, IntermediateCo, and the Reorganized Debtors**

**To Be Filed with the Plan Supplement**

**Exhibit 1.1.48**

**Amendment to the Claims Settlement Guidelines**

**To be Filed with the Plan Supplement**

**Exhibit 1.1.55**

**Contribution Agreement**

CONTRIBUTION AGREEMENT

CONTRIBUTION AGREEMENT, dated February 5, 2010 (this "<u>Agreement</u>"), by and among AHC1 HOLDING CO., a Delaware corporation ("<u>HoldCo</u>"), AHC INTERMEDIATE CO., a Delaware corporation and a wholly owned subsidiary of HoldCo ("<u>IntermediateCo</u>"), RLD ACQUISITION CO., a Delaware corporation and a wholly owned subsidiary of IntermediateCo ("<u>RLD</u>"), RCY ACQUISITION CO., a Delaware corporation and a wholly owned subsidiary of IntermediateCo ("<u>RCY</u>"), SPEC A ACQUISITION CO., a Delaware corporation and a wholly owned subsidiary of RCY ("<u>Spec A</u>"), SPEC P ACQUISITION CO., a Delaware corporation and a wholly owned subsidiary of RCY ("<u>Spec P</u>"), NAME ACQUISITION CO., a Delaware corporation and a wholly owned subsidiary of IntermediateCo ("<u>NAMECO</u>"), INTL ACQUISITION CO., a Delaware corporation and a wholly owned subsidiary of IntermediateCo ("<u>InternationalCo</u>"), UWA ACQUISITION CO., a Delaware corporation and a wholly owned subsidiary of IntermediateCo ("<u>UWA</u>") and HQ1 ACQUISITION CO., a Delaware corporation and a wholly owned subsidiary of IntermediateCo ("<u>HQCO</u>" and collectively, with <u>RLD</u>, <u>RCY</u>, <u>Spec A</u>, <u>Spec P</u>, <u>NAMECO</u>, <u>InternationalCo</u> and <u>UWA</u>, the "<u>Operating Companies</u>").  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Acquisition Agreement (as defined below).

<u>W</u> I <u>T</u> N <u>E</u> S <u>S</u> E <u>T</u> H :

WHEREAS, concurrent herewith, the Operating Companies have entered into that certain Acquisition Agreement (the "<u>Acquisition Agreement</u>"), dated as of the date hereof, with Aleris International, Inc., a Delaware corporation ("<u>Aleris International</u>"), and the Selling Subsidiaries (as defined in the Acquisition Agreement), to purchase substantially all of the assets of Aleris International (including the assets of the Selling Subsidiaries); and

WHEREAS, in connection with the Acquisition Agreement, HoldCo has agreed to issue to IntermediateCo as a capital contribution up to approximately 36.5 million shares of common stock, par value $0.01 per share, of HoldCo (the "<u>HoldCo Contributed Assets</u>"), which shall equal 100% of the outstanding shares of common stock issued by HoldCo on the Closing Date (as defined in the Acquisition Agreement), to be transferred (directly or indirectly) by IntermediateCo to the Operating Companies; and

WHEREAS, in connection with the Acquisition Agreement, subject to the terms of the Equity Commitment Agreement (as defined in the Plan), certain affiliated investment funds and accounts managed by Oaktree Capital Management, L.P., have committed to buy (either alone or together with one or more of the other Backstop Parties (as defined in the Plan)), and IntermediateCo has committed to issue and sell, for $5 million in cash (the "<u>Cash Proceeds</u>"), 5,000 shares of exchangeable preferred stock of IntermediateCo (the "<u>Preferred Stock</u>"), which have a stated value equal to $5 million (as described in the Acquisition Agreement) and IntermediateCo has agreed to transfer the Cash Proceeds to the Operating Companies (in proportion to the relative net value of the assets to be acquired by each respective Operating Company) as a contribution to capital; and

WHEREAS, in connection with the Acquisition Agreement, IntermediateCo has agreed to (i) transfer to the Operating Companies (in proportion to the relative net value of the assets to be acquired by each respective Operating Company) as a capital contribution the HoldCo Contributed Assets and (ii) transfer to the Operating Companies (in proportion to the relative net value of the assets to be acquired by each respective Operating Company) as a capital contribution subordinated, unsecured exchangeable notes due 2020 issued pursuant to the IntermediateCo Note Indenture between IntermediateCo and an indenture trustee to be named, in an aggregate principal amount equal to $45 million (as described in the Acquisition Agreement) (the "Exchangeable Notes" and together with the HoldCo Contributed Assets, the "Contributed Assets"), to be transferred by the Operating Companies to Aleris International, pursuant to the Acquisition Agreement; and

WHEREAS, the HoldCo Contributed Assets shall be contributed by HoldCo to IntermediateCo and the Contributed Assets and the right to the Cash Proceeds shall then be contributed by IntermediateCo (directly or indirectly) to each of the Operating Companies immediately prior to the Closing (as defined in the Acquisition Agreement) and that such contribution shall take place prior to the transactions contemplated by the Acquisition Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, HoldCo, IntermediateCo and the Operating Companies hereby agree as follows:

1.  Contribution.

(a)  Immediately prior to the Closing, HoldCo agrees to assign, transfer, convey, contribute and deliver to IntermediateCo all of HoldCo's right, title and interest in and to the HoldCo Contributed Assets, and IntermediateCo agrees to accept such assignment, transfer, contribution and conveyance, as a contribution to capital.

(b)  Immediately after the contribution from HoldCo to IntermediateCo is effected, IntermediateCo agrees to assign, transfer, convey, contribute and deliver to each Operating Company (in proportion to the relative net value of the assets to be acquired by each respective Operating Company as will be agreed to among IntermediateCo and the Operating Companies prior to the Closing and will be set forth in Schedule 1, which shall be completed by the parties and attached hereto prior to the Closing Date) all of IntermediateCo's right, title and interest in and to the Contributed Assets and the Cash Proceeds, and each Operating Company agrees to accept such assignment, transfer, contribution and conveyance, as a contribution to capital.

(c)  Immediately after the contribution from IntermediateCo to RCY is effected, RCY agrees to assign, transfer, convey, contribute and deliver to Spec A and Spec P (in proportion to the relative net value of the assets to be acquired by Spec A and Spec P, respectively, as will be agreed to among IntermediateCo, RCY, Spec A and Spec P prior to the Closing and will be set forth in Schedule 1, which shall be completed by the parties and attached hereto prior to the Closing Date) certain of RCY's right, title and interest in and to the Contributed Assets and the Cash Proceeds, and each of Spec A and

Spec P agrees to accept such assignment, transfer, contribution and conveyance, as a contribution to capital.

(d)     The transfer of the HoldCo Contributed Assets to IntermediateCo shall be entered into the records of HoldCo and IntermediateCo, and the Contributed Common Stock shall be deemed duly authorized, validly issued, fully paid and nonassessable.

(e)     The transfer of the Contributed Assets and Cash Proceeds to the Operating Companies shall be entered into the records of IntermediateCo and each respective Operating Company.

2.     <u>IntermediateCo Preferred Stock</u>.  As provided for in, and subject to, the Equity Commitment Agreement, IntermediateCo will issue and sell to the Backstop Parties the Preferred Stock for $5 million in cash.

3.     <u>Stockholders Agreement and Registration Rights Agreement</u>.  In furtherance of the transactions contemplated by the Acquisition Agreement, Holdco agrees to enter into (i) a registration rights agreement with substantially the same terms as set forth in Exhibit F to the Equity Commitment Agreement (as defined in the Plan) and (ii) a stockholders' agreement with substantially the same terms as set forth in Exhibit G to the Equity Commitment Agreement (as defined in the Plan).

4.     <u>Miscellaneous</u>.

(a)     <u>Notices</u>.  Any notices or communications required or permitted hereunder shall be in writing and shall be deemed to have been given or made when personally delivered or when mailed by registered or certified mail, postage prepaid, return receipt requested or sent by telecopy, addressed as follows or to such other address as the party to whom the same is intended shall have specified in conformity with the foregoing:

If to HoldCo, IntermediateCo or any of the Operating Companies:

c/o Aleris International, Inc.
25825 Science Park Dr., Suite 400
Beachwood, Ohio 44122
Attention:  Christopher R. Clegg, Esq.
Telecopy No.:  (216) 910-3654

(b)     <u>Successors</u>.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

(c)     <u>Applicable Law</u>.  This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York, without regard to the conflict of laws principals thereof.

(d)     <u>Paragraph Headings</u>.  The paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(e)     Severability.    If at any time subsequent to the date hereof, any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement.

(f)     Entire Agreement.    This Agreement represents the entire understanding and agreement among the parties hereto with respect to the subject matter hereof and can be amended, supplemented or changed, and any provision thereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

(g)     Counterparts.    This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same instrument.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first set forth above.

AHC1 HOLDING CO.

By: _____
    Name: Sean M. Stack
    Title: President

AHC INTERMEDIATE CO.

By: _____
    Name: Sean M. Stack
    Title: President

RLD ACQUISITION CO.

By: _____
    Name: Sean M. Stack
    Title: President

RCY ACQUISITION CO.

By: _____
    Name: Sean M. Stack
    Title: President

SPEC A ACQUISITION CO.

By: _____
    Name: Sean M. Stack
    Title: President

SPEC P ACQUISITION CO.

By: _____
    Name:  Sean M. Stack
    Title:   President

INTL ACQUISITION CO.

By: _____
    Name:  Sean M. Stack
    Title:   President

UWA ACQUISITION CO.

By: _____
    Name:  Sean M. Stack
    Title:   President

NAME ACQUISITION CO.

By: _____
    Name:  Sean M. Stack
    Title:   President

HQ1 ACQUISITION CO.

By: _____
    Name:  Sean M. Stack
    Title:   President

**Distribution of Assets**

[see attached]

**Exhibit 1.1.84**

**Equity Commitment Agreement**

**EQUITY COMMITMENT AGREEMENT**

February 5, 2010

Aleris International, Inc.
25825 Science Park Drive, Suite 400
Beachwood, Ohio 44122
Attention:  Steve Demetriou

Ladies and Gentlemen:

We understand that Aleris International, Inc. (the "Company"), together with certain of its Subsidiaries (as defined herein) other than Aleris Deutschland Holding GmbH ("Aleris Deutschland") and its Subsidiaries, and Aleris Deutschland propose to file a joint plan of reorganization with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), in the form attached hereto as Exhibit A (as the same may be amended, supplemented or modified from time to time in accordance with the terms therein and, after the execution thereof, the Plan Support Agreements (as defined herein) the "Plan").

Among other things, the Plan will provide for an offering (the "Rights Offering") to holders of allowed U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims and/or European Term Loan Claims (collectively, the "Eligible Claims") of non-transferable rights ("Rights") to purchase units (each, a "Unit" and collectively, the "Units") consisting of, in the aggregate, (i) shares of common stock, par value $0.01 per share (the "Holdco Common Stock"), of ACH1 Holding Co., a Delaware corporation and the indirect parent company of certain operating entities that will, in the aggregate, hold all of the assets of the Company on the Effective Date pursuant to the Restructuring Transactions ("Holdco"), representing in the aggregate at least 66.5% of the Holdco Common Stock issued as of the Effective Date (subject to dilution and adjustment as set forth herein) and (ii) $45,000,000 of exchangeable unsecured notes (the "IntermediateCo Notes") issued by ACH Intermediate Co., a Delaware corporation and a first-tier Subsidiary of Holdco ("IntermediateCo").  The terms of the IntermediateCo Notes are set forth on Exhibit C hereto.

In order to facilitate the Rights Offering, pursuant to this letter (the "Equity Commitment Agreement") and subject to the terms, conditions and limitations set forth herein, including the conditions set forth in Section 11 hereof and pursuant to Sections 25 and 26 hereof, each respective undersigned investor (acting individually or through one or more of their Affiliates) (together, the "Investors") agrees to purchase on the Closing Date (as defined herein), and the Company agrees to sell, for the Subscription Purchase Price set forth herein, (i) the Units issued upon the exercise of the Rights allocated to each Investor under the Plan in respect of its Eligible Claims (such Investor's "Subscription Units") and (ii) such Investor's Backstop Percentage (as defined herein) of such Units as are offered pursuant to the Rights Offering but not purchased on or before the expiration of the Rights Offering (such unpurchased Units in the aggregate, the "Residual Units").

Aleris International, Inc.
February 5, 2010

In consideration of the foregoing, and the representations, warranties and covenants set forth herein, and other good and valuable consideration, the parties hereto agree as follows:

1. **Definitions.** For purposes of this Equity Commitment Agreement, the following capitalized terms shall have the meanings ascribed to them below. Capitalized terms not defined herein shall have the respective meanings ascribed to such terms in the Plan.

(a) "Affiliate" of any specified Person means (i) any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person and (ii) any Client Accounts. For the purposes of this definition, (x) "control," as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise, and (y) "controlling," "controlled by" and "under common control" shall have correlative meanings. Notwithstanding the foregoing, "Affiliate" shall not include any portfolio company of a commingled investment fund or special purpose vehicle thereof.

(b) "Aggregate ABL Exposure" means, on a pro forma basis, the sum of the dollar equivalent of (i) the aggregate principal amount of all loans to be drawn under the Exit ABL Facility as of the Effective Date plus (ii) the aggregate undrawn amount under all letters of credit that will be outstanding under the Exit ABL Facility as of the Effective Date plus (iii) the aggregate amount of all drawings under letters of credit that will be required to be reimbursed under the Exit ABL Facility as of the Effective Date without duplication of clause (ii) hereof.

(c) "Ancillary Agreements" means (i) the Registration Rights Agreement and (ii) the Stockholders Agreement.

(d) "Antitrust Laws" means the HSR Act, the EC Merger Regulation, and any other competition, merger control and antitrust law of any other applicable supranational, national, federal, state, provincial or local law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated by this Equity Commitment Agreement.

(e) "Apollo" means collectively Apollo Investment Fund VII, L.P., Apollo Overseas Partners (Delaware 892) VII, L.P., Apollo Overseas Partners (Delaware) VII, L.P., Apollo Overseas Partners VII, L.P., and Apollo Investment Fund (PB) VII, L.P.; provided, that, notwithstanding anything to the contrary herein, any commitment made by and any liability of any of the foregoing Persons pursuant to the terms of this Equity Commitment Agreement shall be on a several, and not on a joint, basis in the proportions described on Schedule 1(e) hereto.

(f) "Backstop Percentage" means, with respect to each Investor, the amount set forth opposite such Investor's name on Schedule 1(f) hereto, as such schedule may be amended by the relevant Investors from time to time.

(g)     "<u>Chapter 11 Cases</u>" means the voluntary cases (i) commenced by the Company and certain of its Subsidiaries (excluding Aleris Deutschland and its Subsidiaries), and (ii) to be commenced by Aleris Deutschland, in each case by having filed or filing petitions under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 in the Bankruptcy Court.

(h)     "<u>Client Account</u>" means any client or client account with respect to which a Person has investment discretion to purchase, dispose of, vote or otherwise control the actions with regard to the investment activities.

(i)     "<u>Company Subsidiary</u>" means each direct and indirect Subsidiary of the Company (including Aleris Deutschland and its direct and indirect Subsidiaries) and, following the Effective Date, each direct and indirect Subsidiary of Holdco.

(j)     "<u>Disclosure Statement Order</u>" means an order of the Bankruptcy Court approving the Disclosure Statement as complying with section 1125 of the Bankruptcy Code.

(k)     "<u>EC Merger Regulation</u>" means Council Regulation No 139/2004 of January 20, 2004, on the control of concentrations between undertakings.

(l)     "<u>Equity Commitment Order</u>" means an order of the Bankruptcy Court authorizing this Equity Commitment Agreement (including payment of the expenses and indemnification obligations hereunder) in the form attached as <u>Exhibit E</u> hereto.

(m)     "<u>Government Entity</u>" means any U.S., supranational, foreign, domestic, federal, territorial, provincial, state, municipal or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal, arbitral body or organization or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing.

(n)     "<u>HSR Act</u>" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

(o)     "<u>IntermediateCo Preferred Stock</u>" means exchangeable preferred stock of IntermediateCo having a fixed liquidation preference of five million dollars ($5,000,000), the terms of which are set forth on <u>Exhibit D</u> hereto.

(p)     "<u>Long-Term Equity Incentive Program</u>" means that certain long-term equity incentive program described in the Disclosure Statement.

(q)     "<u>Mandatory Antitrust Filings</u>" means all notifications and filings, which the Company and/or the Investors are required to deliver to any Government Entity under the applicable Antitrust Laws of Canada, Mexico, Russia, South Korea and Ukraine, prior to the Closing Date, regarding the transactions contemplated by this Equity Commitment Agreement.

(r)     "<u>Material Adverse Effect</u>" means any change, effect, event, occurrence, state of facts or development that, individually or together with any one or more changes, effects,

events, occurrences, state of facts or developments, has had or would reasonably be expected to have a material adverse effect on the business, assets, liabilities, condition (financial or otherwise) or results of operations of the Company and the Company Subsidiaries taken as a whole or on the ability of the Company or a Company Subsidiary, as the case may be, to consummate the transactions contemplated by this Equity Commitment Agreement, the Ancillary Documents, the Plan or any other documents contemplated hereby or thereby, other than an effect (1) that is fully cured before the earlier of the date of any termination of this Equity Commitment Agreement and the Effective Date or (2) resulting from any act or omission of the Debtors taken with the prior written consent of the Requisite Investors.

(s)     "Oaktree" means Oaktree Capital Management, L.P., on behalf of the investment funds and accounts it manages set forth on Schedule 1(f) hereto; provided, that, notwithstanding anything to the contrary herein, any commitment made by and any liability of any of the foregoing investment funds and accounts pursuant to the terms of this Equity Commitment Agreement shall be on a several, and not on a joint, basis in the proportions set forth on Schedule 1(f), as may be adjusted from time to time.

(t)     "Oaktree Manager" means OCM FIE, L.P., a Delaware limited partnership and an Affiliate of Oaktree Capital Management, L.P.

(u)     "Permitted Transferee" means each of (i) Oaktree or any Affiliate thereof, (ii) Apollo or any Affiliate thereof, or (iii) Sankaty or any Affiliate thereof.

(v)     "Person" means any individual, corporation, partnership, joint venture, association, limited liability company, trust, unincorporated organization, government or agency or political subdivision thereof or any other entity.

(w)     "Plan Support Agreements" means, collectively, the Plan Support Agreements in substantially the forms attached hereto as Exhibit B, to be entered into by the Company and the Backstop Parties following the entry of the Disclosure Statement Order and receipt of the Disclosure Statement (it being understood that prior to the entry of the Plan Support Agreements by the Company and the Backstop Parties, the term "Plan Support Agreements" shall refer to the forms of agreements attached as Exhibit B hereto).

(x)     "Pro Forma Exit ABL Availability" means the amount, determined on a pro forma basis as of the Effective Date, equal to the lesser of  (a) the excess, if any, of (i) the total borrowing base (as computed under the credit agreement for the ABL Exit Facility and net of any reserves assessed against borrowing availability thereunder) over (ii) the Aggregate ABL Exposure; and (b) the excess, if any, of (i) the dollar equivalent of the aggregate commitments thereunder over (ii) the Aggregate ABL Exposure; as such amount is shown on an officer's certificate of a responsible officer of Aleris received by the Requisite Investors no later than five (5) Business Days prior to the Effective Date.

(y)     "Pro Forma Liquidity" means the amount, determined on a pro forma basis as of the Effective Date, equal to (a) Pro Forma Exit ABL Availability plus (b) cash as set forth on the compliance certificate; i.e., "bank cash" minus (c) if borrowings under the DIP Term

Credit Agreement plus accrued but unpaid interest and fees thereon as of the Effective Date exceed $269 million, the excess of the borrowings under the DIP Term Credit Agreement plus accrued but unpaid interest and fees thereon as of the as of the Effective Date over $244 million minus (d) the dollar amount of any accounts payable (as determined in accordance with the definition of "Net Working Capital") of the Company and the Company Subsidiaries to any supplier set forth on Schedule 7(l) if the number of days outstanding under such payable is greater than the payment terms set forth on Schedule 7(l) as of the date hereof.  For the avoidance of doubt, "bank cash" in clause (b) above shall include the proceeds the Company receives pursuant to the sale of the IntermediateCo Preferred Stock as set forth in Section 2(e).

(z)     "Registration Rights Agreement" means that certain registration rights agreement relating to the Holdco Common Stock, to be entered into on the Closing Date, by and among Holdco and each Investor, having the terms set forth in Exhibit F hereto and otherwise in form and substance reasonably satisfactory to the Company and the Requisite Investors.

(aa)     "Requisite Investors" means, as of any particular time, Investors representing in the aggregate 50% or more of the Backstop Percentage at such time.

(bb)     "Sankaty" means Sankaty Advisors, LLC, on behalf of the funds and accounts it manages or advises.

(cc)     "Specified Securities" means the IntermediateCo Notes, the IntermediateCo Preferred Stock and shares of Holdco Common Stock issuable under the Long-Term Equity Incentive Program.

(dd)     "Stockholders Agreement" means that certain stockholders agreement, to be entered into on the Closing Date, by and among Holdco, each Investor and the other stockholders of Holdco (including, for the avoidance of doubt, certain holders of Holdco Common Stock deemed to be parties to the Stockholders Agreement under Section 7.7.2 of the Plan), having the terms set forth in Exhibit G hereto and otherwise in form and substance reasonably satisfactory to the Company and the Requisite Investors.

(ee)     A "Subsidiary" of any Person means another Person of which such first Person, (i) owns directly or indirectly an amount of the voting securities, other voting ownership or voting partnership interests sufficient to elect at least a majority of such other Person's board of directors or other governing body (or, if there are no such voting interests, 50% or more of the equity interests), (ii) in the case of a partnership, serves as a general partner or (iii) in the case of a limited liability company, serves as a managing member.

(ff)     "Termination Date" means (i) June 30, 2010 or (ii) if the Confirmation Order approving the Plan has been entered by June 30, 2010 but has not become a Final Order by such date and all other conditions in Section 11 are satisfied or are capable of being satisfied by June 30, 2010, the earlier of (A) October 31, 2010 and (B) the maturity date (whether the scheduled maturity date or the maturity date pursuant to an acceleration) of any loans under any DIP Credit Agreement, as such date may be extended pursuant to the terms thereof; provided, that, for the avoidance of doubt, notwithstanding the satisfaction of the conditions set forth in

Section 11 hereof by June 30, 2010, the Investors' obligation to consummate the transactions herein shall be subject to the satisfaction or waiver of such conditions as of the Closing Date.

(gg)  "<u>Transaction Expenses</u>" means all reasonable out-of-pocket expenses incurred by each Investor or its Affiliates with respect to the transactions contemplated hereby and all Bankruptcy Court and other judicial and regulatory proceedings related to such transactions (including all reasonable fees and expenses of legal, accounting and financial advisors and management consultants engaged by the Investors or their Affiliates as of the date hereof, and the reasonable fees and expenses of any additional advisors or consultants engaged by the Investors or their Affiliates), filing and recording fees, costs and expenses of due diligence, transportation, duplication and messenger expenses.

(hh)  "<u>Underlying EBITDA</u>" means, with respect to the Company and its Subsidiaries for any period, the sum of (i) the amount of EBITDA set forth in the DIP Term Credit Agreement, (ii) plus any expenses or charges related to the transactions contemplated in this Equity Commitment Agreement and the Plan, (iii) plus or minus, as applicable, metal lag resulting from gains or losses in inventory value due to changes in aluminum prices for such period, as calculated by the Company consistent with past practices, (iv) plus or minus any net one-time cash gains or losses directly resulting from the termination of transactional (non-aircraft related) metal Hedging Agreements (as defined in the DIP Term Credit Agreement) by a counterparty to the Company upon (or as a result of) the filing of the Chapter 11 Cases.

(ii)  Other Defined Terms:

| **Term** | **Section** |
| --- | --- |
| Aleris Deutschland | Preamble |
| Apollo Commitment | 26 |
| Bankruptcy Court | Preamble |
| Claims | 13 |
| Closing Date | 3(a) |
| Commitment | 3(a) |
| Company | Preamble |
| Disclosure Statement | 2(a) |
| Eligible Claims | Recitals |
| Equity Commitment Agreement | Recitals |
| Holdco | Recitals |
| Holdco Common Stock | Recitals |
| Indemnified Party | 12(a) |
| Indemnifying Party | 12(a) |
| IntermediateCo | Recitals |
| IntermediateCo Common Stock | 7(d)(ii) |
| IntermediateCo Notes | Recitals |
| Investors | Preamble |
| Minimum Backstop Parties | 9(c) |
| Plan | Preamble |

| **Term** | **Section** |
| --- | --- |
| Projections | 7(h) |
| Purchase Notice | 2(f) |
| Relevant Claims | 8(e) |
| Required DIP Credit Agreements Paydown | 9(i) |
| Residual Units | Recitals |
| Rights | Recitals |
| Rights Offering | Recitals |
| Rights Offering Reserve Amount | 9(i) |
| Rules | 8(c) |
| Sankaty Residual Units | 25 |
| Securities Act | 8(c) |
| Structuring and Arrangement Fee | 2(d) |
| Subscription Units | Recitals |
| Superior Proposal | 19(b) |
| Termination Fee | 2(d) |
| Unit | Recitals |
| Units | Recitals |

## 2. **The Rights Offering.**

(a)     The Company shall commence, administer and consummate the Rights Offering in accordance with the Plan and the related disclosure statement, which disclosure statement (as the same may be amended, supplemented or modified from time to time) shall be consistent with the Plan and reasonably acceptable to the Requisite Investors (the "Disclosure Statement"), it being understood that the form of the draft Disclosure Statement dated February 5, 2010, delivered to the Investors is acceptable to them.

(b)     As settlement for certain rights described in the Plan, based on their Eligible Claims as of the Effective Date, subject to this Section 2(b), the shares of Holdco Common Stock issued to Oaktree and Apollo or any Affiliates thereof that own Eligible Claims under the Plan shall in the aggregate represent, after giving effect to the Rights Offering but subject to dilution from the Specified Securities, a percentage of the Holdco Common Stock issued under the Plan that is not less than the Minimum Oaktree/Apollo Equity Threshold. If the Minimum Oaktree/Apollo Equity Threshold is not met, the Company shall reduce, in accordance with the Plan, the Units issuable to holders of Eligible Claims (other than the Investors and their Affiliates) that elect to exercise Rights under the Plan in the amount necessary to allow the Minimum Oaktree/Apollo Equity Threshold to be reached, and such Units (allocated as among the Investors as may be determined by Oaktree and Apollo) shall be deemed "Residual Units" hereunder; provided, that, the Company shall not reduce the Units issuable to holders of Eligible Claims (other than the Investors and their Affiliates) that elect to exercise Rights under the Plan by more than 90%.

(c)     Notwithstanding anything in the Plan to the contrary, the Company and the Investors agree that the number of shares of Holdco Common Stock and principal amount of

IntermediateCo Notes that the Investors or their Affiliates may elect to receive pursuant to the Rights Offering shall not be subject to the Minimum Ownership Cutback under Section 7 of the Plan.

(d)     If the transactions contemplated by this Equity Commitment Agreement are consummated, the Company shall pay to the Oaktree Manager and the Investors set forth on Schedule 2(d) hereto (or such Affiliates or third parties as such Persons may designate) on the Closing Date a fee (the "Structuring and Arrangement Fee") equal to 3.5% of the Maximum Rights Offering Amount.  If this Equity Commitment Agreement is terminated pursuant to Section 19(b)(ii), Section 19(b)(iv), Section 19(b)(v), Section 19(b)(vi), Section 19(c)(iii), Section 19(c)(iv), Section 19(c)(v) or Section 19(d) hereof, or if the Plan is not consummated by the Termination Date and on or prior to the Voting Deadline there was made and not withdrawn prior to the Voting Deadline (or there was made prior to the Voting Deadline a public announcement indicating an intention to make) a proposal or offer from (or by, in the case of a public announcement) a third party as to which the Board of Directors of the Company made no determination (by the Voting Deadline) that could reasonably be considered (or could reasonably be expected to lead to) a Superior Proposal, the Company shall pay to the Oaktree Manager and any Investors set forth on Schedule 2(d) hereto (or such Affiliates or third parties as such Persons may designate) concurrently with or promptly after such termination a fee (the "Termination Fee") equal to the Structuring and Arrangement Fee minus $5,000,000.  The percentage of the Structuring and Arrangement Fee or Termination Fee allocated to such Persons is set forth on Schedule 2(d) hereto.  The Structuring and Arrangement Fee and Termination Fee shall be nonrefundable when paid.

(e)     Subject to the consummation of the transactions contemplated by this Equity Commitment Agreement, each Investor (or such other Affiliates or third parties as such Investor may designate) agrees to purchase from IntermediateCo on the Closing Date, at a purchase price equal to $1,000.00 per share, shares of IntermediateCo Preferred Stock calculated by multiplying (i) 5,000, which amount represents the aggregate shares of IntermediateCo Preferred Stock, times (ii) such Investor's percentage set forth on Schedule 1(f) hereto.

(f)     Within two (2) Business Days after the completion of the calculations determined in accordance with the procedures set forth in Section 7.1.1 of the Plan, the Company hereby agrees and undertakes to give each Investor by electronic facsimile transmission the certification by an executive officer of the Company of (i) the number of such Investor's Subscription Units as of such Date and the aggregate purchase price therefor, (ii) such Investor's Residual Units as of such date and the aggregate purchase price therefor, and (iii) the percentage of Holdco Common Stock to be issued under the Plan that such Units represent (after giving effect to the Rights Offering and purchases under this Equity Commitment Agreement, but subject to dilution from the Specified Securities) (the "Purchase Notice").

**3.     The Backstop Commitment.**

(a)     On the basis of the representations and warranties contained herein, but subject to the conditions set forth in Section 11 hereof and the utilization of the proceeds of the Rights Offering solely as set forth in Section 9(i) hereof, and pursuant to Sections 25 and 26

hereof, each Investor agrees to subscribe for in accordance with the Plan and purchase on the Effective Date (the "Closing Date"), and the Company agrees to sell and issue, at a purchase price per Unit equal to the Subscription Purchase Price, (i) such Investor's Subscription Units and (ii) a number of Residual Units calculated by multiplying (x) such Investor's Backstop Percentage times (y) the aggregate number of Residual Units (collectively, the "Commitment"). Subject to the foregoing, each Investor shall, or shall cause its Affiliates to, elect to receive and exercise all of the Rights offered to such Investor or Affiliate in respect of its Eligible Claims in accordance with the Plan.

(b)     The Company shall pay or reimburse each Investor for its Transaction Expenses; provided, that the Company shall not be responsible for any fees and expenses of legal, accounting and financial advisors and management consultants that are engaged by the Investors after the date hereof unless the Company consents to such payment or reimbursement, such consent not to be unreasonably withheld. The Transaction Expenses shall be paid upon the earlier of the Closing Date and termination of this Equity Commitment Agreement in accordance with Section 19 hereof, except for termination resulting from the breach by such Investor of any representation, warranty or covenant set forth herein. The filing fees, if any, required by the HSR Act or other Antitrust Laws shall be paid by the Company when filings under the HSR Act are made. For the avoidance of doubt, this Section 3(b) shall not affect the Company's obligation to pay the fees and expenses of (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, (ii) Wachtell, Lipton, Rosen & Katz, (iii) Milbank, Tweed, Hadley & McCloy LLP and (iv) The Blackstone Group pursuant to the Bankruptcy Court's order approving debtor-in-possession financing and the DIP Financing Documents (as defined therein).

## 4.     Closing; Company Deliverables.

(a)     The documents to be delivered on the Closing Date by or on behalf of the parties hereto and the Subscription Units and Residual Units will be delivered at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153 on the Closing Date.

(b)     The Company shall provide the Purchase Notice to each Investor as provided in Section 2(f) hereto; provided, that on the Closing Date each Investor shall purchase, and the Company shall sell, only such number of such Investor's Subscription Units and Residual Units as are listed in the Purchase Notice, without prejudice to the rights of such Investor to seek later an upward or downward adjustment if the number of such Investor's Subscription Units and/or Residual Units set forth in such Purchase Notice is inaccurate.

(c)     On the Closing Date, the Company shall (i) deliver to the Investors a certificate signed by an officer of the Company pursuant to which such officer shall certify that all of the conditions set forth in Section 11 hereof have been satisfied (or waived in writing by the Investors), (ii) deliver to each Investor or its Affiliates as designated on Schedule 1(f) hereto the shares of Holdco Common Stock and IntermediateCo Notes representing such Investor's or its Affiliates' Subscribed Units and Residual Units in certificated form, duly registered in the name of such Investor or its Affiliates, (iii) cause to be delivered to each Investor or its Affiliates as designated on Schedule 1(f) hereto the IntermediateCo Preferred Stock in certificated form, duly registered in the name of such Investor or its Affiliates, (iv) cause to be delivered to the

Investors the Ancillary Agreements, duly executed by Holdco, and (v) reimburse or pay each Investor for any Transaction Expenses not paid prior to the Closing Date by wire transfer of immediately available funds to the account specified by such Investor at least 24 hours in advance.

(d)     All of the Subscription Units and Residual Units of the Investors or their Affiliates will be delivered with any and all issue, stamp, transfer or similar taxes or duties payable in connection with such delivery duly paid by the Company to the extent required under the Confirmation Order or applicable law.

5.     **Investor Deliverables**.  On the Closing Date, each Investor shall (i) deliver (a) to the Company the payment of the aggregate purchase price for such Investor's Subscription Units and Residual Units and (b) to IntermediateCo the payment of the aggregate purchase price for such Investor's shares of IntermediateCo Preferred Stock by wire transfer of immediately available funds to the account specified by the Company to the Investors, and (b) cause to be delivered to Holdco, the Ancillary Agreements, duly executed by such Investor.

6.     **Arm's-Length Transaction.**  In connection with all aspects of each transaction contemplated by this Equity Commitment Agreement, the Company acknowledges and agrees that: (i) the Commitment, the Rights Offering and any other transactions described in this Equity Commitment Agreement are an arm's-length commercial transaction between the Company, the Company Subsidiaries and their respective Affiliates, on the one hand, and the Investors, on the other hand, and the Company is capable of evaluating and understanding and does understand and accept the terms, risks and conditions of the transactions contemplated by this Equity Commitment Agreement; (ii) in connection with the process leading to such transaction, the Investors are and have been acting solely as principals and are not the financial advisors or fiduciaries for the Company or any of the Company Subsidiaries or their respective Affiliates, or stockholders, creditors (other than the Investors themselves) or employees or any other party; (iii) the Investors have not assumed nor will they assume an advisory or fiduciary responsibility in the Company's or any Company Subsidiary's or their respective Affiliates' favor with respect to any of the transactions contemplated hereby or the process leading thereto (irrespective of whether the Investors have advised or are currently advising the Company or the Company Subsidiaries or their respective Affiliates on other matters) and the Investors have no obligation to the Company or the Company Subsidiaries or their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth in this Equity Commitment Agreement and the other documents relating to the Rights Offering; (iv) the Investors and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from the Company's and the Company Subsidiaries' and their respective Affiliates' and the Investors have no obligation to disclose any of such interests by virtue of their execution, delivery and performance of this Equity Commitment Agreement or any advisory, agency or fiduciary relationship; and (v) the Investors have not provided any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby and the Company has consulted its own legal, accounting, regulatory and tax advisors to the extent the Company has deemed appropriate.  The Company, on behalf of itself and the Company Subsidiaries, hereby waives and releases, to the fullest extent permitted by law, any claims that the Company or any Company Subsidiary may have against the Investors with

respect to any breach or alleged breach of fiduciary duty with respect to the transactions contemplated hereby.

       7.     **Representations and Warranties of the Company.**  The Company hereby represents and warrants to each Investor that:

       (a)     <u>Organization; Standing and Power</u>.  The Company and each Company Subsidiary and, as of the Closing Date, each of Holdco and IntermediateCo (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (ii) subject to the occurrence of the Effective Date, has the full power and authority necessary to own its property and assets and to conduct its business as presently conducted and (iii) subject to the occurrence of the Effective Date, is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications except for failures to be so qualified which, either individually or in the aggregate, have not had, or would not reasonably be expected to have, a Material Adverse Effect.

       (b)     <u>Authority; Execution and Delivery; Enforceability</u>.  Subject to the entry by the Bankruptcy Court of the Equity Commitment Order, the Company, each Company Subsidiary, Holdco and IntermediateCo each has the corporate, partnership or limited liability company power and authority, as the case may be, to execute, deliver and perform the terms and provisions of this Equity Commitment Agreement, each Plan Support Agreement (subject to the entry of the Disclosure Statement Order) and the Ancillary Agreements to which it is, or is specified to be, a party and has taken all necessary corporate, partnership or limited liability company action, as the case may be, to authorize the execution, delivery and performance by it of this Equity Commitment Agreement, each Plan Support Agreement (subject to the entry of the Disclosure Statement Order) and the Ancillary Agreements to which it is a party.  The Company has duly executed and delivered this Equity Commitment Agreement, following the entry of the Disclosure Statement Order subject to the provisions of Section 9(c) hereof, the Company will have duly executed and delivered each Plan Support Agreement, and as of the Closing Date, each of Holdco and IntermediateCo will have duly executed and delivered each Ancillary Agreement to which it is, or is specified to be, a party, and, assuming the due authorization, execution and delivery by the Investors and subject to the entry by the Bankruptcy Court of the Interim Equity Commitment Order, as of the date hereof, this Equity Commitment Agreement constitutes, as of the date of their execution and delivery by the Company, each Plan Support Agreement will constitute, and, as of the Effective Date, each other Ancillary Agreement to which it is, or is specified to be, a party will constitute, the legal, valid and binding obligation of the Company, Holdco and IntermediateCo enforceable against the Company, Holdco and IntermediateCo in accordance with its terms.

       (c)     <u>Issuance of Securities</u>.  The (i) Rights, (ii) shares of Holdco Common Stock, (iii) IntermediateCo Notes, and (iv) shares of IntermediateCo Preferred Stock, when issued and delivered as provided herein, will each have been duly and validly authorized and, in the case of the Holdco Common Stock and IntermediateCo Preferred Stock, will be duly and validly issued and delivered, fully paid and non-assessable, and, in each case, free and clear of all taxes, liens, pre-emptive rights, rights of first refusal, subscription and similar rights and, in the

case of the IntermediateCo Notes, will be legally binding and enforceable obligations of IntermediateCo.

    (d)    <u>Capital Structure; Subsidiaries</u>.

    (i)    As of the Effective Date, the authorized capital stock of Holdco will consist solely of (1) 45,000,000 shares of Holdco Common Stock, of which a number of shares will be issued and outstanding in accordance with the Plan and (2) 1,000,000 shares of preferred stock, of which no shares will be issued and outstanding in accordance with the Plan. As of the Effective Date, Holdco will have reserved (A) a number of shares of Holdco Common Stock for issuance upon the exchange of the IntermediateCo Notes in accordance with the Plan, (B) a number of shares of Holdco Common Stock for issuance upon the exchange or redemption of the IntermediateCo Preferred Stock in accordance with Plan, and (C) a number of shares of Holdco Common Stock for issuance under the Long-Term Equity Incentive Plan as described in the Disclosure Statement.

    (ii)    As of the Effective Date, the authorized capital stock of IntermediateCo will consist solely of (i) 5,000 shares of common stock, par value $0.01 per share (the "<u>IntermediateCo Common Stock</u>"), of which 100 shares will be issued and outstanding and 100% of which will be owned by Holdco, and (ii) 5,000 shares of preferred stock, all of which will be issued and outstanding.

    (iii)    Holdco is a Delaware corporation formed in connection with the Plan and since its formation has not engaged, and does not currently engage, in any business or activity other than serving as the direct parent of IntermediateCo. As of the Effective Date, Holdco has no assets other than the IntermediateCo Common Stock and the books and records of Holdco. IntermediateCo is a Delaware corporation newly formed in connection with the Plan and since its formation has not engaged, and does not currently engage in any business or activity other than serving as the direct or indirect parent of the OpCos that, in turn, will hold, in the aggregate, all of the assets of the Company and the Company Subsidiaries as of the Effective Date. IntermediateCo has no assets other than the interests in the OpCos and the books and records of IntermediateCo.

    (iv)    Except for the Specified Securities and the shares of Holdco Common Stock to be issued under the Plan, as of Closing, there are no outstanding subscription rights, options, warrants, convertible or exchangeable securities or other rights of any character

whatsoever to which the Company, Holdco or IntermediateCo is a party relating to issued or unissued capital stock of the Company, Holdco or IntermediateCo, or any commitments of any character whatsoever relating to issued or unissued capital stock of the Company or Holdco or IntermediateCo or pursuant to which the Company, Holdco or IntermediateCo is or may become bound to issue or grant additional shares of its capital stock or related subscription rights, options, warrants, convertible or exchangeable securities or other rights, or to grant preemptive rights, which, in each instance, will be in effect immediately following the closing of the transactions contemplated hereby.

(v)    As of the Effective Date, Holdco will have no Subsidiaries other than those Subsidiaries listed on Schedule 7(d) hereto (which Schedule identifies the direct owners of each such Subsidiary and their percentage ownership therein).

(e)    No Conflicts or Defaults.  Subject to the entry by the Bankruptcy Court of the Equity Commitment Order, neither the execution, delivery or performance by the Company and the Company Subsidiaries and, as of the Closing Date, Holdco and IntermediateCo of this Equity Commitment Agreement, nor compliance by them with the terms and provisions herein, (i) will contravene any applicable law, statute, rule or regulation or any order, writ, injunction or decree of any court or governmental instrumentality in any material respect, (ii) will conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any lien upon any of the property or assets of the Company or any Company Subsidiary or, as of the Closing Date, Holdco or IntermediateCo pursuant to the terms of any indenture, mortgage, deed of trust, credit agreement or loan agreement (including the debtor-in-possession credit agreements in effect as of the date hereof), or any other material agreement, contract or instrument, in each case to which the Company, Holdco, IntermediateCo or any Company Subsidiary is a party or by which it or any of its property or assets is bound or to which it may be subject, or (iii) will violate any provision of the certificate or articles of incorporation, certificate of formation, limited liability company agreement or by-laws (or equivalent organizational documents), as applicable, of the Company, Holdco, IntermediateCo or any Company Subsidiary, except, in each case, to the extent that any such contravention, conflict or violation has not resulted in, and would not reasonably be expected to result in, a Material Adverse Effect.

(f)    Governmental Consents and Filings.  No order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except for those that have otherwise been obtained or made on or prior to the Closing Date and which remain in full force and effect on the Closing Date) or exemption by, any governmental or public body or authority (except as required under the Bankruptcy Code and applicable state and federal bankruptcy rules or as required by applicable Antitrust Laws), or any subdivision thereof, is required to be obtained or made by, or on behalf of, the Company or any Company Subsidiary or, as of the Closing Date, Holdco or IntermediateCo to authorize, or is required to be obtained or made by, or on behalf of, the Company or any Company Subsidiary or, as of the Closing Date, Holdco or

IntermediateCo in connection with, (i) the execution, delivery and performance of this Equity Commitment Agreement or (ii) the legality, validity, binding effect or enforceability of this Equity Commitment Agreement.

(g)     Financial Statements.  (i) The audited consolidated balance sheets of the Company for its fiscal years ended December 31, 2007 and December 31, 2008 and the related consolidated statements of income and cash flows of the Company for such periods furnished to the Investors prior to the Effective Date, present fairly in all material respects the consolidated financial position of the Company at the date of said financial statements and the consolidated results for the respective periods covered thereby, and (ii) the unaudited consolidated balance sheet of the Company for its fiscal quarter ended September 30, 2009 and the related consolidated statements of income and cash flows of the Company for the nine-month period ended on such date, furnished to the Investors prior to the Effective Date, present fairly in all material respects the consolidated financial position of the Company and the Company Subsidiaries at the date of said financial statements and the results for the period covered thereby, subject to normal year-end adjustments and the absence of footnotes.  All such financial statements have been prepared in accordance with GAAP, consistently applied except to the extent provided in the notes to said financial statements and subject, in the case of the unaudited financial statements, to normal year-end audit adjustments (all of which, when taken as a whole, would not reasonably be expected to result in a Material Adverse Effect) and the absence of footnotes.

(h)     Projections.  All financial information and projections ("Projections") that have been or will be made available to the Investors in writing by the Company or its representatives in connection with the transactions contemplated hereby have been or will be prepared in good faith based upon assumptions believed to be reasonable at the time made (it being understood that such projections are not to be viewed as facts and are subject to significant uncertainties and contingencies, many of which are beyond the Company's control, and that no assurance can be given that any particular projections will be realized and that actual results may differ and such differences may be material).

(i)     Litigation.  Except for the Chapter 11 Cases and as set forth on Schedule 7(i), as of the date hereof, there are no actions, suits or proceedings pending or, to the knowledge of the Company or any Company Subsidiary, threatened in writing (i) with respect to this Equity Commitment Agreement or (ii) that, if adversely determined, have had, or would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(j)     No Material Adverse Effect.  Since September 30, 2009, except as disclosed on Schedule 7(j), there has been no change in the financial condition, results of operations or business of the Company and the Company Subsidiaries, which individually or in the aggregate has had, or reasonably would be expected to have, a Material Adverse Effect.

(k)     Compliance with Laws.  The Company and each Company Subsidiary and, as of the Closing Date, each of Holdco and IntermediateCo is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all

governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property, except such noncompliances as, either individually or in the aggregate, have not, and would not reasonably be expected to have, a Material Adverse Effect.

(l)     Suppliers.  Schedule 7(l) sets forth a true, correct and complete list, for the 12 months ended December 31, 2009, of the 10 largest suppliers of goods and services to the Company and the Company Subsidiaries on a consolidated basis and a summary of terms of payment for such suppliers as of the date hereof.

(m)     Other Representations and Warranties.  No Default or Event of Default (as defined in the DIP Term Credit Agreement or the DIP ABL Credit Agreement, as applicable) under the DIP Term Credit Agreement or the DIP ABL Credit Agreement has occurred and is continuing, other than with respect to (i) the covenants set forth in Section 8.17 (Financial Covenants) of the DIP Term Credit Agreement and Section 10.07 (Financial Covenants) of the DIP ABL Credit Agreement and (ii) representations and warranties of the Company set forth in the DIP Term Credit Agreement and the DIP ABL Credit Agreement.  The representations and warranties of the Company and the Company Subsidiaries set forth in Sections 6.09 (Tax Returns and Payments), 6.10 (Compliance with ERISA), 6.12 (Properties), 6.13(a) (Subsidiaries), 6.15 (Investment Company Act), 6.16 (Environmental Matters), 6.17 (Employment and Labor Relations), 6.18 (Intellectual Property, etc.), 6.19 (Insurance), 6.20 (Indebtedness), 6.21 (Cases), 6.23 (Material Contracts) and 6.24 (German Real Estate Holding Companies) of the DIP Term Credit Agreement are hereby incorporated herein in their entirety and are true and correct as of the date hereof (except to the extent such representations and warranties expressly relate to a specified date, in which case such representations and warranties shall be true and correct on and as of such specified date); provided, that, references to "Aleris" or the "Borrowers" shall be deemed to be references to "Holdco" as of the Closing Date. Notwithstanding the foregoing, for purposes of incorporating such sections into this Equity Commitment Agreement only, the definition of "ERISA Event" set forth in the DIP Term Credit Agreement shall be disregarded and replaced with the definition set forth on Schedule 7(m).

**8.**     **Representations and Warranties of the Investors.**  Each Investor, severally and not jointly, hereby represents and warrants to the Company that:

(a)     Organization, Standing and Power.  Such Investor is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has full power and authority necessary to enable it to conduct its business as presently conducted.

(b)     Authority; Execution and Delivery; Enforceability.  Such Investor has the corporate, partnership or limited liability company power and authority, as the case may be, to execute, deliver and perform the terms and provisions of this Equity Commitment Agreement and the Ancillary Agreements and has taken all necessary corporate, partnership or limited liability company action, as the case may be, to authorize the execution, delivery and performance by it of this Equity Commitment Agreement, and such  Investor has duly executed and delivered this Equity Commitment Agreement and, as of the Closing Date, such Investor will have duly executed and delivered each Ancillary Agreement to which it is, or is specified to be, a party.  Assuming the due authorization, execution and delivery by the Company, Holdco and the

other Investors, as applicable, as of the date hereof, this Equity Commitment Agreement constitutes, and, as of the Effective Date, each other Ancillary Agreement to which it is, or is specified to be, a party will constitute, the legal, valid and binding obligation of such Investor enforceable against the such Investor in accordance with its terms.

(c)     _Investor Status_.  Such Investor is either (a) a qualified institutional buyer as defined in Rule 144A of the Securities Act of 1933, as amended (the "Securities Act"),(b) an accredited investor (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act (the "Rules")) or (c) an entity in which all of the equity owners are accredited investors as defined in the Rules.  Such Investor acknowledges that (i)  any securities purchased or received in connection herewith cannot be resold absent an exemption to the Securities Act or registration of such securities under the Securities Act; (ii) such securities have been acquired for investment and not with a view to distribution or resale; and (iii) the securities being issued to it pursuant hereto are being issued pursuant to an exemption to the Securities Act and will contain legends as set forth in the Disclosure Statement.

(d)     _Information_.  Such Investor acknowledges that it has been afforded the opportunity to ask questions and receive answers concerning the Company and the Company Subsidiaries and to obtain additional information that it has requested to verify the accuracy of the information contained herein.  Notwithstanding the foregoing, nothing contained herein will operate to modify or limit in any respect the representations and warranties of the Company or to relieve it from any obligations to such Investor for breach thereof or the making of misleading statements or the omission of material facts in connection with the transactions contemplated therein.

(e)     _Eligible Claims_.  Such Investor or an Affiliate thereof, as of the date hereof, is the legal owner, beneficial owner and/or the investment advisor or manager for the legal or beneficial owner of such Eligible Claims set forth on such Investor's Schedule 8(e) hereto (collectively, the "Relevant Claims").  There are no Eligible Claims of which such Investor or any of its Affiliates is the legal owner, beneficial owner and/or investment advisor or manager for such legal or beneficial owner that are not part of its Relevant Claims unless such Investor or any of its Affiliates does not possess the full power to vote and dispose of such claims; provided, that the Relevant Claims do not include any interest accrued on, or any repayments of, such Relevant Claims after September 30, 2009.  Such Investor or the applicable Affiliate thereof has full power to vote, dispose of and compromise the aggregate principal amount of the Relevant Claims.

### 9.     **Additional Covenants of the Company.**

(a)     _Approval of Equity Commitment Agreement_.  The Company agrees to file a motion seeking Bankruptcy Court approval of the Equity Commitment Order as soon as practicable but in no event more than three (3) Business Days after the date hereof.

(b)     _Filing of Plan and Disclosure Statement_.  The Company agrees to file the Plan and the Disclosure Statement with the Bankruptcy Court as soon as practicable but in no event more than two (2) Business Days after the date hereof.

(c)     Plan Support Agreements.  Promptly, and in no event later than three (3) Business Days following the receipt of Plan Support Agreements signed by Oaktree and Apollo (or the Affiliates thereof that own Eligible Claims) (each, a "Minimum Backstop Party" and together, the "Minimum Backstop Parties") and any other holders of Eligible Claims signatory hereto that are willing to deliver a Plan Support Agreement, the Company agrees to execute and deliver the Plan Support Agreements from all such Minimum Backstop Parties and other holders of Eligible Claims and to notify the Investors of the Company's receipt, execution and delivery thereof.  Notwithstanding the foregoing, the Company shall not be required to execute any Plan Support Agreements if the holders of Eligible Claims delivering Plan Support Agreements hold in the aggregate, on a pro forma basis after giving effect to the 9019 Settlement, less than 66.6% (by dollar amount) of the outstanding U.S. Roll-Up Loan Claims, 100% (by dollar amount) of the outstanding European Roll-Up Loan Claims and 48.0% (by dollar amount) of the outstanding German Term Loan Claims as of the date of receipt of such Plan Support Agreements by the Company.

(d)     Information Supplements.  The Company agrees to supplement, from time to time, the representations and warranties of the Company contained in Section 7(h) hereof so that they will remain complete and correct in all material respects; provided, that no such supplemental information provided after the date hereof pursuant to this Section 9(d) or otherwise shall be deemed to amend or supplement the Schedules to this Equity Commitment Agreement for purposes of determining whether the conditions set forth in Section 11 hereof have been satisfied.

(e)     Distressed Termination of Pension Plans.  Except as contemplated by the Plan, the Company agrees not to, and to cause the Company Subsidiaries not to, take any action described in Section 4041(c) of ERISA to effectuate a distress termination (as described in such section) of any "Plan" (as defined in the DIP Term Credit Agreement), without Oaktree's prior written consent, which consent shall not be unreasonably withheld.  For purposes of clarity, the actions prohibited in the preceding sentence include, without limitation, (i) issuing a notice of intent to terminate to Plan participants or (ii) submitting any notice, request, motion or filing to the Pension Benefit Guarantee Corporation or the Bankruptcy Court (or any other court), which seeks to satisfy the criteria under Section 4041(c).

(f)     Cooperation.  During the Company's Chapter 11 Cases, the Company and the Company Subsidiaries shall use commercially reasonable efforts to provide to counsel for the Investors draft copies of all motions, proposed orders, applications and other documents, relating to the Plan or this Equity Commitment Agreement, the Company or a Company Subsidiary intends to file with the Bankruptcy Court, if reasonably practicable, at least three (3) Business Days prior to the date when the applicable debtor intends to file any such pleading or other document (and, if not reasonably practicable, as soon as reasonably practicable prior to filing) and shall consult in good faith with such counsel regarding the form and substance thereof prior to filing such pleading with the Bankruptcy Court.  Nothing in this Section 9(f) shall restrict, limit, prohibit or preclude any Investor from appearing in the Bankruptcy Court with respect to any motion, application or other document filed by the Company or the Company Subsidiaries and objecting to, or commenting upon, the relief requested therein, to the extent such objection

or comment is not inconsistent with the provisions of this Equity Commitment Agreement or such Investor's Plan Support Agreement, as applicable.

(g)     Notification.  The Company agrees to notify, or to cause the Company's subscription agent to notify, on each Friday during the exercise period for the Rights Offering and on each Business Day during the five (5) Business Days prior to the expiration thereof (and any extensions thereto), or more frequently if reasonably requested by the Investors, the Investors of the aggregate number of Rights known by the Company or its subscription agent to have been exercised pursuant to the Rights Offering as of the close of business on the preceding day or the most recent practicable time before such request, as the case may be.  In addition, the Company agrees to provide written notice to the Investors of the anticipated occurrence of the Effective Date at least fourteen (14) days prior to the occurrence of the Effective Date and to provide as much notice as is practicable of any anticipated delay beyond the projected Effective Date described in the Company's initial notice to the Investors pursuant to this sentence.

(h)     Regulatory Approvals.  To the extent required under the HSR Act or applicable Antitrust Laws, the Company agrees to use its commercially reasonable efforts to (i) prepare and file as promptly as practicable, and in any event by no later than thirty (30) days from the entry by the Bankruptcy Court of the Equity Commitment Order, an appropriate Notification and Report Form pursuant to the HSR Act; and (ii) prepare and file as promptly as practicable the Mandatory Antitrust Filings (with the exception of the filings required in (i) above) and all other necessary documents, registrations, statements, petitions, filings and applications for other regulatory approvals and any other consent of any other Government Entities either required or that the Company and the Requisite Investors mutually agree are advisable to satisfy the condition set forth in Section 11(k) hereof.  The Company shall use commercially reasonable efforts to satisfy the conditions set forth in Sections 11(j) and 11(k) hereof.  Notwithstanding the foregoing, none of the Company or the Company Subsidiaries shall have any obligation to divest or dispose of, hold separate or agree to any restrictions on voting, governance or behavioral matters with respect to, any assets or lines of business in connection with obtaining any consents or approvals under this Section 9(h).

(i)     Use of Proceeds.  The proceeds from the Rights Offering shall be used solely as follows:

1.     without utilizing the Rights Offering Reserve Amount, to make the payments set forth in clauses (a) and (b) of the definition of "Rights Offering Value" in full;

2.     without utilizing the Rights Offering Reserve Amount, $430,000,000 to make the payments set forth in clause (c) of the definition of "Rights Offering Value" (the "Required DIP Credit Agreements Paydown"); and

3.     up to an amount equal to the Maximum Rights Offering Amount minus the amounts set forth in Sections 9(i)(1) and (2) (the "Rights Offering Reserve Amount") to make the following payments:

(i) *first,* the payments set forth in clause (d) of the definition of "Rights Offering Value" in full;

(ii) *second,* if the Rights Offering Reserve Amount is available after giving effect to the payment in clause (i), up to the lesser of (x) $20,000,000 and (y) the unutilized amount of the Rights Offering Reserve Amount, for such purposes as the Company determines; and

(iii) *third,* if the Rights Offering Reserve Amount is available after giving effect to the payments in clauses (i) and (ii), and if the condition set forth in Section 11(g) hereof would be satisfied after giving effect to the Required DIP Credit Agreements Paydown and the utilization of the funds available under clause (ii) above, up to the lesser of (x) $25,000,000 and (y) the unutilized amount of the Rights Offering Reserve Amount, for such purposes as the Company determines.

(j) <u>Conduct of Business of the Company</u>.  From the date hereof until the Closing Date, the Company shall, and shall cause each of the Company Subsidiaries to, conduct its business and operations in the ordinary course of business consistent with past practice and use commercially reasonable efforts to (i) preserve intact its present business organization, (ii) keep available the services of its directors, officers and key employees, (iii) maintain good relationships with its customers, suppliers, lenders and others having material business relationships with it and (iv) manage its working capital (including the timing of collection of accounts receivable and of the payment of accounts payable and the management of inventory) in the ordinary course of business consistent with past practice.

### 10. <u>Additional Covenants of Investors.</u>

(a) <u>No Joint Control</u>.  The Investors undertake prior to the Closing Date not to enter into any shareholders' agreements or any other binding or non-binding agreements or arrangements (including any agreements to assign the Investors' rights, shares, interests or obligations) as a result of which any Person other than Oaktree would be deemed under the EC Merger Regulation to acquire control over the Company jointly with Oaktree and/or would be required to submit a Mandatory Antitrust Filing jointly with Oaktree.  The Company will waive this Section 10(a) upon the request of Oaktree if in the Company's reasonable opinion the submission of a joint filing by Oaktree and any other Person would not prevent or materially delay the satisfaction of the condition set forth in Section 11(k) hereof. For the avoidance of doubt, if, in the reasonable judgment of the Company, the European Commission would have declared the transactions contemplated by this Equity Commitment Agreement, in the absence of a submission of a joint filing, to be compatible with the common market pursuant to Article 6(1)(b) of the EC Merger Regulation, but the submission of a joint filing would result in the European Commission failing to declare the transactions contemplated by this Equity Commitment Agreement compatible with the common market pursuant to Article 6(1)(b) of the

EC Merger Regulation, then the submission of a joint filing shall be deemed to cause a material delay in the satisfaction of the condition set forth in Section 11(k) hereof.

        (b)    <u>Regulatory Approvals</u>.  To the extent required under the HSR Act or the EC Merger regulation, each Investor agrees to use its reasonable commercial efforts to (i) prepare and file as promptly as practicable, and in any event by no later than thirty (30) days from the entry by the Bankruptcy Court of the Equity Commitment Order, (x) an appropriate Notification and Report Form pursuant to the HSR Act and (y) a notification on Form CO pursuant to the EC Merger Regulation; and, further, (ii) prepare and file as promptly as practicable the Mandatory Antitrust Filings (with the exception of the filings required in (i) above) and all other necessary documents, registrations, statements, petitions, filings and applications for other regulatory approvals and any other consent of any other Government Entities either required or that the Company and the Requisite Investors hereto mutually agree are advisable to satisfy the condition set forth in Section 11(k) hereof.  The Investors shall use commercially reasonable efforts to satisfy the conditions set forth in Sections 11(j) and 11(k) hereof.  Notwithstanding the foregoing, none of the Investors or their respective Affiliates shall have any obligation to divest or dispose of, hold separate or agree to any restrictions on voting, governance or behavioral matters with respect to, any assets or lines of business in connection with obtaining any consents or approvals under this Section 10(b).

        **11.**    **<u>Conditions Precedent</u>.**  The Commitment and the obligation of the Investors to consummate the transactions herein is subject to the satisfaction (or, subject to the terms of Section 20(b), waiver by the Requisite Investors) on or prior to the Closing Date of the following conditions:

        (a)    the representations and warranties of the Company set forth in Section 7 hereof shall be true and correct (without giving effect to any limitations as to materiality or Material Adverse Effect set forth therein) in each case as of the date hereof and the Closing Date, as if such representations and warranties were made as of the Closing Date (except to the extent such representations and warranties expressly relate to a specified date, in which case such representations and warranties shall be true and correct as of such specified date), except to the extent that any failure of such representations and warranties, individually or in the aggregate, to be so true and correct has not had, and would not reasonably be expected to have, a Material Adverse Effect, and the Company shall have complied in all material respects with all covenants and agreements in this Equity Commitment Agreement and, following the execution thereof, Sections 2 (Effectuating the Restructuring) and 4 (Company Responsibilities) of the Plan Support Agreements.  The Company shall have delivered to the Investors a certificate, dated the date of the Closing Date and signed by an executive officer of the Company, to the foregoing effect;

        (b)    Holdco shall have executed and delivered the Ancillary Agreements on the terms and conditions consistent in all material respects with this Equity Commitment Agreement;

        (c)    the Plan Support Agreements, if entered into by the Minimum Backstop Parties, shall not have been terminated pursuant to Section 9 (Termination) thereof;

(d) the Restructuring Transactions and the Plan shall be consummated substantially simultaneously with the transactions contemplated herein on the terms and conditions set forth herein and in each Plan Support Agreement;

(e) the U.S. Plan Value is no less than $120,000,000;

(f) the Company shall have obtained the Exit ABL Facility on terms reasonably acceptable to Oaktree with a commitment in an amount not less than $500,000,000, it being understood that the terms set forth in the draft term sheet for the Exit ABL Facility, dated November 7, 2009, are acceptable to Oaktree;

(g) the Pro Forma Liquidity shall be no less than $233,000,000;

(h) the roll-up rights of Oaktree and Apollo and their Affiliates under the DIP Term Credit Agreement shall have not been rescinded or modified in any way without the consent of Oaktree and Apollo;

(i) Holdco shall have entered into employment arrangements with senior executives as described and on terms and conditions as set forth in Section VI.A.3 of the Disclosure Statement;

(j) all governmental approvals and consents required by the Plan, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained and be in full force and effect; and all applicable mandatory waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

(k) to the extent that regulatory filings are required under Section 10(b) hereof as to one or more Investors, then as to such individual Investor:

(x) the applicable waiting period under the HSR Act (including any extension thereof by reason of a request for additional information) shall have expired or been terminated;

(y) the European Commission shall have (i) declared the transactions contemplated by this Equity Commitment Agreement to be compatible with the common market pursuant to Article 6(1)(b), 8(1), or 8(2) of the EC Merger Regulation either unconditionally or conditionally in terms reasonably satisfactory to the parties hereto; or (ii) failed to issue a decision under Article 6(1) of the EC Merger Regulation within the required deadlines with the consequence that the transactions contemplated by this Equity Commitment Agreement are deemed compatible with the common market pursuant to Article 10(6) of the EC Merger Regulation; and

(z)     any competent authority (as to those Mandatory Antitrust Filings in the jurisdictions set forth on <u>Schedule 11(k)</u> with respect to which clearance or approval of the transactions contemplated by this Equity Commitment Agreement is required prior to closing or which impose a mandatory waiting period which must be observed prior to closing) shall (i) have declined jurisdiction over the transactions contemplated by this Equity Commitment Agreement; (ii) have granted clearance explicitly either unconditionally or in terms reasonably satisfactory to the parties; or (iii) through the expiration of time periods available for their investigation, be deemed to have granted clearance;

(l)     since the date hereof, a Material Adverse Effect shall not have occurred;

(m)     for any period of three consecutive calendar months (x) commencing with the three-month period ending March 31, 2010 and (y) ending with the three-month period ending on the last day of the calendar month immediately preceding the Closing Date (or, if the Closing Date is less than ten (10) Business Days after such month, the immediately preceding month), the Underlying EBITDA for the Company and its Subsidiaries shall not be less than the amount for such period set forth on <u>Schedule 11(m)</u>; and

(n)     The Company shall have delivered to the Investors a certificate signed by an executive officer of the Company certifying as to the Company's compliance with its obligations under Section 9(j)(iv) hereof.

## 12.     <u>Indemnification and Exculpation</u>.

(a)     The Company (in such capacity, the "<u>Indemnifying Party</u>") agrees to indemnify and hold harmless the Investors, and each of their Affiliates and each of the Investors' and their Affiliates' respective officers, directors, partners, shareholders, members, trustees, controlling persons, employees, agents, advisors, attorneys and representatives (each, an "<u>Indemnified Party</u>") from and against any and all losses, claims, damages, liabilities, and costs and expenses (including, without limitation, reasonable and documented fees and disbursements of outside counsel), to which any Indemnified Party may become subject arising out of or in connection with or relating to this Equity Commitment Agreement or the transaction documents and the transactions contemplated hereby, or any breach by the Company of this Equity Commitment Agreement or any Plan Support Agreement, or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Party is a party thereto, and the Company shall reimburse each Indemnified Party upon demand for all reasonable and documented out-of-pocket legal and other expenses incurred by it in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including, without limitation, in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether the transactions contemplated hereby are consummated, except to the extent such cost or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted

from an Indemnified Party's bad faith, gross negligence or willful misconduct or from such Indemnified Party's breach of the relevant Plan Support Agreement, as applicable, or this Equity Commitment Agreement; provided, that the Indemnifying Party shall not have to reimburse the legal fees and expenses of more than one outside counsel (and any local counsel) for all Indemnified Persons with respect to any specific matter for which indemnification is sought unless, as reasonably determined by any such Indemnified Person or its counsel, representation of all such Indemnified Persons would be inappropriate or impracticable or create an actual or potential conflict of interest.

(b)     The Company agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Company or any Company Subsidiary for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct or from such Indemnified Party's breach of the relevant Plan Support Agreement, as applicable, or this Equity Commitment Agreement.  In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages.

(c)     The Company further agrees that, without the prior written consent of the Requisite Investors, neither the Company nor any Company Subsidiary will enter into any settlement of any lawsuit, claim or other proceeding arising out or relating to of this Equity Commitment Agreement or the transactions contemplated hereby unless such settlement (i) includes an explicit and unconditional release from the party bringing such lawsuit, claim or other proceeding of all Indemnified Parties and (ii) does not include a statement as to or an admission of fault, culpability, or a failure to act by or on behalf of any Indemnified Party.

13.     **Governing Law, etc.**  THIS EQUITY COMMITMENT AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAWS PRINCIPLES THEREOF.  By its execution and delivery of this Equity Commitment Agreement, each of the parties hereto hereby irrevocably and unconditionally agrees for itself that, so long as the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction of any legal action, suit or proceeding with respect to any matter under or arising out of or in connection with this Equity Commitment Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding (collectively, "Claims").  To the extent that any Claims arise after the termination of the Chapter 11 Cases, such Claims shall be brought exclusively in either a state or federal court of competent jurisdiction in the State of New York and County of New York.  By execution and delivery of this Equity Commitment Agreement, each of the parties hereto hereby irrevocably accepts and submits itself to the exclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding.

14.     **Notices.**  All notices and other communications in connection with this Equity Commitment Agreement will be in writing and will be deemed given (and will be deemed to have been duly given upon receipt) if delivered personally, sent via electronic facsimile (with

confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the parties at the following addresses (or at such other address for a party as will be specified by like notice):

If to Oaktree, to:

Oaktree Capital Management, L.P.
333 South Grand Avenue, 28th Floor
Los Angeles, California  90071
Facsimile No.:  (213) 830-8810
                        (213) 830-6499
Attention:  Scott L. Graves
                Brian Laibow

with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Facsimile No.: (212) 373-7757
Attention:  Alan W. Kornberg
                Kenneth M. Schneider

If to Apollo, to:

Apollo Management VII, L.P.
c/o Apollo Management
9 West 57th Street
New York, New York 10019
Facsimile No.: (212) 515-3263
Attention:  Eric L. Press
                Matthew R. Michelini

with a copy to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York  10019
Facsimile No.: (212) 403-2000
Attention:  Philip Mindlin
                Andrew J. Nussbaum

If to the Company, to:

Aleris International, Inc.
25825 Science Park Drive, Suite 400
Beachwood, Ohio  44122
Facsimile No.: (216) 910-3654
Attention:  Christopher R. Clegg

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Facsimile No.: (212) 310-8007
Attention:  Stephen Karotkin
                    Debra A. Dandeneau

If to Sankaty, to:

Sankaty Advisors LLC
111 Huntington Ave
Boston, Massachusetts 02199
Facsimile No.: (617) 516-2710
Attention: Jeff Robinson

with a copy to:

Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, New York 10005
Facsimile No.: (212) 822-5410
Attention: Michael Bellucci


     15.     **Assignments; Third Party Beneficiaries.**  This Equity Commitment Agreement is not assignable by any party without the prior written consent of the other parties; provided, however, that the Investors may transfer or distribute any or all shares of Holdco Common Stock or Specified Securities the Investors receive under the Plan to their Affiliates; provided, further, that the Investors may assign their rights, interests or obligations (including all or a portion of their Backstop Percentages) hereunder to one or more Permitted Transferees without the Company's prior written consent, or to any other Person with the Company's prior written consent, such consent not to be unreasonably withheld; provided, further, all such assignments are subject to the covenant set forth in Section 10(a) hereof and that no such assignment shall relieve the Investors of their obligations hereunder and, upon the satisfaction of the conditions set forth in Section 11 hereof (except the condition set forth in Section 11(k) hereof, which shall be satisfied solely with respect to Oaktree), Oaktree shall be required to

consummate the transactions contemplated herein; and provided, further, the Company may assign its post-Closing Date obligations hereunder to Name Acquisition Co. pursuant to the Acquisition Agreement.  This Equity Commitment Agreement is intended to be solely for the benefit of the parties hereto, the Indemnified Parties, and their respective successors and assigns.  Nothing herein, express or implied, is intended to or shall confer upon any other third party any legal or equitable right, benefit, standing or remedy of any nature whatsoever under or by reason of this Equity Commitment Agreement.

16. **Waiver of Jury Trial.**  Each party hereto irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Equity Commitment Agreement or the transactions contemplated hereby or the actions of the Investors or any of their Affiliates in the negotiation, performance, or enforcement of this Equity Commitment Agreement.

17. **Further Assurances; No Agreement to Support of the Plan.**

(a)      The parties hereto agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate, from time to time, to effectuate the agreements and understandings of the parties hereto, whether the same occurs before or after the date of this Equity Commitment Agreement.

(b)      For the avoidance of doubt, this Equity Commitment Agreement shall not bind the Investors to vote in favor of the Plan.  The Investors shall only be bound to vote in favor of the Plan upon execution and delivery of, and under the terms of, the Plan Support Agreements.  Nothing herein shall be deemed to limit the rights of the Investors to vote in favor of, or against, the Plan.

18. **Survival of Representations and Warranties.**  All representations and warranties made in this Equity Commitment Agreement will survive the execution and delivery of this Equity Commitment Agreement but will terminate and be of no further force or effect after the Closing Date.

19. **Termination.**

(a)      Notwithstanding anything to the contrary herein, this Equity Commitment Agreement may be terminated by any party or as otherwise provided below at any time prior to the Closing Date upon the earliest of the following events:  (i) the termination of this Equity Commitment Agreement by mutual consent of the Requisite Investors and the Company, (ii) by the Company or any Minimum Backstop Party who signed its Plan Support Agreement if the Plan Support Agreements shall not have been entered into by the Company and the Minimum Backstop Parties within four (4) Business Days after the date of the Disclosure Statement Order; provided that the right to terminate pursuant to this clause (ii) shall be waived if it is not exercised within six (6) Business Days after the date of the Disclosure Statement Order, (iii) the Bankruptcy Court shall not have entered the Equity Commitment Order by April 1, 2010, (iv) the Equity Commitment Order shall not have become a Final Order by April 15, 2010, (v) the

Bankruptcy Court shall have stated in writing that it will not approve the Company entering into this Equity Commitment Agreement or will not approve any provision hereof (including the Structuring and Arrangement Fee, the Termination Fee, the Transaction Expenses and the Company's indemnification obligations hereunder) and (vi) the Termination Date.

(b)     This Equity Commitment Agreement may be terminated by the Requisite Investors if (i) any Plan Support Agreement is terminated or, prior to the execution and delivery of the Plan Support Agreements, any event occurs that would have constituted a Termination Event under Section 9(a) of the Plan Support Agreements if they were in effect, (ii) the Company fails to perform its obligations under this Equity Commitment Agreement or any Plan Support Agreement in any material respect or is in material breach of any of its representations and warranties contained herein or therein, (iii) any of the conditions set forth in Section 11 hereof shall have become incapable of being satisfied and shall not have been waived by the Requisite Investors, (iv) the Company files, supports or endorses a plan or reorganization other than the Plan, (v) the Company withdraws the Plan or publicly announces its intention not to support the Plan, or (vi) the Board of Directors of the Company has determined that continued pursuit of the Plan is inconsistent with its fiduciary duties because, and the Board of Directors of the Company determines in good faith that, a proposal or offer from a third party is reasonably likely to be more favorable to the Company than is proposed under the Plan, taking into account, among other factors, the identity of the third party, the likelihood that any such proposal or offer will be negotiated to finality within a reasonable time, the potential loss to the Company if the proposal or offer were not accepted and consummated, and the likelihood that any such proposal will be consummated within a reasonable time (such proposal as determined by the Board of Directors of the Company in good faith, a "Superior Proposal").

(c)     This Equity Commitment Agreement may be terminated by the Company if (i) any of the Plan Support Agreements are terminated, (ii) the Investors fail to perform their obligations under this Equity Commitment Agreement or the Plan Support Agreements, if applicable, in any material respect or are in material breach of any of their representations and warranties contained herein or therein, (iii) the Company files, supports or endorses a plan or reorganization other than the Plan, (iv) the Company withdraws the Plan or publicly announces its intention not to support the Plan, or (v) if the Board of Directors of the Company has determined that continued pursuit of the Plan is inconsistent with its fiduciary duties because of a Superior Proposal; provided that, the Company shall pay the Termination Fee pursuant to Section 2(e) hereof prior to termination pursuant to clauses (iii), (iv) or (v) of this Section 19(c) and such payment shall be a condition to termination.

(d)     The Company must pay the Termination Fee pursuant to Section 2(d) hereof upon termination by a Minimum Backstop Party pursuant to Section 19(a)(ii) hereof if (i) the Disclosure Statement Order shall have been entered prior to such date and (ii) the Minimum Backstop Parties shall have executed and delivered, or were prepared to execute and deliver, the Plan Support Agreements prior to or on such termination date.

(e)     Upon any such expiration or termination of this Equity Commitment Agreement, this Equity Commitment Agreement shall become void and there shall be no liability under this Equity Commitment Agreement on the part of the Investors or the Company;

provided, however, that the provisions of this Equity Commitment Agreement set forth in Sections 2(d) (The Rights Offering), 3(b) (The Backstop Commitment), 12 (Indemnification and Exculpation), 13 (Governing Law, etc.), and 16 (Waiver of Jury Trial) shall remain in full force and effect; provided, further, that, to the extent that such termination results from the breach by a party of any representation, warranty or covenant set forth in this Equity Commitment Agreement, such party shall not be relieved of liability from such breach, but such party shall not be liable on any theory of liability for any special, indirect, consequential or punitive damages.

## 20. **Amendments and Waivers.**

(a)     This Equity Commitment Agreement may not be amended except by an instrument in writing signed on behalf of Oaktree and the Company.  By an instrument in writing, the Requisite Investors, on the one hand, or the Company, on the other hand, may waive compliance by the Company or the Investors, respectively, with any term or provision of this Equity Commitment Agreement that such other party was or is obligated to comply with or perform.

(b)     Notwithstanding the foregoing, if the applicable Investor has executed and delivered a Plan Support Agreement and such Plan Support Agreement has not been terminated, (i) any amendment, modification or waiver to Section 25 or any other provision in this Equity Commitment Agreement that would materially adversely affect Sankaty in a disproportionate manner relative to Oaktree and Apollo shall require Sankaty's consent (such consent not to be unreasonably withheld) and (ii) Section 26 may not be amended, modified or waived without Apollo's consent; provided, that, after the Voting Deadline, no Plan Modification (as defined in the Plan Support Agreement) that would constitute a Subject Change (as defined in the Plan Support Agreement) may be made without Apollo's consent (to be given or withheld in its sole discretion).

## 21. **Binding Obligation.**  Subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code and the entry of the Equity Commitment Order by the Bankruptcy Court, this Equity Commitment Agreement is a legally valid and binding obligation of the parties hereto, enforceable in accordance with its terms, and shall inure to the benefit of the parties hereto and their representatives.  Nothing in this Equity Commitment Agreement, express or implied, shall give to any entity, other than the parties hereto and their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, Affiliates, successors, assigns, heirs, executors, administrators and representatives, any benefit or any legal or equitable right, remedy or claim under this Equity Commitment Agreement.

## 22. **Headings.**  The headings of all sections of this Equity Commitment Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction or interpretation of any term or provision hereof.

## 23. **Other Agreements, Complete Agreement, Interpretation.**

(a)    The Company and each Investor agree that, based on the amount of Relevant Claims set forth on such Investor's Schedule 8(e) hereto, the amount of Relevant Claims such Investor or its Affiliates, as applicable, would own pro forma after giving effect to the 9019 Settlement is set forth on <u>Schedule 23(a)</u>.

(b)    This Equity Commitment Agreement and the other agreements, exhibits and other documents referenced herein constitute the complete agreement between the parties hereto with respect to the subject matter hereof and supersede all prior agreements, oral or written, between or among the parties hereto with respect thereto (including, as among Oaktree, Apollo and the Company, that certain non-binding proposal letter, dated December 1, 2009, and all exhibits attached thereto).  This Equity Commitment Agreement is the product of negotiation by and among the parties hereto.  Any party enforcing or interpreting this Equity Commitment Agreement shall interpret it in a neutral manner.  There shall be no presumption concerning whether to interpret this Equity Commitment Agreement for or against any party by reason of that party having drafted this Equity Commitment Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

24.    **Settlement Discussions.**  This Equity Commitment Agreement and the transactions contemplated herein are part of a proposed settlement of a dispute between the parties hereto.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Equity Commitment Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding, except to the extent filed with, or disclosed to, the Bankruptcy Court in connection with the Chapter 11 Cases, other than a proceeding to enforce the terms of this Equity Commitment Agreement.

25.    **Sankaty Participation.**  If (i) the Effective Date occurs and (ii) the conditions set forth in Sections 11(j) and 11(k) hereof are satisfied with respect to Sankaty, Sankaty hereby agrees to receive and exercise all of the Subscription Rights offered to Sankaty or its Affiliates and to purchase the Sankaty Residual Units (as defined herein).  The Company and the Investors agree that Sankaty's Subscription Units shall not be subject to the Minimum Ownership Cutback under Section 7 of the Plan.  In addition, after Oaktree and Apollo reach the Minimum Oaktree/Apollo Equity Threshold, any additional Residual Units shall be allocated to Sankaty *pro rata* based on the pre-rights offering equity value into which Eligible Claims owned by Oaktree and Apollo in the aggregate may be converted, on the one hand, and Sankaty, on the other hand (the "<u>Sankaty Residual Units</u>").  Sankaty shall receive a percentage of the Structuring and Arrangement Fee and shall purchase a percentage of the IntermediateCo Preferred Stock, in each case equal to the fraction, expressed as a percentage, (i) the numerator of which is the aggregate number of Units purchased by Sankaty or its Affiliates and (ii) the denominator of which is the aggregate number of Units purchased by Apollo, Oaktree and Sankaty or their respective Affiliates.  Sankaty would receive a percentage of the Termination Fee (if any) equal to the fraction, expressed as a percentage, (i) the numerator of which is the aggregate number of Units that would be purchased by Sankaty or its Affiliates and (ii) the denominator of which is the aggregate number of Units that would be purchased by Apollo, Oaktree and Sankaty or their respective Affiliates, in each case in proportion to their respective ownership of Eligible Claims (pro forma after giving effect to the 9019 Settlement) as of the date the Equity Commitment

Agreement is terminated, and after giving effect to the Minimum Oaktree/Apollo Equity Threshold and assuming that all Eligible Holders elect to receive their respective Subscription Rights under the Plan.  Notwithstanding anything in this Equity Commitment Agreement to the contrary, any modifications to the terms set forth in Exhibit F or Exhibit G hereto shall not require Sankaty's consent unless such modification materially adversely affects Sankaty in a disproportionate manner relative to Oaktree and Apollo, in which case Sankaty's consent shall be required (such consent not to be unreasonably withheld).  This Section 25 and the rights and obligations hereunder may not be assigned or delegated by Sankaty without the prior written consent of the Company and the Requisite Investors.  Notwithstanding the foregoing, without affecting the rights and obligations of the other parties hereunder, (i) Sankaty, if Sankaty has executed and delivered a Plan Support Agreement and such Plan Support Agreement has terminated in accordance with Section 9 thereof, or (ii) Oaktree, if Sankaty's Plan Support Agreement is terminated pursuant to Section 9(b)(iii) of the Plan Support Agreement or the Termination Event set forth in Section 9(a)(x) has occurred due to a breach of the Plan Support Agreement by Sankaty (regardless of whether the Plan Support Agreement is terminated), may terminate Sankaty's rights and obligations under this Equity Commitment Agreement, in which case (i) Sankaty shall not be required to purchase the Sankaty Residual Units, (ii) Sankaty shall no longer be entitled to a portion of the Structuring and Arrangement Fee or the Termination Fee, (iii) Sankaty shall no longer be a Backstop Party for purposes of this Equity Commitment Agreement and the Plan, and (iv) Sankaty's Subscription Units shall be subject to the Minimum Ownership Cutback under Section 7 of the Plan; provided that Sankaty's rights and obligations under the provisions of this Equity Commitment Agreement set forth in Sections 12, 13 and 16 shall remain in full force and effect.

## 26. **Apollo Participation.**

(a)     If (i) the Effective Date occurs and (ii) the conditions set forth in Sections 11(j) and 11(k) hereof, if applicable to Apollo, are satisfied with respect to Apollo, then Apollo hereby agrees to receive and exercise all of the Subscription Rights offered to Apollo or its Affiliates and to purchase a number of Residual Units as may be agreed by Apollo and Oaktree (collectively, the "Apollo Commitment"); provided, that, without limiting and subject to Apollo's obligations in the Plan Support Agreement if signed by Apollo or any of its Affiliates that hold Eligible Claims, Apollo may, at its option, elect to withdraw all or a portion of the Apollo Commitment and/or withdraw its election on any Ballot of Apollo or any of its Affiliates to receive ADH Term Loan Stock, ADH Roll-Up Stock or U.S. Roll-Up Stock, as applicable, and Subscription Rights in respect of its European Term Loan Claims, European Roll-Up Term Loan Claims and/or US Roll-Up Term Loan Claims, respectively and elect cash in lieu thereof, in each case by written notice to the Company and Oaktree no later than the date that is ten (10) days prior to the Effective Date; provided, further, that upon the satisfaction of the conditions set forth in Section 11 hereof (other than Sections 11(j) and (k)), if (X) the conditions set forth in Sections 11(j) and (k) are satisfied with respect to Oaktree but not Apollo, (Y) to the extent that regulatory filings are required under Section 9(h) hereof as to the Company, then the Company shall have made such filings with respect to Apollo, and (Z) the conditions set forth in Section 11(j) and (k) are not satisfied as to Apollo on or prior to the 70th day following (i) the Company's initial filing under the HSR Act with respect to Apollo, if such filing is required or (ii) if no such filing is required, the date of this Agreement, then Apollo shall be deemed to

immediately withdraw the Apollo Commitment. Upon withdrawal of the Apollo Commitment, Oaktree shall be deemed to assume the Apollo Commitment in its entirety, and Apollo shall be released of the Apollo Commitment. The Company agrees that Apollo's Subscription Units shall not be subject to the Minimum Ownership Cutback under Section 7 of the Plan. Apollo Management VII, L.P., on behalf of its affiliated investment funds or for its own account, as may be designated by Apollo Management VII, L.P. shall receive a portion of the Structuring and Arrangement Fee and shall purchase a portion of the IntermediateCo Preferred Stock, in each case equal to the fraction, expressed as a percentage, (i) the numerator of which is the aggregate number of Units purchased by Apollo or its Affiliates and (ii) the denominator of which is the aggregate number of Units purchased by Apollo, Oaktree and Sankaty or their respective Affiliates. So long as Apollo has not withdrawn the Apollo Commitment, Apollo would receive a percentage of the Termination Fee (if any) equal to the fraction, expressed as a percentage, (i) the numerator of which is the aggregate number of Units that would be purchased by Apollo or its Affiliates and (ii) the denominator of which is the aggregate number of Units that would be purchased by Apollo, Oaktree and Sankaty or their respective Affiliates, in each case in proportion to their respective ownership of Eligible Claims (pro forma after giving effect to the 9019 Settlement) as of the date the Equity Commitment Agreement is terminated, and after giving effect to the Minimum Oaktree/Apollo Equity Threshold and assuming that all Eligible Holders elect to receive their respective Subscription Rights under the Plan.

(b)     Each of the Company and Oaktree agree to continue to consult with Apollo during and to keep Apollo informed of developments in respect the negotiation, drafting, confirmation, and consummation of the Plan.

*[Remainder of page intentionally left blank; signature page follows.]*

Very truly yours,

**OCM Opportunities ALS Holdings, L.P.**

By: Oaktree Fund GP, LLC,
    *its General Partner*

By: Oaktree Fund GP I, L.P.,
    *its Managing Member*

By: _____
Name: Scott Graves
Title: Authorized Signatory

By: _____
Name: **Emily Alexander**
Title: Authorized Signatory

**OCM High Yield Plus ALS Holdings, L.P.**

By: Oaktree Fund GP IIA, LLC,
    *its General Partner*

By: Oaktree Fund GP II, L.P.,
    *its Managing Member*

By: _____
Name: Scott Graves
Title: Authorized Signatory

By: _____
Name: Emily Alexander
Title: Authorized Signatory

**Oaktree European Credit Opportunities Holdings, Ltd.**

By: Oaktree Europe GP, Limited,
*its Director*

By: Oaktree Capital Management, L.P.,
*its Director*

By: _____
Name:   John B. Frank
Title:    Managing Principal

By: _____
Name:
Title:    Brian D. Beck
           Managing Director

**APOLLO INVESTMENT FUND VII, L.P.**

By: Apollo Advisors VII, L.P.,
     its general partner

By: Apollo Capital Management VII, LLC
     its general partner

By: _____
    Name:
    Title:


**APOLLO OVERSEAS PARTNERS
(DELAWARE 892) VII, L.P.**

By: Apollo Advisors VII, L.P.,
     its general partner

By: Apollo Capital Management VII, LLC
     its general partner

By: _____
    Name:
    Title:


**APOLLO OVERSEAS PARTNERS
(DELAWARE) VII, L.P.**

By: Apollo Advisors VII, L.P.,
     its general partner

By: Apollo Capital Management VII, LLC
     its general partner

By: _____
    Name:
    Title:


*[Signature Page to Equity Commitment Agreement]*

**APOLLO OVERSEAS PARTNERS VII, L.P.**

By: Apollo Advisors VII, L.P.,
     its general partner

By: Apollo Capital Management VII, LLC
     its general partner

By: _____
     Name:
     Title:


**APOLLO INVESTMENT FUND (PB) VII, L.P.**

By: Apollo Advisors VII, L.P.,
     its general partner

By: Apollo Capital Management VII, LLC
     its general partner

By: _____
     Name:
     Title:

Acknowledged and Agreed, solely for
purposes of Section 2(d) hereof:

**OCM FIE, L.P.**

By: Oaktree Fund GP, LLC
  *its General Partner*

By: Oaktree Fund GP I, L.P.
  *its Managing Member*

By: _____
  Name:  Todd Molz
  Title: Authorized Signatory

By: _____
  Name: **Emily Alexander**
  Title: Authorized Signatory

Acknowledged and Agreed, solely for
purposes of Section 25 hereof:


**SANKATY ADVISORS, LLC,**
on behalf of certain Funds and Accounts it
manages or advises

By: _____
Name: Ranesh Ramanathan
Title: Authorized Signatory

Accepted and agreed to this 5th day of
February, 2010:

**Aleris International, Inc.**

By: _____
      Name: SEAN M. STACY
      Title: EXEC. VICE PRES. + CFO

**Schedule 1(e)**

**Apollo**

**[Redacted]**

**Schedule 1(f)**

**Investors**

| **Investor** | **Backstop Percentage** | **Percentage of IntermediateCo Preferred Stock** |
|---|---|---|
| Oaktree Investment Funds and Accounts[1] | 100% | 100% |
| Apollo | Percentage to be determined pursuant to Section 26. | Percentage to be determined pursuant to Section 26. |
| Sankaty | Percentage to be determined pursuant to Section 25. | Percentage to be determined pursuant to Section 25. |
| **Total** | 100% | 100% |

---

[1] Fund specific information is redacted.

**Schedule 2(d)**

**Structuring and Arrangement Fee**

| Entity | Structuring and Arrangement Fee Percentage |
|---|---|
| OCM FIE, L.P. | 100% |
| Sankaty Advisors, LLC | Percentage to be determined pursuant to Section 25. |
| Apollo Management VII, L.P., on behalf of its affiliated investment funds or for its own account, as may be designated by Apollo Management VII, L.P. | Percentage to be determined pursuant to Section 26. |
| **Total** | 100% |

**Schedule 7(d)**

**Subsidiaries**

<u>Subsidiary of AHC1 Holding Co.</u>

- AHC Intermediate Co. (100% owned by parent)

<u>Subsidiaries of AHC Intermediate Co.</u>

- RLD Acquisition Co. (100% owned by parent)
- RCY Acquisition Co. (100% owned by parent)
- Name Acquisition Co. (100% owned by parent)
- Intl Acquisition Co. (100% owned by parent)
- UWA Acquisition Co. (100% owned by parent)
- HQ1 Acquisition Co. (100% owned by parent)

<u>Subsidiaries of RCY Acquisition Co.</u>

- SPEC A Acquisition Co. (100% owned by parent)
- SPEC P Acquisition Co. (100% owned by parent)

### Schedule 7(i)

### Litigation

### None.

**Schedule 7(j)**

**Material Adverse Effect**

**None.**

**Schedule 7(*l*)**

**Suppliers**

**[Redacted]**

**DIP Term Credit Agreement Representations and Warranties – ERISA Event**

For purposes of incorporating the sections of the DIP Term Credit Agreement into this Equity Commitment Agreement only, the definition of "ERISA Event" set forth in the DIP Term Credit Agreement shall be disregarded and replaced with the following definition:

(a)      any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30 day notice period is waived);

(b)      the failure to meet the minimum funding standard of Sections 412 and 430 of the Code with respect to any Plan, whether or not waived;

(c)      the filing pursuant to Section 412(c) of the Code or Section 303(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan;

(d)      the incurrence by Aleris or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan;

(e)      the receipt by Aleris or any ERISA Affiliate from the PBGC or a plan administrator of any notice of an intent to terminate any Plan or Plans or to appoint a trustee to administer any Plan;

(f)      any Plan is or becomes subject to the limitations of Section 436 of the Code;

(g)      the incurrence of any obligation, liability, or expense (other than those reflected on the most recent financial statements of Aleris or its Subsidiaries) which arises under or relates to any "employee benefit plan" (within the meaning of Section 3(3) of ERISA) that is subject to Title IV of ERISA, Section 302 of ERISA, Section 412 or 430 of the Code, the Consolidated Omnibus Budget Reconciliation Act of 1986, as amended ("COBRA"), the Coal Industry Retiree Health Benefit Act of 1992, as amended, or any other statute or regulation, other than such obligation, liability or expense that occurs in the normal course of business and consistent with past practice and is not the result of a breach of obligations required by law, that imposes liability on a so-called "controlled group" basis with or without reference to any provision of Section 414 of the Code or Section 4001 of ERISA, including by reason of any of Aleris or its Subsidiaries' affiliation with any ERISA Affiliate;

(h)      receipt from the Internal Revenue Service of notice of the failure of any Plan or any employee benefit plan intended to be qualified under Section 401(a) of the Code to qualify under Section 401(a) of the Code or the failure of any trust forming part of any Plan or employee benefit plan to qualify for exemption from taxation under Section 501(a) of the Code;

(i)      the incurrence by Aleris or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan;

(j)     the receipt by Aleris or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from Aleris or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is insolvent or in reorganization, within the meaning of Title IV of ERISA or is in endangered or critical status within the meaning of ERISA Section 305; or

(k)     the incurrence by Aleris or its Subsidiaries of projected liabilities in respect of post-employment health, medical or life insurance benefits for any current or former employees of Aleris or its Subsidiaries (except as may be required under COBRA and at the expense of the employee or former employee) other than 110% of those reflected on the financial statements of Aleris or its Subsidiaries for fiscal year ending December 31, 2008, which Aleris represents have been made available to Oaktree.

**Schedule 8(e)**

**Relevant Claims**

**[Redacted]**

**Schedule 11(k)**

**Required Jurisdictions for Mandatory Antitrust Filings**

**[Redacted]**

**Schedule 11(m)**

**Projected Underlying EBITDA**

| **Three-Month Period Ending** | **70% Projected Underlying EBITDA Covenant ($ in millions)** |
|---|---|
| March 31, 2010 | 22.8 |
| April 30, 2010 | 25.7 |
| May 31, 2010 | 28.7 |
| June 30, 2010 | 31.7 |
| July 31, 2010 | 30.3 |
| August 31, 2010 | 29.2 |
| September 30, 2010 | 28.0 |

**Schedule 23(a)**

**Relevant Claims (Post-9019 Settlement)**

**[Redacted]**

**EXHIBIT A**

**JOINT PLAN OF REORGANIZATION**

**(Attached without Exhibits)**

**Document Not Included Pursuant to Section 1.3 of the Plan**

# EXHIBIT B

## FORMS OF PLAN SUPPORT AGREEMENT

### (Attached without Exhibits)

# Form of Oaktree Plan Support Agreement

# PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (this "Agreement") is made and entered into as of [__], 2010 by and between the following parties:

(a) [the undersigned Holder] (the "Undersigned Holder"); and

(b) Aleris International, Inc., a Delaware corporation ("Aleris"), and each of its direct and indirect subsidiaries identified on the signature pages attached hereto (collectively, the "Company" and the Undersigned Holder and the Company, each, a "Party", and collectively, the "Parties").

## RECITALS

WHEREAS, on February 12, 2009, Aleris and certain of its subsidiaries (excluding Aleris Deutschland Holding GmbH ("Aleris Deutschland") and its subsidiaries) commenced voluntary cases (the "Existing Chapter 11 Cases") by filing petitions under chapter 11 of title 11 of the United States Code 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, on [    ] Aleris Deutschland commenced a voluntary case (the "Aleris Deutschland Case" and, together with the Existing Chapter 11 Cases, the "Chapter 11 Cases") by filing a petition under chapter 11 of title 11 of the Bankruptcy Code in the Bankruptcy Court;

WHEREAS, on [    ] the Company filed the Plan (as defined herein) with the Bankruptcy Court (the date of that event being the "Trigger Date");

WHEREAS, on [    ] the Bankruptcy Court entered an order approving the disclosure statement for the Plan attached hereto as Exhibit 2 (such disclosure statement, as the same may be amended, supplemented or modified from time to time, in a manner consistent with the Plan (as defined below) and reasonably acceptable to the Undersigned Holder, the "Disclosure Statement");

WHEREAS, other holders of certain U.S. Roll-Up Term Loan claims under that certain Amended and Restated Debtor-in-Possession Credit Agreement, dated as of February 12, 2009, and amended and restated as of March 19, 2009 (each, a "Consenting U.S. Roll-up Loan Holder"), by and among Aleris, Aleris Aluminum Duffel BVBA, Aleris Deutschland, the lenders party thereto and Deutsche Bank AG New York Branch, as administrative agent and collateral agent (as may be amended, supplemented or otherwise modified in accordance with the terms thereof, the "DIP Credit Agreement"), each of whom are unaffiliated parties, are party to similar plan support agreements with the Company;

WHEREAS, other holders of certain European Roll-up Term Loan claims under the DIP Credit Agreement (each, a "Consenting European Roll-up Loan Holder"), each of whom are unaffiliated parties, are party to similar plan support agreements with the Company;

**WHEREAS**, other holders of certain German Term Loan claims under that certain Amended and Restated Term Loan Agreement, dated as of August 1, 2006 and amended and restated as of December 19, 2006, as further amended on March 16, 2007 and February 10, 2009 (each, a "Consenting German Term Loan Holder" and together with the Undersigned Holder, the Consenting U.S. Roll-up Loan Holders and the Consenting European Roll-up Loan Holders, the "Consenting Holders"), by and among Aleris, Aleris Deutschland, the lenders party thereto, Deutsche Bank AG New York Branch, as administrative agent, Goldman Sachs Credit Partners L.P., as syndication agent, and PNC Bank, National Association, National City Business Credit, Inc. and Key Bank National Association, as co-documentation agents, and Goldman Sachs Credit Partners L.P. and Deutsche Bank Securities Inc., as joint lead arrangers and joint book running managers (as may be amended, supplemented or otherwise modified in accordance with the terms thereof, the "Prepetition Credit Agreement" and together with the DIP Credit Agreement, the "Credit Agreements"), each of whom are unaffiliated parties, are party to similar plan support agreements with the Company;

**WHEREAS**, each Consenting Holder is the holder of a claim, as defined in the Bankruptcy Code arising out of, or related to the DIP Credit Agreement (each, a "U.S. Roll-up Loan Claim" or a "European Roll-up Loan Claim", as applicable) and/or the Prepetition Credit Agreement (each, a "German Term Loan Claim" and together with the U.S. Roll-up Loan Claims and the European Roll-up Loan Claims, the "Aleris Claims");

**WHEREAS**, the Parties now desire to implement a financial restructuring (the "Restructuring") of the Company on the terms and conditions set forth in the form of joint plan of reorganization attached hereto as Exhibit 1 (such joint plan, in such form (the "Base Plan"), with such amendments, modifications, waivers, exhibits, supplements (including any Plan Supplement filed in connection therewith), schedules and related or ancillary agreements and instruments (and only such amendments, modifications, waivers, exhibits, supplements, schedules and related or ancillary agreements and instruments) to which the Undersigned Holder has consented (such consent to be given or withheld in the Undersigned Holder's sole discretion), being hereinafter referred to as the "Plan");[1]

**WHEREAS**, Aleris and certain affiliates of the Undersigned Holder and certain other parties are parties to that certain Equity Commitment Agreement, dated February 5, 2010 (such agreement, in the form attached hereto as Exhibit 3, as the same may be amended, supplemented or modified in accordance with the terms therein, being hereinafter referred to as the "Equity Commitment Agreement");

**WHEREAS**, the Parties have engaged in good faith negotiations with the objective of reaching an agreement with regard to restructuring the outstanding claims of, and interests in, the Company in accordance with the terms set forth in this Agreement and the Plan;

**WHEREAS**, each Party has reviewed, or has had the opportunity to review, this Agreement and the Plan with the assistance of professional legal advisors of its own choosing;

---

[1]      Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.

**WHEREAS**, the Company desires to obtain the commitment of the Undersigned Holder to support and vote to accept the Plan, subject to the terms and conditions set forth herein to which the Undersigned Holder is party; and

**WHEREAS**, subject to the execution of definitive documentation and appropriate approvals by the Bankruptcy Court of the Plan, the following sets forth the agreement between the Parties concerning their respective obligations.

## AGREEMENT

**NOW THEREFORE**, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1. **[Intentionally Omitted].**

2. **Effectuating the Restructuring.**

   To implement the Plan, the Parties have agreed, on the terms and conditions set forth herein, that the Company shall use its commercially reasonable efforts to:

   (a)   solicit the requisite acceptances of the Plan in accordance with section 1125 of the Bankruptcy Code;

   (b)   seek confirmation of the Plan as expeditiously as practicable under the Bankruptcy Code, including under section 1129(b) thereof, the Federal Rules of Bankruptcy Procedure and the Bankruptcy Court's local rules; and

   (c)   consummate the Plan.

3. **Commitments of the Undersigned Holder Under this Agreement.**

   (a)   Voting by Undersigned Holder.

   As long as a Termination Event (as defined herein) has not occurred, or has occurred but has been duly waived (or, in the case of a breach under Section 9(a)(x) or (xii), cured) in accordance with the terms hereof, the Undersigned Holder agrees for itself that, so long as it is the legal owner, beneficial owner and/or the investment advisor or manager of or with power and/or authority to bind any Aleris Claims, to vote on a plan of reorganization which comports with the definition of the Plan in this Agreement, it shall be bound to, and will, timely vote its Aleris Claims (and not revoke or withdraw its vote) to accept the Plan.

   (b)   Support of Plan.

   As long as a Termination Event has not occurred, or has occurred but has been duly waived (or, in the case of a breach under Section 9(a)(x) or (xii), cured) in accordance with the terms hereof, the Undersigned Holder, agrees for itself that, so long as it remains the legal

owner, beneficial owner and/or the investment advisor or manager of or with power and/or authority to bind any Aleris Claims it will:

    i.       from and after the date hereof, not directly or indirectly seek, solicit, support or vote in favor of any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring of the Company that could reasonably be expected to prevent, delay or impede the Restructuring of the Company in accordance with the Plan;

    ii.       agree to permit disclosure of the contents of this Agreement; *provided* that the amount of the Aleris Claims held by the Undersigned Holder shall be disclosed only to the Company and shall not be disclosed by the Company to any other person or entity except as required by law or in connection with the enforcement of this Agreement;

    iii.       not object to or otherwise commence any proceeding opposing any of the terms of this Agreement, the Disclosure Statement, the Plan or the Equity Commitment Agreement;

    iv.       not object to a motion by the Company to extend the exclusive period for the Company to propose a plan of reorganization; provided that such period does not extend beyond the Termination Date as defined in the Equity Commitment Agreement as in effect on the date hereof; and

    v.       not take any action that is inconsistent with, or that is intended to delay, confirmation of the Plan.

    (c)       Transfer (as defined below) of Claims, Interests and Securities.

The Undersigned Holder hereby agrees, until this Agreement shall have terminated, not to sell, assign, transfer or otherwise dispose of, directly or indirectly (each such disposition, for the avoidance of doubt not including a pledge or collateral assignment or other grant of a security interest until the occurrence of a transfer pursuant to enforcement thereof, a "Transfer"), all or any of its Aleris Claims (including any voting rights associated with such Aleris Claims), *unless* the transferee thereof (a) agrees in an enforceable writing to assume and be bound by this Agreement, and to assume the rights and obligations of the Undersigned Holder under this Agreement and (b) promptly delivers such writing to the Company (each such transferee becoming, upon the Transfer, an Undersigned Holder hereunder). The Company shall promptly acknowledge any such Transfer in writing and provide a copy of that acknowledgement to the transferor. By its acknowledgement of the relevant Transfer, the Company shall be deemed to have acknowledged that its obligations to the Undersigned Holder hereunder shall be deemed to constitute obligations in favor of the relevant transferee as an Undersigned Holder hereunder. Any Transfer of any Relevant Claim (as defined below) that

does not comply with the procedure set forth in the first sentence of this Subsection 3(c) shall be deemed void *ab initio*.

(d)     Further Acquisition of Aleris Claims.

This Agreement shall in no way be construed to preclude the Undersigned Holder or any of its respective subsidiaries from acquiring additional Aleris Claims; <u>*provided*</u> that any such additional Aleris Claims acquired by the Undersigned Holder or any subsidiary thereof shall automatically be deemed to be subject to the terms of this Agreement.  Upon the request of the Company, the Undersigned Holder shall, in writing and within five (5) business days, provide an accurate and current list of all Aleris Claims that it and any subsidiary holds at that time, subject to any applicable confidentiality restrictions and applicable law.

(e)     Representation of the Undersigned Holder's holdings.

The Undersigned Holder represents that, as of the date hereof:

    i.      it is the legal owner, beneficial owner and/or the investment advisor or manager for the legal or beneficial owner of such Aleris Claims set forth on its respective signature page (collectively, the "<u>Relevant Claims</u>");

    ii.     there are no Aleris Claims of which it is the legal owner, beneficial owner and/or investment advisor or manager for such legal or beneficial owner that are not part of its Relevant Claims unless the Undersigned Holder does not possess the full power to vote and dispose of such claims; and

    iii.    it has full power to vote, dispose of and compromise the aggregate principal amount of the Relevant Claims.

## 4.     **The Company's Responsibilities.**

(a)     Other Support Agreements.

The Company represents and warrants that, if it has entered into (or concurrently herewith is entering into) restructuring agreements, plan support or lock-up agreements (collectively, the "<u>Other Support Agreements</u>") with other Consenting Holders (each, an "<u>Other Support Agreement Party</u>," and collectively, the "<u>Other Support Agreement Parties</u>"), the Other Support Agreements are substantially similar to this Agreement, including without limitation, substantially similar provisions to those set forth in Section 3(a), (b), (c), (d) and (e) above and Section 9 below.

(b)     Implementation of the Plan.

The Company shall use its commercially reasonable efforts to:

i.   effectuate and consummate the Restructuring on the terms described in the Plan and the Equity Commitment Agreement;

ii.  obtain from the Bankruptcy Court an order confirming the Plan, which order shall be in form and substance consistent with the Plan and reasonably acceptable to the Undersigned Holder (the "<u>Confirmation Order</u>"), which Confirmation Order shall be entered by the Bankruptcy Court no later than on or before the one hundred and twentieth (120th) day following the Trigger Date;

iii. cause the Effective Date of the Plan to occur no later than on or before the one hundred and fiftieth (150th) day following the Trigger Date; and

iv.  take no actions inconsistent with this Agreement, the Plan or the Equity Commitment Agreement or the expeditious confirmation and consummation of the Plan.

5.   **Mutual Representations and Warranties**

Each Party, severally and not jointly, makes the following representations and warranties (as to itself only) to the other Party, each of which is a continuing representation and warranty:

(a)   Enforceability.

Subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is a legal, valid and binding obligation of the Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(b)   No Consent or Approval.

Except as expressly provided in this Agreement, no consent or approval is required by any other entity in order for it to carry out the provisions of this Agreement.

(c)   Power and Authority.

It has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement and the Plan.

(d)   Authorization.

The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

(e)   No Conflicts.

The execution, delivery and performance of this Agreement does not: (a) violate any provision of law, rule or regulations applicable to it or any of its subsidiaries; (b) violate its certificate of incorporation, bylaws or other organizational documents or those of any of its subsidiaries; or (c) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

**6.** [Reserved]

**7.** <u>**No Waiver of Participation and Preservation of Rights.**</u>

If the transactions contemplated by this Agreement or otherwise set forth in the Plan are not consummated as provided herein, if a Termination Event occurs, or if this Agreement is otherwise terminated for any reason, the Parties each fully reserve any and all of their respective rights, remedies, claims and interests.

**8.** <u>**Acknowledgement.**</u>

This Agreement and the Plan and the transactions contemplated herein and therein are the product of negotiations between the Parties and their respective representatives. This Agreement is not and shall not be deemed to be a solicitation of votes for the acceptance of a plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. The Company will not solicit acceptances of the Plan from the Undersigned Holder in any manner inconsistent with the Bankruptcy Code or applicable nonbankruptcy law.

**9.** <u>**Termination.**</u>

(a) Termination Events.

The term "<u>Termination Event</u>," wherever used in this Agreement, means any of the following events (whatever the reason for such Termination Event and whether it is voluntary or involuntary):

      i.     (a) the commitments set forth in the Equity Commitment Agreement expire or terminate pursuant to Section 19 of the Equity Commitment Agreement or (b) the Company declares that the Equity Commitment Agreement has terminated or is invalid or of no force or effect;

      ii.     the Company's board of directors, based on the advice of its outside counsel, determines that continued pursuit of the Plan is inconsistent with its fiduciary duties because, and the board of directors determines in good faith that, (A) a proposal or offer from a third party is reasonably likely to be more favorable to the Company than is proposed under the Plan, taking into account, among other factors, the identity of the third party, the likelihood that any such proposal or offer will be negotiated to finality within a reasonable time, the potential loss to the Company if the proposal

or offer were not accepted and consummated, and the likelihood that any such proposal will be consummated within a reasonable time, or (B) the Plan is no longer confirmable or feasible;

iii.    the Company files, supports or endorses a plan of reorganization other than the Plan;

iv.    a Confirmation Order reasonably acceptable to the Company and the Undersigned Holder is not entered by the Bankruptcy Court on or before the one hundred and twentieth (120th) day following the Trigger Date;

v.    the Effective Date shall not have occurred on or before the Termination Date (as defined in the Equity Commitment Agreement in effect as of the date hereof);

vi.    any of the Chapter 11 Cases is converted to cases under chapter 7 of the Bankruptcy Code;

vii.    the Bankruptcy Court shall enter an order in any of the Chapter 11 Cases appointing (i) a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, (ii) a responsible officer, or (iii) an examiner, in each case with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of section 1106(a)) under section 1106(b) of the Bankruptcy Code;

viii.    any of the Chapter 11 Cases of (a) Aleris or Aleris Deutschland or (b) any other Debtor is dismissed or suspended pursuant to section 305 of the Bankruptcy Code;

ix.    the Confirmation Order (a) is reversed on appeal or vacated or (b) shall not have become a Final Order on or before the Termination Date (as defined in the Equity Commitment Agreement in effect as of the date hereof);

x.    any Party has breached any material provision of this Agreement or the Company has breached any material provision of the Equity Commitment Agreement, and any such breach has not been duly waived or cured in accordance with the terms hereof or of the Equity Commitment Agreement, as applicable, after a period of five (5) days;

xi.    the Company shall (a) withdraw the Plan or (b) publicly announce its intention not to support the Plan;

xii.    (a) any Other Support Agreement has terminated or (b) the Company has breached any material provision of any Other Support Agreement and any such breach under clause (b) has not

been duly waived or cured in accordance with the terms of such Other Support Agreement after a period of five (5) days;

xiii.   the Release, dated as of February 5, 2010, by and among Aleris, certain of the other Debtors and the other parties thereto, shall cease to be in full force and effect;

xiv.   the Effective Date shall have occurred; or

xv.   any change to the Base Plan shall have been made or any exhibit, supplement, schedule or related or ancillary agreement or instrument or any amendment, modification, consent or waiver to any of the foregoing shall have been agreed to, entered into, executed and delivered, filed with the Bankruptcy Court or otherwise given effect without the consent of the Undersigned Holder, unless otherwise approved in a manner in accordance with the Plan.

The foregoing Termination Events are intended solely for the benefit of the Company and the Undersigned Holder; *provided* that no Party may seek to terminate this Agreement based upon a material breach or a failure of a condition (if any) in this Agreement arising out of its own actions or omissions that were in violation of this Agreement; *provided, further,* that the Termination Events contemplated by clauses (i)(b), (ii), (viii)(b), (xi)(b) and (xii)(b) of this Section 9(a) and the deadlines contemplated by clauses (iv) and (v) of this Section 9(a) may be waived or extended, respectively, by Consenting Holders holding at least a majority in aggregate principal amount of the Aleris Claims held by the Consenting Holders (the "Requisite Holders") within 5 Business Days following the occurrence thereof unless such waiver or extension materially adversely affects the Undersigned Holder in a disproportionate manner relative to the other Consenting Holders, in which case the Undersigned Holder's consent to such waiver or extension shall be required, such consent not to be unreasonably withheld; *provided, further,* that in the cases of clauses (i)(b), (ii), (xi)(b), and (xii)(b), if the applicable Termination Event has been waived by the Requisite Holders but has not been cured and/or is continuing for more than 15 calendar days following the occurrence of such Termination Event, the Undersigned Holder's consent to such waiver or extension shall be required, such consent not to be unreasonably withheld.

(b) Termination Event Procedures.

i.   Upon the occurrence of a Termination Event contemplated by clause (i)(a), (ii) or (ix)(b) of Section 9(a) hereof or clause (x) of Section 9(a) hereof due to a material breach of this Agreement by the Undersigned Holder, in each case subject to the last sentence of Section 9(a) hereof, the Company shall have the right to terminate this Agreement by giving written notice thereof to the Undersigned Holder.

ii.      Upon the occurrence of a Termination Event contemplated by clause (vi), (ix)(a) or (xiii) of Section 9(a) hereof, in each case subject to the last sentence of Section 9(a) hereof, this Agreement shall automatically terminate without further action.

iii.      Except as set forth in Section 9(b)(ii) hereof, upon the occurrence of a Termination Event (including, for the avoidance of doubt, a Termination Event contemplated by clause (i) or (ii) of Section 9(a) hereof), subject to the last sentence of Section 9(a) hereof, the Undersigned Holder shall have the right to terminate this Agreement by giving written notice to the Company. The Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder in connection with giving any such notice (and agree not to object to any non-breaching Party seeking to lift the Automatic Stay in connection with giving any such notice, if necessary).

iv.      Any such termination (or partial termination) of the Agreement shall not restrict the Parties' rights and remedies for any breach of the Agreement by any Party, including, but not limited to, pursuant to the reservation of rights set forth in Section 7 hereof.

## 10. <u>Miscellaneous Terms.</u>

(a)     Binding Obligation; Assignment.

**Binding Obligation.** Subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is a legally valid and binding obligation of the Parties, enforceable in accordance with its terms, and shall inure to the benefit of the Parties and their representatives. Nothing in this Agreement, express or implied, shall give to any entity, other than the Parties and their respective successors or permitted assigns, any benefit or any legal or equitable right, remedy or claim under this Agreement.

**Assignment.** No rights or obligations of any Party under this Agreement may be assigned or transferred to any other entity except as provided in Section 3(c) hereof, and any purported assignment or transfer in violation of Section 3(c) shall be null and void ab initio.

(b) Further Assurances.

The Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the agreements of the Parties expressed herein.

(c) Headings.

The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction or interpretation of any term or provision hereof.

(d) Governing Law.

THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAWS PRINCIPLES THEREOF.  By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought exclusively in either a state or federal court of competent jurisdiction in the State of New York and County of New York.  By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits itself to the exclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding.  Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State of New York and County of New York, each of the Parties hereto hereby agrees that, so long as any of the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

(e) Waiver of Jury Trial

Each Party hereto irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Agreement or the transactions contemplated hereby or the actions of the Undersigned Holder or any of its affiliates in the negotiation, performance or enforcement of this Agreement.

(f) Specific Performance

The Parties hereby acknowledge that the rights of the Parties under this Agreement are unique and that remedies at law for breach or threatened breach of any provision of this Agreement would be inadequate and, in recognition of this fact, agree that, in the event of a breach or threatened breach of the provisions of this Agreement, in addition to any remedies at law, the Parties shall, without posting any bond, be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available and the Parties hereby waive any objection to the imposition of such relief.

(g) Complete Agreement, Interpretation and Modification.

i.  **Complete Agreement.**  This Agreement, the Plan and the other agreements, exhibits and other documents referenced herein and therein constitute the complete agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements, oral or written, between or among the Parties with respect thereto.

ii.  **Interpretation.**  This Agreement is the product of negotiation by and among the Parties.  Any Party enforcing or interpreting this

Agreement shall interpret it in a neutral manner. There shall be no presumption concerning whether to interpret this Agreement for or against any Party by reason of that Party having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

    iii.    **Modification of this Agreement.** This Agreement may only be modified, altered, amended or supplemented by an agreement in writing signed by the Company and the Undersigned Holder.

(h) Execution of this Agreement.

This Agreement may be executed and delivered (by facsimile or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

(i) Settlement Discussions.

This Agreement and the Restructuring are part of a proposed settlement of a dispute between the Parties. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement. Notwithstanding the foregoing, this Agreement may be filed with the Bankruptcy Court in connection with the Chapter 11 Cases.

(j) Consideration.

The Company and the Undersigned Holder hereby acknowledge that no consideration, other than that specifically described herein and in the Plan, shall be due or paid to the Undersigned Holder for its agreement to vote to accept the Plan in accordance with the terms and conditions of this Agreement, other than the Company's representations, warranties and agreement to use its commercially reasonable best efforts to seek to confirm and consummate the Plan.

(k) Notices.

All notices hereunder shall be deemed given if in writing and delivered, if sent by facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers (or at such other addresses or facsimile numbers as shall be specified by like notice):

    i.    If to the Company, to:

Aleris International, Inc.
25825 Science Park Drive, Suite 400

Beachwood, Ohio  44122
Facsimile No.:  (216) 910-3654
Attention:   Christopher R. Clegg

with copies (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Facsimile No.:  (212) 310-8007
Attention:  Stephen Karotkin
        Debra A. Dandeneau;

    ii.    If to the Undersigned Holder or a transferee thereof, to the addresses or facsimile numbers set forth below following the Undersigned Holder's signature (or as directed by any transferee thereof), as the case may be, with copies (which shall not constitute notice) to:

        Paul, Weiss, Rifkind, Wharton & Garrison LLP
        1285 Avenue of the Americas
        New York, New York  10019
        Facsimile No.:  (212) 757-3990
        Attention:  Alan W. Kornberg
                Kenneth M. Schneider

    iii.    Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by facsimile shall be effective upon oral or machine confirmation of transmission.

(l)  Time of the Essence.

The Parties agree that time is of the essence with respect to Sections 4(b)(ii), 4(b)(iii) and the events that give rise to the occurrence of a Termination Event under Section 9 of this Agreement.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

IN WITNESS WHEREOF, the Parties have entered into this Agreement on the day and year first above written.

Aleris International, Inc.

By: _____

Title: _____

[INSERT ENTITY NAME HERE]


By: _____
    Name:
    Title:


U.S. Roll-Up Claims: _____

European Roll-Up Claims: _____

German Term Loan Claims: _____

## **EXHIBIT 1**

PLAN

**Document Not Included Pursuant to Section 1.3 of the Plan**

**EXHIBIT 2**

DISCLOSURE STATEMENT

**Document Not Included Pursuant to Section 1.3 of the Plan**

# **EXHIBIT 3**

EQUITY COMMITMENT AGREEMENT

**Document Not Included Pursuant to Section 1.3 of the Plan**

# Form of Apollo Plan Support Agreement

# PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (this "<u>Agreement</u>") is made and entered into as of [__], 2010 by and between the following parties:

(a)    [the undersigned Holder] (the "<u>Undersigned Holder</u>"); and

(b)    Aleris International, Inc., a Delaware corporation ("<u>Aleris</u>"), and each of its direct and indirect subsidiaries identified on the signature pages attached hereto (collectively, the "<u>Company</u>" and the Undersigned Holder and the Company, each, a "<u>Party</u>", and collectively, the "<u>Parties</u>").

# RECITALS

**WHEREAS**, on February 12, 2009, Aleris and certain of its subsidiaries (excluding Aleris Deutschland Holding GmbH ("<u>Aleris Deutschland</u>") and its subsidiaries) commenced voluntary cases (the "<u>Existing Chapter 11 Cases</u>") by filing petitions under chapter 11 of title 11 of the United States Code 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>");

**WHEREAS**, on [     ] Aleris Deutschland commenced a voluntary case (the "<u>Aleris Deutschland Case</u>" and, together with the Existing Chapter 11 Cases, the "<u>Chapter 11 Cases</u>") by filing a petition under chapter 11 of title 11 of the Bankruptcy Code in the Bankruptcy Court;

**WHEREAS**, on [     ] the Company filed the Plan (as defined herein) with the Bankruptcy Court (the date of that event being the "<u>Trigger Date</u>");

**WHEREAS**, on [     ] the Bankruptcy Court entered an order approving the disclosure statement for the Plan attached hereto as <u>Exhibit 2</u> (such disclosure statement, as the same may be amended, supplemented or modified from time to time, unless such amendment, supplement or modification is a Subject Change to which the Undersigned Holder has not consented (such consent to be given or withheld in the Undersigned Holder's sole discretion) the "<u>Disclosure Statement</u>");

**WHEREAS**, other holders of certain U.S. Roll-Up Term Loan claims under that certain Amended and Restated Debtor-in-Possession Credit Agreement, dated as of February 12, 2009, and amended and restated as of March 19, 2009 (each, a "<u>Consenting U.S. Roll-up Loan Holder</u>"), by and among Aleris, Aleris Aluminum Duffel BVBA, Aleris Deutschland, the lenders party thereto and Deutsche Bank AG New York Branch, as administrative agent and collateral agent (as may be amended, supplemented or otherwise modified in accordance with the terms thereof, the "<u>DIP Credit Agreement</u>"), each of whom are unaffiliated parties, are party to similar plan support agreements with the Company;

**WHEREAS**, other holders of certain European Roll-up Term Loan claims under the DIP Credit Agreement (each, a "<u>Consenting European Roll-up Loan Holder</u>"), each of whom are unaffiliated parties, are party to similar plan support agreements with the Company;

**WHEREAS**, other holders of certain German Term Loan claims under that certain Amended and Restated Term Loan Agreement, dated as of August 1, 2006 and amended and restated as of December 19, 2006, as further amended on March 16, 2007 and February 10, 2009 (each, a "Consenting German Term Loan Holder" and together with the Undersigned Holder, the Consenting U.S. Roll-up Loan Holders and the Consenting European Roll-up Loan Holders, the "Consenting Holders"), by and among Aleris, Aleris Deutschland, the lenders party thereto, Deutsche Bank AG New York Branch, as administrative agent, Goldman Sachs Credit Partners L.P., as syndication agent, and PNC Bank, National Association, National City Business Credit, Inc. and Key Bank National Association, as co-documentation agents, and Goldman Sachs Credit Partners L.P. and Deutsche Bank Securities Inc., as joint lead arrangers and joint book running managers (as may be amended, supplemented or otherwise modified in accordance with the terms thereof, the "Prepetition Credit Agreement" and together with the DIP Credit Agreement, the "Credit Agreements"), each of whom are unaffiliated parties, are party to similar plan support agreements with the Company;

**WHEREAS**, each Consenting Holder is the holder of a claim, as defined in the Bankruptcy Code arising out of, or related to the DIP Credit Agreement (each, a "U.S. Roll-up Loan Claim" or a "European Roll-up Loan Claim", as applicable) and/or the Prepetition Credit Agreement (each, a "German Term Loan Claim" and together with the U.S. Roll-up Loan Claims and the European Roll-up Loan Claims, the "Aleris Claims");

**WHEREAS**, the Parties now desire to implement a financial restructuring (the "Restructuring") of the Company on the terms and conditions set forth in the form of joint plan of reorganization attached hereto as Exhibit 1 (such joint plan, in such form (the "Base Plan"), with such amendments, modifications, waivers, exhibits, supplements (including any Plan Supplement filed in connection therewith), schedules and related or ancillary agreements and instruments (and only such amendments, modifications, waivers, exhibits, supplements, schedules and related or ancillary agreements and instruments) that either (i) do not constitute a Subject Change or (ii) constitute a Subject Change to which the Undersigned Holder has consented (such consent to be given or withheld in the Undersigned Holder's sole discretion), being hereinafter referred to as the "Plan");[1]

**WHEREAS**, Aleris and certain affiliates of the Undersigned Holder and certain other parties are parties to that certain Equity Commitment Agreement, dated February 5, 2010 (such agreement, in the form attached hereto as Exhibit 3, as the same may be amended, supplemented or modified in accordance with the terms therein, unless such amendment, supplement or modification is a Subject Change to which the Undersigned Holder has not consented (such consent to be given or withheld in the Undersigned Holder's sole discretion), being hereinafter referred to as the "Equity Commitment Agreement");

**WHEREAS**, the Parties have engaged in good faith negotiations with the objective of reaching an agreement with regard to restructuring the outstanding claims of, and interests in, the Company in accordance with the terms set forth in this Agreement and the Plan;

---

[1]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.

**WHEREAS**, each Party has reviewed, or has had the opportunity to review, this Agreement and the Plan with the assistance of professional legal advisors of its own choosing;

**WHEREAS**, the Company desires to obtain the commitment of the Undersigned Holder to support and vote to accept the Plan, subject to the terms and conditions set forth herein to which the Undersigned Holders is party; and

**WHEREAS**, subject to the execution of definitive documentation and appropriate approvals by the Bankruptcy Court of the Plan, the following sets forth the agreement between the Parties concerning their respective obligations.

## AGREEMENT

**NOW THEREFORE**, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1. **[Intentionally Omitted].**

2. **Effectuating the Restructuring.**

   To implement the Plan, the Parties have agreed, on the terms and conditions set forth herein, that the Company shall use its commercially reasonable efforts to:

   (a) solicit the requisite acceptances of the Plan in accordance with section 1125 of the Bankruptcy Code;

   (b) seek confirmation of the Plan as expeditiously as practicable under the Bankruptcy Code, including under section 1129(b) thereof, the Federal Rules of Bankruptcy Procedure and the Bankruptcy Court's local rules; and

   (c) consummate the Plan.

3. **Commitments of the Undersigned Holder Under this Agreement.**

   (a) Voting by Undersigned Holder.

   As long as a Termination Event (as defined herein) has not occurred, or has occurred but has been duly waived (or, in the case of a breach under Section 9(a)(x) or (xii), cured) in accordance with the terms hereof, the Undersigned Holder agrees for itself that, so long as it is the legal owner, beneficial owner and/or the investment advisor or manager of or with power and/or authority to bind any Aleris Claims, to vote on a plan of reorganization which comports with the definition of the Plan in this Agreement, it shall be bound to, and will, timely vote its Aleris Claims (and not revoke or withdraw its vote) to accept the Plan.

   (b) Support of Plan.

As long as a Termination Event has not occurred, or has occurred but has been duly waived (or, in the case of a breach under Section 9(a)(x) or (xii), cured) in accordance with the terms hereof, the Undersigned Holder, agrees for itself that, so long as it remains the legal owner, beneficial owner and/or the investment advisor or manager of or with power and/or authority to bind any Aleris Claims it will:

i.      from and after the date hereof, not directly or indirectly seek, solicit, support or vote in favor of any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring of the Company that could reasonably be expected to prevent, delay or impede the Restructuring of the Company in accordance with the Plan;

ii.      agree to permit disclosure of the contents of this Agreement; *provided* that the amount of the Aleris Claims held by the Undersigned Holder shall be disclosed only to the Company and shall not be disclosed by the Company to any other person or entity except as required by law or in connection with the enforcement of this Agreement;

iii.      not object to or otherwise commence any proceeding opposing any of the terms of this Agreement, the Disclosure Statement, the Plan or the Equity Commitment Agreement;

iv.      not object to a motion by the Company to extend the exclusive period for the Company to propose a plan of reorganization; provided that such period does not extend beyond the Termination Date as defined in the Equity Commitment Agreement as in effect on the date hereof;

v.      consent to any amendments, waivers or modifications to the Plan consented to by Oaktree other than any amendments, waivers or modifications that constitute a Subject Change (in which case, such consent shall be given or withheld in the Undersigned Holder's sole discretion); and

vi.      not take any action that is inconsistent with, or that is intended to delay, confirmation of the Plan.

(c) Transfer (as defined below) of Claims, Interests and Securities.

The Undersigned Holder hereby agrees, until this Agreement shall have terminated, not to sell, assign, transfer or otherwise dispose of, directly or indirectly (each such disposition, for the avoidance of doubt not including a pledge or collateral assignment or other grant of a security interest until the occurrence of a transfer pursuant to enforcement thereof, a "Transfer"), all or any of its Aleris Claims (including any voting rights associated with such Aleris Claims), *unless* the transferee thereof (a) agrees in an enforceable writing to assume and

be bound by this Agreement, and to assume the rights and obligations of the Undersigned Holder under this Agreement and (b) promptly delivers such writing to the Company (each such transferee becoming, upon the Transfer, an Undersigned Holder hereunder). The Company shall promptly acknowledge any such Transfer in writing and provide a copy of that acknowledgement to the transferor. By its acknowledgement of the relevant Transfer, the Company shall be deemed to have acknowledged that its obligations to the Undersigned Holder hereunder shall be deemed to constitute obligations in favor of the relevant transferee as an Undersigned Holder hereunder. Any Transfer of any Relevant Claim (as defined below) that does not comply with the procedure set forth in the first sentence of this Subsection 3(c) shall be deemed void *ab initio*.

(d) Further Acquisition of Aleris Claims.

This Agreement shall in no way be construed to preclude the Undersigned Holder or any of its respective subsidiaries from acquiring additional Aleris Claims; *provided* that any such additional Aleris Claims acquired by the Undersigned Holder or any subsidiary thereof shall automatically be deemed to be subject to the terms of this Agreement. Upon the request of the Company, the Undersigned Holder shall, in writing and within **five (5) business days**, provide an accurate and current list of all Aleris Claims that it and any subsidiary holds at that time, subject to any applicable confidentiality restrictions and applicable law.

(e) Representation of the Undersigned Holder's holdings.

The Undersigned Holder represents that, as of the date hereof:

    i.        it is the legal owner, beneficial owner and/or the investment advisor or manager for the legal or beneficial owner of such Aleris Claims set forth on its respective signature page (collectively, the "Relevant Claims");

    ii.        there are no Aleris Claims of which it is the legal owner, beneficial owner and/or investment advisor or manager for such legal or beneficial owner that are not part of its Relevant Claims unless the Undersigned Holder does not possess the full power to vote and dispose of such claims; and

    iii.        it has full power to vote, dispose of and compromise the aggregate principal amount of the Relevant Claims.

**4.  The Company's Responsibilities.**

(f)     Other Support Agreements.

The Company represents and warrants that, if it has entered into (or concurrently herewith is entering into) restructuring agreements, plan support or lock-up agreements (collectively, the "Other Support Agreements") with other Consenting Holders (each, an "Other Support Agreement Party," and collectively, the "Other Support Agreement Parties"), the Other

Support Agreements are substantially similar to this Agreement, including without limitation, substantially similar provisions to those set forth in Section 3(a), (b), (c), (d) and (e) above and Section 9 below.

(g) Implementation of the Plan.

The Company shall use its commercially reasonable efforts to:

> i. effectuate and consummate the Restructuring on the terms described in the Plan and the Equity Commitment Agreement;
>
> ii. obtain from the Bankruptcy Court an order confirming the Plan, which order shall be in form and substance consistent with the Plan and reasonably acceptable to the Undersigned Holder (the "Confirmation Order"), which Confirmation Order shall be entered by the Bankruptcy Court no later than on or before the one hundred and twentieth (120th) day following the Trigger Date;
>
> iii. cause the Effective Date of the Plan to occur no later than on or before the one hundred and fiftieth (150th) day following the Trigger Date; and
>
> iv. take no actions inconsistent with this Agreement, the Plan or the Equity Commitment Agreement or the expeditious confirmation and consummation of the Plan.

5. **Mutual Representations and Warranties**

Each Party, severally and not jointly, makes the following representations and warranties (as to itself only) to the other Party, each of which is a continuing representation and warranty:

(h) Enforceability.

Subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is a legal, valid and binding obligation of the Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(i) No Consent or Approval.

Except as expressly provided in this Agreement, no consent or approval is required by any other entity in order for it to carry out the provisions of this Agreement.

(j) Power and Authority.

It has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement and the Plan.

(k) Authorization.

The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

(l) No Conflicts.

The execution, delivery and performance of this Agreement does not: (a) violate any provision of law, rule or regulations applicable to it or any of its subsidiaries; (b) violate its certificate of incorporation, bylaws or other organizational documents or those of any of its subsidiaries; or (c) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

**6.** [Reserved]

**7.** <u>**No Waiver of Participation and Preservation of Rights.**</u>

If the transactions contemplated by this Agreement or otherwise set forth in the Plan are not consummated as provided herein, if a Termination Event occurs, or if this Agreement is otherwise terminated for any reason, the Parties each fully reserve any and all of their respective rights, remedies, claims and interests.

**8.** <u>**Acknowledgement.**</u>

This Agreement and the Plan and the transactions contemplated herein and therein are the product of negotiations between the Parties and their respective representatives. This Agreement is not and shall not be deemed to be a solicitation of votes for the acceptance of a plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. The Company will not solicit acceptances of the Plan from the Undersigned Holder in any manner inconsistent with the Bankruptcy Code or applicable nonbankruptcy law.

**9.** <u>**Termination.**</u>

(a) Termination Events.

The term "<u>Termination Event</u>," wherever used in this Agreement, means any of the following events (whatever the reason for such Termination Event and whether it is voluntary or involuntary):

    i.     (a) the commitments set forth in the Equity Commitment Agreement expire or terminate pursuant to Section 19 of the Equity Commitment Agreement or (b) the Company declares that the Equity Commitment Agreement has terminated or is invalid or of no force or effect;

    ii.     the Company's board of directors, based on the advice of its outside counsel, determines that continued pursuit of the Plan is

inconsistent with its fiduciary duties because, and the board of directors determines in good faith that, (A) a proposal or offer from a third party is reasonably likely to be more favorable to the Company than is proposed under the Plan, taking into account, among other factors, the identity of the third party, the likelihood that any such proposal or offer will be negotiated to finality within a reasonable time, the potential loss to the Company if the proposal or offer were not accepted and consummated, and the likelihood that any such proposal will be consummated within a reasonable time, or (B) the Plan is no longer confirmable or feasible;

iii.    the Company files, supports or endorses a plan of reorganization other than the Plan;

iv.    a Confirmation Order reasonably acceptable to the Company and the Undersigned Holder is not entered by the Bankruptcy Court on or before the one hundred and twentieth (120th) day following the Trigger Date;

v.    the Effective Date shall not have occurred on or before the Termination Date (as defined in the Equity Commitment Agreement in effect as of the date hereof);

vi.    any of the Chapter 11 Cases is converted to cases under chapter 7 of the Bankruptcy Code;

vii.    the Bankruptcy Court shall enter an order in any of the Chapter 11 Cases appointing (i) a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, (ii) a responsible officer, or (iii) an examiner, in each case with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of section 1106(a)) under section 1106(b) of the Bankruptcy Code;

viii.    any of the Chapter 11 Cases of (a) Aleris or Aleris Deutschland or (b) any other Debtor is dismissed or suspended pursuant to section 305 of the Bankruptcy Code;

ix.    the Confirmation Order (a) is reversed on appeal or vacated or (b) shall not have become a Final Order on or before the Termination Date (as defined in the Equity Commitment Agreement in effect as of the date hereof);

x.    any Party has breached any material provision of this Agreement or the Company has breached any material provision of the Equity Commitment Agreement, the waiver of which breach of the Equity Commitment Agreement would be a Subject Change, and any such breach has not been duly waived or cured in accordance with the

terms hereof or of the Equity Commitment Agreement, as applicable, after a period of five (5) days;

xi.    the Company shall (a) withdraw the Plan or (b) publicly announce its intention not to support the Plan;

xii.    (a) the Other Support Agreement to which Oaktree is a party has terminated or (b) the Company has breached any material provision of such Other Support Agreement and any such breach under clause (b) has not been duly waived or cured in accordance with the terms of such Other Support Agreement after a period of five (5) days;

xiii.    the Release (as defined below) shall cease to be in full force and effect;

xiv.    the Effective Date shall have occurred; or

xv.    any change to the Base Plan shall have been made or any exhibit, supplement, schedule or related or ancillary agreement or instrument or any amendment, modification, consent or waiver to any of the foregoing (any of the foregoing, a "Plan Modification") shall have been agreed to, entered into, executed and delivered, filed with the Bankruptcy Court or otherwise given effect without the consent of the Undersigned Holder (to be given or withheld in its sole discretion), which Plan Modification: (a) affects in a manner that is adverse to Apollo the economic terms of the Plan and the documents and transactions related thereto, including the amount and timing of distributions to creditors of the Debtors, the Oaktree/Apollo Minimum Equity Threshold, and the rights of Apollo as a creditor of the Debtors and their affiliates (including in connection with the "snapback" provisions in the Release, dated as of February 5, 2010 (the "Release"), by and between Aleris, certain of the other Debtors and the other parties thereto), but excluding waivers of or amendments to the definition of or conditions, representations or other provisions related to the occurrence of a "material adverse effect" or any term of similar import, breaches of or changes to representations of the Debtors relating to their financial statements or projections, and the liquidity and permitted amount of debt of the Debtors when they emerge from bankruptcy, (b) affects in a manner that is adverse to Apollo Apollo's rights as a post-Effective Date shareholder in the Debtors (including, without limitation, any rights (i) to receive information relating to the Debtors, (ii) to registration of stock held by Apollo, or (iii) relating to governance of the Debtors if such Plan Modification relating to the governance of the Debtors does not provide Apollo with proportionate governance rights to persons

owning a comparable number of shares in the Debtors), (c) affects Apollo in a disproportionate manner relative to other similarly situated creditors or the other Consenting Holders, (d) directly relates to Apollo or any of its affiliates (and not to similarly situated persons) or (e) (i) extends to a date later than October 31, 2010 (the "Subject Change Outside Date") the date by which the Effective Date of the Plan must occur or (ii) an effect of which is to make the occurrence of the Effective Date by the Subject Change Outside Date substantially unlikely (any such Plan Modification described in clauses (a) through (d) hereof, a "Subject Change").

The foregoing Termination Events are intended solely for the benefit of the Company and the Undersigned Holder; *provided* that no Party may seek to terminate this Agreement based upon a material breach or a failure of a condition (if any) in this Agreement arising out of its own actions or omissions that were in violation of this Agreement; *provided, further,* that the Termination Events contemplated by clauses (i)(b), (ii), (viii)(b), (xi)(b) and (xii)(b) of this Section 9(a) and the deadlines contemplated by clauses (iv) and (v) of this Section 9(a) may be waived or extended, respectively, by Consenting Holders holding at least a majority in aggregate principal amount of the Aleris Claims held by the Consenting Holders (the "Requisite Holders") within 5 Business Days following the occurrence thereof if such waiver or extension is not a Subject Change; *provided, further,* that in the cases of clauses (i)(b), (ii), (xi)(b), and (xii)(b), if the applicable Termination Event has been waived by the Requisite Holders but has not been cured and/or is continuing for more than 15 calendar days following the occurrence of such Termination Event, the Undersigned Holder's consent to such waiver or extension shall be required, such consent not to be unreasonably withheld.

(b) Termination Event Procedures.

    i.    Upon the occurrence of a Termination Event contemplated by clause (i)(a), (ii) or (ix)(b) of Section 9(a) hereof or clause (x) of Section 9(a) hereof due to a material breach of this Agreement by the Undersigned Holder, in each case subject to the last sentence of Section 9(a) hereof, the Company shall have the right to terminate this Agreement by giving written notice thereof to the Undersigned Holder.

    ii.    Upon the occurrence of a Termination Event contemplated by clause (vi), (ix)(a) or (xiii) of Section 9(a) hereof, in each case subject to the last sentence of Section 9(a) hereof, this Agreement and, except for termination pursuant to clause (xiv), the Apollo Commitment (as defined in the Equity Commitment Agreement) shall automatically terminate without further action.

    iii.    Except as set forth in Section 9(b)(ii) hereof, upon the occurrence of a Termination Event (including, for the avoidance of doubt, a Termination Event contemplated by clause (i) or (ii) of Section

9(a) hereof), subject to the last sentence of Section 9(a) hereof, the Undersigned Holder shall have the right to terminate this Agreement and the Apollo Commitment by giving written notice to the Company. The Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder in connection with giving any such notice (and agree not to object to any non-breaching Party seeking to lift the Automatic Stay in connection with giving any such notice, if necessary).

iv.    Any such termination (or partial termination) of the Agreement shall not restrict the Parties' rights and remedies for any breach of the Agreement by any Party, including, but not limited to, pursuant to the reservation of rights set forth in Section 7 hereof.

## 10.    **Miscellaneous Terms.**

(a)    Binding Obligation; Assignment.

**Binding Obligation.** Subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is a legally valid and binding obligation of the Parties, enforceable in accordance with its terms, and shall inure to the benefit of the Parties and their representatives. Nothing in this Agreement, express or implied, shall give to any entity, other than the Parties and their respective successors or permitted assigns, any benefit or any legal or equitable right, remedy or claim under this Agreement.

**Assignment.** No rights or obligations of any Party under this Agreement may be assigned or transferred to any other entity except as provided in Section 3(c) hereof, and any purported assignment or transfer in violation of Section 3(c) shall be null and void ab initio.

(b) Further Assurances.

The Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the agreements of the Parties expressed herein.

(c) Headings.

The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction or interpretation of any term or provision hereof.

(d) Governing Law.

THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAWS PRINCIPLES THEREOF. By its execution and

delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought exclusively in either a state or federal court of competent jurisdiction in the State of New York and County of New York. By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits itself to the exclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State of New York and County of New York, each of the Parties hereto hereby agrees that, so long as any of the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

(e) Waiver of Jury Trial

Each Party hereto irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Agreement or the transactions contemplated hereby or the actions of the Undersigned Holder or any of its affiliates in the negotiation, performance or enforcement of this Agreement.

(f) Specific Performance

The Parties hereby acknowledge that the rights of the Parties under this Agreement are unique and that remedies at law for breach or threatened breach of any provision of this Agreement would be inadequate and, in recognition of this fact, agree that, in the event of a breach or threatened breach of the provisions of this Agreement, in addition to any remedies at law, the Parties shall, without posting any bond, be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available and the Parties hereby waive any objection to the imposition of such relief.

(g) Complete Agreement, Interpretation and Modification.

    i.     **Complete Agreement.** This Agreement, the Plan and the other agreements, exhibits and other documents referenced herein and therein constitute the complete agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements, oral or written, between or among the Parties with respect thereto.

    ii.     **Interpretation.** This Agreement is the product of negotiation by and among the Parties. Any Party enforcing or interpreting this Agreement shall interpret it in a neutral manner. There shall be no presumption concerning whether to interpret this Agreement for or against any Party by reason of that Party having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

iii. **Modification of this Agreement.** This Agreement may only be modified, altered, amended or supplemented by an agreement in writing signed by the Company and the Undersigned Holder.

(h)     Execution of this Agreement.

This Agreement may be executed and delivered (by facsimile or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

(i)     Settlement Discussions.

This Agreement and the Restructuring are part of a proposed settlement of a dispute between the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.  Notwithstanding the foregoing, this Agreement may be filed with the Bankruptcy Court in connection with the Chapter 11 Cases.

(j)     Consideration.

The Company and the Undersigned Holder hereby acknowledge that no consideration, other than that specifically described herein and in the Plan, shall be due or paid to the Undersigned Holder for its agreement to vote to accept the Plan in accordance with the terms and conditions of this Agreement, other than the Company's representations, warranties and agreement to use its commercially reasonable best efforts to seek to confirm and consummate the Plan.

(k)     Notices.

All notices hereunder shall be deemed given if in writing and delivered, if sent by facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers (or at such other addresses or facsimile numbers as shall be specified by like notice):

i.     If to the Company, to:

Aleris International, Inc.
25825 Science Park Drive, Suite 400
Beachwood, Ohio 44122
Facsimile No.:  (216) 910-3654
Attention:  Christopher R. Clegg

with copies (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Facsimile No.: (212) 310-8007
Attention:  Stephen Karotkin
            Debra A. Dandeneau;

ii.     If to the Undersigned Holder or a transferee thereof, to the addresses or facsimile numbers set forth below following the Undersigned Holder's signature (or as directed by any transferee thereof), as the case may be, with copies (which shall not constitute notice) to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Facsimile No.: (212) 403-1000
Attention:      Philip Mindlin
                Andrew Nussbaum

iii.    Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by facsimile shall be effective upon oral or machine confirmation of transmission.

(l)  Time of the Essence.

The Parties agree that time is of the essence with respect to Sections 4(b)(ii), 4(b)(iii) and the events that give rise to the occurrence of a Termination Event under Section 9 of this Agreement.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

IN WITNESS WHEREOF, the Parties have entered into this Agreement on the day and year first above written.

Aleris International, Inc.

By: _____

Title: _____

**[INSERT ENTITY NAME HERE]**


By: _____
    Name:
    Title:


U.S. Roll-Up Claims: _____

European Roll-Up Claims: _____

German Term Loan Claims: _____

# **EXHIBIT 1**

PLAN

**Document Not Included Pursuant to Section 1.3 of the Plan**

## **EXHIBIT 2**

DISCLOSURE STATEMENT

**Document Not Included Pursuant to Section 1.3 of the Plan**

# **EXHIBIT 3**

EQUITY COMMITMENT AGREEMENT

**Document Not Included Pursuant to Section 1.3 of the Plan**

# Form of Sankaty Plan Support Agreement

# PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (this "Agreement") is made and entered into as of [__], 2010 by and between the following parties:

(a) [the undersigned Holder] (the "Undersigned Holder"); and

(b) Aleris International, Inc., a Delaware corporation ("Aleris"), and each of its direct and indirect subsidiaries identified on the signature pages attached hereto (collectively, the "Company" and the Undersigned Holder and the Company, each, a "Party", and collectively, the "Parties").

# RECITALS

**WHEREAS**, on February 12, 2009, Aleris and certain of its subsidiaries (excluding Aleris Deutschland Holding GmbH ("Aleris Deutschland") and its subsidiaries) commenced voluntary cases (the "Existing Chapter 11 Cases") by filing petitions under chapter 11 of title 11 of the United States Code 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS**, on [    ] Aleris Deutschland commenced a voluntary case (the "Aleris Deutschland Case" and, together with the Existing Chapter 11 Cases, the "Chapter 11 Cases") by filing a petition under chapter 11 of title 11 of the Bankruptcy Code in the Bankruptcy Court;

**WHEREAS**, on [    ] the Company filed the Plan (as defined herein) with the Bankruptcy Court (the date of that event being the "Trigger Date");

**WHEREAS**, on [    ] the Bankruptcy Court entered an order approving the disclosure statement for the Plan attached hereto as Exhibit 2 (such disclosure statement, as the same may be amended, supplemented or modified from time to time, the "Disclosure Statement");

**WHEREAS**, other holders of certain U.S. Roll-Up Term Loan claims under that certain Amended and Restated Debtor-in-Possession Credit Agreement, dated as of February 12, 2009, and amended and restated as of March 19, 2009 (each, a "Consenting U.S. Roll-up Loan Holder"), by and among Aleris, Aleris Aluminum Duffel BVBA, Aleris Deutschland, the lenders party thereto and Deutsche Bank AG New York Branch, as administrative agent and collateral agent (as may be amended, supplemented or otherwise modified in accordance with the terms thereof, the "DIP Credit Agreement"), each of whom are unaffiliated parties, are party to similar plan support agreements with the Company;

**WHEREAS**, other holders of certain European Roll-up Term Loan claims under the DIP Credit Agreement (each, a "Consenting European Roll-up Loan Holder"), each of whom are unaffiliated parties, are party to similar plan support agreements with the Company;

**WHEREAS**, other holders of certain German Term Loan claims under that certain Amended and Restated Term Loan Agreement, dated as of August 1, 2006 and amended

and restated as of December 19, 2006, as further amended on March 16, 2007 and February 10, 2009 (each, a "Consenting German Term Loan Holder" and together with the Undersigned Holder, the Consenting U.S. Roll-up Loan Holders and the Consenting European Roll-up Loan Holders, the "Consenting Holders"), by and among Aleris, Aleris Deutschland, the lenders party thereto, Deutsche Bank AG New York Branch, as administrative agent, Goldman Sachs Credit Partners L.P., as syndication agent, and PNC Bank, National Association, National City Business Credit, Inc. and Key Bank National Association, as co-documentation agents, and Goldman Sachs Credit Partners L.P. and Deutsche Bank Securities Inc., as joint lead arrangers and joint book running managers (as may be amended, supplemented or otherwise modified in accordance with the terms thereof, the "Prepetition Credit Agreement" and together with the DIP Credit Agreement, the "Credit Agreements"), each of whom are unaffiliated parties, are party to similar plan support agreements with the Company;

WHEREAS, each Consenting Holder is the holder of a claim, as defined in the Bankruptcy Code arising out of, or related to the DIP Credit Agreement (each, a "U.S. Roll-up Loan Claim" or a "European Roll-up Loan Claim", as applicable) and/or the Prepetition Credit Agreement (each, a "German Term Loan Claim" and together with the U.S. Roll-up Loan Claims and the European Roll-up Loan Claims, the "Aleris Claims");

WHEREAS, the Parties now desire to implement a financial restructuring (the "Restructuring") of the Company on the terms and conditions set forth in the form of joint plan of reorganization attached hereto as Exhibit 1 (such joint plan, in such form (the "Base Plan"), with such amendments, modifications, waivers, exhibits, supplements (including any Plan Supplement filed in connection therewith), schedules and related or ancillary agreements and instruments (and only such amendments, modifications, waivers, exhibits, supplements, schedules and related or ancillary agreements and instruments) to which the Requisite Holders (as defined below) have consented unless such amendments, modifications, waivers, exhibits, supplements, schedules or related or ancillary agreements or instruments materially adversely affect the Undersigned Holder in a disproportionate manner relative to Oaktree or Apollo, if such party has executed and delivered an Other Support Agreement (as defined below) and such Other Support Agreement has not terminated pursuant to the terms thereof (such parties, the "Consenting Backstop Parties"), in which case the Undersigned Holder's consent shall be required (such consent not to be unreasonably withheld), being hereinafter referred to as the "Plan");[1]

WHEREAS, Aleris and certain affiliates of the Undersigned Holder and certain other parties are parties to that certain Equity Commitment Agreement, dated February 5, 2010 (such agreement, in the form attached hereto as Exhibit 3, as the same may be amended, supplemented or modified in accordance with the terms therein, being hereinafter referred to as the "Equity Commitment Agreement");

WHEREAS, the Parties have engaged in good faith negotiations with the objective of reaching an agreement with regard to restructuring the outstanding claims of, and interests in, the Company in accordance with the terms set forth in this Agreement and the Plan;

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.

**WHEREAS**, each Party has reviewed, or has had the opportunity to review, this Agreement and the Plan with the assistance of professional legal advisors of its own choosing;

**WHEREAS**, the Company desires to obtain the commitment of the Undersigned Holder to support and vote to accept the Plan, subject to the terms and conditions set forth herein to which the Undersigned Holder is party; and

**WHEREAS**, subject to the execution of definitive documentation and appropriate approvals by the Bankruptcy Court of the Plan, the following sets forth the agreement between the Parties concerning their respective obligations.

## AGREEMENT

**NOW THEREFORE**, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1. **[Intentionally Omitted].**

2. **Effectuating the Restructuring.**

To implement the Plan, the Parties have agreed, on the terms and conditions set forth herein, that the Company shall use its commercially reasonable efforts to:

    (a) solicit the requisite acceptances of the Plan in accordance with section 1125 of the Bankruptcy Code;

    (b) seek confirmation of the Plan as expeditiously as practicable under the Bankruptcy Code, including under section 1129(b) thereof, the Federal Rules of Bankruptcy Procedure and the Bankruptcy Court's local rules; and

    (c) consummate the Plan.

3. **Commitments of the Undersigned Holder Under this Agreement.**

    (a) Voting by Undersigned Holder.

As long as a Termination Event (as defined herein) has not occurred, or has occurred but has been duly waived (or, in the case of a breach under Section 9(a)(x) or (xii), cured) in accordance with the terms hereof, the Undersigned Holder agrees for itself that, so long as it is the legal owner, beneficial owner and/or the investment advisor or manager of or with power and/or authority to bind any Aleris Claims, to vote on a plan of reorganization which comports with the definition of the Plan in this Agreement, it shall be bound to, and will, timely vote its Aleris Claims (and not revoke or withdraw its vote) to accept the Plan.

    (b) Support of Plan.

As long as a Termination Event has not occurred, or has occurred but has been duly waived (or, in the case of a breach under Section 9(a)(x) or (xii), cured) in accordance with the terms hereof, the Undersigned Holder, agrees for itself that, so long as it remains the legal owner, beneficial owner and/or the investment advisor or manager of or with power and/or authority to bind any Aleris Claims it will:

      i.      from and after the date hereof, not directly or indirectly seek, solicit, support or vote in favor of any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring of the Company that could reasonably be expected to prevent, delay or impede the Restructuring of the Company in accordance with the Plan;

      ii.      agree to permit disclosure of the contents of this Agreement; *provided* that the amount of the Aleris Claims held by the Undersigned Holder shall be disclosed only to the Company and shall not be disclosed by the Company to any other person or entity except as required by law or in connection with the enforcement of this Agreement;

      iii.      not object to or otherwise commence any proceeding opposing any of the terms of this Agreement, the Disclosure Statement, the Plan or the Equity Commitment Agreement;

      iv.      not object to a motion by the Company to extend the exclusive period for the Company to propose a plan of reorganization; provided that such period does not extend beyond the Termination Date as defined in the Equity Commitment Agreement as in effect on the date hereof;

      v.      consent to any amendments, waivers or modifications to the Plan consented to by Oaktree, unless such amendments, waivers or modifications materially adversely affect the Undersigned Holder in a disproportionate manner relative to the Consenting Backstop Parties, in which case the Undersigned Holder's consent shall be required but shall not be unreasonably withheld; and

      vi.      not take any action that is inconsistent with, or that is intended to delay, confirmation of the Plan.

(c)      Transfer (as defined below) of Claims, Interests and Securities.

The Undersigned Holder hereby agrees, until this Agreement shall have terminated, not to sell, assign, transfer or otherwise dispose of, directly or indirectly (each such disposition, for the avoidance of doubt not including a pledge or collateral assignment or other grant of a security interest until the occurrence of a transfer pursuant to enforcement thereof, a "Transfer"), all or any of its Aleris Claims (including any voting rights associated with such Aleris Claims), *unless* the transferee thereof (a) agrees in an enforceable writing to assume and

be bound by this Agreement, and to assume the rights and obligations of the Undersigned Holder under this Agreement and (b) promptly delivers such writing to the Company (each such transferee becoming, upon the Transfer, an Undersigned Holder hereunder).  The Company shall promptly acknowledge any such Transfer in writing and provide a copy of that acknowledgement to the transferor.  By its acknowledgement of the relevant Transfer, the Company shall be deemed to have acknowledged that its obligations to the Undersigned Holder hereunder shall be deemed to constitute obligations in favor of the relevant transferee as an Undersigned Holder hereunder.  Any Transfer of any Relevant Claim (as defined below) that does not comply with the procedure set forth in the first sentence of this Subsection 3(c) shall be deemed void *ab initio*.

(d)     Further Acquisition of Aleris Claims.

This Agreement shall in no way be construed to preclude the Undersigned Holder or any of its respective subsidiaries from acquiring additional Aleris Claims; *provided* that any such additional Aleris Claims acquired by the Undersigned Holder or any subsidiary thereof shall automatically be deemed to be subject to the terms of this Agreement.  Upon the request of the Company, the Undersigned Holder shall, in writing and within **five (5) business days**, provide an accurate and current list of all Aleris Claims that it and any subsidiary holds at that time, subject to any applicable confidentiality restrictions and applicable law.

(e)     Representation of the Undersigned Holder's holdings.

The Undersigned Holder represents that, as of the date hereof:

  i.  it is the legal owner, beneficial owner and/or the investment advisor or manager for the legal or beneficial owner of such Aleris Claims set forth on its respective signature page (collectively, the "Relevant Claims");

  ii.  there are no Aleris Claims of which it is the legal owner, beneficial owner and/or investment advisor or manager for such legal or beneficial owner that are not part of its Relevant Claims unless the Undersigned Holder does not possess the full power to vote and dispose of such claims; and

  iii.  it has full power to vote, dispose of and compromise the aggregate principal amount of the Relevant Claims.

## 4.   **The Company's Responsibilities.**

(a)     Other Support Agreements.

The Company represents and warrants that, if it has entered into (or concurrently herewith is entering into) restructuring agreements, plan support or lock-up agreements (collectively, the "Other Support Agreements") with other Consenting Holders (each, an "Other Support Agreement Party," and collectively, the "Other Support Agreement Parties"), the Other

Support Agreements are substantially similar to this Agreement, including without limitation, substantially similar provisions to those set forth in Section 3(a), (b), (c), (d) and (e) above and Section 9 below.

(b) Implementation of the Plan.

The Company shall use its commercially reasonable efforts to:

    i.      effectuate and consummate the Restructuring on the terms described in the Plan and the Equity Commitment Agreement;

    ii.      obtain from the Bankruptcy Court an order confirming the Plan, which order shall be in form and substance consistent with the Plan and reasonably acceptable to the Undersigned Holder (the "Confirmation Order"), which Confirmation Order shall be entered by the Bankruptcy Court no later than on or before the one hundred and twentieth (120th) day following the Trigger Date;

    iii.      cause the Effective Date of the Plan to occur no later than on or before the one hundred and fiftieth (150th) day following the Trigger Date; and

    iv.      take no actions inconsistent with this Agreement, the Plan or the Equity Commitment Agreement or the expeditious confirmation and consummation of the Plan.

5. **Mutual Representations and Warranties**

Each Party, severally and not jointly, makes the following representations and warranties (as to itself only) to the other Party, each of which is a continuing representation and warranty:

(a)    Enforceability.

Subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is a legal, valid and binding obligation of the Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(b) No Consent or Approval.

Except as expressly provided in this Agreement, no consent or approval is required by any other entity in order for it to carry out the provisions of this Agreement.

(c) Power and Authority.

It has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement and the Plan.

(d) Authorization.

The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

(e) No Conflicts.

The execution, delivery and performance of this Agreement does not: (a) violate any provision of law, rule or regulations applicable to it or any of its subsidiaries; (b) violate its certificate of incorporation, bylaws or other organizational documents or those of any of its subsidiaries; or (c) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

**6.** [Reserved]

**7.** <u>**No Waiver of Participation and Preservation of Rights.**</u>

If the transactions contemplated by this Agreement or otherwise set forth in the Plan are not consummated as provided herein, if a Termination Event occurs, or if this Agreement is otherwise terminated for any reason, the Parties each fully reserve any and all of their respective rights, remedies, claims and interests.

**8.** <u>**Acknowledgement.**</u>

This Agreement and the Plan and the transactions contemplated herein and therein are the product of negotiations between the Parties and their respective representatives. This Agreement is not and shall not be deemed to be a solicitation of votes for the acceptance of a plan of reorganization for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. The Company will not solicit acceptances of the Plan from the Undersigned Holder in any manner inconsistent with the Bankruptcy Code or applicable nonbankruptcy law.

**9.** <u>**Termination.**</u>

(a)    Termination Events.

The term "<u>Termination Event</u>," wherever used in this Agreement, means any of the following events (whether the reason for such Termination Event and whether it is voluntary or involuntary):

    i.    (a) Sankaty's commitments set forth in the Equity Commitment Agreement expire or terminate in accordance with Section 19 or the last sentence set forth in Section 25 of the Equity Commitment Agreement or (b) the Company declares that the Equity Commitment Agreement has terminated or is invalid or of no force or effect;

ii. the Company's board of directors, based on the advice of its outside counsel, determines that continued pursuit of the Plan is inconsistent with its fiduciary duties because, and the board of directors determines in good faith that, (A) a proposal or offer from a third party is reasonably likely to be more favorable to the Company than is proposed under the Plan, taking into account, among other factors, the identity of the third party, the likelihood that any such proposal or offer will be negotiated to finality within a reasonable time, the potential loss to the Company if the proposal or offer were not accepted and consummated, and the likelihood that any such proposal will be consummated within a reasonable time, or (B) the Plan is no longer confirmable or feasible;

iii. the Company files, supports or endorses a plan of reorganization other than the Plan;

iv. a Confirmation Order reasonably acceptable to the Company and the Undersigned Holder is not entered by the Bankruptcy Court on or before the one hundred and twentieth (120th) day following the Trigger Date;

v. the Effective Date shall not have occurred on or before the Termination Date (as defined in the Equity Commitment Agreement in effect as of the date hereof);

vi. any of the Chapter 11 Cases is converted to cases under chapter 7 of the Bankruptcy Code;

vii. the Bankruptcy Court shall enter an order in any of the Chapter 11 Cases appointing (i) a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, (ii) a responsible officer, or (iii) an examiner, in each case with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of section 1106(a)) under section 1106(b) of the Bankruptcy Code;

viii. any of the Chapter 11 Cases of (a) Aleris or Aleris Deutschland or (b) any other Debtor is dismissed or suspended pursuant to section 305 of the Bankruptcy Code;

ix. the Confirmation Order (a) is reversed on appeal or vacated or (b) shall not have become a Final Order on or before the Termination Date (as defined in the Equity Commitment Agreement in effect as of the date hereof);

x. any Party has breached any material provision of this Agreement, and any such breach has not been duly waived or cured in accordance with the terms hereof after a period of five (5) days;

xi.      the Company shall (a) withdraw the Plan or (b) publicly announce its intention not to support the Plan;

xii.     (a) the Other Support Agreement to which Oaktree is a party has terminated or (b) the Company has breached any material provision of such Other Support Agreement and any such breach under clause (b) has not been duly waived or cured in accordance with the terms of such Other Support Agreement after a period of **five (5) days**;

xiii.    the Release, dated as of February 5, 2010, by and among Aleris, certain of the other Debtors and the other parties thereto, shall cease to be in full force and effect;

xiv.     the Effective Date shall have occurred; or

xv.      any change to the Base Plan shall have been made or any exhibit, supplement, schedule or related or ancillary agreement or instrument or any amendment, modification, consent or waiver to any of the foregoing shall have been agreed to, entered into, executed and delivered, filed with the Bankruptcy Court or otherwise given effect that materially adversely affects the Undersigned Holder in a disproportionate manner relative to Consenting Backstop Parties without the consent of the Undersigned Holder (such consent not to be unreasonably withheld).

The foregoing Termination Events are intended solely for the benefit of the Company and the Undersigned Holder; *provided* that no Party may seek to terminate this Agreement based upon a material breach or a failure of a condition (if any) in this Agreement arising out of its own actions or omissions that were in violation of this Agreement; *provided, further,* that, except for the Termination Event contemplated in clause (xv) of this Section 9(a), any Termination Event or deadline contemplated therein may be waived or extended, respectively, by Consenting Holders holding at least a majority in aggregate principal amount of the Aleris Claims held by the Consenting Holders (the "Requisite Holders") within 5 Business Days following the occurrence thereof unless such waiver or extension materially adversely affects the Undersigned Holder in a disproportionate manner relative to the Consenting Backstop Parties, in which case the Undersigned Holder's consent to such waiver or extension shall be required, such consent not to be unreasonably withheld.

(b)   Termination Event Procedures.

i.       Upon the occurrence of a Termination Event contemplated by clause (i)(a), (ii) or (ix)(b) of Section 9(a) hereof or clause (x) of Section 9(a) hereof due to a material breach of this Agreement by the Undersigned Holder, in each case subject to the last sentence of Section 9(a) hereof, the Company shall have the right to terminate

this Agreement by giving written notice thereof to the Undersigned Holder.

ii. Upon the occurrence of a Termination Event contemplated by clause (vi), (ix)(a) or (xiii) of Section 9(a) hereof, in each case subject to the last sentence of Section 9(a) hereof, this Agreement shall automatically terminate without further action.

iii. Except as set forth in Section 9(b)(ii) hereof, upon the occurrence of a Termination Event (including, for the avoidance of doubt, a Termination Event contemplated by clause (i) or (ii) of Section 9(a) hereof), subject to the last sentence of Section 9(a) hereof, the Undersigned Holder shall have the right to terminate this Agreement by giving written notice to the Company. The Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder in connection with giving any such notice (and agree not to object to any non-breaching Party seeking to lift the Automatic Stay in connection with giving any such notice, if necessary).

iv. Any such termination (or partial termination) of the Agreement shall not restrict the Parties' rights and remedies for any breach of the Agreement by any Party, including, but not limited to, pursuant to the reservation of rights set forth in Section 7 hereof.

10. **Miscellaneous Terms.**

(a)    Binding Obligation; Assignment.

**Binding Obligation.**  Subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is a legally valid and binding obligation of the Parties, enforceable in accordance with its terms, and shall inure to the benefit of the Parties and their representatives.  Nothing in this Agreement, express or implied, shall give to any entity, other than the Parties and their respective successors or permitted assigns, any benefit  or any legal or equitable right, remedy or claim under this Agreement.

**Assignment.**  No rights or obligations of any Party under this Agreement may be assigned or transferred to any other entity except as provided in Section 3(c) hereof, and any purported assignment or transfer in violation of Section 3(c) shall be null and void ab initio.

(b)    Further Assurances.

The Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the agreements of the Parties expressed herein.

(c)    Headings.

The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction or interpretation of any term or provision hereof.

(d)     Governing Law.

THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAWS PRINCIPLES THEREOF.  By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought exclusively in either a state or federal court of competent jurisdiction in the State of New York and County of New York.  By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits itself to the exclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding.  Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State of New York and County of New York, each of the Parties hereto hereby agrees that, so long as any of the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

(e)     Waiver of Jury Trial

Each Party hereto irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Agreement or the transactions contemplated hereby or the actions of the Undersigned Holder or any of its affiliates in the negotiation, performance or enforcement of this Agreement.

(f)     Specific Performance

The Parties hereby acknowledge that the rights of the Parties under this Agreement are unique and that remedies at law for breach or threatened breach of any provision of this Agreement would be inadequate and, in recognition of this fact, agree that, in the event of a breach or threatened breach of the provisions of this Agreement, in addition to any remedies at law, the Parties shall, without posting any bond, be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available and the Parties hereby waive any objection to the imposition of such relief.

(g)     Complete Agreement, Interpretation and Modification.

i.      **Complete Agreement.**  This Agreement, the Plan and the other agreements, exhibits and other documents referenced herein and therein constitute the complete agreement between the Parties with respect to the subject matter hereof and supersede all prior

agreements, oral or written, between or among the Parties with respect thereto.

ii.   **Interpretation.**   This Agreement is the product of negotiation by and among the Parties.   Any Party enforcing or interpreting this Agreement shall interpret it in a neutral manner.   There shall be no presumption concerning whether to interpret this Agreement for or against any Party by reason of that Party having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

iii.  **Modification of this Agreement.**   This Agreement may only be modified, altered, amended or supplemented by an agreement in writing signed by the Company and the Undersigned Holder.

(h)   Execution of this Agreement.

This Agreement may be executed and delivered (by facsimile or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.   Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

(i)   Settlement Discussions.

This Agreement and the Restructuring are part of a proposed settlement of a dispute between the Parties.   Nothing herein shall be deemed an admission of any kind.   Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.   Notwithstanding the foregoing, this Agreement may be filed with the Bankruptcy Court in connection with the Chapter 11 Cases.

(j)   Consideration.

The Company and the Undersigned Holder hereby acknowledge that no consideration, other than that specifically described herein and in the Plan, shall be due or paid to the Undersigned Holder for its agreement to vote to accept the Plan in accordance with the terms and conditions of this Agreement, other than the Company's representations, warranties and agreement to use its commercially reasonable best efforts to seek to confirm and consummate the Plan.

(k)   Notices.

All notices hereunder shall be deemed given if in writing and delivered, if sent by facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers (or at such other addresses or facsimile numbers as shall be specified by like notice):

i.        If to the Company, to:

        Aleris International, Inc.
        25825 Science Park Drive, Suite 400
        Beachwood, Ohio 44122
        Facsimile No.:  (216) 910-3654
        Attention:  Christopher R. Clegg

        with copies (which shall not constitute notice) to:

        Weil, Gotshal & Manges LLP
        767 Fifth Avenue
        New York, NY 10153
        Facsimile No.: (212) 310-8007
        Attention:  Stephen Karotkin
                    Debra A. Dandeneau;

ii.       If to the Undersigned Holder or a transferee thereof, to the addresses or facsimile numbers set forth below following the Undersigned Holder's signature (or as directed by any transferee thereof), as the case may be, with copies (which shall not constitute notice) to:

        [_____]

iii.      Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by facsimile shall be effective upon oral or machine confirmation of transmission.

(l)       Time of the Essence.

      The Parties agree that time is of the essence with respect to Sections 4(b)(ii), 4(b)(iii) and the events that give rise to the occurrence of a Termination Event under Section 9 of this Agreement.

[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*]

IN WITNESS WHEREOF, the Parties have entered into this Agreement on the day and year first above written.

Aleris International, Inc.

By: _____

Title: _____

**[INSERT ENTITY NAME HERE]**


By: _____
    Name:
    Title:


U.S. Roll-Up Claims: _____

European Roll-Up Claims: _____

German Term Loan Claims: _____

## **EXHIBIT 1**

PLAN

**Document Not Included Pursuant to Section 1.3 of the Plan**

# **EXHIBIT 2**

DISCLOSURE STATEMENT

**Document Not Included Pursuant to Section 1.3 of the Plan**

## **EXHIBIT 3**

EQUITY COMMITMENT AGREEMENT

**Document Not Included Pursuant to Section 1.3 of the Plan**

**EXHIBIT C**

**TERMS OF INTERMEDIATECO NOTES**

**(Attached)**

## Terms of IntermediateCo Notes

Set forth below is a term sheet summarizing certain terms of the IntermediateCo Notes.

| | |
|---|---|
| *Principal Amounts:* | $45,000,000. |
| *Maturity:* | Ten years. |
| *Issue Price:* | 100% of the principal amount on the Effective Date. |
| *Interest:* | Interest rate will be equal to 6% per annum, at the discretion of IntermediateCo's board of directors, in cash or by accretion to the face value of the IntermediateCo Notes, semiannually in arrears on March 31 and September 30 of each year, beginning on March 31, 2011. Stated interest will be treated as Original Issue Discount for tax purposes due to the ability to defer payment. |
| *Exchange Rights:* | At the holder's option, after the third anniversary of the Effective Date, exchangeable for New Common Stock on a per share dollar exchange ratio to be determined at the time of issuance based upon 100% of the Plan Value Share Price (as defined in the Plan), subject to adjustment for dilution. |
| *Anti-Dilution Provisions:* | Exchange ratio will be adjusted to provide anti-dilution protection for recapitalizations, below-market issuances, subdivisions or combinations. |
| *Fundamental Change:* | Notwithstanding anything to the contrary contained herein, after the date that occurs six (6) months after the Effective Date, the holder shall have the right to exchange the IntermediateCo Notes for New Common Stock immediately prior to an initial public offering (an "**IPO**") of HoldCo at face value plus any accrued but unpaid interest divided by the IPO price or upon the occurrence of a fundamental change (as defined in the indenture for the IntermediateCo Notes) of HoldCo. |

| | |
|---|---|
| *Optional Redemption:* | On or after the third anniversary of the Effective Date upon not less than 30 nor more than 60 days' notice, at the following redemption prices (expressed as a percentage of the principal amount) plus accrued and unpaid interest, if any, to the applicable redemption date (subject to the right of the holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the twelve-month period beginning on the date of the anniversary of the issuance of the IntermediateCo Notes of the years indicated below: |

| **Year** | **Percentage** |
|---|---|
| 2013...................................................... | 102% |
| 2014...................................................... | 101% |
| 2015 and thereafter............................... | 100% |

On or after the later of the six month anniversary of the Effective Date and January 1, 2011, and only upon the occurrence of a fundamental change of HoldCo, at the following redemption prices (expressed as a percentage of the principal amount) plus accrued and unpaid interest, if any, to the applicable redemption date (subject to the right of the holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the twelve-month period beginning on the date of the anniversary of the issuance of the IntermediateCo Notes of the years indicated below:

| **Year** | **Percentage** |
|---|---|
| 2011...................................................... | 104% |
| 2012 and thereafter............................... | 103% |

| | |
|---|---|
| *Covenants:* | None. |
| *Events of Default:* | • Default due to non-payment of the Notes upon maturity |
| | • Customary default due to bankruptcy or receivership |
| *Registration Rights:* | New Common Stock that may be issued upon exchange of the IntermediateCo Notes will be offered rights, if any, pursuant to the Registration Rights Agreement. |
| *Transfer Restrictions:* | As provided for in Section IX to the Disclosure Statement. |
| *Ranking:* | IntermediateCo shall have the full and absolute discretion to subordinate the debt represented by the IntermediateCo Notes to any debt or other borrowing of money designated by IntermediateCo to be senior in ranking. |
| *Governing Law:* | New York. |

# EXHIBIT D

# TERMS OF INTERMEDIATECO PREFERRED STOCK

## (Attached)

## Terms of IntermediateCo Preferred Stock

Set forth below is a term sheet summarizing certain terms of the IntermediateCo Preferred Stock.

| | |
|---|---|
| *Liquidation Preference:* | $5 million (in the aggregate), plus accrued and unpaid dividends, to be paid upon the liquidation of IntermediateCo prior to any payment on the common stock of IntermediateCo. |
| *Dividends:* | Payable at 8% per annum multiplied by the liquidation preference, compounded semiannually on each dividend payment date. IntermediateCo's board of directors may declare and pay dividends; if undeclared, dividends will accumulate to the extent they are not paid on the dividend payment date for the semiannual period to which they relate. |
| *Voting Rights:* | Holders of the IntermediateCo Preferred Stock will have the right to elect one director if IntermediateCo fails to pay in full and in Cash six consecutive semiannual dividends or the mandatory redemption payment. At such time, IntermediateCo's board of directors must be comprised of at least five members. |
| *Amendments and Waivers:* | The affirmative vote of the holders of 80% of the IntermediateCo Preferred Stock is necessary for amendments of the IntermediateCo Preferred Stock that (i) change the stated redemption date of the IntermediateCo Preferred Stock; (ii) reduce the liquidation preference of, or dividend rate on, the IntermediateCo Preferred Stock; (iii) adversely affect the right to exchange the IntermediateCo Preferred Stock, or (iv) reduce the percentage of outstanding IntermediateCo Preferred Stock necessary to amend the terms thereof or to grant waivers. |
| *Registration Rights:* | New Common Stock that may be issued upon exchange of the IntermediateCo Preferred Stock will be offered customary registration rights. |
| *Redemption:* | Subject to mandatory redemption on the fifth anniversary of the Effective Date at a redemption price equal to the liquidation preference, plus any accrued and unpaid dividends. There will be no optional redemption rights. |
| *Holder's Option to Exchange:* | At the holder's option, at any time prior to redemption but after the third anniversary of the Effective Date, the IntermediateCo Preferred Stock will be exchangeable into New Common Stock on a per share dollar exchange ratio to be determined at the time of issuance based upon 110% of the Plan Value Share Price (as defined in the Plan). |
| | Notwithstanding anything to the contrary contained herein, after the first anniversary of the Effective Date, the holder shall have the right to exchange the IntermediateCo Preferred Stock into New Common Stock |

under the following circumstances:

> immediately prior to an IPO ***or***

> upon the occurrence of a Fundamental Change (as defined in the IntermediateCo Note Indenture) of HoldCo.

*Anti-Dilution Provisions:*   Exchange ratio will be adjusted to provide anti-dilution protection for recapitalizations, below-market issuances, or subdivisions or combinations.

*Transfer Restrictions:*   Any transfer restrictions will be described in the Plan Supplement.

**EXHIBIT E**

**EQUITY COMMITMENT ORDER**

**(Attached)**

-------------------------------------------------------x
                                                   :
*In re*                                            :          Chapter 11
                                                   :
ALERIS INTERNATIONAL, INC., *et al.*,              :          Case No. 09-10478 (BLS)
                                                   :
                                                   :          (Jointly Administered)
                       Debtors.                    :
                                                   :
-------------------------------------------------------x

## ORDER AUTHORIZING THE DEBTORS TO
## ENTER INTO EQUITY COMMITMENT AGREEMENT IN CONNECTION
## WITH RIGHTS OFFERING UNDER PLAN OF REORGANIZATION
## AND TO PAY FEES AND EXPENSES IN CONNECTION THEREWITH

Upon the motion, dated February 5, 2010 (the "***Motion***"),[1] of Aleris

International, Inc. ("***Aleris***") and certain of its direct and indirect domestic subsidiaries,

as debtors and debtors in possession (collectively, the "***U.S. Debtors***"),[2] together with

---

[1] Capitalized terms used, but not defined, in this Order have the respective meanings ascribed to such terms in the Motion.

[2] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are Aleris International, Inc. (8280), Alchem Aluminum Shelbyville Inc. (8122), Alchem Aluminum, Inc. (5207), Aleris Aluminum Europe, Inc. (0921), Aleris Aluminum U.S. Sales Inc. (9536), Aleris Blanking and Rim Products, Inc. (7340), Aleris Light Gauge Products, Inc. (7311), Aleris Nevada Management, Inc. (2935), Aleris Ohio Management, Inc. (0637), Aleris, Inc. (6630), Alsco Holdings, Inc. (5535), Alsco Metals Corporation (7792), Alumitech of Cleveland, Inc. (1568), Alumitech of Wabash, Inc. (4425), Alumitech of West Virginia, Inc. (3237), Alumitech, Inc. (9351), AWT Properties, Inc. (5332), CA Lewisport, LLC (6561), CI Holdings, LLC (9484), Commonwealth Aluminum Concast, Inc. (7844), Commonwealth Aluminum Lewisport, LLC (7736), Commonwealth Aluminum Metals, LLC (8491), Commonwealth Aluminum Sales Corporation (8512), Commonwealth Aluminum Tube Enterprises, LLC (7895), Commonwealth Aluminum, LLC (5039), Commonwealth Industries, Inc. (5741), ETS Schaefer Corporation (9350), IMCO Indiana Partnership L.P. (3840), IMCO International, Inc. (8362), IMCO Investment Company (5738), IMCO Management Partnership, L.P. (2738), IMCO Recycling of California, Inc. (0255), IMCO Recycling of Idaho Inc. (8990), IMCO Recycling of Illinois Inc. (7227), IMCO Recycling of Indiana Inc. (4357), IMCO Recycling of Michigan L.L.C. (5772), IMCO Recycling of Ohio Inc. (1405), IMCO Recycling of Utah Inc. (2330), IMCO Recycling Services Company (0589), IMSAMET, Inc. (7929), Rock

Aleris' indirect subsidiary, Aleris Deutschland Holding GmbH, a limited liability

company organized under the laws of Germany, as debtor and debtor in possession

("**ADH**" and together with the U.S. Debtors, the "**Debtors**") in the above referenced

chapter 11 cases, for entry of an order pursuant to sections 105(a), 363(b), and 503(b) of

title 11 of the United States Code (the "**Bankruptcy Code**"), authorizing the Debtors to

(i) enter into the Equity Commitment Agreement and (ii) effectuate the transactions

contemplated thereunder including, but not limited to, the payment by the Debtors of the

Structuring and Arrangement Fee, the Transaction Expenses, and the Termination Fee, on

the terms and conditions set forth in the Equity Commitment Agreement; and the Court

having jurisdiction to consider the Motion and the relief requested therein pursuant to 28

U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein

being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before

this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the

Motion having been provided to the parties listed therein, and it appearing that no other

or further notice need be provided; and the Court having determined that the relief sought

in the Motion is in the best interests of the Debtors and their respective estates; and the

Court having determined that the legal and factual bases set forth in the Motion establish

just cause for the relief granted herein; and upon all of the proceedings had before the

Court and after due deliberation and sufficient cause appearing therefor, it is

---

Creek Aluminum, Inc. (3607), Silver Fox Holding Company (1188), and Wabash Alloys, L.L.C. (0708). Aleris is the direct or indirect parent of each of its affiliated Debtors as well as various non-debtor international affiliates located in Canada, South America, Europe, and Asia. Aleris Deutschland Holding GmbH (3721), an affiliate of the above debtors with a case under chapter 11 of the Bankruptcy Code which the Debtors are seeking to have jointly administered with their cases, also joined in the Motion.

ORDERED that, the Equity Commitment Agreement is hereby approved; and it is further

ORDERED that, the Debtors be, and they hereby are, authorized to enter into the Equity Commitment Agreement and to perform all of their obligations thereunder, including, without limitation, paying all fees and expenses required to be paid thereunder, including the Structuring and Arrangement Fee, the Transaction Expenses, the Termination Fee, and any amounts required to be paid pursuant to the indemnification agreement contained in the Equity Commitment Agreement, in each case in accordance with the terms and conditions of the Equity Commitment Agreement; and it is further

ORDERED that the fees and expenses required to be paid under the Equity Commitment Agreement, including the Structuring and Arrangement Fee, the Transaction Expenses, the Termination Fee, and any fees required to be paid pursuant to the indemnification agreement contained in the Equity Commitment Agreement, shall constitute allowed administrative expenses of the Debtors' estates pursuant to section 503(b)(1)(A) of the Bankruptcy Code; and it is further

ORDERED that the Court shall retain jurisdiction to interpret this Order and the Equity Commitment Agreement.

Dated: _____, 2010
      Wilmington, Delaware

_____
BRENDAN L. SHANNON
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT F**

**TERMS OF REGISTRATION RIGHTS AGREEMENT**

**(Attached)**

# Terms of Registration Rights Agreement

Set forth below is a term sheet summarizing the material terms of the Registration Rights Agreement relating to ACH1 Holding Co. ("Holdco"). Capitalized terms not defined herein shall have the respective meanings ascribed to such terms in the Equity Commitment Agreement to which this term sheet is attached.

| | |
|---|---|
| *Parties:* | Holdco, Oaktree, and other holders of at least 10% of the outstanding shares of Holdco Common Stock (the "Other Investors" and, together with Oaktree, the "Investors"). |
| *Demand Registrations:* | Oaktree has the right to request Holdco to effect three demand registrations. At any time following an initial public offering of Holdco (an "IPO"), Apollo has the right to request Holdco to effect two demand registrations and Sankaty has the right to request Holdco to effect one demand registration. Each Other Investor has the right to request Holdco to effect one demand registration at any time following the one-year anniversary of an IPO. |
| *Piggyback Registrations:* | Subject to customary exceptions, whenever Holdco proposes to register any of its common stock ("Common Stock") other than on a Form S-8 or Form S-4, Holdco will provide notice to each Investor and any holder of registrable securities of Holdco will be granted piggyback registration rights.<br><br>In the event of any underwritten offering, the underwriter may exclude shares from registration and the underwriting, and the shares will be given priority as follows: (i) to Holdco for securities it proposes to register, (ii) to each holder requesting piggyback registration on a *pari passu* basis with each other and (iii) to any other securities to be registered on behalf of any other holder. |
| *Form S-3 Registration:* | After Holdco is eligible to register any securities on Form S-3, each Investor and any Person to whom any Investor transfers shares of Common Stock (together with the Investors so long as they hold registrable securities of Holdco, a "Holder"), so long as such Holder holds at least 10% of the outstanding shares of Holdco Common Stock, will have the right to demand Holdco to effect any number of registrations on Form S-3 and such registrations will not be counted as a demand registration. |
| *Underwriting Cutbacks:* | The Holder requesting a demand registration or registration on Form S-3 may choose to distribute its securities in an underwritten offering by notifying Holdco of such intent as a part of its request. The underwriter may limit the size of the offering and exclude shares from the registration and underwriting, and the shares that will be included will be given priority as follows: (i) to the Holders requesting inclusion of their securities on a *pari passu* basis with each other and (ii) to other holders of securities of Holdco. |
| *Holdback Agreement:* | Subject to customary exceptions, in the case of an underwritten offering, if so requested by the managing underwriter, each Holder will not for a period of |

up to 180 days from the effectiveness of the registration statement effect any public sale of its Common Stock or any other registrable securities, except for those securities included in such registration.

*Indemnification:*   Holdco and each Holder will provide customary indemnification.

**EXHIBIT G**

**TERMS OF STOCKHOLDERS' AGREEMENT**

**(Attached)**

# Terms of Stockholders' Agreement

Set forth below is a term sheet summarizing the material terms of the Stockholders' Agreement relating to ACH1 Holding Co. ("Holdco"). Capitalized terms not defined herein shall have the respective meanings ascribed to such terms in the Equity Commitment Agreement to which this term sheet is attached.

*Board of Directors:* At the Closing Date, the Board of Directors of Holdco (the "Board") will consist of a five (5) members, of which one member will be the Chief Executive Officer of Holdco and the remaining members will be appointed by Oaktree to be named in the Plan Supplement (as defined in the Plan).

*Drag-Along Transactions:* Holders of a majority of the outstanding shares of Holdco Common Stock will have the right to effect a merger or other business combination of Holdco or a sale, lease, transfer or other disposition of all of the Holdco Common Stock or all or substantially all of the assets of Holdco, in each case to an unaffiliated third party, without the approval of other holders of Holdco Common Stock.

*Tag Along Rights:* Holders of Holdco Common Stock will have the right to participate in sales of Holdco Common Stock by Oaktree on a proportionate basis other than sales to Apollo.

*Preemptive Rights:* If Holdco proposes to issue any additional equity securities and Oaktree is participating in such equity offering, then all other shareholders will have a preemptive right to proportionately participate in such equity offering on the same terms as the proposed issuance to Oaktree.

*Transfer Restrictions:* Prior to an initial public offering of Holdco, holders of Holdco Common Stock may not transfer their shares of Holdco Common Stock if, at any time, the combined number of stockholders of Holdco Common Stock of record equals or exceeds 450, unless such transfer is being made (i) to an existing stockholder of Holdco, (ii) with the prior written consent of Holdco, or (iii) to a single transferee of record and 100% of their shares of Holdco Common Stock are being transferred.

**Exhibit 1.1.112**

**Form of IntermediateCo Note Indenture**

**To Be Filed with the Plan Supplement**

**Exhibit 1.1.114**

**Terms of IntermediateCo Preferred Stock**

# Terms of IntermediateCo Preferred Stock

Set forth below is a term sheet summarizing certain terms of the IntermediateCo Preferred Stock.

| | |
|---|---|
| *Liquidation Preference:* | $5 million (in the aggregate), plus accrued and unpaid dividends, to be paid upon the liquidation of IntermediateCo prior to any payment on the common stock of IntermediateCo. |
| *Dividends:* | Payable at 8% per annum multiplied by the liquidation preference, compounded semiannually on each dividend payment date. IntermediateCo's board of directors may declare and pay dividends; if undeclared, dividends will accumulate to the extent they are not paid on the dividend payment date for the semiannual period to which they relate. |
| *Voting Rights:* | Holders of the IntermediateCo Preferred Stock will have the right to elect one director if IntermediateCo fails to pay in full and in Cash six consecutive semiannual dividends or the mandatory redemption payment. At such time, IntermediateCo's board of directors must be comprised of at least five members. |
| *Amendments and Waivers:* | The affirmative vote of the holders of 80% of the IntermediateCo Preferred Stock is necessary for amendments of the IntermediateCo Preferred Stock that (i) change the stated redemption date of the IntermediateCo Preferred Stock; (ii) reduce the liquidation preference of, or dividend rate on, the IntermediateCo Preferred Stock; (iii) adversely affect the right to exchange the IntermediateCo Preferred Stock, or (iv) reduce the percentage of outstanding IntermediateCo Preferred Stock necessary to amend the terms thereof or to grant waivers. |
| *Registration Rights:* | New Common Stock that may be issued upon exchange of the IntermediateCo Preferred Stock will be offered customary registration rights. |
| *Redemption:* | Subject to mandatory redemption on the fifth anniversary of the Effective Date at a redemption price equal to the liquidation preference, plus any accrued and unpaid dividends. There will be no optional redemption rights. |
| *Holder's Option to Exchange:* | At the holder's option, at any time prior to redemption but after the third anniversary of the Effective Date, the IntermediateCo Preferred Stock will be exchangeable into New Common Stock on a per share dollar exchange ratio to be determined at the time of issuance based upon 110% of the Plan Value Share Price (as defined in the Plan). |
| | Notwithstanding anything to the contrary contained herein, after the first anniversary of the Effective Date, the holder shall have the right to exchange the IntermediateCo Preferred Stock into New Common Stock |

under the following circumstances:

> immediately prior to an IPO *or*

> upon the occurrence of a Fundamental Change (as defined in the IntermediateCo Note Indenture) of HoldCo.

| | |
|---|---|
| *Anti-Dilution Provisions:* | Exchange ratio will be adjusted to provide anti-dilution protection for recapitalizations, below-market issuances, or subdivisions or combinations. |
| *Transfer Restrictions:* | Any transfer restrictions will be described in the Plan Supplement. |

**Exhibit 1.1.151**

**Form of Registration Rights Agreement**

**To Be Filed with the Plan Supplement**

**Exhibit 1.1.176**

**Form of Stockholders Agreement**

**To Be Filed with the Plan Supplement**

**Exhibit 7.10**

**Terms of the Amendment to the European Term Loan Facility**

**To Be Filed with the Plan Supplement**

## Schedules to the Plan

| Schedule No. | Description |
|:---:|:---:|
| 1.1.11 | ADH Liquidity Adjustment |
| 1.1.12(j) | ADH Plan Deductions |
| 1.1.108 | Insured Claims |
| 1.1.187 | U.S. Liquidity Adjustment |
| 1.1.188(o) | U.S. Plan Deductions |
| 7.6.1 | Transactions under Section 7.6.1 of the Plan (Merger/Dissolution/Consolidation) |
| 7.6.3 | Assets to Be Disposed under Section 7.6.3 (Disposition of Certain Assets) |
| 7.11.2 | Members of HoldCo Board of Directors |
| 9.1 | Executory Contracts and Leases to Be Assumed |
| 9.2 | Executory Contracts and Leases to Be Rejected |
| 9.4 | Previously Scheduled Contracts |
| 9.8 | Management Agreements |

**Schedule 1.1.11**

**ADH Liquidity Adjustment**
**($ in millions)**

|  | MARCH | APRIL | MAY | JUNE |
|---|---|---|---|---|
| ADH Liquidity Adjustment a) | $24.7 | $24.7 | $29.7 | $19.7 |

**Schedule 1.1.12 (j)**

**ADH Plan Deduction (j)**
**($ in millions)**

|  | MARCH | APRIL | MAY | JUNE |
|---|---|---|---|---|
| Outstanding under the Belgium and German sub facilities and European ABL Term Credit Agreements |  |  |  |  |
| - Belgium | $30.8 | $30.8 | $30.8 | $30.8 |
| - German | 45.3 | 45.3 | 45.3 | 45.3 |
| - European ABL | 135.4 | 135.4 | 130.4 | 140.4 |
|  | $211.5 | $211.5 | $206.5 | $216.5 |

**Schedule 1.1.108**

**Schedule of Insured Claims**

| Proof of Claim Number | Claimant | Debtor |
|---|---|---|
| 2755 | Lewis Hindman | IMCO Recycling of Ohio, Inc. |
| 3480 | Michael Mills | Aleris International, Inc. |

**Schedule 1.1.187**

**U.S. Liquidity Adjustment**
**($ in millions)**

|  | MARCH | APRIL | MAY | JUNE |
|---|---|---|---|---|
| U.S. Liquidity Adjustment a) | $21.2 | $21.3 | $8.8 | $10.3 |

**Schedule 1.1.188 (o)**

**U.S. Plan Deductions (o)**
**($ in millions)**

|  | MARCH | APRIL | MAY | JUNE |
|---|---|---|---|---|
| Outstanding borrowings by Non-European entities under the DIP Credit Agreements | | | | |
| - DIP Term | $171.3 | $171.3 | $171.3 | $171.3 |
| - ABL | 202.6 | 202.5 | 215.0 | 213.5 |
| | $373.9 | $373.8 | $386.3 | $384.8 |

**Schedule 7.6.1**

**Transactions under Section 7.6.1 of the Plan
(Merger/Dissolution/Consolidation)**

**To Be Filed with the Plan Supplement**

**Schedule 7.6.3**

**Assets to Be Disposed under Section 7.6.3
(Disposition of Certain Assets)**

**To Be Filed with the Plan Supplement**

**Schedule 9.1**

**Executory Contracts and Leases to Be Assumed**

**To Be Filed with the Plan Supplement**

**Schedule 9.2**

**Executory Contracts and Leases to Be Rejected**

**To Be Filed with the Plan Supplement**

**Schedule 9.4**

**Previously Scheduled Contracts**

**To Be Filed with the Plan Supplement**

**Schedule 9.8**

**Management Agreements**

**To Be Filed with the Plan Supplement**