**To:  Holders of Claims Against and Equity Interests in Aleris International, Inc. and its Affiliated Debtors**

We are transmitting to you with this letter the Disclosure Statement with respect to the first amended joint plan of reorganization (the "***Plan***") of Aleris International, Inc. ("***Aleris***") and its affiliated debtors (collectively, the "***Debtors***," and together with their non-debtor affiliates, the "***Company***").  The Disclosure Statement describes the provisions of the Plan.  The Plan is supported by the Official Committee of Unsecured Creditors (the "***Creditors' Committee***"), Oaktree Capital Management, L.P., on behalf of its affiliated investment funds ("***Oaktree***"), certain investment funds managed by affiliates of Apollo Management Holdings, L.P. ("***Apollo***"), and Sankaty Advisors, LLC, on behalf of the investment funds advised by it (collectively, the "***Backstop Parties***"), three of the Debtors' largest lenders.  The Disclosure Statement has been approved for dissemination to parties in interest.  You should read the Disclosure Statement carefully.  A summary of the distributions that will be made under the Plan is included in Section II, entitled, "OVERVIEW OF THE PLAN" and Section V, entitled, "THE PLAN OF REORGANIZATION," of the Disclosure Statement.  If you are entitled to vote on the Plan, a Ballot is enclosed for you.  WE URGE YOU TO VOTE TO ACCEPT THE PLAN.

THE BACKSTOP PARTIES HAVE COMMITTED TO INVEST UP TO **$690** MILLION IN THE REORGANIZED DEBTORS SUBJECT TO THE TERMS OF THE EQUITY COMMITMENT AGREEMENT. WITH THIS INVESTMENT, THE PLAN WILL ENABLE THE DEBTORS TO EMERGE FROM CHAPTER 11 AS VIABLE, ONGOING ENTERPRISES WITH A HEALTHY BALANCE SHEET AND SUFFICIENT FLEXIBILITY TO WEATHER ANY FUTURE ECONOMIC UNCERTAINTIES. ACCORDINGLY, THE DEBTORS, THE CREDITORS' COMMITTEE, AND THE BACKSTOP PARTIES BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF ALL CREDITORS.

Claims under the DIP ABL Credit Facility and the DIP Term Credit Facility, including claims under the Prepetition Term Loan Agreements that were "rolled" up into U.S. Roll-Up Term Loan Claims or European Roll-Up Term Loan Claims (together the "***Roll-Up Claims***"), total in excess of $1 billion.  These Claims are secured, superpriority administrative expenses, and, absent the agreement of the lenders pursuant to the terms of their agreements with the Debtors, any unencumbered assets must be used to pay these claims in full before any value may be made available to prepetition unsecured creditors.  Although the DIP ABL Credit Facility and the New Money Term DIP Facility will be paid in full under the Plan, the Roll-Up Claims will not.  The Debtors believe that even under the most optimistic projections and assumptions about the Debtors' businesses, insufficient value exists to repay the Roll-Up Claims in full, and no value exists for the benefit of unsecured creditors.  Under the Plan, however, the Debtors estimate that over $23.5 million will be paid on account of prepetition, unsecured claims, with possible recoveries to certain unsecured creditors of up to 50%.  THERE IS NO ASSURANCE THAT ANY RECOVERY WOULD BE AVAILABLE TO UNSECURED CREDITORS UNDER AN ALTERNATIVE PLAN OR A SALE OF THE DEBTORS' ASSETS.

The Plan is attached to the Disclosure Statement as Exhibit "A."  In order for a class to accept the Plan, at least two-thirds in dollar amount of the claims voted in such class and more than one-half in number of the claims voted in the class must be voted to accept the Plan.  Your acceptance will facilitate and expedite the emergence of the Debtors from chapter 11.

If you did not receive a Ballot with the Disclosure Statement, please see the summary of who may not vote on the Plan on page 4 of the Disclosure Statement. If you believe that you are entitled to vote on the Plan but did not receive a Ballot, received a damaged Ballot, lost your Ballot, or if you have any other questions about the Plan or this Disclosure Statement, please call Kurtzman Carson Consultants, LLC ("*KCC*"), the official claims agent in these cases, at (866) 927-7089.

**If you are a holder of a U.S. Roll-Up Term Loan Claim, European Roll-Up Term Loan Claim, or European Term Loan Claim and are either an "accredited investor" (as such term is defined under Regulation D of the Securities Act) or not a "U.S. person" (as such term is defined under Regulation S of the Securities Act), you are eligible to participate in a Rights Offering, and a Subscription Form is included with this Disclosure Statement. If you are eligible and wish to participate in the Rights Offering, you must complete and return your Subscription Form by April 23, 2010.** *PLEASE NOTE THAT THIS DATE IS BEFORE THE DEADLINE FOR RETURNING YOUR BALLOT.* If you believe that you are entitled to participate in the Rights Offering but did not receive a Subscription Form, received a damaged Subscription Form, or lost your Subscription Form, please call KCC at (866) 927-7089.

Please note that BALLOTS MUST BE RECEIVED NO LATER THAN 5:00 P.M., WILMINGTON DELAWARE TIME, ON APRIL 29, 2010. If you are entitled to vote on the Plan, a Ballot and return envelope are enclosed for your convenience. **IT IS OF THE UTMOST IMPORTANCE THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN.**

Sincerely,

Aleris International, Inc. and its affiliated Debtors

By: _____

Steven J. Demetriou, Chairman and Chief Executive Officer

# ReedSmith

Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103-7301
+1 215 851 8100
Fax +1 215 851 1420
reedsmith.com

Reed Smith LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222-2716
+1 412 288 3131
Fax +1 215 851 1420
reedsmith.com

Reed Smith LLP
1201 Market Street
Suite 1500
Wilmington, DE 19801-1163
+1 302 778 7500
Fax +1 302 778 7575
reedsmith.com

March 22, 2010

To: General Unsecured Creditors of Aleris
International, Inc., et al.

**Re:**    <u>**Aleris International, Inc., et al., Bankr. D. Del. 09-10478 (BLS)**</u>

**The Committee SUPPORTS The Plan**

Ladies and Gentlemen:

We have been retained as counsel to the Official Committee of Unsecured Creditors of Aleris International, Inc. (the "**Committee**") appointed by the Office of the United States Trustee in the above-referenced bankruptcy case. Accompanying this letter you have received a copy of the Debtors' Disclosure Statement For The First Amended Joint Plan of Reorganization Of Aleris International, Inc. And Affiliated Debtors together with various other solicitation materials (collectively, the "**Solicitation Package**"). The Solicitation Package contains information and solicits your vote in connection with the First Amended Joint Plan Of Reorganization Of Aleris International, Inc. And Its Affiliated Debtors (the "**Plan**") submitted by Aleris International, Inc. and its various affiliates (collectively, the "**Debtors**" or "**Aleris**").

NEW YORK ◆ LONDON ◆ HONG KONG ◆ CHICAGO ◆ WASHINGTON, D.C. ◆ BEIJING ◆ PARIS ◆ LOS ANGELES ◆ SAN FRANCISCO ◆ PHILADELPHIA ◆ PITTSBURGH

OAKLAND ◆ MUNICH ◆ ABU DHABI ◆ PRINCETON ◆ NORTHERN VIRGINIA ◆ WILMINGTON ◆ SILICON VALLEY ◆ DUBAI ◆ CENTURY CITY ◆ RICHMOND ◆ GREECE

General Unsecured Creditors of Aleris International, Inc., et al.
March 22, 2010
Page 2

ReedSmith

We write this letter to you, on behalf of the Committee, to advise you that after considerable negotiations with the parties funding the Plan and concessions made by such parties, the Committee supports the Plan for the following reasons:

- **While the Plan rewards the Plan Supporters, the Plan Supporters have agreed to make a total of $16.5 million available to fund the claims of Class 5 creditors and to pay holders of unsecured trade claims that are Class 4 claimants, the lesser of (i) $5000.00 or (ii) depending upon the circumstances, either 25% or 50% of their unsecured claims.**

The Plan will be funded by a "rights offering" made available exclusively to certain creditors, and underwritten by Oaktree Capital Management, LP, Apollo Investment Fund VII, LP and Sankaty Advisors LLC (collectively, the "Plan Supporters"). The initial draft of the Plan provided for very little money being available to pay holders of Class 5 claims (principally holders of various unsecured notes). The Committee was able to improve the amount available for payment to holders of Class 5 Claims (from an initial proposed amount of $4 million to $16.5 million) and to also provide for the full payment of the fees and expenses of the trustees for the various indentures. The Committee believes that the amounts now committed in the Plan for holders of Class 5 Claims is reasonable in light of the very difficult and challenging circumstances of this case.

- **The Plan provides for a separate class of unsecured creditors that could receive up to a 50% distribution on account of their claims.**

The majority of unsecured trade creditors may find it beneficial to reduce the amount of their claims, if necessary, in order to be included for treatment in Class 4 of the Plan. The holders will likely receive up to 50% of their claims or $5,000.00, whichever is less. The majority of the Debtors' unsecured creditors fall within this class.

- **The Plan now allocates value to unsecured creditors for assets which were not subject to liens at the time of Aleris's chapter 11 filing.**

At the time of the Chapter 11 filings, various Aleris assets were not subject to liens. The Committee believes that the current proposed payments to unsecured creditors in the Plan accords them the value of these various assets which were not subject to the liens of the secured lenders on the Petition Date.

General Unsecured Creditors of Aleris International, Inc., et al.
March 22, 2010
Page 3

ReedSmith

**IN SUM**

While the Committee would have liked to have reported a better recovery for the unsecured creditors of the Debtors, the Committee does believe that given the significant improvement in the offer made by the Plan Supporters and the litigation risk involved in challenging the Plan as well as the current values of the enterprise, that the Plan as currently drafted is worthy of your support and your affirmative vote.

Very Truly Yours,

Reed Smith LLP
(Counsel to the Official Committee of Unsecured Creditors of Aleris International, Inc., et al.)

**TO:**  **ALL HOLDERS OF "EUROPEAN TERM LOAN CLAIMS" AGAINST ALERIS DEUTSCHLAND HOLDING GMBH (HOLDERS OF CLAIMS IN ADH CLASS 3 OF THE PLAN)**

**FROM:** **CASPIAN CAPITAL ADVISORS LLC AND ITS AFFILIATED FUNDS, HIGHLAND CAPITAL MANAGEMENT, L.P., ON BEHALF OF ITS MANAGED ACCOUNTS, ING CAPITAL LLC, MARBLEGATE ASSET MANAGEMENT AND ITS AFFILIATED FUNDS, HALCYON STRUCTURED ASSET MANAGEMENT EUROPEAN CLO 2006-II B.V., ON BEHALF OF ITSELF AND ITS AFFILIATE FUNDS, GSC GROUP AND ITS AFFILIATED FUNDS, AND RIVERSOURCE INVESTMENTS LLC, EACH HOLDERS OF CLAIMS IN ADH CLASS 3 OF THE PLAN (COLLECTIVELY, THE "OBJECTING EUROPEAN LENDERS")** [1]

**RE:**  **RECOMMENDATION TO VOTE _AGAINST_ THE JOINT PLAN OF REORGANIZATION (THE "PLAN") OF ALERIS INTERNATIONAL, INC. AND ITS AFFILIATED DEBTORS (COLLECTIVELY, THE "DEBTORS")** [2]

The Objecting European Lenders are writing to inform you of infirmities in the proposed Plan and to urge you to **vote to reject the Plan. We believe the Plan improperly dilutes recoveries otherwise due to the lenders** under the German sub-facility of the Amended and Restated Term Loan Agreement, dated August 1, 2006 (the "Prepetition Term Loan Agreement"), among Aleris Deutschland Holding GmbH ("ADH"), as borrower, and certain other Debtors and non-debtor affiliates, as guarantors. These claims have been classified under "ADH Class 3" of the Plan.

---

### FOR THE REASONS SET FORTH BELOW, WE RECOMMEND THAT YOU VOTE TO REJECT THE PLAN

The Objecting European Lenders urge you to vote to reject the Plan and its improper treatment of ADH Class 3 Claims.

The Plan proposes to provide claims in ADH Class 3 with an estimated recovery of no more than **21%**. This is a substantially lower recovery than the estimated recovery of between 94% to 100% that the Plan proposes to provide to claims held by other secured lenders in ADH Class 1 (European Loans under the DIP Term Credit Facility) and ADH Class 2 (European Roll-Up Term Loan Claims under the DIP Term Credit Facility) even though the ADH Class 1 and 2 Claims (1) **do not possess security interests in substantial collateral** that secures the ADH Class 3 Claims and (2) **rank junior** to the ADH Class 3 Claims with respect to certain collateral which they both share.

If it is confirmed, the Plan will have the effect of releasing valuable collateral that supports the Prepetition Term Loan. **In the event the Plan is rejected and not confirmed, credit support for the Prepetition Term Loan will not be released.**

Although under the Plan your secured claims are projected to receive 21 cents on the dollar at most, the Plan

---

[1] This document reflects the position of the lenders identified herein. Certain of the parties' positions are subject to disagreement and will likely be the subject of litigation. The Debtors and certain lenders that have contracted to backstop a rights offering (_i.e._, Oaktree and Apollo) in connection with the Plan do not agree with the positions set forth herein. Such parties' views are set forth in the Disclosure Statement.

[2] Capitalized terms not defined herein shall have the meanings set forth in the Plan or the Disclosure Statement.

proposes to provide an estimated recovery of 100% to all other claims against and interests in ADH, including general unsecured claims and equity interests which are undisputedly **junior** to the claims you hold under the Prepetition Term Loan Agreement.

We believe that the 21 cent recovery to the ADH Class 3 Claimants is too low, in part because of (i) an artificially depressed valuation of the Debtors' enterprise value and an allocation of such enterprise value that disproportionately favors the creditors of the U.S. Debtors over the creditors of ADH, and (ii) the so-called 9019 Settlement, through which the Debtors, Oaktree and Apollo purport to resolve an intercreditor dispute without the involvement of the agent or any other lenders under either the Prepetition Term Facility or the DIP Term Credit Facility, and pursuant to which Oaktree and Apollo are provided with certain advantages, including, the guarantee that Oaktree and Apollo will collectively own at least 72.1% of the New Common Stock of the Reorganized Debtors issued on the effective date of the Plan.

**THE OBJECTING EUROPEAN LENDERS BELIEVE THAT THE PLAN AND 9019 SETTLEMENT RESULT IN SUBSTANTIALLY DIMINISHED RECOVERIES TO THE ADH CLASS 3 CLAIMANTS THROUGH ARRANGEMENTS THAT WERE NEVER AGREED UPON OR CONSENTED TO BY THE LENDERS.**

The Objecting European Lenders believe that the Plan is not confirmable as a matter of law. They intend to object to the confirmation of the Plan for the reasons outlined in their March 8, 2010 objection to the Disclosure Statement (Docket No. 1585) (the "Objection"). The Objecting European Lenders have already served the Debtors, the Backstop Parties and certain other parties in interest with discovery requests, and intend to take further discovery in connection with their confirmation objection. For a more complete understanding of the Objecting European Lenders' objections to the Plan, please refer to the Objection.

**THE PLAN PROPOSES TO PROVIDE ADH CLASS 1 AND 2 CLAIMS WITH ESTIMATED RECOVERIES OF AT LEAST 94 – 100% EVEN THOUGH THESE LOANS ARE NOT SECURED BY INTERESTS IN SUBSTANTIAL EUROPEAN COLLATERAL WHICH SECURES THE ADH CLASS 3 CLAIMS YOU HOLD.**

- We believe the distribution scheme under the proposed Plan improperly inflates the recovery to ADH Class 1 and ADH Class 2 Claimants because the Plan fails to recognize that these claims are **not secured** by certain collateral that secures the European Term Loans under the Prepetition Term Facility.

- Under the Prepetition Term Facility, ADH and certain of its European affiliates granted first-priority security interests in collateral consisting of, among other things, "moveable assets" (including all machinery, stock-in-trade, inventory, furniture and equipment), certain German bank accounts and related investments and deposits, and/or certain intellectual property rights. The DIP Term Credit Facility is **not secured** by interests in these assets. Nevertheless, the Disclosure Statement and Plan erroneously assumes that the DIP Term Credit Facility is secured by this collateral.

- Contrary to the Debtors' contention, the European Term Loans continue to be secured by these assets notwithstanding the purported release of the non-Debtor guarantors. First, we believe the Release may be ineffectual because the guarantees could not be released through the Backstop Parties' consents alone and the Prepetition Term Agent Bank did not sign it. Second, even if the Release was effective, the collateral pledged under the prepetition security documents continues to secure ADH's obligations directly and would not be unavailable merely because the guarantors were purportedly released.[3]

---

[3]     Specifically, under the prepetition security documents, the European guarantors' collateral was pledged to secure the "Secured Obligations" of each "Obligor," which includes ADH as well as each of the German guarantors. (*E.g.,* Security Transfer

- Based on these and other incorrect assumptions, we believe the Plan improperly proposes to dilute your claims.

**THE PLAN PROPOSES TO PROVIDE ADH CLASS 1 AND 2 CLAIMS WITH ESTIMATED RECOVERIES OF AT LEAST 94 – 100% EVEN THOUGH THESE POSTPETITION LOANS ARE SECURED, IN PART, BY SECOND LIENS WHICH ARE JUNIOR TO THE RIGHTS MAINTAINED BY YOU AS A HOLDER OF ADH CLASS 3 CLAIMS.**

- The Share Pledge Agreement and Interest Pledge Agreement, pursuant to which pledges of equity and other interests in ADH and certain of ADH's German affiliates were granted to the DIP Lenders, explicitly recognizes that these security interests are **"ranking … behind" the Prepetition Term Facility's security interests**. [4]

- No intercreditor agreement conferring priority to the DIP Term Credit Facility over the Prepetition Term Facility with respect to Prepetition European Collateral was ever executed.[5]

- The Prepetition Term Lenders **did not consent** to have their ADH Class 3 Claims primed by holders of ADH Class 1 and 2 Claims. We believe that the Plan and Disclosure Statement incorrectly assume that the ADH Class 1 and 2 Claims possess senior security interests in the Prepetition European Collateral, and that therefore the Plan inflates recoveries for these claims.

**IF HOLDERS OF OVER 1/3 OF THE AMOUNT OF THE ADH CLASS 3 CLAIMS OR 51% OF THE NUMBER OF HOLDERS OF ADH CLASS 3 CLAIMS VOTES TO REJECT THE PLAN, WE BELIEVE THE PLAN IS UNLIKELY TO BE CONFIRMED.**

- We contend that the Plan, in its current form, cannot be confirmed over ADH Class 3's dissent (*i.e.*, "crammed down") if such class were to vote to reject the Plan, because the Plan unfairly discriminates against and is not fair and equitable with respect to ADH Class 3. Unless you consent or are paid in full, the law prohibits junior classes from receiving or retaining anything and further prohibits any other class from receiving more than 100%. The proposed Plan would do both.

  o We believe the Plan improperly proposes to provide ADH Class 2 Claimants a recovery **in excess of 100%**, since the estimated recovery of 94 - 100% proposed for this class does not include the value of participating in the rights offering. Accordingly, we believe ADH Class 3 is the only class of ADH creditors that is truly impaired.

---

Agreement, dated August 2006, between Corus Aluminium Walzprodukte GmbH n/k/a Aleris Aluminum Koblenz GmbH ("Aleris Koblenz") and Citicorp North America, Inc. ("CNAI") at §§ 1.1, 4; Accounts Pledge Agreement, dated August 2006, between Aleris Koblenz and CNAI at §§ 1.1, 3; Share Pledge Agreement, dated August 3, 2006, between Corus Aluminium GmbH, Corus Aluminium Profiltechnik GmbH, and CNAI at §§ 1.1, 3; Intellectual Property Rights Security Agreement, dated August 2006, between Aleris Koblenz and CNAI at §§ 1.1, 3).

[4] Specifically, under that certain Share Pledge Agreement, dated February 13, 2009, between ADH and certain of its affiliates, as pledgors, and the DIP Term Agent Bank, as collateral agent, over shares in ADH and certain of its German affiliates, the pledgors thereunder represented that the DIP Term Agent Bank has a validly perfected security interest in the shares of the pledged companies, **"ranking only behind the pledges granted under the Existing Share Pledge Agreement"** and that the shares in the pledged companies "are free and clear of any Encumbrances … **other than as created or permitted under the Existing Share Pledge Agreements**." (*See* Share Pledge Agreement at §§ 6(h), (n); *see also* §§ 6(i), 6(j), 8). The "Existing Share Pledge Agreements" are defined by reference to the specific share pledges in favor of the Prepetition Term Facility. Comparable provisions exist under that certain Interest Pledge Agreement, dated February 13, 2009, between ADH and Aleris Deutschland Vierte Verwaltungs, as pledgors, and the DIP Term Agent Bank, as collateral agent. (*See* Interest Pledge Agreement at §§ 6(g), (h), (i), (m), 8).

[5] The Intercreditor Agreement, dated March 19, 2009, that was executed specifically provides that it does not apply to the European collateral. (*See* Intercreditor Agreement at § 6.20 ("any assets or property pledged by the Term Foreign Borrowers or any Subsidiary of the Term Foreign Borrowers or certain other Foreign Subsidiaries of Aleris… to secure (or which are subject to a Lien to secure) any Term Obligations shall not be subject to the terms or provisions of this Agreement….")).

- o We believe the Plan improperly proposes to reinstate all other claims against and interests in ADH, including general unsecured claims and holders of ADH's equity interests, all of which are junior to the ADH Class 3 Claims.

- We also believe the Debtors cannot prove beyond a reasonable doubt that the value of the proposed distributions of common stock or cash will equal the value of the ADH Class 3 Claimants' secured claims.

**THE PLAN PROPOSES TO APPROVE A 9019 SETTLEMENT OF AN INTERCREDITOR DISPUTE THAT WAS ENTERED INTO BY THE DEBTORS, APOLLO AND OAKTREE WITHOUT ANY INVOLVEMENT BY THE AGENT OR OTHER LENDERS UNDER THE PREPETITION TERM FACILITY.**

- The 9019 Settlement is not fair, reasonable or in the best interests of ADH's creditors. The 9019 Settlement, which purports to resolve an **intercreditor dispute** over the relative priority of the ADH Class 1, 2 and 3 Claims cannot be properly resolved **without involvement of the Prepetition Term Agent Bank and/or any other Prepetition Term Lenders**. Instead, this intercreditor dispute was negotiated between the Debtors, who purported to negotiate on the ADH Class 3 Claimants' behalf, and the Backstop Parties.

- The significant concessions that were granted to the Backstop Parties and the Plan's distribution scheme cannot be justified. Under the 9019 Intercreditor Settlement, Oaktree and Apollo are guaranteed a minimum ownership of at least 72.1% of the New Common Stock issued as of the effective date, as the Minimum Oaktree/Apollo Equity Threshold.

- In order to ensure Oaktree and Apollo receive this threshold amount, the amount of New Common Stock that ADH Class 3 Claimants can subscribe for may be further **reduced**. The Disclosure Statement indicates that your share of the Rights Offering **could be reduced by up to 90%** to ensure Oaktree and Apollo end up with at least 72.1% of the Company upon emergence.

**ADH'S ENTERPRISE VALUE MAY BE GROSSLY UNDERSTATED.**

- We believe the Debtors have not provided sufficient information to support or justify the asserted enterprise value of the Debtors or the proposed allocation of such enterprise value between the U.S. Debtors and ADH to allow ADH Class 3 Claimants to assess whether these valuations are justified. The Disclosure Statement summarily concludes that the Debtors' enterprise value is $1 billion, $700 million allocated to the U.S. Debtors and $300 million allocated to ADH. (Disclosure Statement at 72).

- Without knowing how the Debtors valued their U.S. operations and ADH, you cannot assess your legal entitlement to repayment or the fairness of the proposal in the Plan to transfer at least 72.1% of the New Common Stock of the Reorganized Debtors to Apollo and Oaktree.

---

**BASED ON THE FOREGOING, THE OBJECTING EUROPEAN LENDERS BELIEVE THAT THE PLAN, IN ITS CURRENT FORM, CANNOT BE CONFIRMED.**

**THE OBJECTING EUROPEAN LENDERS URGE ALL HOLDERS OF ADH CLASS 3 CLAIMS TO VOTE TIMELY TO REJECT THE PLAN BY RETURNING THE BALLOT INDICATING YOUR REJECTION OF THE PLAN IN ACCORDANCE WITH THE VOTING INSTRUCTIONS SET FORTH ON THE BALLOT.**

**VOTING TO REJECT THE PLAN WILL NOT AFFECT YOUR ABILITY TO ELECT TO RECEIVE EITHER CASH OR NEW COMMON STOCK OR TO SUBSCRIBE IN THE RIGHTS OFFERING IN THE EVENT THAT THE PLAN IS CONFIRMED.**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
Matthew B. Lunn (No. 4119)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

- and -

WILLKIE FARR & GALLAGHER LLP
Rachel C. Strickland
Brian E. O'Connor
Weston Eguchi
787 Seventh Avenue
New York, New York 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

*Co-counsel for Caspian Capital Advisors LLC and its affiliated funds, Highland Capital Management, L.P., on behalf of its managed accounts, ING Capital LLC, Marblegate Asset Management and its affiliated funds, Halcyon Structured Asset Management European CLO 2006-II B.V., on behalf of itself and its affiliate funds, GSC Group and its affiliated funds, and Riversource Investments LLC*

TO:        All holders of "European Term Loan Claims" [1] against Aleris Deutschland Holding GmbH

FROM:    Aleris International, Inc. and its affiliated debtors

RE:        Recommendation to vote <u>in favor</u> of the Joint Plan of Reorganization (the "**Plan**")

---

**THIS LETTER RESPONDS TO THE LETTER YOU ARE RECEIVING IN THIS MAILING FROM CERTAIN OBJECTING HOLDERS OF EUROPEAN TERM LOAN CLAIMS.**

**THE DEBTORS BELIEVE THAT MANY OF THE FACTUAL ASSERTIONS MADE IN THAT LETTER ARE INCORRECT OR INCOMPLETE AND THAT THE LEGAL CONCLUSIONS DRAWN THEREFROM ARE WRONG.**

**<u>THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.</u>**

---

The Debtors believe that the views set forth by the Objecting European Lenders reflect a fundamental misunderstanding of the nature and priority of the claims in ADH Class 3.

The Debtors believe that, in determining how to vote on the Plan, holders of European Term Loan Claims should consider several key facts regarding the Plan's treatment of their claims:

- The European Term Loans are not secured by the assets of any non-Debtor entity – all non-Debtor guarantees were released in accordance with the terms of the underlying loan documents. The released guarantees do not automatically "snap back" if the Plan is not confirmed.

- Because ADH is a holding company, the collateral securing the European Term Loan Claims does not include any "moveable assets" (*i.e.*, machinery, stock-in-trade, inventory, furniture, and equipment) or real estate. The primary collateral securing the European Term Loan Claims is ADH's equity interests in its direct subsidiaries. The Debtors believe that, after other claims against ADH's subsidiaries are satisfied, these equity interests will have little value.

- Other classes of ADH claims – the New Money Term DIP Claims and the European Roll-Up Term Loan Claims – are fully secured by substantial, non-ADH assets and would have to be paid in full, in cash, in order for any plan of reorganization to be confirmed.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the Disclosure Statement.

- The Plan shifts up to $75 million of value from the U.S. Roll-Up Claims to the European Term Loan Claims. There is no assurance that this value shift would be available to holders of European Term Loan Claims under any alternative plan.

- All Rights Offering Participants (including the Backstop Parties) are paying the same value for their investment in the New Common Stock.

---

**BASED ON THE FOREGOING, THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF ALL CREDITORS, INCLUDING CREDITORS IN ADH CLASS 3 OF THE PLAN.**

**THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

---

| | |
|---|---|
| Paul N. Heath (No. 3704) | Stephen Karotkin |
| RICHARDS, LAYTON & FINGER, P.A. | Debra A. Dandeneau |
| One Rodney Square | WEIL, GOTSHAL & MANGES LLP |
| 920 North King Street | 767 Fifth Avenue |
| Wilmington, DE 19801 | New York, NY 10153 |
| Telephone: (302) 651-7700 | Telephone: (212) 310-8000 |
| | Facsimile: (212) 310-8007 |

ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

---------------------------------------------------------x
                :

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| ALERIS INTERNATIONAL, INC., *et al.*, | : | Case No. 09-10478 (BLS) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

---------------------------------------------------------x

## DISCLOSURE STATEMENT FOR THE FIRST
## AMENDED JOINT PLAN OF REORGANIZATION OF
## ALERIS INTERNATIONAL, INC. AND ITS AFFILIATED DEBTORS

**PURSUANT TO SECTION 10.2.7(c) OF THE PLAN, UNLESS OTHERWISE ORDERED BY THE BANKRUPTCY COURT, ON OR AFTER THE CONFIRMATION DATE, ANY PERSON OR GROUP OF PERSONS CONSTITUTING A "FIFTY PERCENT SHAREHOLDER" OF ALERIS INTERNATIONAL, INC. WITHIN THE MEANING OF SECTION 382(g)(4)(D) OF THE TAX CODE SHALL BE ENJOINED FROM CLAIMING A WORTHLESS STOCK DEDUCTION WITH RESPECT TO ANY ALERIS EQUITY INTERESTS HELD BY SUCH PERSON(S) (OR OTHERWISE TREATING SUCH EQUITY INTERESTS AS WORTHLESS FOR U.S. FEDERAL INCOME TAX PURPOSES) FOR ANY TAXABLE YEAR OF SUCH PERSON(S) ENDING PRIOR TO THE EFFECTIVE DATE.**

I.      INTRODUCTION ................................................................................................... 1

II.     OVERVIEW OF THE PLAN ................................................................................. 7

III.    GENERAL INFORMATION .............................................................................. 14

        A.      History and Description of the Company's Business ........................................... 14

                1.      History of the Business ............................................................................. 14

                2.      Description of the Business ...................................................................... 15

                3.      Rolled Products North America ................................................................ 16

                4.      Recycling and Specification Alloy Americas .......................................... 16

                5.      Europe ...................................................................................................... 16

                6.      Controlling Risk ....................................................................................... 19

                7.      Research and Development ....................................................................... 19

                8.      Seasonality ............................................................................................... 19

                9.      Employees ................................................................................................ 20

                10.     Environmental .......................................................................................... 20

        B.      Competition .......................................................................................................... 20

        C.      Prepetition Indebtedness and Capital Structure ................................................... 21

                1.      The Prepetition ABL Facility ................................................................... 21

                2.      The Prepetition Term Facility .................................................................. 22

                3.      Outstanding Prepetition Unsecured Bonds .............................................. 25

        D.      Events Leading to the Commencement of the U.S. Debtors' Chapter 11
                Cases ..................................................................................................................... 26

                1.      Global Economic Downturn ..................................................................... 26

                2.      Effects of Economic Environment on Rolled and Extruded
                        Products .................................................................................................... 26

                3.      Effects of Economic Environment on the Debtors' Recycling
                        Business .................................................................................................... 27

                4.      Liquidity Crunch and Commencement of the U.S. Debtors'
                        Chapter 11 Cases ...................................................................................... 27

        E.      Events Leading to the Commencement of ADH's Chapter 11 Case .................... 28

IV.     THE CHAPTER 11 CASES ................................................................................ 31

        A.      General .................................................................................................................. 31

        B.      Professionals Retained in the Chapter 11 Cases .................................................. 31

| | | |
|---|---|---|
| | 1. | The Debtors' Attorneys and Advisers.................................... 31 |
| | 2. | The Advisers to the Official Committee of Unsecured Creditors........... 32 |
| C. | | Significant Events During the Chapter 11 Cases................................. 33 |
| | 1. | The DIP Credit Facilities ..................................................... 33 |
| | 2. | Employee Related Matters................................................... 39 |
| | 3. | Vendor and Customer Issues ................................................ 39 |
| | 4. | The Debtors' Exclusive Right to File and Confirm a Plan ..................... 39 |
| | 5. | Claims Issues .................................................................. 40 |
| | 6. | Allowance of Certain Environmental Claims ......................... 45 |
| | 7. | Developments Regarding the Debtors' Proposed Termination of Pension Plans ................................................................. 45 |
| | 8. | Additional Information Regarding Pension Plans ................. 46 |
| | 9. | ADH Disclosure Relating to Pension Plans............................ 47 |
| V. | | THE PLAN OF REORGANIZATION................................................. 49 |
| A. | | Classification and Treatment of Claims and Equity Interests............................ 49 |
| | 1. | Administrative Expenses ................................................... 49 |
| B. | | U.S. Tax Claims................................................................. 54 |
| C. | | Classification and Treatment of Claims Against and Equity Interests in the U.S. Debtors................................................................. 56 |
| | 1. | U.S. Debtors Class 1 (Priority Non-Tax Claims) .................. 56 |
| | 2. | U.S. Debtors Class 2 (Other U.S. Secured Claims)................ 57 |
| | 3. | U.S. Debtors Class 3 (U.S. Roll-Up Term Loan Claims)........ 58 |
| | 4. | U.S. Debtors Class 4 (Convenience Claims) ......................... 60 |
| | 5. | U.S. Debtors Class 5 (General Unsecured Claims Other than Convenience Claims and Insured Claims)................................ 63 |
| | 6. | U.S. Debtors Class 6 (U.S. Affiliate Claims) ......................... 67 |
| | 7. | U.S. Debtors Class 7 (Insured Claims) .................................. 68 |
| | 8. | U.S. Debtors Class 8 (Aleris Equity Interests) ....................... 70 |
| | 9. | U.S. Debtors Class 9 (Cancelled U.S. Equity Interests) .......... 70 |
| | 10. | U.S. Debtors Class 10 (Other U.S. Equity Interests)............... 71 |
| D. | | Classification and Treatment of Claims Against and Equity Interests in ADH................................................................. 72 |

# TABLE OF CONTENTS
## (continued)

|   |   |   |
|---|---|---|
| 1. | ADH Class 1 (German Tranche of U.S. DIP Loan Claims) | 72 |
| 2. | ADH Class 2 (European Roll-Up Term Loan Claims) | 72 |
| 3. | ADH Class 3 (European Term Loan Claims) | 74 |
| 4. | ADH Class 4 (Other ADH Claims) | 76 |
| 5. | ADH Class 5 (ADH Equity Interests) | 78 |

E. Description of Allocation of Plan Value, New Common Stock and Subscription Rights Among Holders of U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, and European Term Loan Claims ... 78

F. Convenience Class ... 81

G. Impairment under the Plan ... 83

H. Securities to Be Distributed under the Plan ... 83

    1. Subscription Rights ... 83

    2. The New Common Stock ... 83

    3. The IntermediateCo Notes ... 86

    4. The IntermediateCo Preferred Stock ... 88

I. Modification, Revocation, or Withdrawal of the Plan ... 90

    1. Modification of the Plan ... 90

    2. Revocation or Withdrawal ... 90

    3. Amendment of Plan Documents ... 91

J. Treatment of Disputed Claims ... 91

    1. Objections to Claims; Prosecution of Disputed Claims ... 91

    2. Amendment to the Claims Settlement Guidelines ... 91

    3. Distributions on Account of Disputed Claims ... 91

K. Implementation of the Plan ... 92

    1. The Rights Offering and Equity Commitment Agreement. ... 92

    2. Calculation of Plan Value ... 97

    3. Issuance of Subscription Rights in the Rights Offering ... 97

    4. The 9019 Settlement ... 105

    5. Additional Description of the 9019 Settlement ... 108

    6. Corporate Action ... 110

    7. Amendment of Organizational Documents ... 111

| | | | |
|---|---|---|---|
| | 8. | The Restructuring Transactions | 111 |
| | 9. | The Exit ABL Facility | 113 |
| | 10. | Cancellation of Securities of the U.S. Debtors | 113 |
| | 11. | The European Term Loan | 115 |
| | 12. | Effectuating Documents and Further Transactions | 116 |
| L. | | Distributions | 116 |
| | 1. | Disbursing Agent | 116 |
| | 2. | Distribution Record Date for Distributions under the Plan | 116 |
| | 3. | Time of Distributions under the Plan | 117 |
| | 4. | Single Distribution to Each Creditor | 117 |
| | 5. | Compliance with Tax Withholding and Reporting Requirements | 118 |
| | 6. | Distributions Administered by the Indenture Trustees | 118 |
| | 7. | Manner of Payment under the Plan | 119 |
| | 8. | Fractional Shares or Other Distributions | 119 |
| | 9. | Distribution of Unclaimed Property | 120 |
| | 10. | Interest on Distributions | 120 |
| M. | | Executory Contracts and Unexpired Leases | 121 |
| | 1. | Assumption of Executory Contracts and Unexpired Leases | 121 |
| | 2. | Rejection of Executory Contracts and Unexpired Leases of the U.S. Debtors | 122 |
| | 3. | Claims Arising from Rejection, Termination, or Expiration | 122 |
| | 4. | Previously Scheduled Contracts | 123 |
| | 5. | Insurance Policies and Agreements | 123 |
| | 6. | Indemnification and Reimbursement Obligations | 124 |
| | 7. | Employee Compensation and Benefit Programs | 124 |
| | 8. | Management Agreements | 126 |
| N. | | Confirmation of the Plan | 126 |
| | 1. | Condition Precedent to Entry of the Confirmation Order | 126 |
| | 2. | Conditions Precedent to the Effective Date Under the Plan | 127 |
| | 3. | Effects of Confirmation | 128 |
| O. | | Retention of Jurisdiction | 132 |

| | | | |
|---|---|---|---|
| P. | | Miscellaneous Provisions of the Plan | 134 |
| | 1. | Payment of Statutory Fees | 134 |
| | 2. | Third Party Agreements | 134 |
| | 3. | Dissolution of Creditors' Committee | 134 |
| | 4. | Notices | 134 |
| | 5. | Inconsistency | 136 |
| | 6. | Severability | 136 |
| | 7. | Governing Law | 136 |
| | 8. | Exemption from Transfer Taxes | 136 |
| | 9. | Supplemental Plan Documents | 137 |
| VI. | | MANAGEMENT OF HOLDCO AND THE REORGANIZED DEBTORS | 138 |
| | A. | Board of Directors and Management | 138 |
| | 1. | Composition of Management and the Board of Directors | 138 |
| | 2. | Long-Term Equity Incentive Program. | 141 |
| | 3. | Management Contracts | 144 |
| VII. | | REORGANIZATION VALUE | 147 |
| | A. | Going Concern Valuation | 147 |
| | B. | Valuation Methodology | 149 |
| | 1. | Discounted Cash Flow Analysis | 149 |
| | 2. | Comparable Companies Analysis | 150 |
| VIII. | | RISK FACTORS | 151 |
| | A. | Certain Bankruptcy Considerations | 151 |
| | B. | Risk Factors that May Affect the Value of Securities to Be Distributed Under the Plan and/or Recoveries under the Plan | 151 |
| | C. | Risk Factors that Could Negatively Affect the Reorganized Debtors' Business | 153 |
| IX. | | EXEMPTIONS FROM SECURITIES ACT REGISTRATION | 164 |
| | A. | Transfer and Securities Laws Restrictions | 164 |
| | 1. | New Securities and the Rights Offering | 164 |
| | 2. | Transfer and Securities Laws Restrictions | 164 |
| X. | | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 168 |

A.  Consequences to the U.S. Debtors ...................................................................... 169

    1.  Implementation of the Plan and Acquisition Agreement ....................... 170

    2.  Cancellation of Debt .............................................................................. 171

    3.  Limitations on NOL Carryforwards and Other Tax Attributes ............. 172

B.  Consequences to U.S. Holders of Certain Claims ............................................. 173

    1.  Gain or Loss ........................................................................................... 173

    2.  Distributions in Respect of Accrued Interest ......................................... 174

    3.  Tax Treatment of Subscription Rights ................................................... 175

    4.  Ownership and Disposition of the IntermediateCo Notes .................... 175

    5.  Information Reporting and Backup Withholding ................................... 178

C.  Consequences to Non-U.S. Holders of Certain Claims ..................................... 178

    1.  Exchanges under the Plan ...................................................................... 178

    2.  Tax Treatment of Subscription Rights ................................................... 180

    3.  Ownership and Disposition of New Common Stock ............................. 180

    4.  Ownership and Disposition of the IntermediateCo Notes .................... 182

    5.  Information Reporting and Backup Withholding ................................... 182

XI.  GERMAN INCOME TAX CONSEQUENCES OF THE PLAN ................................ 184

A.  Elimination of  Tax Carryforwards .................................................................... 184

B.  Transfer of Allowed European Roll-Up Term Loan Claims and Allowed European Term Loan Claims .............................................................................. 185

C.  Participation in Chapter 11 Process ................................................................... 185

XII.  CONFIRMATION AND CONSUMMATION PROCEDURE ..................................... 187

A.  Plan Support Agreements ................................................................................... 187

B.  Substantive Consolidation for Voting and Distribution Purposes ..................... 188

    1.  Deemed Substantive Consolidation ....................................................... 188

    2.  Reservation of Rights ............................................................................. 189

C.  Confirmation Procedure ..................................................................................... 190

    1.  Solicitation of Votes .............................................................................. 190

    2.  The Confirmation Hearing ..................................................................... 191

    3.  Confirmation .......................................................................................... 191

    4.  Acceptance ............................................................................................. 191

5. Unfair Discrimination and Fair and Equitable Tests ............................ 191

6. Unfair Discrimination Test ................................................................... 193

7. Feasibility .............................................................................................. 193

8. Best Interests Test ................................................................................. 194

D. Consummation .............................................................................................. 196

XIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN ........................................................................................................................ 197

A. Sale Under Section 363 of the Bankruptcy Code ........................................ 197

B. Liquidation Under Chapter 7 ........................................................................ 197

C. Alternative Plan of Reorganization .............................................................. 197

XIV. CONCLUSION AND RECOMMENDATION ........................................................... 199

# I.

## INTRODUCTION

Aleris International, Inc. ("*Aleris*") and its affiliated debtors (collectively, the "*Debtors*," and together with their non-debtor affiliates, the "*Company*") submit this Disclosure Statement pursuant to section 1125 of chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") to the holders of Claims against any of the Debtors (each a "*Creditor*") and to the holders of Equity Interests in the Debtors in connection with the solicitation of acceptances or rejections of the chapter 11 plan of reorganization (the "*Plan*") of the Debtors, dated February 5, 2010, filed with the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*") and the hearing on confirmation of the Plan (the "*Confirmation Hearing*").  The Confirmation Hearing is scheduled for May 13, 2010 at 9:30 a.m.

**Unless otherwise defined herein, all capitalized terms contained in this Disclosure Statement shall have the meanings ascribed to them in the Plan.**

Attached as Exhibits to this Disclosure Statement are the following documents:

➢ Plan (Exhibit "A");

➢ Order of the Bankruptcy Court, dated March 12, 2010, approving this Disclosure Statement (the "*Disclosure Statement Order*"), and an Order amending the Disclosure Statement Order (Exhibit "B");

➢ Financial Appendix, including audited financial statements for the year ended December 31, 2008, financial statements for the three quarters ended September 30, 2009, and Projected Financial Information (the "*Projected Financial Information*," or the "*Projections*") (Exhibit "C");

➢ Ballot Tabulation and Solicitation Procedures, as approved by the order of the Bankruptcy Court, dated March 12, 2010 (the "*Voting Procedures*") (Exhibit "D");

➢ Liquidation Analysis (Exhibit "E");

➢ List of Debtors (Exhibit "F");

➢ Current organizational structure of the Debtors (Exhibit "G"); and

➢ Expected organizational and capital structure of HoldCo, IntermediateCo, the OpCos, and the Reorganized Debtors (Exhibit "H").

In addition, the Ballot for acceptance or rejection of the Plan is enclosed with this Disclosure Statement if you are entitled to vote to accept or reject the Plan, and a Subscription Form is enclosed if you are a Creditor in a class that is entitled to participate in the Rights Offering.

Certain exhibits and schedules to the Plan are included with this Disclosure Statement and attached as exhibits and schedules to the Plan. The remaining exhibits and schedules to the Plan will be contained in a separate exhibit volume or plan supplement (the "***Plan Supplement***"), which will be filed with the clerk of the Bankruptcy Court by April 13, 2010, which is no later than the earlier of (i) thirty (30) days prior to the commencement of the Confirmation Hearing and (ii) fifteen (15) days prior to the Voting Deadline. The Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal hours of operation of the Bankruptcy Court. The Plan Supplement will also be available for download from the following website: www.kccllc.net/aleris. Holders of Claims and Equity Interests also may obtain a copy of the Plan Supplement, once filed, from the Debtors by written request sent to the following address:

> Aleris Ballot Processing
> c/o Kurtzman Carson Consultants LLC
> 2335 Alaska Ave.
> El Segundo, CA 90245

On March 12, 2010, after notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable a hypothetical, reasonable investor typical of the Creditors to make an informed judgment as to whether to accept or reject the Plan. On March 22, 2010, the Bankruptcy Court amended the order to approve the changes to the Disclosure Statement and the "Solicitation Date" that were made as a result of the agreement reached with the Official Committee of Unsecured Creditors (the "***Creditors' Committee***"). **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.**

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "*SEC*"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

On March 12, 2010, after notice and a hearing, the Bankruptcy Court entered an order approving the Voting Procedures. Among other things, these procedures (i) designate which Creditors are entitled to vote on the Plan and (ii) establish other procedures governing the solicitation and tabulation of Ballots. A copy of the Voting Procedures is attached to this Disclosure Statement as Exhibit "D." *See* Section XII.C.1, entitled, "CONFIRMATION AND CONSUMMATION PROCEDURE – Solicitation of Votes," for a description of the Voting Procedures.

Each Creditor entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting on the Plan.

Under the Bankruptcy Code, only classes of claims or equity interests that are "impaired" are entitled to vote to accept or reject the Plan. The Plan divides classes among the U.S. Debtors and Aleris Deutschland Holding GmbH ("***ADH***"). The Claims in each of the following classes are impaired:

- ➢ U.S. Debtors Class 3 (U.S. Roll-Up Term Loan Claims),

- ➢ U.S. Debtors Class 4 (Convenience Claims),

- ➢ U.S. Debtors Class 5 (General Unsecured Claims other than Convenience Claims and Insured Claims),

- ➢ U.S. Debtors Class 7 (Insured Claims),

- ➢ U.S. Debtors Class 8 (Aleris Equity Interests),

- ➢ U.S. Debtors Class 9 (Cancelled U.S. Equity Interests),

- ➢ ADH Class 2 (European Roll-Up Term Loan Claims), and

- ➢ ADH Class 3 (European Term Loan Claims).

*See* Section V.A, entitled, "THE PLAN OF REORGANIZATION – Classification and Treatment of Claims and Equity Interests," for a description of these classes.

With the exception of U.S. Debtors Class 8 (Aleris Equity Interests) and U.S. Debtors Class 9 (Cancelled U.S. Equity Interests), which are not receiving or retaining anything under the Plan and are, therefore, deemed to have rejected the Plan, holders of Claims in all other impaired Classes are entitled to vote on the Plan. Creditors in each of these classes who, pursuant to the Voting Procedures, are entitled to vote on the Plan may do so by completing and mailing the enclosed Ballot to the address set forth on the Ballot so that it is received by 5:00 p.m., Wilmington, Delaware time, on April 29, 2010 (the "***Voting Deadline***").

**Beneficial owners of debt securities of the Debtors ("*Debt Securities*") that are registered either fully or as to principal only who hold such securities through nominees should return their individual ballots to their nominees in sufficient time to allow their nominees to complete and return a master ballot prior to the Voting Deadline UNLESS such beneficial owners receive "prevalidated" ballots.** "Prevalidated" ballots may be sent directly to the address set forth on the Ballot. *See* the Voting Procedures, a copy of which is annexed hereto as Exhibit "D," and Section XII.C.1, entitled, "CONFIRMATION AND CONSUMMATION PROCEDURE – Solicitation of Votes," for a more detailed description of the Voting Procedures. If you are the holder of any Debt Securities and have any questions about voting on the Plan, please call the Debtors' special balloting and solicitation agent for Debt Securities, Financial Balloting Group LLC, at (646) 282-1800. If you hold any other type of Claim or Equity Interest, please contact KCC at (866) 927-7089 with any questions about the Ballot, the Plan, or the Voting Procedures.

If you did not receive a Ballot, it is because the Debtors believe that, in accordance with the Voting Procedures, you are not entitled to vote on the Plan.

Whether or not the holder of a Claim or Equity Interest is in a class that is entitled to vote on the Plan, such holder is entitled to object to confirmation of the Plan. Any such objection must be filed and served by April 29, 2010 at 4:00 p.m.

The following are **NOT** entitled to vote on the Plan and, therefore, have not received Ballots with this Disclosure Statement:

- ➢ Holders of Administrative Expenses
- ➢ Holders of Equity Interests in Aleris
- ➢ Holders of Cancelled U.S. Equity Interests
- ➢ Holders of Other U.S. Equity Interests
- ➢ Holders of Priority Non-Tax Claims
- ➢ Holders of Other U.S. Secured Claims
- ➢ Holders of U.S. Affiliate Claims
- ➢ Holders of German Tranche of U.S. DIP Loan Claims
- ➢ Holders of Other ADH Claims
- ➢ Holders of ADH Equity Interests
- ➢ Creditors whose Claims have been fully disallowed
- ➢ Creditors whose Claims are the subject of pending objections and have not been allowed for voting purposes

If you are not listed above and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please call KCC at (866) 927-7089.

If you are not entitled to vote solely because your Claim is the subject of a pending objection, you may apply to the Bankruptcy Court for an order allowing your Claim for voting purposes only. *You must file any such motion no later than April 12, 2010 (fifteen (15) days after the deadline for the Debtors to complete their mailing of solicitation packages).*

If you did not receive a Subscription Form, it is because the Debtors believe that, in accordance with the Plan, you are not entitled to participate in the Rights Offering. Only holders of U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, and European Term Loan Claims who are either an "accredited investor" (as such term is defined under Regulation D of the Securities Act) or not a "U.S. person" (as such term is defined under Regulation S of the Securities Act) are eligible to participate in the Rights Offering. If you are a holder of one of the above claims and did not receive a Subscription Form, please call KCC at (866) 927-7089.

The Bankruptcy Code defines "acceptance" of a plan by a class of Creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number

of the claims of that class that cast ballots for acceptance or rejection of the plan. The Debtors are seeking acceptance of the Plan by Creditors in the following classes: U.S. Debtors Class 3 (U.S. Roll-Up Term Loan Claims), U.S. Debtors Class 4 (Convenience Claims), U.S. Debtors Class 5 (General Unsecured Claims other than Convenience Claims and Insured Claims), U.S. Debtors Class 7 (Insured Claims), ADH Class 2 (European Roll-Up Term Loan Claims), and ADH Class 3 (European Term Loan Claims). For a complete description of the requirements for acceptance of the Plan, *see* Section XII.C.4, entitled, "CONFIRMATION AND CONSUMMATION PROCEDURE – Confirmation Procedure – Acceptance."

The Voting Record Date for determining which Creditors (including holders of Debt Securities) are entitled to vote on the Plan is March 10, 2010. **THE TRUSTEES FOR DEBT SECURITIES ARE NOT ENTITLED TO VOTE ON BEHALF OF THE HOLDERS OF SUCH SECURITIES, AND, CONSEQUENTLY, SUCH HOLDERS MUST SUBMIT THEIR OWN BALLOTS.** Please see the Voting Procedures for further information regarding voting procedures that have been established for holders of Debt Securities.

After carefully reviewing this Disclosure Statement, including the Exhibits, each Creditor in an impaired Class that is entitled to vote should vote on the enclosed Ballot and return the Ballot in the envelope provided so that it is actually received by the Voting Deadline – 5:00 p.m., Wilmington, Delaware time, on April 29, 2010. If you have a Claim in more than one class and you are entitled to vote Claims in more than one class, you will receive separate Ballots for each Claim. All of your Claims against all the Debtors in each Class, however, are aggregated for voting purposes, and you will only receive a single Ballot for each Class in which you hold Claims.

All Creditors, *other than holders of Debt Securities*, should vote and return their Ballots to KCC at the following address:

Aleris Ballot Processing
c/o Kurtzman Carson Consultants LLC
2335 Alaska Ave.
El Segundo, CA 90245

Phone: (866) 927-7089

*Holders of Debt Securities should follow the instructions on their Ballots for returning their Ballots.*

If you have any questions about the Plan, this Disclosure Statement, or the Voting Procedures, please call KCC at (866) 927-7089.

To be counted, your ballot must be actually received at the appropriate address by the voting deadline – 5:00 p.m., Wilmington, Delaware time, on April 29, 2010. Ballots must be delivered by mail, courier, or delivery service. Ballots delivered by facsimile or other electronic means of transmission will not be accepted. Any completed Ballots received that do not indicate either an

ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATE BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED.

TO PARTICIPATE IN THE RIGHTS OFFERING, YOUR SUBSCRIPTION FORM MUST BE RECEIVED BY THE SUBSCRIPTION EXPIRATION DATE – APRIL 23, 2010 – AND YOU MUST COMPLY WITH THE OTHER DEADLINES OUTLINED IN SECTION V.K.1, ENTITLED, "THE PLAN OF REORGANIZATION – IMPLEMENTATION OF THE PLAN – THE RIGHTS OFFERING AND EQUITY COMMITMENT AGREEMENT." *PLEASE NOTE THAT THE DATE FOR RETURNING YOUR SUBSCRIPTION FORM IS EARLIER THAN THE VOTING DEADLINE.*

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on May 13, 2010 at 9:30 a.m. (Eastern Time), at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 6th Floor, Wilmington, Delaware 19801, Courtroom No. 1. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed on or before April 29, 2010 at 4:00 p.m. (Wilmington, Delaware time), in the manner described in this Disclosure Statement under Section XII.C.2, entitled, "CONFIRMATION AND CONSUMMATION PROCEDURE – The Confirmation Hearing." The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned date of the Confirmation Hearing.

> THE DEBTORS AND THE CREDITORS' COMMITTEE BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERIES TO THE CREDITORS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF EVERY CLASS OF CREDITORS. ACCORDINGLY, THE DEBTORS AND THE CREDITORS' COMMITTEE RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

> ### IRS CIRCULAR 230 NOTICE:
> TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS IN THE DEBTORS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISER.

# II.

# OVERVIEW OF THE PLAN

The following is a brief overview of the Plan. This overview is qualified in its entirety by reference to the Plan, a copy of which is included as Exhibit "A." In addition, for a more detailed description of the terms of the Plan, *see* Section V, entitled, "THE PLAN OF REORGANIZATION."

The Plan and the Chapter 11 Cases accomplish the following objectives, which the Debtors believe are essential components of a successful reorganization:

➢ Reducing the Debt on the Debtors' balance sheets;

➢ Fair treatment for unsecured claims; and

➢ Corporate reorganization of the Debtors.

The Plan designates fifteen classes of Claims and Equity Interests: ten classes of Claims against and Equity Interests in the U.S. Debtors and five classes of Claims against and Equity Interests in ADH. The U.S. Debtors classes consist of seven classes of Claims and three classes of Equity Interests. U.S. Debtors Class 8 represents Equity Interests in Aleris (which are held by Aurora Acquisition Holdings, Inc. ("**Aurora**"), Aleris' sole shareholder), U.S. Debtors Class 9 represents Equity Interests in certain of the U.S. Debtors which will be cancelled under the Plan, including Equity Interests in Wabash Alloys, L.L.C. ("**Wabash Alloys**") (held by Alchem Aluminum Shelbyville Inc.) and Aleris Aluminum U.S. Sales Inc. (held by CA Lewisport, LLC), and U.S. Debtors Class 10 represents Equity Interests comprised of Equity Interests in the U.S. Debtors other than Aleris and the Dissolving U.S. Subsidiaries. The ADH classes consist of four classes of Claims and one class of Equity Interests in ADH. These classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Equity Interests. The treatment each class of Claims and Equity Interests receives is set forth in summary fashion in the table on pages 10 through 12 below.

The Plan contemplates that Reorganized Aleris will sell its assets to "**OpCos**," certain entities established for the purposes of acquiring such assets. These entities will, in turn, be owned, directly or indirectly, by IntermediateCo, which will be owned by HoldCo. Among other things, the common stock of HoldCo (the "**New Common Stock**") will be contributed to the OpCos, used by the OpCos as part of the consideration paid to Reorganized Aleris for its assets, and then distributed pursuant to the Plan. As used in this Disclosure Statement, "**Reorganized Debtors**" refers to any of the Debtors, as reorganized as of the Effective Date in accordance with the Plan, or any successors in interest thereto (including, without limitation, any OpCo to the extent that such Entity, pursuant to the Acquisition Agreement, assumes the liabilities of such Debtor for Allowed Administrative Expenses or other amounts payable under the Plan), from and after the Effective Date.

Pursuant to the Plan, a holder of U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, and/or European Term Loan Claims who is either an "accredited

investor" (as such term is defined under Regulation D of the Securities Act) or not a "U.S. person" (as such term is defined under Regulation S of the Securities Act) will have the right to participate in a rights offering for shares of New Common Stock and the IntermediateCo Notes. The Rights Offering, which is described in more detail in Section V.K.1, entitled, "THE PLAN OF REORGANIZATION – Implementation of the Plan – The Rights Offering and Equity Commitment Agreement," is expected to generate Cash proceeds of up to $690 million, which will be used to repay the DIP ABL Credit Facility and the New Money Term DIP Facility, to fund other Cash distributions required by the Plan, and to provide the Reorganized Debtors with sufficient operating cash. Subject to the terms of the Equity Commitment Agreement, the Backstop Parties have agreed to underwrite the full amount of the Rights Offering.

The proposed capital structure for the Reorganized Debtors and their parent entities, including post-Effective Date financing arrangements that the Reorganized Debtors expect to enter into in order to meet the working capital needs for their ongoing business operations, is as follows:

> ➤ Exit financing facility through an asset-based revolving credit facility with a commitment of at least $500 million (the "*Exit ABL Facility*"). A more complete description of the expected terms of the Exit ABL Facility is set forth in Section V.K.9 of this Disclosure Statement, entitled, "THE PLAN OF REORGANIZATION – Implementation of the Plan – The Exit ABL Facility."

> ➤ The equity in the Reorganized Debtors will be owned indirectly by holders of U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, European Term Loan Claims, participants in the Rights Offering, and the Backstop Parties, which, collectively, will own all of the New Common Stock outstanding as of the Effective Date. *See* Section V.H.2, entitled, "THE PLAN OF REORGANIZATION – Securities to be Distributed under the Plan – The New Common Stock," for a description of the New Common Stock. Existing management is not receiving New Common Stock under the Plan on the Effective Date, although pursuant to the Long-Term Equity Incentive Program, certain members of management will receive restricted New Common Stock and options to purchase New Common Stock, subject to vesting requirements contained in the Long-Term Equity Incentive Program. The Aleris Equity Interests, which are held directly by Aurora, and the Cancelled U.S. Equity Interests, will be cancelled on the Effective Date. Equity Interests in the Debtors other than the Cancelled U.S. Equity Interests, which are held by other Debtors, will be reinstated on the Effective Date.

> ➤ Subordinated, unsecured exchangeable notes distributed to participants in the Rights Offering and the Backstop Parties under the IntermediateCo Note Indenture ("*IntermediateCo Notes*") in an aggregate principal amount equal to Forty-Five and 00/100 Million Dollars ($45,000,000) and having such other terms, covenants and conditions set forth in the Plan. *See* Section V.H.3, entitled, "THE PLAN OF REORGANIZATION – Securities to be Distributed

under the Plan – The IntermediateCo Notes," for a description of the IntermediateCo Notes.

➢ Shares of IntermediateCo Preferred Stock, which will have an aggregate stated value of Five and 00/100 Million Dollars ($5,000,000), will be sold by IntermediateCo to the Backstop Parties. *See* Section V.H.4, entitled, "THE PLAN OF REORGANIZATION – Securities to be Distributed under the Plan – The IntermediateCo Preferred Stock," for a description of the IntermediateCo Preferred Stock.

A summary of the proposed organizational and capital structure of HoldCo, IntermediateCo, the OpCos, and the Reorganized Debtors is set forth on Exhibit "H."

**Important Note**: The industry in which the Debtors operate is affected by numerous uncertainties. Those uncertainties and other investment risks make it difficult to determine a precise value for the Debtors and the New Common Stock distributed under the Plan. The recoveries described in the table below represent the Debtors' best estimate of these values given the information available at this time. This estimate does not predict the potential trading prices of the securities distributed under the Plan. Unless otherwise noted, the information in the following table and in the sections below is based upon an assumed Effective Date of June 1, 2010. The Debtors believe that an Effective Date as late as October 31, 2010 will not materially affect these estimates or the underlying assumptions. The estimated recoveries set forth below are based upon the following assumptions:

➢ The estimated enterprise value of the Debtors is approximately $1 billion.

➢ The estimated Plan Value, which is the estimated value of the equity of the Reorganized Debtors before giving effect to the Rights Offering, is $270.6 million. Plan Value may be higher if the amounts deducted from the enterprise value under the formulas set forth in the Plan are less than expected. The Plan Value, however, will not be lower than $221.7 million.

➢ Of the Plan Value, $168.9 million is the estimated U.S. Plan Value, and $101.7 million is the estimated ADH Plan Value. The ADH Plan Value will be no less than $101.7 million, and a condition to the Plan provides that the U.S. Plan Value be no less than $120 million.

➢ The amount of Cash required to be raised in the Rights Offering will be the Maximum Rights Offering Amount, $690 million.

Based upon these assumptions, the Debtors estimate that the total value of the reorganization consideration to be available to be distributed pro rata to holders of claims to be as set forth below.

# SUMMARY OF CLASSIFICATION AND
# TREATMENT UNDER THE PLAN

The Plan classifies Claims and Equity Interests against the U.S. Debtors for all purposes, including voting, confirmation, and distribution, as follows:

| Class | Treatment | Status | Entitled to Vote | Estimated Recovery[1] |
|---|---|---|---|---|
| **U.S. Debtors Class 1:** Priority Non-Tax Claims | Paid in full, in Cash, on the later of the Effective Date and as soon as practicable after the Priority Non-Tax Claim becomes Allowed. | Unimpaired | No. Deemed to accept. | 100% |
| **U.S. Debtors Class 2:** Other U.S. Secured Claims | Reinstated or otherwise left unimpaired. | Unimpaired | No. Deemed to accept. | 100% |
| **U.S. Debtors Class 3:** U.S. Roll-Up Term Loan Claims | Pro Rata Share of one of the following:<br><br>1. U.S. Roll-Up Stock and U.S. Subscription Rights<br><br>*or*<br><br>2. Cash equal to the U.S. Plan Value | Impaired | Yes. | 28% |
| **U.S. Debtors Class 4:** Convenience Claims | Paid Cash equal to 25% of Allowed Amount of Allowed Convenience Claim on later of the Initial Distribution Date and as soon as practicable after such Convenience Claim becomes Allowed.<br><br>Eligible for an additional 25% payout on the Final Distribution Date if total Allowed Amount of Administrative Expenses under section 503(b)(9) is less than $6.5 million (including any such expenses that have been paid by the Debtors prior to the Effective Date). | Impaired | Yes. | 25% to 50% |
| **U.S. Debtors Class 5:** General Unsecured Claims other than Convenience Claims and Insured Claims | Pro Rata Share of $16.5 million in Cash. | Impaired | Yes. | 0.8-1.1% |
| **U.S. Debtors Class 6:** U.S. Affiliate Claims | Reinstated or otherwise left unimpaired. | Unimpaired | No. Deemed to accept. | 100% |

---

[1] Estimated recoveries on Claims denominated in euros assume an exchange rate of $1.48 dollars per euro.

| Class | Treatment | Status | Entitled to Vote | Estimated Recovery[1] |
|---|---|---|---|---|
| **U.S. Debtors Class 7:** Insured Claims | The holder of an Insured Claim may elect to**:**<br><br>1. remain in U.S. Debtors Class 7 and limit such holder's recovery on account of its Allowed Insured Claim to any Insurance Proceeds available for such Claim,<br><br>2. have its Insured Claim be treated under the Plan as a General Unsecured Claim in U.S. Debtors Class 5, *or*<br><br>3. subject to Section 3.2.4(b) of the Plan, have its Insured Claim be treated under the Plan as a Convenience Claim in U.S. Debtors Class 4. | Impaired | Yes. | Unknown |
| **U.S. Debtors Class 8:** Aleris Equity Interests | Cancelled. | Impaired | No. Deemed to reject. | 0% |
| **U.S. Debtors Class 9:** Cancelled U.S. Equity Interests | Cancelled. | Impaired | No. Deemed to reject. | 0% |
| **U.S. Debtors Class 10:** Other U.S. Equity Interests | Reinstated. | Unimpaired | No. Deemed to accept. | 100% |

Claims against and Equity Interests in ADH are classified for all purposes, including, without express or implied limitation, voting, confirmation, and distribution pursuant to the Plan, as follows:

| Class | Treatment | Status | Entitled to Vote | Estimated Recovery[2] |
|---|---|---|---|---|
| **ADH Class 1:** German Tranche of U.S. DIP Loan Claims | Paid in full, in Cash, on the Effective Date. | Unimpaired | No. | 100% |
| **ADH Class 2:** European Roll-Up Term Loan Claims | Pro Rata Share of one of the following:<br><br>1. ADH Roll-Up Stock and the ADH Roll-Up Subscription Rights,<br><br>*or*<br><br>2. Cash equal to $25 million. | Impaired | Yes. | Option 1: 100%<br><br>Option 2: 94% |
| **ADH Class 3:** European Term Loan Claims | Pro Rata Share of one of the following:<br><br>1. ADH Term Loan Stock and the ADH Term Loan Subscription Rights,<br><br>*or*<br><br>2. Cash equal to the ADH Term Loan Value. | Impaired | Yes. | 21% |
| **ADH Class 4:** Other ADH Claims | Reinstated or otherwise left unimpaired. | Unimpaired | No. Deemed to accept. | 100% |
| **ADH Class 5:** ADH Equity Interests | Reinstated. | Unimpaired | No. Deemed to accept. | 100% |

Termination of certain of the U.S. Debtors' pension plans in accordance with 29 U.S.C. § 1341(c) or 1342, and as discussed in more detail in Section V.N.1, entitled, "THE PLAN OF REORGANIZATION – Confirmation of the Plan – Condition Precedent to Entry of the Confirmation Order" is a condition precedent to confirmation of the Plan. Following confirmation of the Plan, the Plan will not become effective until the "***Effective Date***" which will be a Business Day selected by the Debtors, with the consent of a Majority in Interest, that is within thirty-one (31) days after the date by which all of the conditions precedent to the effectiveness of the Plan specified in Section 10.1 thereof have been satisfied or waived in accordance with such section or, if a stay of the Confirmation Order is in effect, a date mutually acceptable to the Debtors and the "***Majority in Interest***" that is within thirty-one (31) days after

---

[2] Estimated recoveries on Claims denominated in euros assume an exchange rate of $1.48 dollars per euro.

the date of the expiration, dissolution, or lifting of such stay. At any time before the Voting Deadline, "*Majority in Interest*" means Backstop Parties (i) having executed a Plan Support Agreement and (ii) at such time, holding over fifty percent (50%) of the funding commitments under the Equity Commitment Agreement of the Backstop Parties that have executed a Plan Support Agreement, and at any time on and after the Voting Deadline, "Majority in Interest" shall mean Backstop Parties (x) having executed a Plan Support Agreement and (y) at such time, holding over 83% of the funding commitments under the Equity Commitment Agreement of the Backstop Parties that have executed a Plan Support Agreement (it being understood that for purposes of this definition, the percentage of funding commitments of each Backstop Party that executes a Plan Support Agreement shall equal the total amount of such Backstop Party's European Term Loan Claims, European Roll-Up Term Loan Claims, and U.S. Roll-Up Term Loan Claims (such claims, the "*Relevant Claims*"), as a percentage of Relevant Claims held by all of the Backstop Parties that have executed a Plan Support Agreement) and in each case giving *pro forma* effect to the 9019 Settlement. For purposes of this Disclosure Statement, the Debtors have assumed that the Effective Date will be June 1, 2010. Of course, there can be no certainty that the Effective Date will occur by such date. The satisfaction of many of the conditions to the occurrence of the Effective Date is beyond the control of the Debtors.

Distributions on account of U.S. Debtors Class 4 (Convenience Claims) and U.S. Debtors Class 5 (General Unsecured Claims other than Convenience Claims and Insured Claims) will be made on the "*Initial Distribution Date*," which is a date selected by the Reorganized Debtors within fifteen (15) days after the Effective Date, or such later date as the Bankruptcy Court may establish upon request by the Reorganized Debtors, for cause shown. In no event, however, will the Initial Distribution Date be more than forty-five (45) days after the Effective Date. Additional distributions may be made to holders of Allowed Claims in U.S. Debtors Class 5 (General Unsecured Claims other than Convenience Claims and Insured Claims) on subsequent Distribution Dates, which will occur on the first Business Day of the month commencing six (6) months after the Initial Distribution Date, and every six (6) months thereafter, until the Final Distribution Date when all Disputed Claims have become either Allowed Claims or Disallowed Claims. In addition, holders of Allowed Convenience Claims may be eligible for a subsequent distribution on the Final Distribution Date (or such earlier date as the Reorganized Debtors, in their sole discretion, may select) if the aggregate amount of Allowed Administrative Expenses under section 503(b)(9) of the Bankruptcy Code is less than $6.5 million, including any such expenses that have been paid by the Debtors prior to the Effective Date. Distributions on account of all other Allowed Claims will be made on the Effective Date or as soon as practicable thereafter, but in no event more than fifteen (15) days after the Effective Date.

Notwithstanding the foregoing, a payment will only be made on account of a Disputed Claim after, and to the extent that, such Disputed Claim becomes Allowed. All payments to be made in Cash under the Plan will be made, at the election of the Reorganized Debtors or the Disbursing Agent, by check or wire transfer.

# III.

# GENERAL INFORMATION

A.   **History and Description of the Company's Business.**

1.   **History of the Business.**

The Company was formed in December 2004 pursuant to the merger of two leading companies in the aluminum industry – Commonwealth Industries, Inc. ("***Commonwealth***") and IMCO Recycling, Inc. ("***IMCO***").  The Commonwealth-IMCO merger created a vertically integrated aluminum recycler and sheet manufacturer with approximately $2 billion in revenues.  In 2005, the Company expanded its geographic footprint and diversified its product offerings through a series of asset and company acquisitions including, among others, (i) debtor ALSCO Holdings, Inc. (and its subsidiary, debtor ALSCO Metals Corporation), a manufacturer and fabricator of aluminum sheet products for the building and construction industry, and (ii) debtor Alumitech, Inc. (and its subsidiary, debtor ETS Schaefer Corporation), an aluminum recycler and salt cake processor.  That same year the Company also acquired non-debtor Tomra Latasa Reciclagem and certain assets of Ormet Corporation.

In August 2006, the Company acquired the downstream aluminum rolling and extrusion businesses (the "***Corus Business***") from the Corus Group plc ("***Corus***").  In conjunction with the Corus Business acquisition, the Company entered into (i) a $750 million revolving credit facility (the "***Prepetition ABL Facility***" as described below), (ii) a $650 million term loan facility,[3] and (iii) a one-year senior unsecured facility ("***Senior Unsecured Facility***").  Amounts drawn on these facilities following the Corus Business acquisition included approximately $470 million on the Prepetition ABL Facility, $650 million on the prepetition term facility and $505 million on the Senior Unsecured Facility.  In addition to funding the purchase price paid to acquire the Corus Business, the Company used the proceeds from these facilities to refinance substantially all of its indebtedness existing at the time the facilities were entered into and to pay costs associated with the Corus Business acquisition and new facilities.

Until December 2006, the Company's common stock was publicly traded on the New York Stock Exchange.  In December 2006, Texas Pacific Group ("***TPG***") acquired the Company through Aurora, an entity that has no assets other than the shares of Aleris.  The acquisition by TPG and certain officers and senior management included an equity investment of approximately $848.8 million plus proceeds from the refinancing and increasing of substantially all of the Company's outstanding indebtedness.  In conjunction with the TPG acquisition, on December 19, 2006, the Company (i) amended and restated the Prepetition ABL Facility, (ii) amended and restated the prepetition term facility to increase the maximum borrowings to $825 million and €303 million, and (iii) issued $600 million of Senior Notes and $400 million of

---

[3] This is the prepetition term loan facility described in more detail in Section III.C.2, entitled, "GENERAL INFORMATION – Prepetition Indebtedness and Capital Structure – The Prepetition Term Facility."

Senior Subordinated Notes, a portion of which was used to repay the Senior Unsecured Facility. As a result of the TPG acquisition, Aleris is wholly owned by Aurora.

Subsequent to TPG's acquisition of the Company, the Company continued its expansion through various asset and company acquisitions. In May 2007, the Company acquired EKCO Products, a producer of light gauge aluminum sheet used in consumer and pharmaceutical foil packaging and fin stock, and in September of 2007, the Company acquired debtor Wabash Alloys, a producer of aluminum casting alloys and molten metal. When the Company acquired debtor Wabash Alloys, the Company financed the acquisition with the proceeds received from its issuance of the 2007 Senior Notes and from additional borrowings under its Prepetition ABL Facility. In 2008, the Company acquired non-debtors H.T. Aluminum Specialties, Inc. and Granular Aluminum Products, Inc., aluminum scrap metal processors.

The Company also completed certain international acquisitions. In September 2007, the Company acquired Alumox Holding AS of Norway, a recycler of dross and scrap (for recovery of aluminum) and a processor of salt slag (for recovery of aluminum and aluminum oxide).

The Company operates 41 production facilities worldwide, with 13 production facilities that provide rolled and extruded aluminum products and 28 recycling production plants. The Company's facilities are strategically located and well-positioned to service its customers, which include a number of the world's largest companies in the building and construction, containers and packaging, metal distribution, and transportation industries.

Aleris is the direct or indirect parent corporation of each of the Debtors. All business operations are carried out by Aleris, its affiliated Debtors, two domestic non-debtor affiliates (H.T. Aluminum Specialties, Inc. and Granular Aluminum Products, Inc.), two domestic non-wholly owned partnerships (IMSAMET of Arizona and Solar Aluminum Technology Services), and Aleris's non-debtor international affiliates with operations in, among other places, Canada, Mexico, Brazil, Belgium, the United Kingdom, Germany, the Netherlands, Norway, Switzerland, and China. The Company now has operations or offices in approximately 13 states in the United States and in 18 foreign countries. The Company's principal executive offices and global headquarters are located at 25825 Science Park Drive, Suite 400, Beachwood, Ohio 44122-7392.

## 2. Description of the Business.

The Company is a global leader in the production and sale of aluminum rolled and extruded products, recycled aluminum, and specification alloy manufacturing. The Company operates primarily through three reportable business segments: (i) Rolled Products North America ("*RPNA*"), (ii) Recycling and Specification Alloys Americas ("*RSAA*"), and (iii) Europe. The Company's RPNA segment shipped 861.0 million pounds of aluminum rolled products for the fiscal year ended December 31, 2008 and 528.1 million pounds for the nine month period ended September 30, 2009. The Company's RSAA segment shipped 2,427.0 million pounds of recycled metal and specification alloys for the fiscal year ended December 31, 2008 and 1,091.6 million pounds for the nine month period ended September 30, 2009. The Company's Europe segment shipped 1,798.0 million pounds of aluminum rolled and extruded

products and recycled metal for the fiscal year ended December 31, 2008 and 989.3 million pounds for the nine month period ended September 30, 2009. In 2008, the Company generated approximately $5.906 billion of revenues for the fiscal year ended December 31, 2008, and the Company generated approximately $2.157 billion of revenues for the nine month period ended September 30, 2009. The Company generates substantially all of its revenue from the manufacture and sale of these products.

ADH is a holding company that owns the stock of certain German and Belgium subsidiaries that produce rolled and extruded products as in the Europe segment. ADH has no operations and no employees.

### 3. Rolled Products North America.

The Company's RPNA segment produces rolled products for a wide variety of applications, including building and construction, distribution, transportation, and other uses in the consumer durables general industrial segments. Except for depot sales, which are for standard size products, substantially all of the rolled aluminum products in the United States are manufactured to specific customer requirements, using direct-chill and continuous ingot cast technologies that allow the Company to use and offer a variety of alloys and products for a number of end uses. Specifically, those products are integrated into, among other things, building panels, truck trailers, gutters, appliances, and recreational vehicles.

### 4. Recycling and Specification Alloy Americas.

The Company's RSAA segment includes aluminum melting, processing and recycling activities, as well as its specification alloy manufacturing business. The segment's recycling operations convert scrap and dross (a byproduct of melting aluminum) and combine these materials with other alloy agents as needed to produce recycled metal generally for participants in the metal industry serving end-uses related to consumer packaging, transportation and construction. Historically, a significant percentage of these products are sold through "tolling" arrangements, in which the Company converts customer-owned scrap and dross and returns the recycled metal in ingot or molten form to its customers for a fee.

The segment's specification alloy operations combine various aluminum scrap types with hardeners and other additives to produce alloys and chemical compositions with specific properties (including increased strength, formability and wear resistance) as specified by customers for their particular applications. The specification alloy operations typically deliver its recycled and specification alloy products to customers in molten or ingot form. The specification alloy operations principally serve the U.S. automotive industry.

### 5. Europe.

The Company's Europe segment is comprised of the rolled and extruded products and recycling operations in Europe and a single extrusion facility in China. The Europe segment produces rolled products for a wide variety of technically sophisticated applications, including aerospace plate and sheet, brazing sheet, automotive sheet, and other uses in the engineering, construction, transportation, and packaging industry segments. Substantially all of the Company's rolled aluminum products in Europe are manufactured to specific customer

requirements using direct-chill ingot cast technologies that allow the Company to use and offer a variety of alloys and products for a number of technically demanding end uses.

The Europe segment also produces extruded aluminum products for the transportation (automotive, rail, and shipbuilding), electrical, mechanical engineering, and building and construction sectors. With one of the largest extrusion presses in the world, the Company produces high-end, value-added, large-profile extruded products. The Company further serves its customers by performing value-added fabrication on most of its extruded products. The Company's extruded products are used for, among other things, urban rail and other transport systems, automotive parts, aircraft, and the building and construction industry.

The Europe segment also includes certain aluminum melting, processing and recycling activities. These recycling operations convert scrap and dross (a byproduct of melting aluminum) and combine these materials with other alloy agents as needed to produce recycled metal and specification alloys. Historically, a significant percentage of these products are sold through "tolling" arrangements, in which the Company converts customer-owned scrap and dross and returns the recycled metal to its customers for a fee.

The following is a list of each segment's principal products and services:

| Segment | Principal products and services | Principal end-use/product category |
|---|---|---|
| RPNA | Rolled aluminum products ranging from thickness (gauge) of 0.002 to 0.249 inches in widths of up to 72 inches | Building and construction (roofing, rainware, and siding) |
| | | Metal distribution |
| | | Transportation equipment (truck trailers and bodies) |
| | | Consumer durables |
| | | Automotive sheet (inner, outer and structural parts) |
| | | Specialty coil and sheet (cookware, fuel tanks, ventilation, cooling, and lamp bases) |
| | | Converter foil, fins and tray materials |
| | | Coated coil (building and transport sectors) |
| RSAA | Recycles aluminum scrap and dross into recycled metal in molten or ingot form | Aluminum Production (containers and packaging, general industrial) |
| | Specification alloy | Automotive |
| Europe | Rolled aluminum products ranging from thickness (gauge) of 0.00026 to 23.0 inches in widths of up to 156 inches | Aircraft plate and sheet |
| | | Brazing coil and sheet (heat exchanger materials for automotive and general industrial) |
| | | Commercial plate and sheet (tooling, molding, road transport, shipbuilding, LNG transport and silos), |
| | | Automotive body sheet (inner, outer and structural parts) |
| | | Specialty coil and sheet (cookware, fuel tanks, ventilation, cooling, and lamp bases) |
| | | Building and construction (roofing, rainware, and siding) |
| | | Metal distribution |
| | | Transportation equipment (truck trailers and bodies) |
| | | Consumer durables |
| | | Foil stock |
| | Extruded aluminum products ranging from 0.2 to 120.0 kilograms per cubic meter | Industrial extrusions (construction, transport, and engineering sectors) |
| | | BUG building systems (windowsills, water bars, roofing products, window systems, and balconies) |
| | | Project business extrusions (urban transport systems, high speed trains, mobile bridges for defense purposes and shipbuilding) |
| | | Rods and hard alloy extrusions (automotive parts, aircraft, hydraulic and pneumatic systems and leisure) |
| | Recycles aluminum scrap and dross into recycled metal in molten or ingot form | Aluminum Production (containers and packaging, general industrial) |
| | Specification alloy | Automotive |

6.      **Controlling Risk.**

Prior to the Commencement Date, the Company entered into derivatives to hedge the cost of energy, the sale and purchase prices of certain aluminum products and certain alloys used in its production processes, and certain currency exposures and variable interest rates.

The Company uses forward contracts and options, as well as contractual price escalators, to reduce the risks associated with its natural gas and other supply requirements. Generally, the Company enters into master netting arrangements with its counterparties and offsets net derivative positions with the same counterparties against amounts recognized for the right to reclaim cash collateral or the obligation to return cash collateral under those arrangements.

In April 2009, the Company entered into various option contracts to reduce its exposure to increases in the London Metal Exchange ("***LME***") aluminum prices and natural gas prices. The Company paid premiums of approximately $10.2 million in the quarter ended June 30, 2009 to enter into these contracts. In addition, the U.S. Debtors sought formal approval from the Bankruptcy Court for entering into derivative financial contracts. On June 23, 2009, the Bankruptcy Court authorized the U.S. Debtors to enter into derivative transactions and issued its *Order Pursuant to Sections 105(a), 363(c) and 364(c) of the Bankruptcy Code Authorizing the Debtors to Enter Into Derivative Transactions and to Grant First Priority Liens in Cash Collateral Posted in Connection with Such Transactions* (Docket No. 707). Under this order the U.S. Debtors are permitted to post cash collateral and to grant first priority liens in such collateral to secure derivative transactions. The Debtors, however, are not permitted to enter into any new derivative transactions at a time when the total cash collateral already posted exceeds $40 million. As of December 31, 2009, the Company had posted cash collateral totaling approximately $8.8 million in connection with its postpetition derivative transactions. The Company has not entered into hedged transactions with respect to interest payments in 2009 or 2010.

7.      **Research and Development.**

In connection with the acquisition of the Corus Business, the Company entered into a five-year research and development agreement with Corus pursuant to which Corus assists the Company in research and development projects on a fee-for-service basis.

8.      **Seasonality.**

Many of the Company's rolled and extruded products and recycling and specification alloy end-uses are seasonal. Demand in the rolled and extruded products business is generally stronger in the spring and summer seasons due to higher demand in the building and construction industry. The Company's recycling business experiences greater demand in the spring season due to stronger automotive and can sheet demand. Such factors typically result in higher operating income in the first half of the year.

9. **Employees.**

As of December 31, 2009, the Company had a total of approximately 6,100 employees, consisting of approximately 1,900 employees engaged in administrative and supervisory activities and approximately 4,200 employees engaged in manufacturing, production and maintenance functions. The Company has approximately 2,400 active employees in the United States and 3,700 in foreign countries.

10. **Environmental.**

The Company is subject to federal, state, local and foreign environmental laws and regulations, which govern, among other things, air emissions, wastewater discharges, the handling, storage, and disposal of hazardous substances and wastes, the investigation or remediation of contaminated sites, and employee health and safety. These laws can impose joint and several liability for releases or threatened releases of hazardous substances upon statutorily defined parties, including the Company, regardless of fault or the lawfulness of the original activity or disposal. Given the changing nature of environmental legal requirements, the Company may be required, from time to time, to install additional pollution control equipment, make process changes, or take other environmental control measures at some of its facilities to meet future requirements.

The Company has been named as a potentially responsible party in certain proceedings initiated pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act and similar state statutes and may be named a potentially responsible party in other similar proceedings in the future. It is not anticipated that the costs incurred in connection with presently pending environmental proceedings will, individually or in the aggregate, have a material adverse effect on our financial position or results of operations.

B. **Competition.**

The worldwide aluminum industry is highly competitive. Aluminum competes with other materials such as steel, plastic, and glass for various applications.

The Company's RPNA and Europe's rolled and extruded products businesses compete in the production and sale of rolled aluminum sheet and extrusion products. In the sectors in which the Company competes, the other industry leaders include Alcoa, Alcan, Novelis, Quanex, Norsk Hydro and Jupiter Aluminum. The Company competes with other rolled and extruded products suppliers on the basis of quality, price, timeliness of delivery, and customer service.

The principal factors of competition in the Company's recycling business are price, metal recovery rates, proximity to customers, molten metal delivery capability, environmental and safety regulatory compliance, and other types of services. Freight costs also limit the geographic areas in which the Company can compete effectively. The international recycling business is highly fragmented and very competitive. The Company's major competitors include Trimet for recycling and Remetel and Konzelmann/BUS for specification alloys.

**C.     Prepetition Indebtedness and Capital Structure.**

**1.     The Prepetition ABL Facility.**

As described above, in order to finance the acquisition of the Corus Business, the TPG transaction, other acquisitions, and the Company's operations, Aleris and each of its affiliated Debtors (and certain international non-debtor affiliates, including certain Canadian subsidiaries and Aleris Switzerland GmbH) entered into and became obligated under, either as a direct borrower or as a guarantor, an Amended and Restated Credit Agreement, dated August 1, 2006, as amended and restated as of December 19, 2006, (together with all amendments, related agreements, and documents, the "***Prepetition ABL Agreements***") with various financial institutions and other persons from time to time as lenders thereunder (collectively, the "***Prepetition ABL Lenders***"), and Deutsche Bank AG New York Branch ("***Deutsche Bank***") as the administrative agent.

The Prepetition ABL Agreements provide for the Prepetition ABL Facility, which is comprised of the following:

> ➢ a facility for use in connection with the Company's U.S. and European operations comprised of (i) a senior secured asset-based revolving credit facility of up to $809 million (including a $250 million sublimit for European borrowings) subject to borrowing base limitations; (ii) up to $75 million of letters of credit; and (iii) certain swingline facilities, and

> ➢ a sub-facility for the Company's Canadian subsidiaries in the aggregate amount of $35 million (the "***Prepetition Canadian ABL Sub-Facility***").

All borrowings by foreign subsidiaries under the Prepetition ABL Facility, including borrowings under the Prepetition Canadian ABL Sub-Facility, were guaranteed on a senior secured basis by the U.S. Debtors and certain of the Company's non-debtor foreign subsidiaries.  Debtor ADH was not a borrower or a guarantor under the Prepetition ABL Facility. To secure the U.S. Debtors' obligations under the Prepetition ABL Facility, the U.S. Debtors entered into that certain U.S. Security Agreement, dated as of August 1, 2006, and amended and restated as of December 19, 2006, pursuant to which they granted the Prepetition ABL Lenders, among other things, a first priority security interest in, and continuing liens on, substantially all of the U.S. Debtors' current assets (including, among other things, accounts receivable and inventory) and related intangible assets located in the United States (the "***ABL Collateral***") and a second priority security interest in, and continuing liens on, substantially all of the U.S. Debtors' other assets located in the United States (the "***Term Collateral***").  The Company entered into separate security agreements with respect to its European and Canadian commitments under the Prepetition ABL Facility.

There was no scheduled amortization under the Prepetition ABL Facility, and, in the absence of a default, the principal amount outstanding would have been due and payable in full at maturity on December 19, 2011.  As discussed further in Section III.D.4, entitled, "GENERAL INFORMATION – Events Leading to the Commencement of the U.S. Debtors' Chapter 11 Cases – Liquidity Crunch and Commencement of the U.S. Debtors' Chapter 11

Cases," a severe drop in the price of metal and the impact of the global recession on volumes sold led to a decline by over 50% in the borrowing base under the Prepetition ABL Facility during the six months prior to the U.S. Debtors' Commencement Date. As of the U.S. Debtors' Commencement Date, the amount outstanding under the Prepetition ABL Facility (including outstanding letters of credit) exceeded the borrowing base, and the Company had no access to working capital under the Prepetition ABL Facility.

As of the U.S. Debtors' Commencement Date, the liabilities under the Prepetition ABL Facility included approximately (i) $201.8 million in principal amount and (ii) $42.2 million in face amount of outstanding letters of credit.

Following the U.S. Debtors' Commencement Date, with the approval of the Bankruptcy Court, the Company refinanced the Prepetition ABL Facility and replaced it with the DIP ABL Credit Facility. *See* discussion of the DIP ABL Credit Facility in Section IV.C.1, entitled, "THE CHAPTER 11 CASES – Significant Events During the Chapter 11 Cases – The DIP Credit Facilities."

**2.      The Prepetition Term Facility.**

As additional financing to effectuate the acquisition of the Corus Business, the TPG transaction, other acquisitions, and the Company's operations, each of the U.S. Debtors (and certain of their non-debtor international affiliates, including ADH), also were obligated as borrowers or guarantors under that certain Amended and Restated Term Loan Agreement, dated as of August 1, 2006, and amended and restated as of December 19, 2006, and further amended as of March 13, 2007 and February 10, 2009 (the "***Prepetition Term Loan Agreement***," and together with related agreements and documents, the "***Prepetition Term Loan Agreements***"), with the various financial institutions and other persons from time to time as lenders thereunder (collectively, the "***Prepetition Term Lenders***"), and Deutsche Bank, as administrative agent (the "***Prepetition Term Loan Agent Bank***"). The Prepetition Term Loan Agreements provide for a term loan facility (the "***Prepetition Term Facility***") for the U.S. Debtors in the maximum aggregate commitment of $825 million borrowed by Aleris and guaranteed by the U.S. Debtors (the "***U.S. Term Loan Facility***") and a sub-facility for €303 million in euro borrowings by ADH and guaranteed by the U.S. Debtors and certain non-debtor international affiliates (the "***European Term Loan Facility***").

To secure the obligations under the Prepetition Term Loan Agreements, the U.S. Debtors entered into, among other things, that certain U.S. Security Agreement, dated as of August 1, 2006, and amended and restated as of December 19, 2006. Pursuant to the Prepetition Term Loan Agreement, the Prepetition Term Lenders were granted a first priority security interest in and continuing liens on the Term Collateral (which consists of, among other things, certain stock in certain subsidiaries, intellectual property rights, equipment, fixtures, general intangibles and real property) and a second priority interest in and continuing liens on the ABL Collateral. ADH entered into separate security agreements with respect to the European Term Loan Facility, pursuant to which ADH granted a lien on, and security interest in, among other things, bank accounts, intellectual property rights, certain stock in certain subsidiaries, and/or moveable property.

In connection with the Prepetition ABL Facility and the Prepetition Term Loan Agreements, Deutsche Bank, as administrative agent and collateral agent under the Prepetition ABL Facility and the Prepetition Term Loan Agreements, entered into that certain Intercreditor Agreement, dated as of August 1, 2006, and amended and restated as of December 19, 2006 (the "**Prepetition Intercreditor Agreement**"), governing the respective rights of the Prepetition ABL Lenders and the Prepetition Term Lenders with respect to the ABL Collateral and the Term Collateral. Pursuant to the Prepetition Intercreditor Agreement, the Prepetition Term Lenders agreed that liens on any ABL Collateral securing obligations under the Prepetition ABL Facility would be senior and prior to any lien on the ABL Collateral securing obligations under the Prepetition Term Loan Agreements, and the Prepetition ABL Lenders agreed that liens on any Term Collateral securing obligations under the Prepetition Term Loan Agreements would be senior and prior to any lien on the Term Collateral securing obligations under the Prepetition ABL Facility.

As of the U.S. Debtors' Commencement Date, the maximum aggregate commitment under the Prepetition Term Facility was drawn, approximately $808.5 million in principal amount of indebtedness under the U.S. Term Loan Facility was outstanding, and approximately €296,940,000 in principal amount of indebtedness under the European Term Loan Facility was outstanding.[4]

On March 13, 2007 the Prepetition Term Loan Agreement was amended, among other things, to reduce the amount of the interest margin. On February 10, 2009, the Prepetition Term Lenders agreed, pursuant to the *Second Amendment to Credit Agreement and Forbearance Agreement*, to forbear from exercising remedies against the non-Debtor obligors under the Prepetition Term Facility as a result of the imminent bankruptcy filing of the U.S. Debtors and other defaults existing under the Prepetition Term Loan Agreements, to permit the incurrence of indebtedness by ADH, to permit the granting of security pursuant to the DIP Term Credit Facility and the entering into by Deutsche Bank, as administrative agent and collateral agent, under the Prepetition Term Loan Agreements of an intercreditor agreement governing the priority of such security relative to the liens securing the Prepetition Term Loan Agreements, and to modify the mandatory prepayment provisions. On February 5, 2010, pursuant to the *Release*, the Prepetition Term Lenders agreed to release the non-Debtor non-U.S. obligors under the Prepetition Term Facility from their obligations under the applicable Guaranty (as defined under the Prepetition Term Facility) and to forbear on the collateral granted by ADH and the non-Debtors under the Security Documents (as defined under the Prepetition Term Facility). The Release is effective because it was signed by Required Lenders thereunder. The relevant guarantees provide that amendments and releases may be made by the Required Lenders or all of the Lenders to the extent required pursuant to Section 11.12 of the Prepetition Credit Agreement. None of the matters set forth in the Release require the approval of all Lenders under Section 11.12.

---

[4] Principal amounts do not include amounts owed by the Debtors to counterparties under Secured Hedging Agreements (as such term is defined under the Prepetition Term Loan Facility).

### a. Description of the CAM Exchange

As a result of the U.S. Debtor's Chapter 11 Cases, a Conversion Event (as defined in the Prepetition Term Loan Agreements) occurred under the Prepetition Term Loan Agreements on February 12, 2009, resulting in the automatic conversion of euro denominated prepetition term loans into U.S. Dollars subject to the rights of Eligible Lenders (as defined below) to convert Eligible Loans (as defined below) into euros. As provided in the Prepetition Term Loan Agreements, the conversion rate was the rate specified in the Wall Street Journal on Wednesday, February 11, 2009, which was 1.2884 U.S. Dollars for 1.0 euro (the "***Conversion Rate***").

While the Company was not a party to the CAM Exchange (as defined below) arrangements among the Prepetition Term Lenders, the Company understands that they were implemented as described below.

As a result of the U.S. Debtor's Chapter 11 Cases, each Prepetition Term Lender was required on February 12, 2009 to purchase participations from other Prepetition Term Lenders in the various tranches of the prepetition term loans (*i.e.*, U.S. loans and German loans) so that, after giving effect to such purchases, each Prepetition Term Lender had the same percentage credit exposure in each tranche at such time, whether or not such Prepetition Term Lender had previously participated therein (the "***CAM Exchange***"). The purchase of participations did not extend to regularly accruing interest and fees through February 12, 2009, as such amounts were retained by the Prepetition Term Lender to which such amounts were owed.

After giving effect to the foregoing, each Prepetition Term Lender beneficially held (whether as direct Prepetition Term Lender, net of participations sold, or as a participant pursuant to participations purchased) the identical ratable allocations (on a percentage basis) of principal of each tranche of prepetition term loans.

Under the Second Amendment, the purchases of participations occurred automatically and were automatically elevated to direct assignments of the relevant loans, and each Prepetition Term Lender authorized the Prepetition Term Loan Agent Bank to make all future payments under the Prepetition Term Loan Agreements after giving effect to the participations and assignments as described above.

After giving effect to the foregoing (which occurred on February 12, 2009), the aggregate principal outstanding amount of (i) U.S. loans was approximately $808,500,000 and (ii) German loans was approximately $382,577,496. Each Prepetition Term Lender at the time of the CAM Exchange (and after giving effect thereto) held the same percentage interest (as a direct Prepetition Term Lender) in the loans described in each of (i) and (ii) above. Such percentage interest, for any Prepetition Term Lender immediately after giving effect to the CAM Exchange, may be calculated by taking the aggregate principal amount of its U.S. loans and German loans (converted into U.S. Dollars at the Conversion Rate) and dividing same by $1,191,077,496 (which was the aggregate outstanding principal amount, after conversion to U.S. Dollars at the Conversion Rate, of all loans under the Prepetition Term Loan Agreements).

The Second Amendment further provided that each Eligible Lender (as defined below) had a one time irrevocable right, to be exercised by a Prepetition Term Lender by giving written notice to the Prepetition Term Loan Agent Bank no later than 5:00 p.m. (New York time) on Friday, February 20, 2009, to elect that all or any portion of the Eligible Loans (as defined below) held by such Prepetition Term Lender (whether held as U.S. loans or German loans) be converted into euros, with retroactive effect and at the Conversion Rate. "***Eligible Lender***" means each Prepetition Term Lender which held German loans at 11:59 P.M. Eastern Standard Time on January 30, 2009, and "***Eligible Loans***" means the loans held by an Eligible Lender immediately after the time of conversion in an aggregate principal amount equal to the principal amount of the German loans held by such Eligible Lender immediately prior to the time of conversion. The net result of the foregoing is that each Prepetition Term Lender which held German loans before the CAM Exchange had the right (but only if it made a timely election as provided above) to retain the same amount of euro denominated loans (though they would in part be German loans and in part U.S. loans, in accordance with the CAM Exchange) after the CAM Exchange that it held before the CAM Exchange.

After giving effect to the CAM Exchange described above, the loans (of the various sub-tranches) were permitted to trade separately (although the Prepetition Term Loan Agent Bank has the right to require that assignments of loans appropriately identify the respective sub-tranche being assigned) and no further CAM Exchanges are provided.

**3.      Outstanding Prepetition Unsecured Bonds.**

In addition to the foregoing, each of the U.S. Debtors is obligated, either as a direct borrower or as a guarantor, under (i) that certain Senior Indenture, dated December 19, 2006, pursuant to which Aleris issued $600 million in aggregate original principal amount of 9%/9.75% Senior Notes due 2014 (the "***2006 Senior Notes***"), (ii) that certain Senior Indenture, dated September 11, 2007, pursuant to which Aleris issued $105,379,000 in aggregate original principal amount of 9% Senior Notes due 2014 (the "***2007 Senior Notes***"), and (iii) that certain Senior Subordinated Indenture, dated December 19, 2006, pursuant to which Aleris issued $400 million in aggregate original principal amount of 10% senior subordinated notes due 2016 (the "***Senior Subordinated Notes***," and together with the 2006 Senior Notes and 2007 Senior Notes, the "***Notes***").  The Senior Subordinated Notes are subordinated to other debt of the Debtors, including the 2006 Senior Notes, the 2007 Senior Notes, the Prepetition ABL Facility, and the Prepetition Term Facility.  The Notes are unsecured obligations of the U.S. Debtors.

As of the U.S. Debtors' Commencement Date, the amount outstanding under each of these series of notes was as follows:

| Note Series | Principal Amount | Accrued and Unpaid Interest[5] |
|---|---|---|
| 2006 Senior Notes | $598,000,000 | $8,521,000 |
| 2007 Senior Notes | $105,379,000 | $1,496,016 |
| Senior Subordinated Notes | $399,000,000 | $6,321,945 |

---

[5] Figures are as of the U.S. Debtors' Commencement Date.

**D.      Events Leading to the Commencement of the U.S. Debtors' Chapter 11 Cases.**

**1.      Global Economic Downturn.**

The aluminum industry is highly cyclical in nature and is affected by general and local economic conditions, industry competition, and product development.  In the year prior to the Commencement Date, each major end-use industry that the Company sells products to experienced significant decline in demand due to the global recession and financial crisis.  Specifically, the North American building and construction industries, U.S. and European automotive industries, and general industrial activity experienced these demand declines.  Because of major cutbacks in these sectors, the aluminum industry and the Company were subjected to a significant economic downturn characterized by a marked decrease in demand.  In addition, many users of aluminum rolled and extruded products had significant inventory on hand when the economic decline occurred, which intensified the impact of the volume declines as the customer base had to de-stock inventory levels to adjust to lower demand levels.  Decreased demand – coupled with a surplus of aluminum supply across the industry – increased exposure to commodity price fluctuations, adversely affected hedging positions, reduced profitability in a changing metals price environment, and subjected earnings to greater volatility from period to period.  Much of the decrease in demand was attributable to customer shutdowns and/or large-scale cutbacks, particularly in the residential construction and automotive sectors.  All of these industry-wide circumstances affected the Company.

**2.      Effects of Economic Environment on Rolled and Extruded Products.**

The profitability of the Company's rolled and extruded products is dependent upon the volume of pounds of aluminum shipped, as well as the difference between the per pound selling price and per pound metal cost (the "***Material Margin***").  The majority of rolled and extruded products are priced using a conversion fee-based model, pursuant to which the Company charges customers the prevailing market price for the metal content of their orders plus a fee to convert the metal.  The remaining products are sold under short-term contracts or under long-term contracts using fixed prices for the metal content.  Although the conversion fee-based pricing model was designed to reduce the Company's exposure to changing primary aluminum prices, the Company is susceptible to primary aluminum price changes in its fixed price sales contracts and other customer agreements where price is agreed upon prior to the physical purchase of the metal.  The Company reduces this risk to Material Margin by utilizing various derivative financial instruments to hedge this exposure.  In addition, the results of the Company's businesses producing rolled and extruded products are affected by metal price lag, which is the time difference between when the Company purchases metal to fill orders and when the sale of that metal as finished inventory is reflected in the Company's operating results.  The Company's operations require a significant work in process inventory to meet future production requirements.  This base level of inventory is also susceptible to changing primary metal prices or metal price lag as described above (to the extent it is not committed to fixed price sale orders).  In the four months prior to the U.S. Debtors' Commencement Date, aluminum prices declined by approximately 35% on account of decreased demand, strong supply, and other factors due to the global financial crises, decreasing the realizable value of the Company's large base inventory and negatively affecting revenues and results of operations.

To reduce its market exposure, the Company used various derivative financial instruments designed to reduce the impact of changing primary aluminum prices on future sales for which aluminum had not yet been purchased and on inventory or future purchases of inventory for which a fixed sale price had not yet been arranged. While prepetition hedges reduced the Company's exposure to unfavorable primary aluminum price changes, they also limited the Company's ability to benefit from favorable price changes. Prior to the U.S. Debtors' Commencement Date, however, the precipitous drop in aluminum prices between the date of raw material purchase and the final settlement date on the hedges required the Company to post frequent margin calls, which, in turn, compromised the Company's liquidity situation due to the timing of the Company's margin payments to counterparties versus the payment from customer's for goods associated with the hedges.

Differences in the prices of primary and scrap aluminum (the "***Scrap Spread***") also affected the Material Margin. Because the Company prices its products using the prevailing price of primary aluminum, but purchases large amounts of scrap aluminum to produce its products, the Company benefits when the primary aluminum price increases exceed scrap price increases. Conversely, when scrap price increases exceed primary aluminum price increases, the Company's Material Margin will be negatively affected. The effectiveness of the Company's scrap purchasing activities, furnace recovery of aluminum from scrap, and scrap supply also affects the Scrap Spread. Generally, as the price of aluminum decreases, the Scrap Spread is compressed.

**3.      Effects of Economic Environment on the Debtors' Recycling Business.**

The profitability of the Debtors' recycling business is largely dependent upon the level of demand for the Company's recycling services and the volume of material processed. Increased production results in lower per unit costs and increased profitability. Other influences on profitability include the amount of aluminum recovered from the recycling process, energy costs, and the percentage of customer-owned pounds tolled or processed. Historically, increased processing under such tolling agreements resulted in lower revenues while not affecting segment income and generally resulted in higher gross profit margin and segment income margins. Tolling agreements subject the Company to less risk of changing metal prices and reduce working capital requirements. Although tolling agreements are beneficial to the Company in these ways, the percentage of pounds able to be processed under these agreements is limited by the amount of metal customers own and their willingness to enter into such arrangements. Changes in the price of primary aluminum and, to a greater extent, a changing Scrap Spread also affected profitability in the Company's recycling business. The Scrap Spread was influenced by the macroeconomic factors noted above, as well as the price volatility of alloying agents and movements in the commodity markets.

**4.      Liquidity Crunch and Commencement of the U.S. Debtors' Chapter 11 Cases.**

Excess supply of customer inventory, decreased demand and attendant decreased production, falling primary aluminum prices, negative metal price lag, significant cash margin posting on transactional hedges, and payment of interest on prepetition credit facilities all contributed to a severe loss of liquidity prior to the Commencement Date for the U.S. Debtors.

In the six months prior to the Commencement Date of the U.S. Debtors' Chapter 11 Cases, the borrowing base under the Prepetition ABL Facility declined by over 50%. As a result, the amount outstanding under the Prepetition ABL Facility (including outstanding letters of credit) exceeded the borrowing base. The effect of being in this "overadvance" position was that the Company could not fund its working capital needs through draws under the Prepetition ABL Facility, and the Debtors were required to repay amounts outstanding under the Prepetition ABL Facility so that the outstanding amounts no longer exceeded the borrowing base. Without access to additional financing, the Company did not have liquidity sufficient to repay the overadvance and continue its operations.

On February 10, 2009, the Prepetition ABL Lenders agreed, pursuant to the *Third Amendment to Credit Agreement and Forbearance Agreement*, to forbear from exercising remedies against the non-Debtor obligors under the Prepetition ABL Agreements as a result of the imminent bankruptcy filing of the U.S. Debtors and other defaults existing under the Prepetition ABL Agreements. On the same date, pursuant to the *Second Amendment to Credit Agreement and Forbearance Agreement*, the Prepetition Term Lenders also agreed to forbear from exercising remedies against the non-Debtor obligors under the Prepetition Term Loan Agreements as a result of defaults existing under the Prepetition Term Loan Agreements, including the imminent bankruptcy filing of the U.S. Debtors. In order to preserve the value of the Company as a going concern, the U.S. Debtors filed for protection under chapter 11 of the Bankruptcy Code on February 12, 2009 (the "***U.S. Debtors' Commencement Date***").

**E.      Events Leading to the Commencement of ADH's Chapter 11 Case.**

As described in more detail below, the U.S. Debtors entered into the DIP Term Credit Facility. The DIP Term Credit Facility includes financing for certain of the Company's European operations. ADH is a borrower under the European tranche of the DIP Term Credit Facility. Availability of the DIP Term Credit Facility to ADH terminated on the ADH Commencement Date. The portion of the DIP Term Credit Facility borrowed by ADH matures on the earliest of May 13, 2010 (subject to one three-month extension permitted under the DIP Term Credit Facility if certain conditions are met), the Effective Date, the acceleration of the loans or termination of commitments under the DIP Term Credit Facility, and the final maturity date under the DIP ABL Credit Facility (as extended). In addition, the DIP Term Credit Facility requires that the DIP Term Credit Facility (including the portion of the DIP Term Credit Facility borrowed by ADH) and the DIP ABL Credit Facility have the same maturity date, except where the DIP ABL Credit Facility is extended beyond the maturity date applicable under the DIP Term Credit Facility. ADH is also the Borrower under the prepetition European Term Loan Facility, which matures on December 19, 2013. A forbearance granted by the lenders under the Prepetition European Term Loan Facility to waive the defaults under such facility arising from the chapter 11 filing by the U.S. Debtors expires upon the occurrence of the maturity date of the DIP Term Credit Facility. As mentioned above, the maturity date of the DIP Term Credit Facility would occur upon the Effective Date of any plan of reorganization for the U.S. Debtors, triggering the expiration of this forbearance. Because the prepetition European Term Loan Facility remains in default, the effect of this forbearance expiring would be that the lenders under this facility would have the right to accelerate all the debt under the facility for immediate payment. Accordingly, the Company engaged in negotiations with the holders of its European

Term Loan Facility to restructure the European Term Loan Facility as part of the emergence of the U.S. Debtors from chapter 11.

On February 5, 2010, ADH commenced its chapter 11 case and filed the Plan. Given the risk of harm to ADH and the operations of other non-debtor affiliates in Europe if European trade creditors, customers, or works councils became concerned that the Debtors' European affiliates might commence chapter 11 cases in the United States, the Debtors believed that it was important to announce a plan for restructuring ADH's debt at the time of the commencement of ADH's chapter 11 case. Accordingly, the Debtors negotiated confidentially with ADH's largest creditors, who were willing to become "restricted" in order to make an open dialogue possible, to create a solution for restructuring ADH's debts in accordance with the agreements governing those debts and filed the Plan concurrently with the filing of ADH's chapter 11 case.

All borrowings by ADH under the Prepetition Term Loan Agreements were guaranteed on a senior secured basis by the U.S. Debtors and certain of the Company's non-debtor foreign subsidiaries (the "***European Credit Support Providers***").

Prior to the ADH Commencement Date, the Prepetition Term Lenders agreed to release the European Credit Support Providers from these guarantee obligations, and to forbear from exercising any of their rights to enforce the Prepetition Term Loan Agreements, including any liens securing such obligations. Such release will become immediately and automatically null and void and such forbearance will immediately and automatically terminate as to the European Credit Support Providers (other than Dutch Aluminum C.V., Aleris Recycling Holding B.V. and Aleris Recycling (German Works) GmbH) (collectively, the "***Snapback***"), if one of the following "***Snapback Events***" occurs:

> ➢ the Bankruptcy Court dismisses ADH's chapter 11 case (the "***ADH Case***") or declines to or otherwise abstains from exercising jurisdiction thereover and the Required Lenders (as defined in the Prepetition Term Loan Agreements) have declined to consent or do not, within 45 days thereof, consent in writing to such dismissal;

> ➢ any Federal, state or foreign bankruptcy, insolvency, receivership or other similar proceeding is commenced or petition is filed in respect of ADH (other than the ADH Case) or any other European Credit Support Provider if, among other things, such proceeding or petition is commenced or filed by ADH or any of its affiliates; ***or***

> ➢ any Federal, state or foreign bankruptcy, insolvency, receivership or other similar proceeding is commenced or petition is filed in respect of ADH (other than the ADH Case) or any other European Credit Support Provider if, among other things, (A) such proceeding or petition is commenced or filed by any person (other than ADH or any of its affiliates) and (B) the Required Lenders (as defined under the Prepetition Term Loan Agreements) have declined to consent or do not, within 45 days thereof,

consent to the commencement of such proceeding or the filing of such petition.

No Snapback Event will occur if at any time prior to a Snap-Back Trigger Date (as defined below), Oaktree Capital Management, L.P., Apollo ALS Holdings, LP or Sankaty Advisors, LLC, shall have requested such dismissal or commenced or filed the petition in such proceeding. "***Snap-Back Trigger Date***" means prior to the effectiveness of the Plan Support Agreements, the termination of the Equity Commitment Agreement based on certain termination events as more fully set out in the Release and on and after the effective date of the Plan Support Agreements, the termination of a Plan Support Agreement based on certain termination events as more fully set out in the Release.

Upon the occurrence of the Effective Date of the Plan, (i) the liens granted by non-Debtors to secure the Prepetition Term Loan Agreement will be released, and (ii) the Snapback will irrevocably lapse and be of no further effect.

To facilitate the restructuring, ADH commenced the ADH Case and sought joint administration with the U.S. Debtors' Chapter 11 Cases. ADH also requested that the relief given under certain Bankruptcy Court orders issued during the U.S. Debtors' Chapter 11 Cases apply to ADH.

# IV.

## THE CHAPTER 11 CASES

### A.    General.

Each of the U.S. Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court in order to use the Bankruptcy Court supervised reorganization process to restructure their debt obligations and to ease their liquidity crises.  In addition to Aleris, the U.S. Debtors are 42 of Aleris' direct and indirect subsidiaries.  Each of the U.S. Debtors filed its chapter 11 petition on February 12, 2009, and ADH filed its petition on February 5, 2010.  The Debtors' chapter 11 cases are being jointly administered as *In re Aleris International, Inc.*, *et al.*, Case No. 09-10478 (BLS) (collectively, the "***Chapter 11 Cases***").  The Honorable Brendan L. Shannon, United States Bankruptcy Court Judge for the District of Delaware, is presiding over the Chapter 11 Cases.

Currently, the Debtors are operating their businesses and managing their properties as debtors in possession subject to the provisions of the Bankruptcy Code.  Pursuant to the provisions of the Bankruptcy Code, the Debtors are not permitted to pay any claims or obligations that arose prior to the Commencement Date unless specifically authorized by the Bankruptcy Court.  Similarly, Creditors may not enforce any Claims against the Debtors that arose prior to the Commencement Date unless specifically authorized by the Bankruptcy Court.  In addition, as debtors in possession, the Debtors have the right, subject to the Bankruptcy Court's approval, to assume or reject any executory contracts and unexpired leases in existence as of the Commencement Date.  Parties having Claims as a result of any such rejection may file claims with the Debtors' claim agent, and these claims will be addressed as part of the Chapter 11 Cases.

Since the Commencement Date, the Debtors have been working to develop a plan of reorganization.  As a result, on February 5, 2010, the Debtors filed the Plan.  The Plan has the support of the Backstop Parties, which are the principal lenders to the Debtors under the DIP Term Credit Facility.

### B.    Professionals Retained in the Chapter 11 Cases.

#### 1.    The Debtors' Attorneys and Advisers.

The Debtors have retained the following professionals in connection with chapter 11 matters:

| **Restructuring Counsel** | **Financial Advisers** |
|---|---|
| Weil, Gotshal & Manges LLP | Moelis & Company LLC |
| 767 Fifth Avenue | 399 Park Avenue, 5th Floor |
| New York, New York  10153 | New York, NY 10022 |
| (212) 310 8000 | (212) 883 3800 |
| (212) 310 8007 (telecopy) | (212) 880 4260 (telecopy) |

**Restructuring Counsel**
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651 7700
(302) 651 7701 (telecopy)

**Restructuring Advisers**
Alvarez & Marsal
600 Lexington Avenue
6th Floor
New York, NY 10022
(212) 759 4433
(212) 759 5532 (telecopy)

**Special Financing, Corporate, Tax and Litigation Counsel**
Fried, Frank, Harris, Shriver & Jacobson
One New York Plaza
New York, New York 10004
(212) 859 8000
(212) 859 4000 (telecopy)

**Special Accountants**
PricewaterhouseCoopers LLP
300 Madison Avenue
New York, NY 10017
(646) 471 3000
(813) 286 6000 (telecopy)

**Financial Advisory Service Provider**
Deloitte Financial Advisory Services LLP
2500 One PPG Place
Pittsburgh, PA 15222-5401
(412) 338 7200
(412) 338 7380 (telecopy)

**Noticing, Claims, Balloting and Solicitation Agent**
Kurtzman Carson Consultants, LLC
2335 Alaska Avenue
El Segundo, CA 90245
(310) 823 9000
(310) 823 9133 (telecopy)

**Tax Service Provider**
Deloitte Tax LLP
MA & Reorganization Tax Services
Two World Financial Center
New York, NY 10281
(212) 436 2000
(212) 436 5000 (telecopy)

**Special Ballot Solicitation and Tabulation Agent**
Financial Balloting Group LLC
757 Third Avenue, 3rd Floor
New York, New York 10017
(646) 282-1800
(646) 282 1804 (telecopy)

**Auditors and Tax Advisers**
Ernst & Young, LLP
925 Euclid Avenue, Suite 1300
Cleveland, OH 44115
(216) 861 5000
(216) 583 2013 (telecopy)

## 2. The Advisers to the Official Committee of Unsecured Creditors.

On or about February 20, 2009, the United States Trustee for the District of Delaware (the "*U.S. Trustee*"), pursuant to her authority under section 1102 of the Bankruptcy Code, appointed the Creditors' Committee. The Creditors' Committee has participated actively in all aspects of the Chapter 11 Cases.

The Creditors' Committee currently consists of the following five members:

➢ Oppenheimer Rochester National Fund

- ➢ Wilmington Trust Company

- ➢ United Steelworkers

- ➢ Schnitzer Steel Industries, Inc.

- ➢ Huron Valley Steel Corporation

The Creditors' Committee has retained the following professionals:

| **Counsel** | **Conflicts Counsel** |
|---|---|
| Reed Smith LLP | Landis Rath & Cobb, LLP |
| 1201 N. Market Street, Suite 1500 | 919 N. Market Street, Suite 1800 |
| Wilmington, DE 19801 | Wilmington, DE 19801 |
| (302) 778 7500 | (302) 467 4452 |
| (302) 778 7575 (telecopy) | (302) 467 4450 (telecopy) |
| | |
| 2500 One Liberty Place | **Financial Advisers** |
| 1650 Market Street | Mesirow Financial Consulting LLC |
| Philadelphia, PA 19103-6901 | 666 Third Avenue, 21st Floor |
| (215) 851 8100 | New York, NY 10017 |
| (215) 851 1420 (telecopy) | (212) 808 8330 |
| | (212) 682 5015 (telecopy) |
| Reed Smith Centre | |
| 225 Seventh Avenue | 2828 Routh Street, Suite 650 |
| Pittsburgh, PA 15222 | Dallas, TX 75201 |
| (412) 288 3131 | (214) 954 1444 |
| (412) 288 3063 (telecopy) | (214) 954 1266 (telecopy) |

## C.     Significant Events During the Chapter 11 Cases.

### 1.     The DIP Credit Facilities.

In order to fund their ongoing business operations during the pendency of these Chapter 11 Cases, the U.S. Debtors entered into revolving and term debtor in possession credit facilities with Deutsche Bank AG New York Branch, as administrative agent under each facility for a syndicate of financial institutions (collectively, the "***DIP Lenders***").  On February 13, 2009, the Bankruptcy Court entered an *Interim Order Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Debtors to (I) Use Cash Collateral, (II) Obtain Postpetition Financing and (III) Provide Adequate Protection, and (B) Providing Notice and Scheduling Final Hearing* (Docket No. 46) (the "***Interim DIP Order***") granting interim approval of the U.S. Debtors' postpetition financing arrangements, and on March 18, 2009, the Bankruptcy Court entered the *Final Order Pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Debtors to (I) Use Cash Collateral, and (II) Obtain Postpetition Financing and (B) Granting Adequate Protection* (Docket No. 299) (the "***DIP Order***") pursuant to which the Bankruptcy Court granted final approval of such postpetition financing arrangements.

a.       *The DIP ABL Credit Facility.*

As of March 20, 2009, the U.S. Debtors, Aleris Switzerland GmbH (the "***European Borrower***"), Aleris Aluminum Canada S.E.C/Aleris Aluminum Canada L.P. ("***Aleris Canada***") and Aleris Specification Alloy Products Canada Company ("***Spec Alloys***" and, together with Aleris Canada, the "***Canadian Borrowers***") refinanced the Prepetition ABL Facility by entering into that certain *Amended and Restated Debtor-in-Possession Credit Agreement*, dated as of August 1, 2006 and amended and restated as of December 19, 2006 and as further amended as of November 7, 2007, September 10, 2008, February 10, 2009, and amended and restated as of March 20, 2009 and further amended on June 29, 2009, December 29, 2009, and February 5, 2010, among Aleris, each of the other U.S. Debtors, Aleris Canada, Spec Alloys, Aleris Switzerland GmbH, the lenders from time to time party thereto, the DIP ABL Agent, and Deutsche Bank AG New York Branch, Bank of America, N.A., and Wachovia Bank, N.A. as co-collateral agents, as further amended, amended and restated, supplemented, or otherwise modified from time to time (together with related agreements the "***DIP ABL Credit Facility***"). The maximum availability under the DIP ABL Credit Facility is $575 million. Availability under the DIP ABL Facility, however, is subject to a borrowing base. As of November 30, 2009 approximately $246.8 million in principal amount was outstanding under the DIP ABL Credit Facility, plus approximately $37.5 million in face amount of letters of credit. Total availability under the borrowing base formula for the DIP ABL Credit Facility as of November 30, 2009 was approximately $375 million.

The obligations under the DIP ABL Credit Facility are guaranteed by each U.S. Debtor, and each other domestic subsidiary of Aleris party thereto as a borrower, certain affiliates of the European Borrower and Spec Alloys (including each foreign subsidiary that is a director or indirect parent of the European Borrower or Spec Alloy), and Aleris Luxembourg S.à r.l.

The DIP ABL Credit Facility is secured by a superpriority claim and priming liens on the prepetition ABL Collateral. It expires upon the earliest of May 13, 2010 (subject to one three-month extension at the option of Aleris, provided that it meets certain conditions), the Effective Date, the acceleration of the loans or termination of the commitments under the DIP ABL Credit Facility, and the maturity date of the DIP Term Credit Facility (as extended). In addition, the DIP ABL Credit Facility requires that the DIP ABL Credit Facility and the DIP Term Credit Facility have the same maturity date, except where the DIP Term Credit Facility is extended beyond any maturity date applicable under the DIP ABL Credit Facility. On December 29, 2009, the DIP ABL Credit Facility was amended to allow the merger of certain Brazilian entities and the granting of additional collateral in Europe. On February 5, 2010, the lenders under the DIP ABL Credit Facility agreed to waive any defaults under the DIP ABL Credit Facility that may have occurred in connection with or as a direct result of ADH's chapter 11 filing.

b.       *The DIP Term Credit Facility.*

As of February 12, 2009, the U.S. Debtors, ADH, Aleris Aluminum Duffel BVBA ("***Aleris Duffel***"), and certain of their affiliates entered into that certain *Debtor-in-Possession Amended and Restated Credit Agreement*, dated as of February 12, 2009 and

amended and restated as of March 19, 2009 and amended as of May 12, 2009, June 29, 2009, December 29, 2009, January 29, 2010, and February 5, 2010 among Aleris, ADH, Aleris Duffel, the lenders party thereto, and the DIP Term Agent Bank, as further amended, amended and restated, supplemented, or otherwise modified from time to time (together with related agreements the "*DIP Term Credit Facility*"). Pursuant to the terms of the DIP Term Credit Facility, Aleris, ADH, and Aleris Duffel may borrow up to $500 million (comprised of $448,327,940.24 and €40,445,414.15) (collectively, the "*New Money Term DIP Facility*"). The obligations under the DIP Term Credit Facility are guaranteed by the U.S. Debtors other than Aleris, all other wholly-owned subsidiaries of Aleris organized in the United States, ADH and substantially all of its subsidiaries, Aleris Duffel and its subsidiaries, and certain other non-U.S. subsidiaries of Aleris. Further, each of Aleris, the U.S. Debtors, and three wholly owned subsidiaries of Aleris organized in the United States guarantees the obligations of ADH and Aleris Duffel under the DIP Term Credit Facility. On February 5, 2010, the lenders under the DIP Term Credit Facility agreed to waive any defaults under the DIP Term Credit Facility that may have occurred in connection with or as a direct result of ADH's chapter 11 filing and, upon the occurrence of the Effective Date, and, upon the Effective Date, to release the Credit Parties (as defined in the DIP Term Credit Facility) listed on a schedule to the *Sixth Amendment and Waiver to the Amended and Restated Debtor-in-Possession Credit Agreement* of their obligations under the U.S. Subsidiary Guaranty, the European Subsidiaries Guaranty or the European Parent Guaranty (in each case, as defined in the DIP Term Credit Facility), and to release the Collateral (as defined in the DIP Term Credit Facility) granted by such "Credit Parties" under the Security Documents (as defined in the DIP Term Credit Facility).

The U.S. Debtors drew down approximately $80 million under the New Money Term DIP Facility for the purpose of curing the overdraft on the Prepetition ABL Facility. Following the ADH Commencement Date, the U.S. and Belgian tranches of the New Money Term DIP Facility will be available for funding operational and working capital needs, subject to liquidity requirements in the U.S. and Europe, respectively. Any drawing under the U.S. tranche of the New Money Term DIP Facility to fund intercompany loans to subsidiaries of ADH or Aleris Recycling (German Works) GmbH will be conditioned upon compliance with the maximum European liquidity requirement and, to the extent the Belgian tranche is not fully drawn, is not permitted to exceed $9 million.

The DIP Term Credit Facility expires upon the earliest of May 13, 2010 (subject to one three-month extension permitted under the DIP Term Credit Facility if certain conditions are met), the Effective Date, the acceleration of the loans or termination of commitments under the DIP Term Credit Facility, and the final maturity date under the DIP ABL Credit Facility (as extended). In addition, the DIP Term Credit Facility requires that the DIP Term Credit Facility and the DIP ABL Credit Facility have the same maturity date, except where the DIP ABL Credit Facility is extended beyond the maturity date applicable under the DIP Term Credit Facility. As of December 31, 2009, approximately $179.3 million and €16.2 million in principal amount was outstanding under the New Money Term DIP Facility.

### c.     *The Roll-Up of Prepetition Term Loans under the DIP Term Credit Agreement.*

Pursuant to the terms of the DIP Order, Prepetition Term Lenders under the Prepetition Term Facility were entitled to "roll up" a portion of the amounts owed by the U.S. Debtors under the Prepetition Term Facility in an aggregate principal amount not to exceed $540 million, using a contractual EUR/USD exchange rate of $1.2805 per euro in respect of Roll-Up Loans denominated in Euros.   Each prepetition lender under the Prepetition Term Loan Agreement, or certain persons (or designated affiliates thereof, including funds under common management) who owned beneficially through such Prepetition Term Lender as of January 30, 2009 (the "**Roll-Up Record Date**"), that executed that certain *Second Amendment to the Prepetition Term Loan Agreement and Forbearance Agreement* dated as of February 10, 2009 (the "**Second Amendment**") in respect of the Prepetition Term Loan Agreements and that advanced new money to the DIP Term Credit Facility were entitled to designate a principal amount owed to such Prepetition Term Lender under the Prepetition Term Facility (the "**Dollar for Dollar Portion**") up to the amount of its commitment under the DIP Term Credit Facility, plus five percent (5%) of such amounts other than the Dollar for Dollar Portion, to be "rolled up" and refinanced.   In addition, each Prepetition Term Lender that executed the Second Amendment, but did not commit to advance new money under the DIP Term Credit Facility, was entitled to designate an amount equal to five percent (5%) of the principal amount of its respective outstanding amounts under the Prepetition Term Facility (which are designated by it) to be "rolled up" and refinanced.   Lenders could roll up loans they held under the U.S. Term Facility, and the claims arising under such loans would become U.S. Roll-Up Term Loan Claims, and/or roll up loans that they held under the European Term Loan Facility ("**European Term Loans**"), causing the claims arising under such loans to become European Roll-Up Term Loan Claims.[6]   If a Prepetition Term Lender, on and subject to the same terms, designated its European Term Loans to ADH to be rolled up, however, such Prepetition Term Lender was entitled to choose either to (i) roll up such European Term Loans or (ii) keep such European Term Loans outstanding under the Prepetition Term Loan Agreement and instead roll up the prepetition guarantees of the European Term Loans by the U.S. Debtors.

Certain funds managed by Oaktree and Apollo (collectively, the "**Backstop Term Lenders**") committed to fund the portions of the DIP Term Credit Facility not otherwise committed by a Prepetition Term Lender.   In consideration of this backstop commitment, the Backstop Term Lenders obtained additional roll-up rights.   Specifically, the Backstop Term Lenders were permitted to designate additional loans made to Aleris under the Prepetition Term Loan Agreements, even if acquired by such parties after the Roll-Up Record Date, so long as the aggregate amount of prepetition term loans of any such lender "rolled up" did not exceed the sum of its Dollar for Dollar Portion (as of the roll-up election), plus five percent (5%) of its other prepetition term loans and; provided further that the aggregate principal amount of the rolled up term loans would not exceed $540 million.   On March 19, 2009, lenders under the DIP Term Credit Facility "rolled up" approximately €44.8 million and $244.1 million of prepetition term

---

[6] To date, no holders of European Term Loan Claims (other than Oaktree and Apollo through and in accordance with the 9019 Settlement) have elected to roll up their loans into European Roll-Up Term Loan Claims.

loans under the U.S. tranche of the Prepetition Term Facility.  The initial deadline for Oaktree and Apollo, as backstop lenders, under the New Money Term DIP Facility was January 1, 2010.  In addition, on August 4, 2009, Oaktree "rolled up" $5,120,244.13 of its U.S. loans under the Prepetition Term Facility.  On December 29, 2009, on January 29, 2010 and February 5, 2010, parties to DIP Term Credit Facility agreed to extend the period during which the Backstop Term Lenders may elect to exercise their additional roll-up rights initially until January 29, 2010 (on December 29, 2009), until February 15, 2010 (on January 29, 2010) and subsequently until August 13, 2010 (on February 5, 2010).

The effect of the roll-up rights under the DIP Term Credit Agreement is to convert a portion of the obligations under the Prepetition Term Facility into Administrative Expenses with a lien on the Term Collateral that primes the lien securing the obligations under the Prepetition Term Facility.  Notwithstanding the Administrative Expense status of the rolled up prepetition term loans, the DIP Order reflects the agreement of the lenders of the rolled up loans to waive the requirement that the rolled up prepetition term loans be paid in full, in Cash, on the Effective Date.  Specifically, paragraph 17(c) of the DIP Order provides as follows:

> The DIP Loans under the Roll-Up Term Facility[7] will be required to be repaid in cash on the Maturity Date (as defined in the DIP Term Credit Agreement); provided, that upon the vote of the class of holders of DIP Loans under the Roll-Up Term Facility to accept a Plan in accordance with the standards set forth in Section 1126(c) of the Bankruptcy Code or, failing to obtain same, pursuant to the standards set forth under Section 1129(b)(2)(A) of the Bankruptcy Code for "fair and equitable" treatment of a class of secured claims, a Plan may require that DIP Loans under the Roll-Up Term Facility be refinanced or otherwise replaced with other secured debt securities or financial instruments and, as applicable, guaranties of the obligors in respect of the Roll-Up Term Facility; provided, further that the Debtors shall use reasonable endeavors to cause any such Plan to provide that such DIP Loans under the Roll-Up Term Facility shall be repaid in full in cash on the Maturity Date.

In accordance with the DIP Term Credit Agreement, the amount of euro denominated loans permitted to be rolled up was determined based upon an exchange rate of $1.2805 dollars per euro.  By the Plan, the U.S. Debtors are seeking the requisite consent from the lenders holding rolled up prepetition term loans not to repay the rolled up loans upon the Effective Date.

---

[7] The Roll-Up Term Facility refers to the loans rolled up under the DIP Term Credit Agreement.  In the Plan and this Disclosure Statement, these loans are what comprise the U.S. Roll-Up Term Loan Claims and the European Roll-Up Term Loan Claims.

### d. *Collateral Securing the DIP Facilities.*

Pursuant to the terms of the Interim DIP Order and the DIP Order, the obligations under the DIP ABL Credit Facility and the DIP Term Credit Facility (i) are at all times entitled to joint and several superpriority administrative expense claim status in the Chapter 11 Cases, which claims shall be *pari passu*; (ii) have a lien on substantially all unencumbered assets of the U.S. Debtors with the priorities as set forth on the lien priorities schedule below; (iii) have a junior lien on substantially all encumbered assets of the U.S. Debtors with the priorities as set forth on the lien priorities schedule; and (iv) have a priming lien on substantially all assets of the U.S. Debtors with the priorities as set forth on the lien priorities schedule. Upon the occurrence and during the continuance of an event of default or a default (each as defined in the DIP Credit Agreements), all of these liens and priority claims are subordinate to a "carve-out" for certain Bankruptcy Court, United States Trustee and professional fees and expenses.

The following lien priorities schedule sets forth a simplified summary of the lien priorities of lenders on the U.S. Debtors' property under the various pre- and postpetition credit facilities:

| Lien Priority | Prepetition ABL Collateral and Postpetition ABL Collateral | Prepetition Term Collateral and Postpetition Term Collateral |
|---|---|---|
| First Priority | DIP ABL Credit Facility | New Money Term DIP Facility |
| Second Priority | Deficiency Claim on the New Money Term DIP Facility | Deficiency claim on the DIP ABL Credit Facility and rolled up loans under the DIP Term Credit Agreement on a pari passu basis |
| Third Priority | Prepetition Term Facility "adequate protection" liens and deficiency claim on the rolled up loans under the DIP Term Credit Agreement on a *pari passu* basis | Prepetition Term Facility "adequate protection" liens |
| Fourth Priority | Prepetition Term Facility | Prepetition Term Facility |

During the negotiations on the DIP Term Credit Agreement, the Prepetition Term Lenders authorized the Collateral Agent under the Prepetition Term Facility to enter into an intercreditor agreement governing the relative rights and priorities of the lenders (including roll-up lenders) pursuant to the DIP Term Credit Agreement and the Prepetition Term Lenders under the European Term Loan Facility to certain collateral owned by the Debtors' European affiliates on the terms set forth in the *Summary of Proposed Terms and Conditions $500,000,000*

*Superpriority Priming DIP Term Loan Facility* dated February 12, 2009 (the "***DIP Term Sheet***").  The DIP Term Credit Agreement contemplates that, according to the term sheet with respect to the DIP Term Credit Agreement, an intercreditor agreement that provides for the proceeds of collateral securing the obligations under the Prepetition Term Facility will be allocated as set forth in the chart immediately above in the column labeled "Prepetition Term Collateral and Postpetition Term Collateral" (the "***European DIP Term Loan Intercreditor Agreement***").  The Collateral Agent under the Prepetition Term Facility, however, has not executed the European DIP Term Loan Intercreditor Agreement and the Prepetition Term Lenders may dispute its terms.  The Plan incorporates a compromise and settlement of any dispute relating to the relative priorities of the European Roll-Up Term Loan Claims and the European Term Loan Claims.  Under the compromise, Oaktree and Apollo have agreed, among other things, to limit the amount of European Term Loans they roll up.  For a description of this settlement please *see* Section V.K.4, entitled, "THE PLAN OF REORGANIZATION – Implementation of the Plan – The 9019 Settlement."

### 2. Employee Related Matters.

To maintain the continued support, cooperation, and morale of the U.S. Debtors' employees and to minimize any salary, wage, and employee benefit disruptions that might have been occasioned by the commencement of the Chapter 11 Cases, the U.S. Debtors obtained orders of the Bankruptcy Court that authorized them to (i) pay employees for prepetition wages, salaries, and other compensation and (ii) continue their employee benefit programs, including maintenance of their workers' compensation programs.  ADH does not have any employees.

### 3. Vendor and Customer Issues.

Following the commencement of their Chapter 11 Cases, the U.S. Debtors took certain actions in the Bankruptcy Court, including obtaining orders of the Bankruptcy Court, that authorized the Debtors to (i) pay prepetition claims of critical trade vendors (the "***Critical Vendors***") that supply the U.S. Debtors with essential materials and services; (ii) pay prepetition claims of certain vendors with claims entitled to priority under section 503(b)(9) of the Bankruptcy Code ("***503(b)(9) Claimants***"); (iii) pay prepetition claims of certain common carriers, warehousemen, and holders of possessory liens; (iv) pay prepetition claims held by certain foreign creditors; (v) honor certain customer programs and honor any postpetition obligations in respect thereof; (vi) pay certain prepetition taxes; and (vii) implement global procedures for resolving and paying other types of claims.  As of December 31, 2009, the U.S. Debtors had paid, on account of prepetition claims, approximately $768,286 to Critical Vendors, $2,283,593 to 503(b)(9) Claimants, $97,680 to holders of possessory liens, $0 to foreign creditors, an undisclosed amount to honor customer programs, and approximately $2,407,375 to taxing authorities pursuant to the authority granted them under these orders.  As ADH is a holding company, it does not have many of the types of obligations that the U.S. Debtors were authorized to pay, although ADH did receive authority to pay any prepetition taxes.

### 4. The Debtors' Exclusive Right to File and Confirm a Plan.

The Bankruptcy Court approved an extension of the periods during which the U.S. Debtors have the exclusive right to file and confirm a chapter 11 plan under section 1121(b)

of the Bankruptcy Code (the "***Exclusive Periods***").  The order of the Bankruptcy Court, entered on May 19, 2009 extended the Exclusive Periods through and including December 9, 2009 (for filing a plan) and February 7, 2010 (for solicitation of acceptances of a plan).  (Docket No. 602). On December 30, 2009, the Bankruptcy Court entered an order further extending the Exclusive Periods to file a chapter 11 plan and solicit acceptances thereof to June 7, 2010 and August 6, 2010, respectively.  (Docket No. 1258).  The Exclusive Periods for ADH currently expire on June 7, 2010 and August 4, 2010, respectively.

5.    **Claims Issues.**

a.    ***The Bar Date for Claims against the U.S. Debtors.***

On May 12, 2009, the U.S. Debtors filed with the Bankruptcy Court their respective schedules of assets and liabilities pursuant to the Bankruptcy Court's order dated February 13, 2009 extending the U.S. Debtors' time to file such schedules (together, the "***Schedules***").  The U.S. Debtors listed an aggregate of approximately 3,728 fully liquidated, noncontingent and undisputed claims on their schedules.

On April 30, 2009, the Debtors filed a motion seeking an order fixing a bar date for the filing of proofs of claim against the U.S. Debtors' estates.  By order dated May 19, 2009 (the "***Bar Date Order***"), the Bankruptcy Court set a bar date for filing proofs of claim in the U.S. Debtors' Chapter 11 Cases of September 15, 2009 (the "***Bar Date***").  The U.S. Debtors mailed notices of the Bar Date and proof of claim forms to all the entities identified in the Schedules, among others (the "***Bar Date Notice***"). The Bar Date Notice also was published on one occasion in *The Wall Street Journal*, as well as once in 34 local or regional newspapers.

Pursuant to the Bar Date Order, each creditor holding a prepetition Claim against any of the U.S. Debtors was required, subject to certain limited exceptions, to file a proof of claim on or before the Bar Date.  Specifically, as provided in the Bar Date Notice, creditors holding any of the following types of Claims were not required to file proofs of claim on or before the Bar Date:

> ➢ a Claim that already had been properly filed with the clerk of the Bankruptcy Court or KCC using a claim form that substantially conforms to Official Bankruptcy Form No. 10;

> ➢ a Claim that (i) is listed on the Schedules, (ii) is not described in the Schedules as "disputed," "contingent," or "unliquidated," (iii) is in the same amount, nature and priority as set forth in the Schedules, *and* (iv) as to which the Creditor agrees that the Claim is an obligation of the specific Debtor that has listed the claim in its schedules;

> ➢ a Claim that has been allowed by order of the Bankruptcy Court or satisfied in full prior to the Bar Date;

> ➢ a Claim of a U.S. Debtor or a subsidiary of Aleris against any U.S. Debtor;

> a Claim of any officer, director, or employee for a claim for indemnification, contribution, reimbursement, or wages and benefits; *provided*, *however*, that any officer, director, or employee was required to have filed a proof of claim if he or she wished to assert any other Claims against any of the Debtors unless another exception applied;

> any Claim allowable under section 503(b) or 507(a) of the Bankruptcy Code as an Administrative Expense of the U.S. Debtors' Chapter 11 Cases other than Administrative Expenses allowable under section 503(b)(9) of the Bankruptcy Code;

> any Equity Interest in any Debtor; *provided, however*, that any interest holder who wished to assert any Claim (as opposed to ownership interest) against any of the U.S. Debtors that arises out of or relates to the ownership or purchase of an interest, including claims arising out of or relating to the sale, issuance, or distribution of the interest, was required to have filed its proof of claim on or before the Bar Date unless another exception applied; and

> any Claim for which the Bankruptcy Court fixed a specific deadline to file a proof of claim.

A total of 2,974 proofs of claim against the U.S. Debtors were filed on or before the Bar Date. In addition, as of December 31, 2009, 135 proofs of claim were filed against the U.S. Debtors after the Bar Date. Thus, as of December 31, 2009, a total of 3,190 proofs of claim had been filed against the U.S. Debtors in the Chapter 11 Cases.

Basic information regarding Claims that have been scheduled and filed in the Chapter 11 Cases can be accessed using the following website: www.kccllc.net/aleris.

**b.**     *Objections to Claims.*

Since the Bar Date, the U.S. Debtors, together with their professionals, have engaged in an extensive process of reviewing and reconciling the proofs of claim asserted against the U.S. Debtors in the Chapter 11 Cases. As of December 31, 2009, the U.S. Debtors had filed and prosecuted 8 omnibus objections to Claims. In addition, the U.S. Debtors have engaged in discussions with a wide variety of Creditors regarding, among other things, the withdrawal of Claims where appropriate.

As a result of these efforts, as of December 31, 2009, 396 Claims against the U.S. had been disallowed, expunged or withdrawn, leaving a total of 2,713 proofs of claim outstanding against the U.S. Debtors. Excluding those proofs of claim that either will be expunged because they are duplicative or are multiple claims that will be eliminated as a result of the substantive consolidation provided under the Plan, as of December 31, 2009, there was a total of 2,392 proofs of claim asserted against the U.S. Debtors in the aggregate amount of approximately $1.7 billion.

Furthermore, as of December 31, 2009, in connection with each of the omnibus objections to Claims filed by the U.S. Debtors, as well as settlements and compromises between

the U.S. Debtors and Creditors, the U.S. Debtors had resolved and agreed to allow a total of 19 Claims in the aggregate amount of approximately $5 million.

The U.S. Debtors have assumed that any General Unsecured Claims other than a Debt Claim in an amount of $750,000 or less will elect to be treated in U.S. Debtors Class 4 (Convenience Claims). On the basis of that assumption, the U.S. Debtors expect the total amount of allowed General Unsecured Claims, exclusive of Debt Claims, that will remain in U.S. Debtors Class 5 will be approximately $163 million as a result of the U.S. Debtors' continued claims reconciliation and objection process. Included in this figure is approximately $90.6 million in claims asserted by the Pension Benefit Guaranty Corporation (the "*PBGC*"). The U.S. Debtors anticipate that the PBGC may assert additional Claims as a result of the termination of certain single-employer pension plans. The U.S. Debtors believe that the actual liability on all of these claims may be lower that the asserted Claims based on the use of reasonable actuarial assumptions that differ from the actuarial assumptions used by the PBGC. The U.S. Debtors may object to and seek to reduce the amount of the PBGC Claims. Neither the estimate of total Allowed General Unsecured Claims in Class 5, nor the estimate of the PBGC Claims, includes any liability that may be asserted against the U.S. Debtors as a result of the withdrawal of Wabash from certain multi-employer pension plans. The U.S. Debtors expect that these plans will assert additional prepetition General Unsecured Claims in these cases, but are unable to estimate such claims at this time.

### c.    *Claims Settlement Guidelines.*

In order to enable the U.S. Debtors to efficiently and economically settle numerous claims against their estates and thus limit their potential liability on such claims, the Bankruptcy Court entered an order (the "*Claims Settlement Order*") on June 23, 2009 (Docket No. 706) pursuant to which the Bankruptcy Court approved various guidelines and procedures (the "*Claims Settlement Guidelines*") with respect to the compromise and settlement of Disputed Claims asserted both by and against the U.S. Debtors. Specifically, the Claims Settlement Order authorizes the U.S. Debtors to settle certain claims in a manner substantially consistent with their prepetition practices and without the need for obtaining Bankruptcy Court approval of certain settlements on a case by case basis.

The Claims subject to the Claims Settlement Order include, but are not limited to, (i) Claims that have been asserted against the U.S. Debtors' estates by current or former employees for alleged wrongful termination or other contractual, statutory, and tort based employment claims; (ii) tax refund claims asserted by the U.S. Debtors against taxing authorities; (iii) tax assessment Claims asserted against the U.S. Debtors by taxing authorities, and (iv) General Unsecured Claims. Every three months, the U.S. Debtors are required to file quarterly statements reflecting the settled Claims for such period.

The Claims Settlement Guidelines outline a tiered process, pursuant to which the U.S. Debtors are permitted to settle Claims up to a certain amount per Creditor and a certain amount in the aggregate without further approval or consultation (the "*First Tier Claims*"). The Debtors are permitted to settle Claims exceeding the dollar amount for First Tier Claims but below another threshold amount per Creditor and in the aggregate (the "*Second Tier Claims*"), after submitting the proposed settlement to the Creditors' Committee for review, together with

certain information regarding the settlement (collectively, the "***Settlement Summary***").   All summaries provided to the Creditors' Committee pursuant to the Claims Settlement Guidelines are provided on a confidential, "for professional eyes only" basis.  The Creditors' Committee is required to submit any objections to a proposed settlement on or before ten business days after service of such Settlement Summary.  In the event that the Creditors' Committee objects to the settlement set forth in the Settlement Summary, the Debtors may (i) seek to renegotiate the proposed settlement and may submit a revised Settlement Summary in connection therewith or (ii) file a motion with the Bankruptcy Court seeking approval of the proposed settlement.  If the Creditors' Committee does not timely object to the proposed settlement, then the Debtors are deemed, without further order of the Bankruptcy Court, to be authorized by the Bankruptcy Court to enter into an agreement to settle the claim at issue as provided in the Settlement Summary.

In order to settle claims exceeding the Second Tier Claims on a case-by-case basis or in the aggregate, the Debtors are required to seek Bankruptcy Court approval, pursuant to Bankruptcy Rule 9019.

As part of the Claims Settlement Guidelines, the Debtors are required to file with the Bankruptcy Court a quarterly report of all settlements of Claims into which the Debtors have entered during such quarter pursuant to the Claims Settlement Guidelines.  Such reports set forth the name of the party with whom the Debtors have settled, the types of claims asserted by or against such party, and the amounts for which such claims have been settled.  By order of the Bankruptcy Court, dated October 19, 2009 (Docket No. 1010), the Debtors are permitted to redact from the publicly filed reports any information regarding certain settlements of employee-related claims, although the Debtors filed an unredacted report under seal with the Bankruptcy Court and serve copies of such unredacted report on a confidential basis to (i) the U.S. Trustee, (ii) counsel for the agent for the Debtors' prepetition and postpetition bank lenders, and (iii) the attorneys for the Creditors' Committee.  As of December 31, 2009, the U.S. Debtors had settled two claims pursuant to the Claims Settlement Guidelines.

The Claims Settlement Guidelines are amended as set forth in Exhibit "1.1.49" to the Plan.  Such amendment will maintain the same threshold levels of approval, but will replace the Creditors' Committee with a designated creditor representative.

The dollar amounts for each type of settlement procedure pursuant to the Claims Settlement Guidelines are summarized below:[8]

---

[8] Terms not defined in this table have the meanings set forth in the *Motion of the Debtors for Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019(b) Authorizing the Establishment of Procedures to Settle Certain Prepetition or Postpetition Claims Against the Debtors' Estates*, filed on June 5, 2009 (Docket No. 652).

| Nature of Claim | First Tier Claims | Second Tier Claims | Bankruptcy Court Approval Required |
|---|---|---|---|
| Employee Litigation Claims | Postpetition cash payment of less than or equal to $50,000 per claimant, not to exceed $1,000,000 in the aggregate or an allowed prepetition, unsecured claim of less than or equal to $75,000 per claimant. | Postpetition cash payment per claimant is greater than $50,000 and less than $100,000, or the proposed allowed, unsecured, prepetition claim is greater than $75,000. | Postpetition cash payment per claimant is over $100,000, or postpetition cash payments exceed $1,000,000 in the aggregate. |
| Income Tax Assessment Claims involving one or more U.S. Debtors and any state or local taxing authority | The Income Tax Assessment Settlement Amount is less than or equal to $100,000. | The Income Tax Assessment Settlement Amount is greater than $100,000, but less than $4,000,000. | The Income Tax Assessment Settlement Amount is greater than $4,000,000. |
| Income Tax Assessment Claims involving one or more U.S. Debtors and the United States Internal Revenue Service | The aggregate Income Tax Assessment Settlement Amount for such Income Tax Assessment Claims is less than or equal to $500,000. | The aggregate Income Tax Assessment Settlement Amount for such Income Tax Assessment Claims is greater than $500,000, but less than or equal to $20,000,000. | The aggregate Income Tax Assessment Settlement Amount for such Income Tax Assessment Claims is greater than $20,000,000. |
| Tax Refund Claims involving one or more U.S. Debtors and any state or local taxing authority | The Tax Refund Documented Difference for such Tax Refund Claim is less than or equal to $100,000. | The Tax Refund Documented Difference for such Tax Refund Claim is greater than $100,000, but less than or equal to $2,000,000. | The Tax Refund Documented Difference for such Tax Refund Claim is greater than $2,000,000. |
| Tax Refund Claims involving one or more U.S. Debtors and the United States Internal Revenue Service | The Tax Refund Documented Difference for such Tax Refund Claim is less than or equal to $500,000. | The Tax Refund Documented Difference for such Tax Refund Claim is greater than $500,000, but less than or equal to $10,000,000. | The Tax Refund Documented Difference for such Tax Refund Claim is greater than $10,000,000. |
| General Claims *asserted by* one or more U.S. Debtors | The Documented Difference is less than $100,000. | The Documented Difference is greater than or equal to $100,000 but less than $5,000,000. | The Documented Difference is greater than $5,000,000. |
| General Claims *asserted against* one or more U.S. Debtors | The Documented Difference is less than $25,000. | The Documented Difference is greater than or equal to $25,000 but less than $1,000,000. | The Documented Difference is greater than or equal to $1,000,000. |

US_ACTIVE\43300937\12\12846.0004

### d. *ADH Claims*

As the Plan does not impair any Claims against ADH other than the European Roll-Up Term Loan Claims and the European Term Loan Claims, ADH does not intend to request that the Bankruptcy Court establish a deadline for filing prepetition claims against ADH.

### 6. **Allowance of Certain Environmental Claims.**

Prior to the U.S. Debtors' Commencement Date, the Company had been engaged in discussions with the United States Department of Justice, the United States Environmental Protection Agency and several states (collectively, the "*Government Parties*") with respect to environmental compliance issues relating to certain of the U.S. Debtors' facilities in different states. During the pendency of the Chapter 11 Cases, the Government Parties and certain of the U.S. Debtors reached agreement on the terms of a Consent Decree (the "*Consent Decree*") to resolve these issues. The Consent Decree was approved by the Bankruptcy Court and then was entered by the District Court for the Northern District of Ohio on October 22, 2009. The Consent Decree provides for aggregate monetary penalties of $4.6 million and certain injunctive relief. These monetary penalties will receive treatment as Allowed General Unsecured Claims in the U.S. Debtors' Chapter 11 Cases.

### 7. **Developments Regarding the Debtors' Proposed Termination of Pension Plans**

Aleris or Aleris affiliates are parties to three separate collective bargaining agreements ("*USW CBAs*") with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO (the "*USW*") covering employees at the Debtors' facilities at Lewisport, Kentucky, Ashville, Ohio, and Bens Run, West Virginia. The Debtors are required to maintain certain defined benefit pension plans pursuant to the Lewisport and Ashville CBAs, which include Commonwealth Aluminum Lewisport, LLC Hourly Employees Pension Plan and the Alsco Metals Corp. Retirement Plan for Bargained Employees ("*the USW Plans*"). Pursuant to Section 10.1 of the Plan, entry of the confirmation order (and the occurrence of the Confirmation Date) is subject to the termination of certain pension plans, including the USW Plans, in accordance with 29 U.S.C. §§ 1341(c) or 1342(a). As of the date of this Disclosure Statement, the parties have yet to commence bargaining and the Debtors have yet to present the USW with proposals to modify the USW CBAs.

Because the USW Plans are maintained pursuant to the USW CBAs, the contractual obligation to maintain the USW Plans must be modified in order for the conditions set forth in Section 10.1 to be met and the USW Plans to be terminated. If the Debtors were unable to reach a consensual agreement with the USW concerning the termination of the USW Plans, and they determined to still seek termination of the USW Plans, the Debtors would be obligated seek to reject the USW CBAs pursuant to 11 U.S.C. § 1113 (which would also be necessary under 29 U.S.C. § 1341(c)) and to meet the procedural and substantive requirements of Section 1113 in order to obtain a court order rejecting the USW CBAs. If such an application were granted, the USW would have certain rights, including the right to strike, which could have a material impact on the financial condition of the Debtors, projections, and valuations.

However, as long as the Debtors are pursuing the Joint Plan of Reorganization of Aleris International, Inc. and its Affiliated Debtors, dated February 5, 2010, as it may be modified (the "***Plan***"),[9] the Debtors have agreed to waive the right to utilize Section 1113 and have entered into a stipulation with the USW including such a waiver.

Pension plan termination can be initiated by the employer that sponsors the pension plan or by the PBGC. If an employer wants to terminate a pension plan, then the employer may only terminate the plan: (i) in a standard termination under 29 U.S.C. § 1341(b) if the pension plan has sufficient assets to cover all future benefits; or (ii) in a distress termination under 29 U.S.C. § 1341(c) if the pension plan is underfunded and the employer meets certain statutory financial distress tests. Additionally, PBGC has discretion to initiate the termination of an underfunded plan if it determines that one of the criteria set forth in 29 U.S.C. § 1342(a) has been met. In order to achieve a termination of the Pension Plans (as defined below), the Debtors will also be required to meet the applicable requirements of ERISA, 29 U.S.C. § 1341(c), which requires a finding by the Court that unless the Pension Plans are terminated, the Debtors will be unable to pay all their debts pursuant to a plan of reorganization and will be unable to continue in business outside of the Chapter 11 reorganization process. That finding may also require an evidentiary hearing before the Bankruptcy Court. PBGC has indicated that the Debtors may not be able to satisfy the applicable requirements of ERISA necessary to terminate the Pension Plans and that PBGC may therefore oppose such terminations. If the Pension Plans are terminated under 29 U.S.C. § 1341(c) or 1342(a), the PBGC will have, *inter alia*, an unsecured claim for the amount of unfunded benefit liabilities pursuant to 29 U.S.C. §§ 1362(a) and 1362(b)(1)(A). The PBGC estimated in proof of claim forms filed in this case that the amount of such claims might range as follows per plan, assuming a termination date of April 30, 2009: Alsco Metals Corporation Cash Balance Plan in the amount of $600,000; Alsco Metals Corporation Retirement Plan for Bargained Employees in the amount of $3,300,000; Commonwealth Aluminum Lewisport, LLC Hourly Employees Pension Plan in the amount of $66,600,000; and Commonwealth Industries, Inc. Cash Balance Plan in the amount of $20,700,000. The actual unfunded benefit liabilities may be different, and possibly greater, should the Pension Plans terminate with a later termination date. The PBGC has also filed contingent claims for unpaid minimum funding contributions owed to each pension plan and for statutory premiums owed to the PBGC.

The termination of the USW Plans, as well as the Debtors' other pension plans, will dilute the recovery for unsecured creditors. The Creditors' Committee has not yet taken a position as to whether it will support or oppose the approval of motions that would be required to terminate the USW Plans.

### 8. Additional Information Regarding Pension Plans

Each of the Debtors is currently a sponsor or a member of sponsor's controlled group (within the meaning of 29 U.S.C. § 1301(a)(13), (14)) with respect to the following pension plans: the Alsco Metals Corporation Cash Balance Plan, the Alsco Metals Corporation

---

[9] The definition for the term "Plan" in this section relates to its use in this section only. The definition of the term "Plan" that applies in the rest of the Disclosure Statement is provided on page 1.

Retirement Plan for Bargained Employees, the Commonwealth Industries, Inc. Cash Balance Plan, and the Commonwealth Aluminum Lewisport, LLC Hourly Employees Pension Plan (collectively, the "Pension Plans"), all of which are defined benefit pension plans covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended, (*"ERISA"*), 29 U.S.C. §§ 1301-1461.

ERISA provides that a sponsor and members of the sponsor's controlled group are jointly and severally liable for amounts required to be contributed under ERISA to a pension plan subject to Title IV of ERISA ("***Minimum Funding Contributions***"). *See* 29 U.S.C. §§ 1082, 1083 (as to § 1083, effective for pension plans years beginning after December 31, 2007). ERISA further provides that a sponsor and its controlled group are jointly and severally liable for insurance premiums owed to the Pension Benefit Guaranty Corporation ("***PBGC***"). *See* 29 U.S.C. §§ 1306, 1307. PBGC is the federal agency that administers the pension insurance program under Title IV of ERISA. When an underfunded pension plan covered by Title IV of ERISA terminates with insufficient assets to pay benefits, PBGC generally becomes statutory trustee of the plan and pays benefits to the plan's participants up to statutory limits. *See* 29 U.S.C. §§ 1341 and 1342.

PBGC has filed timely proofs of claims against the Debtors for: (1) the Pension Plans' underfunding on a termination basis ("***Unfunded Benefit Liabilities***"); (2) unpaid Minimum Funding Contributions – a portion of which PBGC asserts is entitled to priority under 11 U.S.C. §§ 507(a)(2), (5); and (3) unpaid premiums. As of April 30, 2009, PBGC estimated the Pension Plans' aggregate Unfunded Benefit Liabilities to be approximately $90 million; these claims are contingent on the Pension Plans terminating (other than through a standard termination) during the bankruptcy and would be withdrawn if no such termination occurs.

9.      **ADH Disclosure Relating to Pension Plans**

ADH intends to negotiate settlements with the PBGC and the Boards of Trustees of the applicable multiemployer plans of ADH's liability under Title IV of ERISA or otherwise contest the application to it of Title IV of ERISA, in recognition of the absence of any material unencumbered assets globally and any material assets or business activities within the United States. If ADH is unable to obtain such settlements in a manner satisfactory to it, ADH may seek to take such actions as may be appropriate to limit its exposure to liability with respect to such United States pension plans, including revisions to the Plan.

The Central States, Southeast and Southwest Areas Pension Fund (the "***Central States Pension Fund***") asserts that it will have claims against ADH arising from the withdrawal of Wabash Alloys from the Central States Pension Fund. At least a portion of these claims will be asserted as general unsecured claims against ADH, and the Debtors do not believe such general unsecured claims will arise prior to the Effective Date of the Plan. In any event, the Plan provides that general unsecured claims against ADH may be resolved in any appropriate forum of competent jurisdiction. To enforce its asserted claim against ADH, the Central States Pension Fund may either initiate a lawsuit in Germany or in the United States. If the Central States Pension Fund initiates a lawsuit in the United States, it would need to bring an enforcement action in Germany to enforce the United States judgment within the German jurisdiction. It is not clear to the Debtors that a German court would recognize a judgment on the claim entered by a

United States court, especially as ADH may have little or no assets in the United States at the time the US lawsuit is initiated.

# V.

## THE PLAN OF REORGANIZATION

The Debtors believe that (i) through the Plan, Creditors will obtain a substantially greater recovery from the Debtors' estates than the recovery that would be available if the Debtors' assets were liquidated under chapter 7 of the Bankruptcy Code, and (ii) the Plan will afford the Debtors the opportunity and ability to continue in business as a viable going concern.

The Plan is annexed hereto as Exhibit "A" and forms a part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by the more detailed provisions set forth in the Plan.

### A. Classification and Treatment of Claims and Equity Interests.

The Plan classifies Claims and Equity Interests separately and provides different treatment for different classes in accordance with the Bankruptcy Code. As described more fully below, the Plan provides, separately for each class, either that Claims are unimpaired or that holders of Claims or Equity Interests will receive various types of consideration (*e.g.*, Cash, U.S. Roll-Up Stock, ADH Roll-Up Stock, ADH Term Loan Stock, U.S. Subscription Rights, ADH Roll-Up Subscription Rights, ADH Term Loan Subscription Rights) or no distribution, thereby giving effect to the different rights of the holders of Claims and Equity Interests.

### 1. Administrative Expenses.

An "***Administrative Expense***" is any Claim constituting a cost or expense of administration in these Chapter 11 Cases under section 503 of the Bankruptcy Code, including, without express or implied limitation, any actual and necessary costs and expenses of preserving the Debtors' estates, any expenses of professionals under sections 330 and 331 of the Bankruptcy Code, any actual and necessary costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession (except as expressly provided otherwise herein), in connection with the conduct of their business or for the acquisition or lease of property or the rendition of services, any allowed compensation or reimbursement of expenses under section 503(b)(2)-(5) of the Bankruptcy Code, and any fees or charges assessed against the Debtors' estates under section 1930, chapter 123, title 28, United States Code.

#### a. *Administrative Bar Date.*

On March 12, 2010, the Bankruptcy Court entered an order setting May 20, 2010 (the "***Administrative Bar Date***") as the deadline for holders of certain Administrative Expenses to file a proof of claim asserting an Administrative Expense against any of the U.S. Debtors (Doc. No. 1654) (the "***Administrative Bar Date Order***"). Pursuant to the Administrative Bar Date Order, only entities asserting that any of the following types of claims are Administrative Expenses (referred to in the Administrative Bar Date Order as "***Specified Administrative Expenses***") must file a proof of Administrative Expense on or before the Administrative Bar Date:

➢ Any Administrative Expense representing personal injury, property damage, or other tort claims against any of the U.S. Debtors;

➢ Any Administrative Expense for breach of an obligation – contractual, statutory or otherwise – by any of the U.S. Debtors, including any environmental liability (but other than any environmental liability with respect to property that is currently owned or operated by any of the U.S. Debtors);

➢ Any Administrative Expense for amounts incurred by any of the U.S. Debtors after the Commencement Date in the ordinary course of the U.S. Debtors' business if payment of such amounts is alleged to be overdue by at least 60 days as of the Confirmation Date;

➢ Any Administrative Expense incurred by the U.S. Debtors *outside* the ordinary course of business or on other than ordinary business terms, except to the extent the incurrence of such Administrative Expense was approved by the Bankruptcy Court (*e.g.*, the DIP ABL Claim, the New Money Term DIP Claims and the U.S. Roll-Up Term Loan Claims) or represents fees and expenses of professionals arising under sections 330, 331, 503(b)(2) - (5) of the Bankruptcy Code;

➢ Any Administrative Expense that would *not* ordinarily be reflected as a payable on the U.S. Debtors' books and records or as a liability on the U.S. Debtors' financial statements; and

➢ Any Administrative Expense representing an employee claim against any of the U.S. Debtors, *other than* (i) a claim for wages, benefits, pension or retirement benefits or expense reimbursement by an employee who is employed by such Debtor as of the Administrative Expense Bar Date or (ii) a grievance claim under any collective bargaining agreement to which such Debtor is a party.

Moreover, if a claim is of the type specified above **and** the holder of such claim has asserted the claim in an action commenced against and served on the U.S. Debtors on or before entry of the Administrative Bar Date Order (and in which such holder alleges that the U.S. Debtors' liability is predicated upon the operation of the U.S. Debtors' business after the Commencement Date or otherwise alleges that such liability should be accorded administrative expense status), then the holder of such alleged Administrative Expense is *not* required to file a proof of Administrative Expense.

    b.     ***Payment of Allowed Administrative Expenses.***

Pursuant to Section 2.1.1 of the Plan, the Allowed Amount of each Administrative Expense against a U.S. Debtor that is Allowed as of the Effective Date shall be paid in full, in Cash, on the Effective Date or as soon thereafter as is reasonably practicable; *provided*, *however*, that (i) Administrative Expenses of the type specified in Section 1.1.30(e)(i) of the Plan will be assumed and paid by the Reorganized Debtors in accordance with the terms and conditions of the particular transactions and any agreements relating thereto, and (ii) the U.S. Roll-Up Term Loan

Claims will be satisfied in accordance with the treatment set forth in U.S. Debtors Class 3. Each Administrative Expense of the type specified in Section 1.1.30(e)(ii) or 1.1.30(e)(iii) of the Plan will be paid the Allowed Amount of such Administrative Expense in full, in Cash, as soon as practicable after such Administrative Expense is Allowed.

       c.      ***Compensation and Reimbursement Claims.***

Pursuant to Section 2.1.2 of the Plan, the Bankruptcy Court will fix in the Confirmation Order a date for the filing of, and a date to hear and determine, all applications for final allowances of compensation or reimbursement of expenses under section 330 of the Bankruptcy Code or applications for allowance of Administrative Expenses arising under section 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 503(b)(6) of the Bankruptcy Code, other than expenses already allowed by Final Order. The Allowed Amount of all Administrative Expenses arising under section 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 503(b)(6) of the Bankruptcy Code shall be paid in full, in Cash, (a) upon the later of (i) the Effective Date and (ii) the date upon which any such Administrative Expense becomes Allowed or (b) at such later date or upon such other terms as may be mutually agreed upon between each such Administrative Expense Creditor and the Reorganized Debtors.

       d.      ***Administrative Expenses Under***
                    ***Section 503(b)(9) of the Bankruptcy Code.***

Section 503(b)(9) of the Bankruptcy Code affords administrative expense status to claims of vendors to the Debtors for the value of goods received by the Debtors within 20 days before the Commencement Date. Notably, such priority status only extends to the value of goods and does not apply to any services received by any of the Debtors within such period. Under the Bar Date Order, any creditor that wished to assert an Administrative Expense under section 503(b)(9) against any of the U.S. Debtors was required to assert such Administrative Expense in a proof of claim filed on or before the Bar Date. Because ADH is a holding company, ADH does not believe any Creditors of ADH hold Administrative Expenses against ADH. In any event, such Claims, if they existed, would be unaffected by ADH's Chapter 11 Case.

By the Bar Date, creditors filed proofs of claim asserting Administrative Expenses against the U.S. Debtors under section 503(b)(9) in an aggregate amount of approximately $13 million. Of these, approximately $5.2 million have been withdrawn or disallowed, the Debtors estimate that approximately $1 million are appropriately subject to an objection, generally because Creditors filed duplicate claims, and another $3.2 million may be subject to an objection because either the goods were not received within the 20-day prepetition window or the Claim otherwise does not meet the requirements of section 503(b)(9) of the Bankruptcy Code. Accordingly, the U.S. Debtors believe an estimated total of approximately $2.9 million in unpaid Administrative Expenses may be allowable pursuant to section 503(b)(9). In addition, as noted above, the U.S. Debtors received authority to pay Administrative Expenses arising under section 503(b)(9), in their discretion, during the Chapter 11 Cases and, as of December 31, 2009, had paid approximately $2.2 million in such Administrative Expenses since the U.S. Debtors' Commencement Date. Many of these payments were made before the Bar Date and, accordingly, most the claimants receiving these payments did not file proofs of claim, but

approximately $400,000 of these claims was paid to 503(b)(9) claimants that did file proofs of claim. Depending upon further review of the asserted Administrative Expenses and the resolution of objections to these Administrative Expenses, however, such estimate could be higher or lower.

### e. *Other Administrative Expenses Specific to the U.S. Debtors.*

The Plan provides certain provisions regarding certain Administrative Expenses specific to the U.S. Debtors. Those provisions are as follows:

#### (1) DIP ABL Claims.

A "*DIP ABL Claim*" is any Claim arising under the DIP ABL Credit Agreement. Pursuant to Section 2.1.3(a) of the Plan, each holder of a DIP ABL Claim will receive payment in full, in the applicable currency under the DIP ABL Credit Agreement, of the unpaid portion of its claim on the Effective Date or as soon thereafter as is reasonably practicable. The payment will be made by Aleris and the Debtors' non-Debtor affiliates, Spec Alloys and Aleris Switzerland GmbH. To fund the payments by Spec Alloys and Aleris Switzerland GmbH, Aleris will make a series of cash capital contributions and/or loans using proceeds from the Rights Offering through its direct and indirect Debtor and non-Debtor subsidiaries, such that Spec Alloys and Aleris Switzerland GmbH, respectively, receive the capital contributions and/or loans. Using the proceeds of the capital contributions and/or loans, on the Effective Date or as soon thereafter as is reasonably practicable, Aleris, Spec Alloys, and Aleris Switzerland GmbH will pay all outstanding DIP ABL Claims in full to the DIP ABL Agent Bank for distribution to holders of DIP ABL Claims.

#### (2) New Money Term DIP Claims.

A "*New Money Term DIP Claim*" is any Claim arising from the New Money Term DIP Facility. Pursuant to Section 2.1.3(b) of the Plan, each holder of a New Money Term DIP Claim will receive payment in full, in the applicable currency under the DIP Term Credit Agreement, of the unpaid portion of its claim on the Effective Date or as soon thereafter as is reasonably practicable. The payment will be made by ADH and the Debtors' non-Debtor affiliate, Aleris Aluminum Duffel BVBA. Specifically, using proceeds from the Rights Offering, Aleris will make a series of cash capital contributions and/or loans through its direct and indirect Debtor and non-Debtor subsidiaries, such that ADH and Aleris Aluminum Duffel BVBA, respectively, receive the cash capital contributions and/or loans. Using the proceeds of the cash capital contributions and/or loans, on the Effective Date or as soon thereafter as is reasonably practicable, ADH and Aleris Aluminum Duffel BVBA will pay all outstanding New Money Term DIP Claims in full in the applicable currency under the DIP Term Credit Agreement to the DIP Term Agent Bank for distribution to holders of New Money Term DIP Claims.

### f. *Estimate of Administrative Expenses Against the U.S. Debtors.*

Other than payables that are recorded on the Debtors' books and records and paid in the ordinary course of business, and other than the U.S. Roll-Up Term Loan Claims (discussed below), on the Effective Date, the Debtors will have Allowed Administrative Expenses. The

main categories of expected Administrative Expenses are estimated in the table below, which contains estimates of U.S. Plan Deductions and ADH Plan Deductions.

### Estimated U.S. Plan Deductions ($mm)

| | |
|---|---|
| DIP Credit Agreements Unpaid Fees and Expenses | 11.2 |
| Estimate of Exit ABL Fees and Expenses | 9.5 |
| Structuring and Arrangement Fee[10] | 16.9 |
| Cash Payments to Allowed Convenience Claims | 7.4 |
| Cash Payments to U.S. Debtors Class 5 | 16.5 |
| Administrative Expenses Pursuant to § 503(b)(9) | 3.5 |
| Professional Fees and Expenses | 18.4 |
| Blackstone Fees | 2.9 |
| U.S. Projected Amounts Under the DIP Credit Agreements[11] | 373.8 |
| U.S. Liquidity Adjustment | 21.3 |
| Deduction on Account of European Term Loan Minimum Recovery | 62.3 |
| **Estimated U.S. Plan Deductions** | **543.6** |

### Estimated ADH Plan Deductions ($mm)

| | |
|---|---|
| DIP Credit Agreements Unpaid Fees and Expenses | 6.3 |
| Estimate of Exit ABL Fees and Expenses | 6.3 |
| Structuring and Arrangement Fee[12] | 7.2 |
| Professional Fees and Expenses | 3.0 |
| Blackstone Fees | 1.6 |
| ADH Projected Amounts Under the DIP Credit Agreements[13] | 211.5 |
| ADH Liquidity Adjustment | 24.7 |
| **Estimated ADH Plan Deductions** | **260.6** |

g.      *U.S. Roll-Up Term Loan Claims.*

A "***U.S. Roll-Up Term Loan Claim***" is any Claim arising out of the U.S. Roll-Up Term Loans.  Pursuant to Paragraph 17(c) of the DIP Order, the holders of the U.S. Roll-Up Term Loans may agree to receive consideration other than payment in full, in Cash, on the Effective Date so long as the class of U.S. Roll-Up Term Loan Claims votes to accept the Plan pursuant to the requisite amount and number set forth in section 1126 of the Bankruptcy Code. Accordingly, holders of U.S. Roll-Up Term Loan Claims are classified in U.S. Debtors Class 3, and the classification and treatment of such claims are set forth below in Section 2.1.3(c) of the Plan.  *See* Section V.C.3, entitled, "THE PLAN OF REORGANIZATION – Classification and

---

[10] Amount provided assumes a Maximum Rights Offering Amount of $690 million.

[11] Amount is projected as of the Determination Date per schedule 1.1.188(o) to the Plan.

[12] Amount provided assumes a Maximum Rights Offering Amount of $690 million.

[13] Amount is projected as of the Determination Date per schedule 1.1.12(j) to the Plan.

Treatment of Claims against and Equity Interests in the U.S. Debtors –U.S. Debtors Class 3 (U.S. Roll-Up Term Loan Claims)," for a more complete description of the treatment of the U.S. Roll-Up Term Loan Claims under the Plan.

If the holders of the U.S. Roll-Up Term Loan Claims do not vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, then the U.S. Debtors may confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code and Paragraph 17(c) of the DIP Order, which permits the U.S. Debtors to "cram down" the Plan on dissenting creditors. Specifically, Paragraph 17(c) provides as follows:

> The DIP Loans under the Roll-Up Term Facility will be required to be repaid in cash on the Maturity Date (as defined in the DIP Term Credit Agreement); <u>provided</u>, that upon the vote of the class of holders of DIP Loans under the Roll-Up Term Facility to accept a Plan in accordance with the standards set forth in Section 1126(c) of the Bankruptcy Code or, failing to obtain same, pursuant to the standards set forth under Section 1129(b)(2)(A) of the Bankruptcy Code for "fair and equitable" treatment of a class of secured claims, a Plan may require that DIP Loans under the Roll-Up Term Facility be refinanced or otherwise replaced with other secured debt securities or financial instruments and, as applicable, guaranties of the obligors in respect of the Roll-Up Term Facility; <u>provided</u>, further that the Debtors shall use reasonable endeavors to cause any such Plan to provide that such DIP Loans under the Roll-Up Term Facility shall be repaid in full in cash on the Maturity Date.

For a general discussion of "cram down," please refer to Section XII.C.5, entitled, "CONFIRMATION AND CONSUMMATION PROCEDURE – Confirmation Procedure – Unfair Discrimination and Fair and Equitable Tests."

**h.** *Administrative Expenses Specific to ADH.*

Pursuant to Section 2.1.4 of the Plan, Administrative Expenses against ADH will be assumed and paid by Reorganized ADH in accordance with the terms and conditions of the particular transactions and any agreements relating thereto.

**B.    U.S. Tax Claims.**

A "***U.S. Tax Claim***" is a Claim against the U.S. Debtors that (i) meets the requirements specified in section 507(a)(8) of the Bankruptcy Code or (ii) that is of the type specified in section 507(a)(8) of the Bankruptcy Code and that is secured by an interest of any of the U.S. Debtors in property of the estate whether or not the Claim arises within the periods specified in section 507(a)(8), and including any related prepetition secured claim for penalties.

By order dated March 9, 2009 (Docket No. 237), the Bankruptcy Court authorized (but did not require) the U.S. Debtors to pay certain U.S. Tax Claims, including certain use, utility, property and franchise taxes, in full in an aggregate amount not to exceed $3,817,600.

The U.S. Debtors do not believe that this authority extends to the payment of prepetition income tax claims. As of December 31, 2009, the U.S. Debtors had paid an aggregate of approximately $2,407,375 in prepetition U.S. Tax Claims. Although approximately $37.3 million of U.S. Tax Claims were filed by the Bar Date, and although the U.S. Debtors continue to reconcile these claims, the U.S. Debtors estimate that the amount of U.S. Tax Claims that may become Allowed is approximately $217,198.49, as follows:

| **Tax** | **Estimated Amount**[14] |
|---|---|
| Income taxes | $8,083.65 |
| Real and personal property taxes | $106,375.00 |
| Employment and other taxes | $102,739.84 |
| **Total:** | $217,198.49 |

Pursuant to Section 2.2 of the Plan, at the sole option of the Debtors or the Reorganized Debtors, each holder of an Allowed U.S. Tax Claim will be paid the Allowed Amount of its Allowed U.S. Tax Claim either:

(1)    in full, in Cash, on the latest of (i) the Effective Date, (ii) the date such Allowed U.S. Tax Claim becomes Allowed, and (iii) the date such Allowed U.S. Tax Claim is payable under applicable non-bankruptcy law,

(2)    equal semi-annual Cash payments in an aggregate amount equal to such Allowed U.S. Tax Claim, together with interest at the applicable non-bankruptcy rate, commencing upon the later of (i) the Effective Date and (ii) the date such U.S. Tax Claim becomes Allowed; or as soon thereafter as is practicable and continuing over a period of eighteen (18) months (but in no event exceeding five (5) years from and after the U.S. Debtors' Commencement Date),

(3)    such other treatment as shall be determined by the Bankruptcy Court to provide the holder of such Allowed U.S. Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed U.S. Tax Claim, *or*

(4)    upon such other terms as may be mutually agreed upon between each holder of a U.S. Tax Claim and the Reorganized Debtor against which such Allowed U.S. Tax Claim is asserted.

---

[14] These figures assume that prepetition taxes that have not yet been paid, but will become due prior to the assumed Effective Date of June 1, 2010 have been paid.

**C.** **Classification and Treatment of Claims Against and Equity Interests in the U.S. Debtors.**

      **1.** **U.S. Debtors Class 1 (Priority Non-Tax Claims).**

      U.S. Debtors Class 1 consists of all Allowed Priority Non-Tax Claims. A "*Priority Non-Tax Claim*" is any Claim against a U.S. Debtor to the extent such claim is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code other than a DIP ABL Claim, New Money Term DIP Claim, Administrative Expense, U.S. Roll-Up Term Loan Claim, and a U.S. Tax Claim. Such claims include, subject to a cap of $10,950 for each individual or corporation, (i) claims for wages, salaries, or commissions, including vacation, severance and sick pay earned by individuals during the 180 days before the U.S. Debtors' Commencement Date, (ii) sales commissions earned by independent contractors during the 12 months preceding the U.S. Debtors' Commencement Date, so long as the contractor derived 75% of the amount that it earned as an independent contractor in the sale of goods or services to the U.S. Debtors, and (iii) subject to certain adjustments, claims for contributions to an employee benefit plan arising from services rendered within 180 days before the U.S. Debtors' Commencement Date.

      By order dated February 13, 2009 (Docket No. 35), the Bankruptcy Court authorized (but did not require) the U.S. Debtors to honor obligations to their employees, subject a cap of $10,950 for each payment recipient and subject to restrictions on certain kinds of payments, in an aggregate amount not to exceed $12,300,000. By order dated March 12, 2009 (Docket No. 267), the Bankruptcy Court lifted the $10,950 cap and the restrictions on the types of payments. Since the U.S. Debtors' Commencement Date, the U.S. Debtors have continued to honor their employee wage and benefit obligations (other than certain contributions to certain employee pension plans). Consequently, the U.S. Debtors do not believe that any significant employee-related Priority Non-Tax Claims remain outstanding, other than Claims that are the subject of an ongoing dispute. The Debtors do not believe that any outstanding employee-related Priority Non-Tax Claims will become Allowed.

      A total of approximately $100,000 in asserted Priority Non-Tax Claims have been filed, excluding employee-related claims, claims subject to a pending objection, and claims asserting unliquidated amounts. The Debtors are evaluating these claims and believe that very few, if any, of these claims will be entitled to priority status.

      Pursuant to Section 3.2.1 of the Plan, on the later of (i) the Effective Date and (ii) as soon as practicable after the date its Priority Non-Tax Claim becomes Allowed, each holder of an Allowed Priority Non-Tax Claim will be paid the Allowed Amount of its Allowed Priority Non-Tax Claim in full, in Cash.

      U.S. Debtors Class 1 is unimpaired. The holders of Claims in U.S. Debtors Class 1 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

2. **U.S. Debtors Class 2 (Other U.S. Secured Claims).**

U.S. Debtors Class 2 consists of all Allowed Other U.S. Secured Claims. An "***Other U.S. Secured Claim***" is any Claim against any of the U.S. Debtors to the extent of the value of the interest in property of the estate of such U.S. Debtor securing such Claim other than a DIP ABL Claim, New Money Term DIP Claim, Administrative Expense, U.S. Roll-Up Term Loan Claim, and any U.S. Tax Claim that is secured by property of the estate of any U.S. Debtor. Although the U.S. Debtors are still in the process of reconciling Claims that have been filed asserting that they are secured by an interest in property of any of the U.S. Debtors' estates, the U.S. Debtors believe that the category of Other U.S. Secured Claims is comprised largely of claims under capital leases as well as mechanic's lien and other possessory lien claims that have been properly perfected under applicable non-bankruptcy law. Claims of this nature, to the extent they were properly perfected as of the U.S. Debtors' Commencement Date or to the extent that their perfection relates back, are not primed by the DIP ABL Credit Facility or the DIP Term Credit Facility.

Based on the Debtors' claims reconciliation as of January 31, 2010, the Debtors estimate that there may be as much as $3.4 million in Allowed Other Secured Claims, although the ultimate amount of Allowed Other Secured Claims could be higher or lower. Excluding tax claims, claims related to derivative contracts, claims related to employee wages and benefits, unliquidated claims, and claims with objections to their secured status pending, approximately $3.5 million in additional claims asserting a secured status have been filed and continue to be reconciled; however, the Debtors believe that few if any of these claims will be Allowed.

Pursuant to Section 3.2.2 of the Plan, each Allowed Other U.S. Secured Claim will be unimpaired in accordance with section 1124 of the Bankruptcy Code. Accordingly, each Allowed Other U.S. Secured Claim will be treated in one of the following ways:

(1)     The legal, equitable, and contractual rights of a holder of an Allowed Other U.S. Secured Claim will be left unaltered, ***or***

(2)     Notwithstanding any contractual provision or applicable law that entitles the holder of an Allowed Other U.S. Secured Claim to demand or receive accelerated payment of such Claim prior to the stated maturity of such Claim from and after the occurrence of a default under the agreements governing or evidencing such Claim or applicable law, such Claim will be reinstated and the applicable U.S. Debtor will

(A)     cure all defaults that occurred before or from and after the U.S. Debtors' Commencement Date (other than defaults of a kind specified in section 365(b)(2) of the Bankruptcy Code),

(B)     reinstate the maturity of such Claim as such maturity existed prior to the occurrence of such default,

(C)     compensate the holder of such Claim for any damages incurred as a consequence of any reasonable reliance by such holder on such contractual provision or such applicable law,

(D)     if such Claim arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensate the holder of such Claim (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure, ***and***

(E)     not otherwise alter the legal, equitable, or contractual rights to which the holder of such Claim is entitled.

U.S. Debtors Class 2 is unimpaired. The holders of Claims in U.S. Debtors Class 2 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

    **3.**      **U.S. Debtors Class 3 (U.S. Roll-Up Term Loan Claims).**

        **a.**      ***Classification, Allowance, and Treatment.***

U.S. Debtors Class 3 consists of all U.S. Roll-Up Term Loan Claims. After giving effect to the 9019 Settlement, as of an assumed Effective Date of June 1, 2010, the U.S. Roll-Up Term Loan Claims would be deemed Allowed in the principal amount of $436,762,168.50 million and €70,944,418.10 million plus accrued interest (including interest accrued pursuant to the 9019 Settlement from August 1, 2009) up to the actual Effective Date. Pursuant to Section 3.2.3 of the Plan, on the Effective Date and in accordance with the Restructuring Transactions, each holder of a U.S. Roll-Up Term Loan Claim as of the Distribution Record Date shall receive, at the election of the holder of such U.S. Roll-Up Term Loan Claim made on or before the Voting Deadline, one of the following:

(1)     its Pro Rata Share of U.S. Roll-Up Stock to be issued on the Effective Date and the U.S. Subscription Rights, ***or***

(2)     Cash equal to its Pro Rata Share of U.S. Plan Value.

     ***If the holder of a U.S. Roll-Up Term Loan Claim (other than a Backstop Party) completes and returns its Subscription Form by the Subscription Expiration Date, such holder shall be deemed to have elected the treatment described in clause 3.2.3(c)(i) of the Plan, unless the holder completes and returns a Ballot in which it elects the treatment described in clause 3.2.3(c)(ii) of the Plan, in which case, such holder will be deemed to have relinquished, forever and irrevocably, its right to participate in the Rights Offering, and the Rights Offering Agent will return any amounts that such holder paid for the exercise of its Subscription Rights without interest. Any other holder of a U.S. Roll-Up Term Loan Claim (i.e., other than a Backstop Party or a holder returning its Subscription Form and electing the treatment described in clause 3.2.3(c)(i) of the Plan pursuant to the preceding sentence) that fails to***

*make a timely election on its Ballot electing the treatment described in clause 3.2.3(c)(i) of the Plan, shall be irrevocably deemed to have elected the treatment under clause 3.2.3(c)(ii) of the Plan.*

*If a holder of a U.S. Roll-Up Term Loan Claim (other than a Backstop Party) elects to receive its Pro Rata Share of U.S. Roll-Up Stock and U.S. Subscription Rights, and such holder wishes to participate in the Rights Offering, it MUST complete and return the Subscription Form by April 23, 2010. This deadline is BEFORE the Voting Deadline. If a Creditor elects on the Ballot to receive U.S. Roll-Up Stock and U.S. Subscription Rights, but it has not timely returned its Subscription Form, such holder will be deemed to have received, but have elected not to exercise, the U.S. Subscription Rights. If, on the other hand, a Creditor timely completes and returns a Subscription Form, but then elects on its Ballot to receive Cash, such Creditor will be deemed to have revoked its election to participate in the Rights Offering.*

Up to ten (10) days prior to the Effective Date and upon written notice to the Debtors and Oaktree, Apollo may change its election of clause 3.2.3(c)(i) of the Plan (*i.e.*, to receive its Pro Rata Share of U.S. Roll-Up Stock to be issued on the Effective Date and the U.S. Subscription Rights) to clause 3.2.3(c)(ii) of the Plan (*i.e.*, Cash equal to its Pro Rata Share of U.S. Plan Value).

For a description of the U.S. Roll-Up Stock and the U.S. Subscription Rights, and the procedures for exercising such rights in the Rights Offering please *see* Sections V.H.2, entitled, THE PLAN OF REORGANIZATION – Securities to Be Distributed under the Plan – The New Common Stock," V.H.1, entitled, "THE PLAN OF REORGANIZATION – Securities to Be Distributed under the Plan – Subscription Rights," and V.K.1, entitled, "THE PLAN OF REORGANIZATION – Implementation of the Plan – The Rights Offering and Equity Commitment Agreement" of the Disclosure Statement respectively.

**b.**      ***Description of Plan Value Allocation to U.S. Roll-Up Claims.***

A description of how the amount of U.S. Roll-Up Stock, U.S. Subscription Rights and U.S. Plan Value are allocated and calculated is contained in Section V.E, entitled, "THE PLAN OF REORGANIZATION – Description of Allocation of Plan Value, New Common Stock and Subscription Rights Among Holders of U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, and European Term Loan Claims."  Based upon the minimum Plan Value and the allocation of Plan Value between the U.S. Debtors and ADH, a holder of U.S. Roll-Up Term Loan Claims that elects to receive its Pro Rata Share of U.S. Plan Value will receive a minimum of $202 in Cash for every $1,000 in U.S. Roll-Up Term Loan Claims it holds.  Based upon the minimum Plan Value, a holder of U.S. Roll-Up Term Loan Claims that elects to receive its Pro Rata Share of U.S. Roll-Up Stock and U.S. Subscription Rights would receive 0.0000267% of the New Common Stock for every $1,000 of U.S. Roll-Up Term Loan Claims it holds (other than any New Common Stock such holder may receive as a result of its exercise of U.S. Subscription Rights).  Moreover, if all such holders elect to receive stock, assuming the minimum Plan Value, the class would receive, as Non-Rights Offering Common Stock, 15.8% of the New Common Stock distributed in connection with the Plan, which represents 54.1% of the total Non-Rights Offering Common Stock that will be distributed.

A holder's Pro Rata Share of the U.S. Plan Value or the U.S. Roll-Up Stock will be calculated as if all holders of U.S. Roll-Up Term Loan Claims elected to receive its Pro Rata Share of U.S. Plan Value. In other words, a holder of U.S. Roll-Up Term Loan Claims will not be entitled to receive a greater share of U.S. Plan Value or the U.S. Roll-Up Stock allocated to U.S. Debtors Class 3 as a result of other holders electing the other option.

### c. *Voting by U.S. Debtors Class 3.*

U.S. Debtors Class 3 is impaired. To the extent and in the manner provided in the Voting Procedures Order, the holders of Claims in U.S. Debtors Class 3 are entitled to vote to accept or reject the Plan.

### 4. U.S. Debtors Class 4 (Convenience Claims).

### a. *Classification and Treatment.*

U.S. Debtors Class 4 consists of all Convenience Claims. A "*Convenience Claim*" is (i) one or more Allowed General Unsecured Claims against any of the U.S. Debtors other than Debt Claims held by a Creditor in an aggregate Allowed Amount of $10,000 or less, or (ii) one or more Allowed General Unsecured Claims against any of the U.S. Debtors other than Debt Claims held by a Creditor in an aggregate Allowed Amount greater than $10,000, the aggregate Allowed Amount of which has been reduced to $10,000 by the election of such Creditor, or (iii) one or more General Unsecured Claims that are wholly Unliquidated Claims against any of the U.S. Debtors held by a Creditor, as to which the Creditor elects to liquidate at an amount equal to $10,000 for purposes of treating such General Unsecured Claims as an Allowed Convenience Claim.

Pursuant to Section 3.2.4 of the Plan, on the later of (i) the Initial Distribution Date and (ii) as soon as practicable after the date its Convenience Claim is Allowed, each holder of an Allowed Convenience Class Claim shall receive a payment of Cash equal to 25% of the Allowed Amount of its Convenience Claim. If the aggregate amount of Allowed Administrative Expenses under section 503(b)(9) of the Bankruptcy Code is less than $6.5 million (including any such expenses that have been paid by the Debtors prior to the Effective Date) then on the later on the Final Distribution Date (or such earlier date selected by the Debtors in their discretion) and as soon as practicable after the date its Convenience Claim is Allowed, each holder of an Allowed Convenience Claim shall receive an additional payment of Cash equal to 25% of the Allowed Amount of its Convenience Claim.

The following chart shows the amounts that might be payable on account of Convenience Claims. The chart is based solely upon scheduled amounts of General Unsecured Claims to the extent such Claims were not superseded by filed proofs of claim and amounts asserted by holders of General Unsecured Claims other than Debt Claims:

|  | Total Claims | Total Amount | 25% payout | 50% payout |
|---|---|---|---|---|
| $.01 to $5,000 | 1,507 | $2,229,289 | $557,322 | $1,114,645 |
| $5,000 to $10,000 | 302 | $2,172,081 | $543,020 | $1,086,040 |
| $10,000 to $15,000 | 148 | $1,847,751 | $370,000 | $740,000 |
| $15,000 to $20,000 | 105 | $1,801,880 | $262,500 | $525,000 |
| $20,000 to $25,000 | 82 | $1,835,747 | $205,000 | $410,000 |
| $25,000 to $30,000 | 63 | $1,729,247 | $157,500 | $315,000 |
| $30,000 to $35,000 | 43 | $1,393,612 | $107,500 | $215,000 |
| $35,000 to $40,000 | 50 | $1,870,567 | $125,000 | $250,000 |
| $40,000 to $45,000 | 35 | $1,477,707 | $87,500 | $175,000 |
| $45,000 to $50,000 | 31 | $1,475,612 | $77,500 | $155,000 |
| $50,000 to $75,000 | 104 | $6,419,743 | $260,000 | $520,000 |
| $75,000 to $100,000 | 56 | $4,823,354 | $140,000 | $280,000 |
| $100,000 to $150,000 | 67 | $8,281,974 | $167,500 | $335,000 |
| $150,000 to $250,000 | 67 | $12,344,014 | $167,500 | $335,000 |
| $250,000 to $500,000 | 48 | $16,308,927 | $120,000 | $240,000 |
| $500,000 to $1,000,000 | 26 | $16,470,946 | $65,000 | $130,000 |
| Over $1,000,000 | 37 | $168,121,829 | $92,500 | $185,000 |
| Fully Unliquidated | 74 | $0 | $185,000 | $370,000 |
| Total | 2,845 | $250,604,282 | $3,690,343 | $7,380,685 |

The above chart reflects the aggregation of Claims discussed below, but does not include any amounts asserted in any proofs of claim filed by the Pension Benefit Guaranty Corporation.

**b.** ***Aggregation of Claims.***

For purposes of treatment in U.S. Debtors Class 4, all General Unsecured Claims, including, without limitation, any Claims arising from the rejection of an executory contract or unexpired lease pursuant to the Plan or otherwise and irrespective of whether any or all such Claims are unliquidated, disputed, or contingent, against all the U.S. Debtors of a Creditor shall be aggregated and treated as a single Convenience Claim. If a holder of a General Unsecured Claim elects to have any eligible General Unsecured Claim, including, among others, any unliquidated, disputed, or contingent General Unsecured Claim or Insured Claim, treated as a Convenience Claim, then that election applies to all such holder's General Unsecured Claims other than Debt Claims against all the U.S. Debtors, and such holder shall have a single Convenience Claim. Notwithstanding the foregoing, in determining the aggregate Allowed Amount of Convenience Claims held by a Creditor, claims acquired by such Creditor after the Commencement Date from an Entity other than an Affiliate of such Creditor shall not be included in such total, and a Creditor may make separate Convenience Claim elections with

respect to General Unsecured Claims acquired after the Commencement Date from an Entity other than an Affiliate of such Creditor.

### c. *Election by Holders of Allowed General Unsecured Claims other than Debt Claims.*

Any creditor whose aggregate Allowed General Unsecured Claims other than Debt Claims against the U.S. Debtors total $10,000 or less automatically shall have such Claims treated as a Convenience Claim. Any holder of any other eligible Allowed General Unsecured Claim that desires treatment of such Claims as a Convenience Claim in the Allowed Amount of $10,000 shall make such election on the Ballot to be provided to holders of Claims in U.S. Debtors Class 5 and return such Ballot to the address specified therein on or before the Voting Deadline, in which case such Ballot shall be tabulated as a Convenience Claim. Any election the Debtors receive after the Voting Deadline shall not be binding on the U.S. Debtors unless the Voting Deadline is expressly waived in writing by Aleris with respect to any such Claim.

### d. *Election by Holders of Wholly Unliquidated General Unsecured Claims.*

Subject to Section 3.2.4(b)(iii) of the Plan, each Creditor that asserts General Unsecured Claims that are only Unliquidated Claims against the U.S. Debtors may elect to settle, liquidate, and have all of such Claims treated as a single Allowed Convenience Claim in the Allowed Amount of $10,000. Any holder of such Unliquidated Claims that desires treatment of its Claims as a Convenience Claim shall make such election on the Ballot to be provided to holders of Claims in U.S. Debtors Class 5 and return the Ballot to the address specified therein on or before the Voting Deadline. Upon the timely receipt of the Ballot, the Claim will be tabulated as a Convenience Claim for voting purposes only. Notwithstanding the foregoing, the Debtors may reject such election by providing notice of such rejection fourteen (14) days after the Voting Deadline, in which case all such Claims shall be treated as Unliquidated Claims that are General Unsecured Claims in U.S. Debtors Class 5 subject to allowance, liquidation, and/or estimation by the Bankruptcy Court for all purposes other than voting. For avoidance of doubt, the Debtors shall tabulate any such wholly Unliquidated General Unsecured Claim against the U.S. Debtors, where the holder of such Claim elects treatment of its Claim as a Convenience Claim, as a Convenience Claim irrespective of whether the Debtors accept or reject such election.

### e. *Election by Holders of Insured Claims.*

Subject to Section 3.2.4(b)(iv) of the Plan, each holder of an Insured Claim may elect to settle, liquidate, and have such Claim treated as an Allowed Convenience Claim in the Allowed Amount of the lesser of $10,000 and the asserted amount of the Claim. Any holder of such a Claim that desires treatment of its Claim as a single Convenience Claim shall make such election on the Ballot to be provided to holders of Insured Claims in U.S. Debtors Class 7 and return the Ballot to the address specified therein on or before the Voting Deadline. Upon the timely receipt of the Ballot, the Claim shall be tabulated as a Convenience Claim for voting purposes only. Notwithstanding the foregoing, the Debtors may reject such election by providing notice of such rejection fourteen (14) days after the Voting Deadline, in which case, such Claim shall be treated as an Insured Claim in U.S. Debtors Class 7 for all purposes other

than voting. For avoidance of doubt, the Debtors shall tabulate any Insured Claim, where the holder of such Claim elects treatment of its Claim as a Convenience Claim, as a Convenience Claim irrespective of whether the Debtors accept or reject such election.

### f. *Voting by U.S. Debtors Class 4.*

U.S. Debtors Class 4 is impaired. To the extent and in the manner provided in the Voting Procedures Order, the holders of Claims in U.S. Debtors Class 4 are entitled to vote to accept or reject the Plan.

### 5. U.S. Debtors Class 5 (General Unsecured Claims Other than Convenience Claims and Insured Claims).

### a. *Classification and Treatment.*

U.S. Debtors Class 5 consists of all General Unsecured Claims other than Convenience Claims and Insured Claims. Pursuant to Section 3.2.5 of the Plan, on the Initial Distribution Date and each Distribution Date until the Final Distribution Date, each holder of an Allowed General Unsecured Claim will receive its Pro Rata Share of $16.5 million in Cash minus the aggregate amount of Cash previously received by such holder on the Initial Distribution Date and each other Distribution Date.

### b. *Debt Claims in U.S. Debtors Class 5.*

A "***Debt Claim***" is any General Unsecured Claim represented by a note or debt security issued pursuant to an indenture, bank credit agreement, note purchase agreement, or otherwise prior to the U.S. Debtors' Commencement Date or any guarantee by any of the U.S. Debtors of any obligations of another Entity under any note or debt security issued pursuant to an indenture, bank credit agreement, note purchase agreement, or otherwise prior to the Commencement Date. Because sufficient value does not exist to satisfy the U.S. Roll-Up Term Loan Claims in full, the U.S. Term Loan Claims are considered to be General Unsecured Claims included in U.S. Debtors Class 5.

Under the Plan, after giving effect to the 9019 Settlement, the following Debt Claims will be deemed Allowed in the following amounts:

| Debt Claims | Amount |
|---|---|
| U.S. Term Loan Claims (dollar denominated)[15] | $220,086,098.00 |
| U.S. Term Loan Claims (euro denominated) | €66,974,920.00 |
| Guarantee by U.S. Debtors on European Term Loan Claims (dollar denominated) | $286,058,937.66 |
| Guarantee by U.S. Debtors of European Term Loan Claims (euro denominated) | €53,237,092.34 |
| 2006 Senior Notes Claims[16] | $606,521,000.00 |
| 2007 Senior Notes Claims | $106,875,016.00 |
| Senior Subordinated Notes Claims | $405,321,945.00 |

Other Debt Claims have been asserted and are in the process of being reviewed by the Debtors. The following chart summarizes the Allowed, as well as the asserted, Debt Claims outstanding as of the Commencement Date:

| Debt Claims | Estimated Amount |
|---|---|
| U.S. Term Loan Claims (dollar denominated) | $220,086,098.00 |
| U.S. Term Loan Claims (euro denominated) | €66,974,920.00 |
| Guarantee by U.S. Debtors on European Term Loan Claims (dollar denominated) | $286,058,937.66 |
| Guarantee by U.S. Debtors of European Term Loan Claims (euro denominated) | €53,237,092.34 |
| 2006 Senior Notes Claims | $606,521,000.00 |
| 2007 Senior Notes Claims | $106,875,016.00 |
| Senior Subordinated Notes Claims | $405,321,945.00 |
| Series 1996 IRB Claim, BONY Mellon Trust Company, N.A. | $5,864,165.00 |
| Series 1997 IRB Claim, BONY Mellon Trust Company, N.A. | $4,688,758.00 |
| Series 1998 IRB Claim, BONY Mellon Trust Company, N.A. | $4,169,533.00 |

---

[15] The figures for dollar and euro denominated U.S. Term Loan Claims account for a reduction in the principal amount of the U.S. Term Loan Claims by the amount of U.S. Term Loan Claims that become U.S. Roll-Up Term Loan Claims, after giving effect to the 9019 Settlement.

[16] Amounts for the 2006 Senior Notes Claims, the 2007 Senior Notes Claims and the Senior Subordinated Notes Claims include both principal and interest accruing up to the U.S. Debtors' Commencement Date and are calculated through February 11, 2009.

| Series 2004 IRB Claim, BONY Mellon Trust Company, N.A.[17] | $0.00 |
| J. Aron & Company[18] | $60,809,898.74 |
| TPG Partners V, L.P.[19] | $26,534,557.49 |

The Backstop Parties have agreed with the Creditors' Committee that, if the Plan is confirmed, they will waive any recovery with respect to Debt Claims held by the Backstop Parties that constitute U.S. Term Loan Claims. The Debtors estimate that this waiver will reduce the amount of Debt Claims participating in recoveries in Class 5 by approximately $100 million.

**c.** **_Subordination of the Subordinated Note Claims._**

With respect to Senior Subordinated Note Claims, the Disbursing Agent will enforce section 506 of the Senior Subordinated Indenture whereby holders of Senior Subordinated Notes agreed to subordinate their Senior Subordinated Note Claims to all Senior Indebtedness (as defined in the Senior Subordinated Indenture), including, without limitation, the Senior Note Claims. "**_Senior Note Claims_**" are Claims arising out of the 2006 Senior Indenture or the 2007 Senior Indenture. Under the Senior Subordinated Indenture "**_Senior Indebtedness_**" includes all other Debt Claims, except those expressly subordinated, and, as a result, the Senior Subordinated Note Claims are subordinated to the other Debt Claims. The Senior Subordinated Indenture defines Senior Indebtedness as follows:

> "Senior Indebtedness" means with respect to any Person: (1) all Indebtedness of such Person, whether outstanding on the Issue Date or thereafter incurred; and (2) all other Obligations of such Person (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to such Person whether or not post-filing interest is allowed in such proceeding) in respect of Indebtedness described in clause (1) above unless, in the case of clauses (1) and (2), the instrument creating or evidencing the same or pursuant to which the same is outstanding expressly provides that such Indebtedness or other Obligations are subordinate in right of payment to or pari passu in right of payment with the Notes or the Subsidiary Guarantee of such Person, as the case may be; provided that Senior Indebtedness shall not include: (1) any obligation of such Person to the Company or any Subsidiary or to any joint venture in which the Company or any Restricted Subsidiary has an interest; (2) any liability for Federal,

---

[17] This bond has an outstanding balance of $5,003,922.00, but it is fully secured by a letter of credit.

[18] Amounts provided here are based on proofs of claim filed by J. Aron & Company, exclusive of claims for interest and fees, and do not reflect the Debtors' view of the validity of the Claim. The Debtors continue to review this Claim.

[19] Amounts provided here are based on a proof of claim filed by TPG Partners V, L.P., exclusive of claims for interest and fees, and do not reflect the Debtors' view of the validity of the Claim. The Debtors continue to review this Claim.

state, local or other taxes owed or owing by such Person; (3) any accounts payable or other liability to trade creditors in the ordinary course of business (including guarantees thereof as instruments evidencing such liabilities); (4) any Indebtedness or other Obligation of such Person that is subordinate or junior in right of payment with respect to any other Indebtedness or other Obligation of such Person; (5) that portion of any Indebtedness that at the time of incurrence is incurred in violation of this Indenture, provided, however, that such Indebtedness shall be deemed not to have been incurred in violation of this Indenture for purposes of this clause (5) if such Indebtedness consists of Designated Senior Indebtedness, and the holder(s) of such Indebtedness or their Representative shall have received a certificate from an officer of the Company to the effect that the incurrence of such Indebtedness does not (or, in the case of a revolving credit facility thereunder, the incurrence of the entire committed amount thereof at the date on which the initial borrowing thereunder is made would not) violate the provisions of this Indenture; or (6) the Notes or the guarantees of the Notes.

Under the terms of this definition, among other things, the Senior Note Claims, the Prepetition Term Facility, and other Debt Claims are considered Senior Indebtedness. To effect the subordination, the remaining holders of Allowed Debt Claims shall be entitled to receive their Pro Rata Share among all Debt Claims (calculated without taking into account the Senior Subordinated Note Claims) of any Distribution that otherwise would have been made under the Senior Subordinated Indenture. This has the effect of increasing the recovery to holders of Debt Claims to approximately 1.1% of their Allowed Debt Claim.

Nothing in the Plan is intended to affect the subordination rights among the 2006 Senior Notes, 2007 Senior Notes, Senior Subordinated Notes, any outstanding IRB, the U.S. Term Loan Facility, and any other Debt Claims, including, without limitation, any applicable Indenture Trustee's rights to exercise Charging Liens with respect to any Distributions.

For information regarding Indenture Trustee fees and expenses that may affect your distribution *see* Section V.K.10, entited, "THE PLAN OF REORGANIZATION—Implementation of the Plan—Cancellation of Securities of the U.S. Debtors."

### d. *Election to Convenience Class or Insured Claims Class by Holders of General Unsecured Claims other than Debt Claims.*

Each holder of a General Unsecured Claim in U.S. Debtors Class 5 (other than a holder of a Debt Claim or a General Unsecured Claim that has become a Disallowed Claim), whether or not it is entitled to vote on the Plan, will receive a Ballot on which the holder may elect on or before the Voting Deadline to be treated as a Convenience Claim in U.S. Debtors Class 4 or an Insured Claim in U.S. Debtors Class 7 by marking such election on the Ballot and returning the Ballot in accordance with the directions provided therein. ***A holder of a General Unsecured Claim should consider carefully the respective treatment of the Claims in each of***

***U.S. Debtors Class 4 (Convenience Claims), U.S. Debtors Class 5 (General Unsecured Claims other than Convenience Claims and Insured Claims), and U.S. Debtors Class 7 (Insured Claims) before making an election.*** If the holder of a General Unsecured Claim receives a Ballot for U.S. Debtors Class 5 and fails to make an election, its General Unsecured Claim will be treated as a General Unsecured Claim in U.S. Debtors Class 5.

The U.S. Debtors expect that the holder of any General Unsecured Claims, other than Debt Claims, that are Allowed in an aggregate amount of $750,000 or less will elect to receive treatment of its Claims as Convenience Claims within U.S. Debtors Class 4. Although many of these General Unsecured Claims are Disputed Claims, the U.S. Debtors estimate that the aggregate of Allowed General Unsecured Claims, exclusive of Debt Claims, in this class could be approximately $163 million. The U.S. Debtors' estimates of the aggregate amount of Allowed General Unsecured Claims in U.S. Debtors Class 5 could be higher or lower depending upon how many holders of Allowed General Unsecured Claims elect to receive treatment as Convenience Claims in U.S. Debtors Class 4, the ultimate allowance of General Unsecured Claims against the U.S. Debtors' estates, and the size of the liability for withdrawing from certain multi-employer pension plans, which the Debtors are unable to estimate at this time. Because holders of Allowed General Unsecured Claims other than Debt Claims do not receive the benefit of the subordination provisions relating to the Senior Subordinated Note Claims, if the ultimate Allowed General Unsecured Claims are $163 million, the Debtors estimate the recovery for Allowed General Unsecured Claims other than Debt Claims to be 0.8%.

e. ***Voting by U.S. Debtors Class 5.***

U.S. Debtors Class 5 is impaired. To the extent and in the manner provided in the Voting Procedures Order, the holders of Claims in U.S. Debtors Class 5 are entitled to vote to accept or reject the Plan.

**6. U.S. Debtors Class 6 (U.S. Affiliate Claims).**

U.S. Debtors Class 6 consists of all Allowed Affiliate Claims. A "***U.S. Affiliate Claim***" is any Claim against any U.S. Debtor held by an Affiliate of any U.S. Debtor other than any Affiliate that is a direct or indirect holder of an equity interest in Aleris.

Pursuant to Section 3.2.6 of the Plan, each Allowed U.S. Affiliate Claim will be unimpaired in accordance with section 1124 of the Bankruptcy Code. Accordingly, each Allowed U.S. Affiliate Claim will be treated in one of the following ways:

(1) The legal, equitable, and contractual rights of a holder of an Allowed U.S. Affiliate Claim will be left unaltered, ***or***

(2) Notwithstanding any contractual provision or applicable law that entitles the holder of an Allowed U.S. Affiliate Claim to demand or receive accelerated payment of such Claim prior to the stated maturity of such Claim from and after the occurrence of a default under the agreements governing or evidencing such Claim or applicable law, such Claim will be reinstated and the applicable U.S. Debtor will

(A)     cure all defaults that occurred before or from and after the U.S. Debtors' Commencement Date (other than defaults of a kind specified in section 365(b)(2) of the Bankruptcy Code),

(B)     reinstate the maturity of such Claim as such maturity existed prior to the occurrence of such default,

(C)     compensate the holder of such Claim for any damages incurred as a consequence of any reasonable reliance by such holder on such contractual provision or such applicable law,

(D)     if such Claim arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensate the holder of such Claim (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure, ***and***

(E)     not otherwise alter the legal, equitable, or contractual rights to which the holder of such Claim is entitled.

The Plan effectively contemplates the transfer of substantially all the Debtors' assets to the holders of U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, and European Term Loan Claims. To that end, the Plan contemplates preserving substantial portions of the Debtors' corporate structure for the benefit of such holders, which, in turn, requires the preservation of the U.S. Affiliate Claims in U.S. Debtors Class 6 and Other U.S. Equity Interests in U.S. Debtors Class 10. Any "recovery" that would be provided to holders of U.S. Affiliate Claims or U.S. Equity Interests is essentially coming from the collateral of the holders of U.S. Roll-Up Term Loan Claims, which, after satisfaction of the DIP ABL Facility and the DIP New Money Term Loan Facility, have liens on substantially all the assets of the U.S. Debtors and superpriority Administrative Expenses against each of the U.S. Debtors. Accordingly, the Debtors believe that the unimpairment of the U.S. Affiliate Claims and Other U.S. Equity Interests does not prejudice any other creditor or equity interest holder, is fair and equitable, and does not unfairly discriminate against any rejecting class.

U.S. Debtors Class 6 is unimpaired. The holders of Claims in U.S. Debtors Class 6 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

**7.      U.S. Debtors Class 7 (Insured Claims).**

U.S. Debtors Class 7 consists of all Insured Claims. An "***Insured Claim***" is any Claim against any of the U.S. Debtors alleging damages, including without limitation, damages arising in connection with personal injuries, allegedly incurred as a result of the U.S. Debtors' operations and activities prior to the U.S. Debtors' Commencement Date that is allegedly

covered by insurance issued on behalf of the applicable U.S. Debtor. Schedule "1.1.109" to the Plan sets forth a list of Claims asserted against the U.S. Debtors that the U.S. Debtors believe may be covered by one or more Insurance Policies. ***Inclusion of any such Claim on such Exhibit, however, does not constitute a representation or warranty by the U.S. Debtors that insurance coverage actually is or will be available for such Claim.***

Pursuant to Section 3.2.7 of the Plan, each holder of an Insured Claim shall elect, by marking the appropriate box on such holder's Ballot, one of the following options:

(1) The recovery of a holder of an Allowed Insured Claim shall be limited to any Insurance Proceeds available to such holder's Claim, if any (without warranty or representation of any kind from the Debtors with respect to the availability of Insurance Proceeds with respect to such Claim), and the holder of an Insured Claim so electing to limit its recovery to Insurance Proceeds shall have the sole responsibility for seeking recovery under the Debtors' Insurance Policies on account of such Insured Claim and to satisfy any and all retroactive premiums, retentions, or deductibles under the Debtors' Insurance Policies,

(2) The Insured Claim shall be treated as a General Unsecured Claim in U.S. Debtors Class 5 and, accordingly, the holder of such Allowed Insured Claim will be limited to any Distribution received by U.S. Debtors Class 5 and will be deemed to have waived any and all rights to seek recovery on such Claim from any other property of the Debtors' estates, including without limitation, any Insurance Proceeds, except to Distributions made to holders of Allowed General Unsecured Claims in U.S. Debtors Class 5; ***or***

(3) The Insured Claim shall be treated as an Allowed Convenience Claim in the Allowed Amount of $10,000 in U.S. Debtors Class 4 and, accordingly, the holder of such Insured Claim will be limited to any Distribution received by U.S. Debtors Class 4 and will be deemed to have waived any and all rights to seek recovery on such claim from any other property of the Debtors' estates, including, without limitation, any Insurance Proceeds, except to Distributions made to holders of Allowed Convenience Claims in U.S. Debtors Class 4; *provided*, *however*, in accordance with Section 3.2.4(b)(iv) of the Plan, the Debtors may reject the election by the holder of an Insured Claim to have its Insured Claim treated as an Allowed Convenience Claim in U.S. Debtors Class 4, in which case the Insured Claim shall be treated as an Insured Claim in U.S. Debtors Class 7 for all purposes other than voting.

***If the holder of an Insured Claim listed on Exhibit "1.1.108" to the Plan fails to make a timely election, such holder shall be irrevocably deemed to have elected to remain an***

***Insured Claim.*** If the holder of an Insured Claim elects to be treated as a General Unsecured Claim in U.S. Debtors Class 5, then its vote shall be tabulated as a vote in U.S. Debtors Class 5.

U.S. Debtors Class 7 is impaired. To the extent and in the manner provided in the Voting Procedures Order, the holders of Claims in U.S. Debtors Class 7 are entitled to vote to accept or reject the Plan.

**8. U.S. Debtors Class 8 (Aleris Equity Interests).**

U.S. Debtors Class 8 consists of all Aleris Equity Interests. An "***Aleris Equity Interest***" is an Equity Interest in Aleris. Aurora, an entity owned by TPG and certain members of management, is the sole holder of Aleris Equity Interests.

Pursuant to Section 3.2.8 of the Plan, each holder of an Aleris Equity Interest will not receive or retain anything on account of the Plan. On the Effective Date, following the implementation of the Restructuring Transactions on such date, all Aleris Equity Interests shall be deemed cancelled and extinguished; holders of Aleris Equity Interests need not surrender their certificates or other documentation evidencing ownership of such Aleris Equity Interests.

***Pursuant to Section 10.3.7(c) of the Plan (and as described in greater detail in Section V.N.3.g(3), entitled, "THE PLAN OF REORGANIZATION – Confirmation of the Plan – Effects of Confirmation – Terms of Injunctions or Stays – Injunction Against Worthless Stock Deductions") certain holders of Aleris Equity Interests shall be enjoined from taking a worthless stock deduction with respect to any such Aleris Equity Interest.***

U.S. Debtors Class 8 is impaired. The holders of Equity Interests in U.S. Debtors Class 8 are deemed to reject the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

**9. U.S. Debtors Class 9 (Cancelled U.S. Equity Interests).**

U.S. Debtors Class 9 consists of all Allowed Cancelled U.S. Equity Interests. A "Cancelled U.S. Equity Interest" is an Equity Interest (including a membership interest) in the Dissolving U.S. Subsidiaries (which are Wabash Alloys and Aleris Aluminum U.S. Sales Inc.). Aleris is the indirect parent of Wabash Alloys and Aleris Aluminum U.S. Sales Inc. Aleris' subsidiary, Debtor Alchem Aluminum Shelbyville Inc., is the sole holder of cancelled Wabash Alloys Equity Interests, and Aleris' subsidiary, Debtor CA Lewisport, LLC, is the sole holder of cancelled Aleris Aluminum U.S. Sales Inc. Equity Interests.

Pursuant to Section 3.2.9 of the Plan, the holders of the Cancelled U.S. Equity Interests shall not receive or retain anything on account of the Plan. On the Effective Date, following the implementation of the Restructuring Transactions on such date, all Cancelled U.S. Equity Interests shall be deemed cancelled and extinguished; the holders of the Cancelled U.S. Equity Interests need not surrender their certificates or other documentation evidencing ownership of such Cancelled U.S. Equity Interests.

U.S. Debtors Class 9 is impaired. The holders of Cancelled U.S. Equity Interests in U.S. Debtors Class 9 are deemed to reject the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

**10.      U.S. Debtors Class 10 (Other U.S. Equity Interests).**

U.S. Debtors Class 10 consists of all Allowed Other U.S. Equity Interests. An "***Other U.S. Equity Interest***" is any Equity Interest in the U.S. Debtors other than the Aleris Equity Interests and the Cancelled U.S. Equity Interests.

Pursuant to Section 3.2.10 of the Plan, on the Effective Date, each Allowed Other U.S. Equity Interest shall be reinstated subject to the corporate reorganization of the U.S. Debtors as described in Section 7.6 of the Plan. The reinstatement of the Other U.S. Equity Interests under the Plan simply serves to facilitate the reorganization of the U.S. Debtors and the transfer of indirect ownership of the U.S. Debtors to the Backstop Parties and the other holders of U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, and European Term Loan Claims.

Under the Plan, each Allowed Other U.S. Equity Interest is preserved, and the holders of the Allowed Other U.S. Equity Interests are deemed to accept the Plan. The Debtors believe the reinstatement of the Allowed Other U.S. Equity Interests is appropriate because, through the Plan and the Rights Offering, holders of U.S. Roll-Up Term Loan Claims are indirectly acquiring the value of the equity of the U.S. Debtors through their ownership of HoldCo, which will indirectly hold the Allowed Other U.S. Equity Interests. By reinstating the Allowed Other U.S. Equity Interests, while distributing the New Common Stock in HoldCo to the U.S. Debtors' secured creditors, the Plan simply effectuates a transfer of the value of the U.S. Debtors' assets to their senior secured creditors without requiring those creditors to first take direct ownership of the Allowed Other U.S. Equity Interests and then transfer those Equity Interests to HoldCo.

The Plan effectively contemplates the transfer of substantially all the Debtors' assets to the holders of U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, and European Term Loan Claims. To that end, the Plan contemplates preserving substantial portions of the Debtors' corporate structure for the benefit of such holders, which, in turn, requires the preservation of the U.S. Affiliate Claims in U.S. Debtors Class 6 and Other U.S. Equity Interests in U.S. Debtors Class 10. Any "recovery" that would be provided to holders of U.S. Affiliate Claims or U.S. Equity Interests is essentially coming from the collateral of the holders of U.S. Roll-Up Term Loan Claims, which, after satisfaction of the DIP ABL Facility and the DIP New Money Term Loan Facility, have liens on substantially all the assets of the U.S. Debtors and superpriority Administrative Expenses against each of the U.S. Debtors. Accordingly, the Debtors believe that the unimpairment of the U.S. Affiliate Claims and Other U.S. Equity Interests does not prejudice any other creditor or equity interest holder, is fair and equitable, and does not unfairly discriminate against any rejecting class.

U.S. Debtors Class 10 is unimpaired. The holders of Equity Interests in U.S. Debtors Class 10 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

**D.      Classification and Treatment of Claims Against and Equity Interests in ADH.**

**1.      ADH Class 1 (German Tranche of U.S. DIP Loan Claims).**

ADH Class 1 consists of all Allowed German Tranche of U.S. DIP Loan Claims. A "***German Tranche of U.S. DIP Loan Claim***" is any New Money Term DIP Claim against ADH (including any Claim arising under any guarantee by ADH of the obligations of Aleris Aluminum Duffel BVBA under the DIP Term Credit Agreement) arising under the DIP Term Credit Agreement. The German Tranche of U.S. DIP Loan Claims will be allowed in full.

Pursuant to Section 3.3.1 of the Plan, on the Effective Date, each holder of an Allowed German Tranche of U.S. DIP Loan Claim shall be paid the Allowed Amount of its Allowed German Tranche of U.S. DIP Loan Claim in full, in the applicable currency under the DIP Term Credit Agreement, as provided in Section 2.1.3(b) of the Plan as described in Section V.A.1.e(2) of the Disclosure Statement, entitled, "THE PLAN OF REORGANIZATION – Classification and Treatment of Claims and Equity Interests – Administrative Expenses – Other Administrative Expenses Specific to the U.S. Debtors – New Money Term DIP Claims." Although the German Tranche of U.S. DIP Loan Claim is a prepetition claim against ADH's estate, the U.S. Debtors, pursuant to the DIP Term Credit Facility, guaranteed payment of the German Tranche of U.S. DIP Loan Claims; accordingly, it is an Allowed Administrative Expense against the U.S. Debtors' estates and will be paid in full, in the applicable currency under the DIP Term Credit Agreement, on the Effective Date as provided in Section 2.1.3(b) of the Plan.

The German Tranche of U.S. DIP Loan Claims are secured by the U.S. Debtors' assets and constitute super-priority administrative expenses against the U.S. Debtors. They are also secured by certain assets of ADH and are guaranteed by certain European non-debtor entities, which have pledged their own assets to secure these claims. These ADH and non-debtor assets include German and Belgian mortgages and pledges over Belgian inventory and moveable assets and pledges of stock, and the Debtors estimate such assets have a value well in excess of the balance of the German Tranche of U.S. DIP Loan Claims.

ADH Class 1 is unimpaired. The holders of Claims in ADH Class 1 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

**2.      ADH Class 2 (European Roll-Up Term Loan Claims).**

**a.      *Classification, Allowance, and Treatment.***

ADH Class 2 consists of all Allowed European Roll-Up Term Loan Claims. A "***European Roll-Up Term Loan Claim***" is any Claim arising under the European Roll-Up Term Loans under the DIP Term Credit Agreement. After giving effect to the 9019 Settlement, the European Roll-Up Term Loan Claims will be allowed in the amount of the ADH Roll-Up Value. Pursuant to Section 3.3.2 of the Plan, on the Effective Date and in accordance with the Restructuring Transactions, each holder of an Allowed European Roll-Up Term Loan Claim will receive, at the election of the holder of such Allowed European Roll-Up Term Loan Claim made on or before the Subscription Expiration Date, one of the following:

<ol>
<li>(1) its Pro Rata Share of ADH Roll-Up Stock to be issued on the Effective Date and the ADH Roll-Up Subscription Rights, *or*</li>
<li>(2) Cash equal to its Pro Rata Share of $25 million.</li>
</ol>

Apollo and Oaktree will be the only holders of Allowed European Roll-Up Term Loan Claims, and their respective elections shall be made in accordance with the Equity Commitment Agreement.

Up to ten (10) days prior to the Effective Date and upon written notice to the Debtors and Oaktree, Apollo may change its election of clause 3.3.2(c)(i) of the Plan (*i.e.*, its Pro Rata Share of the ADH Roll-Up Stock to be issued on the Effective Date and the ADH Roll-Up Subscription Rights) to clause 3.3.2(c)(ii) of the Plan (*i.e.*, Cash equal to its Pro Rata Share of $25 million.

For a description of the ADH Roll-Up Stock and the ADH Roll-Up Subscription Rights, and the procedures for exercising such rights in the Rights Offering please *see* Sections V.H.2, entitled, THE PLAN OF REORGANIZATION – Securities to Be Distributed under the Plan – The New Common Stock," V.H.1, entitled, "THE PLAN OF REORGANIZATION – Securities to Be Distributed under the Plan – Subscription Rights," and V.K.1, entitled, "THE PLAN OF REORGANIZATION –Implementation of the Plan – The Rights Offering and Equity Commitment Agreement" of the Disclosure Statement respectively.

### b. *Description of Plan Value Allocation to European Roll-Up Term Loan Claims.*

A description of how the amount of ADH Roll-Up Stock, ADH Roll-Up Subscription Rights, and the ADH Roll-Up Value are allocated and calculated is contained in Section V.E, entitled, "THE PLAN OF REORGANIZATION – Description of the Allocation of Plan Value and New Common Stock Among Holders of U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, and European Term Loan Claims." The only holders of the European Roll-Up Term Loan Claims are Apollo and Oaktree. Pursuant to the 9019 Settlement, Apollo and Oaktree have agreed to limit the amount of European Term Loan Claims they roll up in exchange for treatment of the European Roll-Up Term Loan Claims with priority over the European Term Loan Claims. Pursuant to the 9019 Settlement, on the Effective Date, Oaktree and Apollo collectively shall be deemed to have rolled up $25 million in principal amount of their European Term Loan Claims.

Based upon the minimum Plan Value, and the allocation of Plan Value between the U.S. Debtors and ADH, a holder of European Roll-Up Term Loan Claims that elects to receive Cash in an amount equal to its Pro Rata Share of ADH Roll-Up Value will receive $1,000 in Cash for every $1,000 in European Roll-Up Term Loan Claims it holds. Based upon the minimum Plan Value, a holder of European Roll-Up Term Loan Claims that elects to receive its Pro Rata Share of ADH Roll-Up Stock and ADH Roll-Up Subscription Rights would receive 0.000138% of the New Common Stock for every $1,000 of European Roll-Up Term Loan Claims it holds (other than any New Common Stock such holder may receive as a result of its exercise of ADH Roll-Up Subscription Rights). Moreover, if all such holders elect to receive

stock, assuming the minimum Plan Value, the class would receive, as Non-Rights Offering Common Stock, 3.5% of the New Common Stock distributed in connection with the Plan, which represents 12% of the total Non-Rights Offering Common Stock that will be distributed.

A holder's Pro Rata Share of the ADH Roll-Up Value or the ADH Roll-Up Stock will be calculated as if all holders of European Roll-Up Term Loan Claims elected to receive their Pro Rata Share of ADH Roll-Up Plan Value. In other words, a holder of European Term Loan Claims will not be entitled to receive a greater share of ADH Roll-Up Value or the ADH Roll-Up Stock allocated to ADH Class 2 as a result of other holders electing the other option.

### c. *Voting by ADH Class 2.*

ADH Class 2 is impaired. To the extent and in the manner provided in the Voting Procedures Order, the holders of Claims in ADH Class 2 are entitled to vote to accept or reject the Plan.

### 3. **ADH Class 3 (European Term Loan Claims).**

### a. *Classification, Allowance, and Treatment.*

ADH Class 3 consists of all Allowed European Term Loan Claims. A "***European Term Loan Claim***" is any Claim arising out of the European Term Loan Facility. After giving effect to the 9019 Settlement, the European Term Loan Claims will be deemed Allowed in the aggregate amount of $286,058,937.66 million and €53,237,092.34 million in principal amount, plus accrued and unpaid interest as of the Commencement Date for ADH.

Pursuant to Section 3.3.3 of the Plan, on the Effective Date, and in accordance with the Restructuring Transactions, each holder of a European Term Loan Claim as of the Distribution Record Date shall receive, at the election of the holder of such European Term Loan Claim made on or before the Voting Deadline, one of the following:

    (1)    its Pro Rata Share of ADH Term Loan Stock to be issued on the Effective Date and the ADH Term Loan Subscription Rights, ***or***

    (2)    Cash equal to its Pro Rata Share of the ADH Term Loan Value.

*If the holder of a European Term Loan Claim (other than a Backstop Party) completes and returns its Subscription Form by the Subscription Expiration Date, such holder shall be deemed to have elected the treatment described in clause 3.3.3(c)(i) of the Plan, unless the holder completes and returns a Ballot in which it elects the treatment described in clause 3.3.3(c)(ii) of the Plan, in which case, such holder will be deemed to have relinquished, forever and irrevocably, its right to participate in the Rights Offering, and the Rights Offering Agent will return any amounts that such holder paid for the exercise of its Subscription Rights without interest. Any other holder of a European Roll-Up Term Loan Claim (i.e., other than a Backstop Party or a holder returning its Subscription Form and electing the treatment described in clause 3.3.3(c)(i) of the Plan pursuant to the preceding sentence) that fails to make a timely election on its Ballot electing the treatment described in clause 3.3.3(c)(i) of the*

*Plan, shall be irrevocably deemed to have elected the treatment under clause 3.3.3(c)(ii) of the Plan.*

*If a holder of a European Term Loan Claim elects to receive its Pro Rata Share of ADH Term Loan Stock and ADH Term Loan Subscription Rights, and such holder wishes to participate in the Rights Offering, it MUST complete and return the Subscription Form by April 23, 2010. This deadline is BEFORE the Voting Deadline. If a Creditor elects on the Ballot to receive ADH Term Loan Stock and ADH Term Loan Subscription Rights, but it has not timely returned its Subscription Form, such holder will be deemed to have received, but have elected not to exercise, the ADH Term Loan Subscription Rights. If, on the other hand, a Creditor timely completes and returns a Subscription Form, but then elects on its Ballot to receive Cash, such Creditor will be deemed to have revoked its election to participate in the Rights Offering.*

Up to ten (10) days prior to the Effective Date and upon written notice to the Debtors and Oaktree, Apollo may change its election of clause 3.3.3(c)(i) of the Plan (*i.e.*, its Pro Rata Share of ADH Term Loan Stock to be issued on the Effective Date and the ADH Term Loan Subscription Rights) to clause 3.3.3(c)(ii) of the Plan (*i.e.*, Cash equal to its Pro Rata Share of ADH Term Loan Value).

For a description of the ADH Term Loan Stock and the ADH Term Loan Subscription Rights, and the procedures for exercising such rights in the Rights Offering please *see* Sections V.H.2, entitled, THE PLAN OF REORGANIZATION – Securities to Be Distributed under the Plan – The New Common Stock," V.H.1, entitled, "THE PLAN OF REORGANIZATION – Securities to Be Distributed under the Plan – Subscription Rights," and V.K.1, entitled, "THE PLAN OF REORGANIZATION – Implementation of the Plan – The Rights Offering and Equity Commitment Agreement" of the Disclosure Statement respectively.

### b. *Description of Plan Value Allocation to European Term Loan Claims.*

A description of how the amount of ADH Term Loan Stock, ADH Term Loan Subscription Rights and ADH Term Loan Value are allocated and calculated is contained in Section V.E, entitled, "THE PLAN OF REORGANIZATION – Description of Allocation of Plan Value, New Common Stock and Subscription Rights Among Holders of U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, and European Term Loan Claims." Based upon the minimum Plan Value, and the allocation of Plan Value between the U.S. Debtors and ADH, a holder of European Term Loan Claims that elects to receive its Pro Rata Share of U.S. Plan Value will receive $206 in Cash for every $1,000 in European Term Loan Claims it holds. Based upon the minimum Plan Value, a holder of European Term Loan Claims that elects to receive its Pro Rata Share of ADH Term Loan Stock and ADH Term Loan Subscription Rights would receive 0.0000271% of the New Common Stock for every $1,000 of European Term Loan Claims it holds (other than any New Common Stock such holder may receive as a result of its exercise of ADH Term Loan Subscription Rights). Moreover, if all such holders elect to receive stock, assuming the minimum Plan Value, the class would receive, as Non-Rights Offering Common Stock, 9.9% of the New Common Stock distributed in connection with the Plan, which represents 33.8% of the total Non-Rights Offering Common Stock that will be distributed.

A holder's Pro Rata Share of the ADH Term Loan Value or the ADH Term Loan Stock will be calculated as if all holders of European Term Loan Claims elected to receive the ADH Term Loan Value. In other words, a holder of European Term Loan Claims will not be entitled to receive a greater share of the ADH Term Loan Value or the ADH Term Loan Stock allocated to ADH Class 3 as a result of other holders electing the other option.

### c. *Distributions on Account of European Term Loan Claims.*

Distribution of the ADH Term Loan Stock, the ADH Term Loan Subscription Rights, and/or Cash shall be made by the Debtors' non-debtor affiliate, the European Term Loan Acquisition Entity. Specifically, Aleris shall make a series of capital contributions and/or loans through its direct and indirect subsidiaries to European Term Loan Acquisition Entity. Using the proceeds of such capital contributions and/or loans, on the Effective Date or as soon thereafter as is reasonably practicable, the European Term Loan Acquisition Entity shall distribute the ADH Term Loan Stock, the ADH Term Loan Subscription Rights, and/or Cash to the Disbursing Agent for distribution to the holders of the European Term Loan Claims as of the Distribution Record Date.

The European Term Loan Claims shall not be canceled or discharged as of the Effective Date; instead, on the Effective Date, the terms and conditions of the European Term Loan Facility shall be modified as set forth in Exhibit "7.10" to the Plan and as described in Section V.K.11, entitled "THE PLAN OF REORGANIZATION – Implementation of the Plan – The European Term Loan," the European Term Loan Claims shall be deemed transferred to the European Term Loan Acquisition Entity, the European Term Loan Acquisition Entity shall be deemed to have assumed all responsibilities of the Prepetition Term Loan Agent Bank thereunder with respect to the European Term Loan Facility, and the Prepetition Term Loan Agent Bank shall be released from all other responsibilities under the Prepetition Term Loan Agreements with respect to the European Term Loan Facility.

### d. *Voting by ADH Class 3.*

ADH Class 3 is impaired. To the extent and in the manner provided in the Voting Procedures Order, the holders of the Claims in ADH Class 3 are entitled to vote to accept or reject the Plan.

### 4. ADH Class 4 (Other ADH Claims).

ADH Class 4 consists of all Allowed Other ADH Claims. An "***Other ADH Claim***" is any Claim against ADH other than the German Tranche of U.S. DIP Loan Claims, European Roll-Up Term Loan Claims, and European Term Loan Claims.

Pursuant to Section 3.3.4 of the Plan, each Allowed Other ADH Claim shall be unimpaired in accordance with section 1124 of the Bankruptcy Code. Accordingly, each Allowed Other ADH Claim will be treated in one of the following ways:

> (1) The legal, equitable, and contractual rights of a holder of an Allowed Other ADH Claim will be left unaltered, ***or***

(2)    Notwithstanding any contractual provision or applicable law that entitles the holder of an Allowed Other ADH Claim to demand or receive accelerated payment of such Claim prior to the stated maturity of such Claim from and after the occurrence of a default under the agreements governing or evidencing such Claim or applicable law, such Claim will be reinstated and ADH shall

    (A)    cure all defaults that occurred before or from and after the ADH Commencement Date (other than defaults of a kind specified in section 365(b)(2) of the Bankruptcy Code),

    (B)    reinstate the maturity of such Claim as such maturity existed prior to the occurrence of such default,

    (C)    compensate the holder of such Claim for any damages incurred as a consequence of any reasonable reliance by such holder on such contractual provision or such applicable law,

    (D)    if such Claim arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensate the holder of such Claim (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure, *and*

    (E)    not otherwise alter the legal, equitable, or contractual rights to which the holder of such Claim is entitled.

Under the Plan, each Allowed Equity Interest in ADH is preserved, and the holders of Equity Interests in ADH Class 5 are deemed to accept the Plan. The Debtors believe the reinstatement of the Allowed Equity Interests in ADH is appropriate because, through the Plan and the Rights Offering, holders of the European Roll-Up Term Loan Claims and European Term Loan Claims are indirectly acquiring the value of the equity of ADH through their ownership of HoldCo, which will indirectly hold the Allowed Equity Interests of ADH. By reinstating the Allowed Equity Interests in ADH Class 5, while distributing the New Common Stock in HoldCo to ADH's secured creditors, the Plan simply effectuates a transfer of the value of ADH's assets to its senior secured creditors without requiring those creditors to first take direct ownership of the Allowed Equity Interests in ADH and then transfer those Equity Interests to HoldCo.

ADH Class 4 is unimpaired. The holders of Claims in ADH Class 4 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

### 5. ADH Class 5 (ADH Equity Interests).

ADH Class 5 consists of all Allowed ADH Equity Interests. An "***ADH Equity Interests***" in any Equity Interest in ADH. Pursuant to Section 3.3.5 of the Plan, each Allowed ADH Equity Interest shall be reinstated. ADH Class 5 is unimpaired. Aleris Recycling Holding B.V, an indirect subsidiary of Aleris, is the sole holder of ADH Equity Interests. The holders of Equity Interests in ADH Class 5 are deemed to accept the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

### E. Description of Allocation of Plan Value, New Common Stock and Subscription Rights Among Holders of U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, and European Term Loan Claims.

The Plan contemplates that three classes of creditors will share in the "Plan Value" of the Debtors – the U.S. Roll-Up Term Loan Claims, the European Roll-Up Term Loan Claims, and European Term Loan Claims. Under the Plan, Creditors in these classes have the right to elect to receive Cash equal to their Pro Rata Share of the portion of such Plan Value[20] allocable to their class *or* to receive Subscription Rights to purchase New Common Stock and IntermediateCo Notes through the Rights Offering, as well as an amount of New Common Stock equivalent to such Creditor's Pro Rata Share of the Plan Value allocable to its Class. The New Common Stock purchased through the Rights Offering is referred to herein as "***Rights Offering Common Stock***" and the New Common Stock distributed to Creditors under the Plan is referred to herein as "***Non-Rights Offering Common Stock***." Both the Non-Rights Offering Common Stock and the Rights Offering Common Stock are subject to dilution.

To determine the respective Plan Value amounts among the three classes, the Debtors started with the assumption, based upon the analysis performed by Moelis & Company ("***Moelis***"), that the enterprise value of the Debtors is approximately $1 billion. Based upon the relative performance of their non-European operations and their European operations, the Debtors allocated $712.5 million of this enterprise value to the U.S. Debtors (*i.e.*, the non-European operations) and $300 million to ADH (*i.e.* the European operations).

"***Plan Value***" is the term used in the Plan to describe the equity value of the Debtors before giving effect to any value ascribed to the Rights Offering. The Plan Value is what remains of the enterprise value after deducting payments under the Plan and reserving for a liquidity adjustment provided under the Plan. The Debtors will allocate these deductions and a liquidity adjustment between the U.S. Debtors and ADH. These deductions are referred to in the Plan as the "***U.S. Plan Deductions***" and the "***ADH Plan Deductions***," and are described in detail in Sections 1.1.188 and 1.1.12 of the Plan, respectively.

One of the deductions applicable to U.S. Plan Value and ADH Plan Value is an amount to account for liquidity requirements to operate the Reorganized Debtors' businesses

---

[20] A holder of European Roll-Up Term Loan Claims that elects to receive Cash, however, will not receive the full value of its claims. *See* the description of the treatment of European Roll-Up Term Loan Claims in Section V.D.2, entitled, "THE PLAN OF REORGANIZATION – Classification and Treatment of Claims and Equity Interests – ADH Class 2 (European Roll-Up Term Loan Claims)."

after their emergence from chapter 11 (the "***U.S. Liquidity Adjustment***" in the case of U.S. Plan Value and the "***ADH Liquidity Adjustment***" in the case of ADH Plan Value). Formulas for calculating the ADH Liquidity Adjustment and the U.S. Liquidity Adjustment are set forth respectively in the Plan at Sections 1.1.11 and 1.1.187. These deductions are calculated off of a projected schedule and are adjusted as of the Determination Date by the "***Closing Liquidity Adjustment***." A formula for the total Closing Liquidity Adjustment is set forth in the Plan in Section 1.1.51. The "***Determination Date***" will be the last day of the month immediately preceding the month in which the Confirmation Date occurs. If, however the Effective Date is more than **forty-five (45) days** after such Determination Date, then a new Determination Date will be established on the last day of the month immediately preceding the month in which the Effective Date occurs.

To derive the "***U.S. Plan Value***," which is the portion of the Plan Value allocable to the U.S. Roll-Up Term Loan Claims, the Plan subtracts the U.S. Plan Deductions from the $712.5 million of the enterprise value attributable to the U.S. Debtors. In the event that the ADH Plan Value is not sufficient to provide for the minimum ADH Plan Value (described below), an additional U.S. Plan Deduction will be made from U.S. Plan Value and will be used to provide for the minimum ADH Plan Value.

The "***ADH Plan Value***" is allocated between the Classes of European Roll-Up Term Loan Claims (which receive the "***ADH Roll-Up Value***") and the European Term Loan Claims (which receive the "***ADH Term Loan Value***"). The European Roll-Up Term Loan Claims are entitled to priority over the European Term Loan Claims. Accordingly the ADH Term Loan Value will be the difference between the ADH Plan Value and the ADH Roll-Up Value, which is equal to $25 million (plus certain accrued but unpaid interest and minus certain paid interest). The ADH Term Loan Value, however, must receive a minimum recovery of $75 million (defined in the Plan as the "***European Term Loan Minimum Recovery***"). Therefore, the ADH Plan Value is the greater of (i) $300 million minus the ADH Plan Deductions and (ii) the ADH Roll-Up Value plus the European Term Loan Minimum Recovery. As a result, the ADH Plan Value will be no less than the ADH Roll-Up Value plus the European Term Loan Minimum Recovery. If such minimum value is not achieved, the deduction from U.S. Plan Value discussed above will make up the difference.

The sum of the U.S. Plan Value, ADH Roll-Up Value, and the ADH Term Loan Value equals the Plan Value. For each of the respective categories of Claims, the formulas for U.S. Plan Value and the ADH Term Loan Value reflect the cash-out amount that a Claimant in such class is entitled to receive, pro rata based upon the amount of its Claim compared to all Claims in the class, if a Claimant elects the cash-out option.

To determine the amount of Non-Rights Offering Common Stock the Classes of U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, and European Term Loan Claims are each entitled to receive, the Plan allocates the Non-Rights Offering Common Stock among each class based, in each case, on the ratio of U.S. Plan Value to Plan Value, ADH Roll-Up Value to Plan Value, and the ADH Term Loan Value to Plan Value respectively. The assumed price per share of the Non-Rights Offering Common Stock ("***Plan Value Share Price***") is calculated by dividing the Plan Value by the aggregate number of shares of Non-Rights Offering Common Stock, which will be equal to 10 million shares of New Common Stock. The

proportion of Subscription Rights to which holders of U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, and European Term Loan Claims are entitled is calculated in the same way. Therefore, for example, the calculation of the amount of Non-Rights Offering Common Stock and Subscription Rights for holders of U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, and European Term Loan Claims (assuming such holders elect to subscribe to the Rights Offering) would be as described below.

> Holders of U.S. Roll-Up Term Loan Claims collectively would be entitled to receive an amount of "***U.S. Roll-Up Stock***," or Non-Rights Offering Common Stock equal to the aggregate number of shares of Non-Rights Offering Common Stock multiplied by the ratio of the U.S. Plan Value to the Plan Value. Such holders are entitled to subscribe to a number of shares of Rights Offering Common Stock equal to the aggregate number of shares of Rights Offering Common Stock multiplied by the ratio of U.S. Plan Value to Plan Value. As part of such subscription, holders of U.S. Roll-Up Term Loan Claims will also purchase IntermediateCo Notes in an aggregate principal amount equal to the aggregate principal amount of the IntermediateCo Notes multiplied by the ratio of U.S. Plan Value to Plan Value.

> Holders of European Roll-Up Term Loan Claims collectively would be entitled to receive an amount of "***ADH Roll-Up Stock***," or Non-Rights Offering Common Stock equal to the aggregate number of shares of Non-Rights Offering Common Stock multiplied by the ratio of the ADH Roll-Up Value to the Plan Value. Such holders are entitled to subscribe to a number of shares of Rights Offering Common Stock equal to the aggregate number of shares of Rights Offering Common Stock multiplied by the ratio of ADH Roll-Up Value to Plan Value. As part of such subscription, holders of European Roll-Up Term Loan Claims will also purchase IntermediateCo Notes in an aggregate principal amount equal to the aggregate principal amount of the IntermediateCo Notes multiplied by the ratio of ADH Roll-Up Value to Plan Value.

> Holders of European Term Loan Claims collectively would be entitled to receive an amount of "***ADH Term Loan Stock***," or Non-Rights Offering Common Stock equal to the aggregate number of shares of Non-Rights Offering Common Stock multiplied by the ratio of the ADH Term Loan Value to the Plan Value. Such holders are entitled to subscribe to a number of shares of Rights Offering Common Stock equal to the aggregate number of shares of Rights Offering Common Stock multiplied by the ratio of ADH Term Loan Value to Plan Value. As part of such subscription, holders of European Term Loan Claims will also purchase IntermediateCo Notes in an aggregate principal amount equal to the aggregate principal amount of the IntermediateCo Notes multiplied by the ratio of ADH Term Loan Value to Plan Value.

Under the terms of the Plan, the Rights Offering Participants are entitled to a discount of 10% with respect to the Rights Offering Common Stock that they purchase in the Rights Offering. To do this, the Rights Offering Participants are offered shares at a discount to the Plan Value Share Price. The discount is calculated by issuing Rights Offering Common Stock at a "***Rights Offering Common Stock Price***" equal to the Plan Value Share Price multiplied by 90%. As a result of this discount, the Rights Offering Share Price will be less than the Plan Value Share Price. The aggregate number of shares of Rights Offering Common Stock will be determined by dividing (i) the Rights Offering Value minus the principal amount of IntermediateCo Notes by (ii) the Rights Offering Common Stock Price.

The Rights Offering Value represents the amount of value contributed to the Debtors' businesses on account of the Rights Offering and the IntermediateCo Notes. It is the sum of the ADH Plan Deductions, the U.S. Plan Deductions, and the amounts payable to holders of U.S. Roll-Up Term Loan Claims, holders of European Roll-Up Term Loan Claims and holders of European Term Loan Claims that elect to receive Cash under the Plan; *provided*, *however* that the Rights Offering Value does not include (i) the liquidity adjustments provided for in each set of plan deductions (ii) in the case of the U.S. Plan Deductions, the adjustment to account for the minimum ADH Plan Value, and (iii) the portion of payments for outstanding borrowings under the DIP Credit Agreements that will be funded by the Debtors' exit financing and not by the proceeds of the Rights Offering.[21]

The Plan Value and the Rights Offering Value will be affected by the size of the U.S. Plan Deductions and the ADH Plan Deductions and the total outstanding borrowings under the DIP Credit Agreements and, accordingly will not be calculated until after the Confirmation Date. In accordance with Section 7.1.1 of the Plan, after the Confirmation Date and before the Effective Date, the Debtors, in consultation with, and subject to approval of, a Majority in Interest, will calculate the Plan Value, the Closing Liquidity Adjustment, the ADH Liquidity Adjustment, the U.S. Liquidity Adjustment, and the Determination Date Net Working Capital (and all amounts related to any of the foregoing). The Debtors will then be able to calculate the Rights Offering Value, the Plan Value Share Price, the Rights Offering Common Stock Price, and the number of shares of Rights Offering Common Stock issued to Rights Offering Participants.

## F. Convenience Class.

The Debtors believe that the creation of U.S. Debtors Class 4 (Convenience Claims) is a reasonable and necessary means to ease the administrative burdens of these chapter 11 cases. Specifically, the Debtors believe that, in their business judgment, the administrative burden of reconciling and making multiple distributions on account of claims equal to or less than $10,000 outweighs the relative size of such claims.

---

[21] Under Section 9(i) of the Equity Commitment Agreement, the Debtors must repay a minimum of $430 million of the amounts outstanding under the DIP Credit Agreements using proceeds of the Rights Offering. The Debtors may pay the remainder, at their option, by using additional proceeds from the Rights Offering (subject to certain limitations and conditions set forth in the Equity Commitment Agreement) using proceeds of their exit financing.

Based upon the Debtors' analysis above, claims under $10,000 equal approximately 63.5% of the total number of general unsecured claims asserted in these chapter 11 cases (*i.e.*, 1,809 of 2,845 claims) but account only for 1.75% of the total amount of liquidated general unsecured claims not including Debt Claims (*i.e.*, approximately $4.4 million of $250.6 million).

To encourage claims reconciliation and administrative convenience related thereto, the Plan provides that general unsecured creditors in U.S. Debtors Class 5 (General Unsecured Claims Other than Convenience Claims and Insured Claims) (*i.e.*, creditors with general unsecured claims in excess of $10,000) have the option to reduce their claims to $10,000 and be treated as a Convenience Claim. In addition, holders of disputed and/or unliquidated general unsecured claims in U.S. Debtors Class 5 also may elect to settle and/or liquidate their claims to an Allowed Convenience Claim in the amount of $10,000 in U.S. Debtors Class 4. This option is significantly more cost effective than resolving such claims through a formal process in which the Debtors—and the affected Creditors—must expend resources documenting and seeking court approval of the settlement. If larger General Unsecured Claims elect treatment as Convenience Claims, the need to reconcile such claims is virtually eliminated as, in most cases, the Debtors' books and records reflect a liability of at least $10,000 with respect to such Claims.

The use of a convenience class reduces the administrative burden and expense of making multiple distributions. Unlike distributions to U.S. Debtors Class 5, distributions to U.S. Debtors Class 4 are not subject to a claims reserve and, as such, the Debtors will not need to make multiple distributions on account of such Claims (except to the extent the Debtors later make a one-time additional distribution to increase the Convenience Claim recovery from 25% to 50%). As noted above, 63.5% of all general unsecured claims already qualify as Convenience Claims in U.S. Debtors Class 4. Assuming all creditors in U.S. Debtors Class 5 that receive a greater recovery by reducing the amount of their general unsecured claim to a $10,000 Convenience Claim in U.S. Debtors Class 4 do so, the Debtors estimate that approximately more than 95% of all general unsecured claims will end up in U.S. Debtors Class 4. As a result, the Debtors will need to make multiple distributions, calculate claims reserves, and incur expenses related thereto for less than 5.0% of all General Unsecured Claims.

The limited number of distributions also has the added benefit of improving relationships with trade creditors, whose claims comprise the vast majority of claims in U.S. Debtors Class 4, because such creditors will have certainty and immediate satisfaction on account of their claims.

The Indenture Trustee for the 2006 Senior Notes and the 2007 Senior Notes has questioned whether the Convenience Class is "reasonable and necessary for administrative convenience" as required by section 1122(b) of the Bankruptcy Code, is proposed in good faith, or would satisfy the fair and equitable and unfair discrimination provisions of the Bankruptcy Code. The Indenture Trustee for the 2006 Senior Notes and 2007 Senior Notes has indicated that it reserves its right to object to the Plan on those, and other, bases.

## G.     Impairment under the Plan.

In the event of a controversy as to whether any class of Claims or Equity Interests is impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy at or prior to the Confirmation Date.

## H.     Securities to Be Distributed under the Plan.

As discussed in more detail in Section V.K.8, entitled, "THE PLAN OF REORGANIZATION – Implementation of the Plan – The Restructuring Transactions," prior to the filing of the Plan, HoldCo, IntermediateCo, and the OpCos were formed.  Part of the consideration to be paid by the OpCos to Reorganized Aleris pursuant to the Acquisition Agreement will be the shares of New Common Stock.  This section describes the terms and conditions of such securities.

Under the Plan, holders of certain Allowed Claims will receive (i) shares of New Common Stock, (ii) the Subscription Rights, and/or (iii) Cash.  In addition, Rights Offering Eligible Creditors who exercise, as part of the Rights Offering, Subscription Rights will be entitled to receive (x) shares of New Common Stock and (y) the IntermediateCo Notes.

Pursuant to the terms of the Equity Commitment Agreement, the Backstop Parties (or such affiliate, fund, or account managed by a Backstop Party, as may be designated by the managing Backstop Party) shall purchase the IntermediateCo Preferred Stock from IntermediateCo and shall pay to IntermediateCo, by wire transfer in immediately available funds on the Effective Date, Cash in an amount equal to $5 million.

For more information regarding certain securities law issues related to the New Common Stock, the Subscription Rights, the IntermediateCo Notes and the IntermediateCo Preferred Stock, please *see* Section IX, entitled, "EXEMPTIONS FROM SECURITIES ACT REGISTRATION."

## 1.     Subscription Rights.

As described above, certain holders of Allowed U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, and European Term Loan Claims may elect to receive Subscription Rights.  Creditors that elect to receive and exercise Subscription Rights will receive New Common Stock and IntermediateCo Notes.  The proposed terms of the New Common Stock and the IntermediateCo Notes are discussed in this section.

## 2.     The New Common Stock.

The New Common Stock will be common stock of HoldCo, which will have a par value of $0.01.  In connection with the Transaction Agreements, HoldCo has authorized 45 million shares of New Common Stock.  Of these shares, the Debtors expect approximately 30 million shares will be distributed to holders of U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, and European Term Loan Claims under the Plan (including through the Rights Offering).  These shares will be subject to dilution as a result of rights granted pursuant to

the Long-Term Equity Incentive Program, or as a result of the exchange of IntermediateCo Notes or IntermediateCo Preferred Stock into New Common Stock.

Each share of New Common Stock will have the same rights, preferences, privileges, interests and attributes, and will be subject to the same limitations, as every other share of New Common Stock. Each share of New Common Stock entitles the holder to one vote with respect to each matter on which the holders of New Common Stock are entitled to vote, including elections of directors.

The holders of the New Common Stock will be entitled to receive such dividends and other distributions in Cash, stock, evidences of indebtedness or property of HoldCo as may be declared from time to time by the board of directors of HoldCo (the "*HoldCo Board*") out of funds legally available therefor and, upon any liquidation, dissolution or winding up of affairs, and will be entitled to participate pro rata (at the same rate per share of the New Common Stock) in all distributions to the holders of New Common Stock.

The HoldCo Board will be authorized to provide for the issuance of preferred stock in one or more series and to fix the preferences, powers and relative, participating, optional or other special rights and such qualifications, limitations or restrictions thereof. Any preferred stock so issued may rank senior to the New Common Stock with respect to the payment of dividends or amounts upon liquidation, dissolution or winding up, or both. In addition, any such shares of preferred stock may have class or series voting rights.

Any shares of New Common Stock to be distributed under the Plan to any entity required to file a Premerger Notification and Report Form under the HSR Act will not be distributed, until the notification and waiting periods applicable under such Act to such entity shall have expired or been terminated. The Debtors will not refund any Subscription Purchase Price in the event that any Rights Offering Participant fails to receive any applicable regulatory approval (including any approval under the HSR Act). It is a condition to Oaktree's obligations under the Equity Commitment Agreement, however, that Oaktree has received all required regulatory approvals in connection with Oaktree's receipt of New Common Stock under the Plan.

A description of how Plan Value is allocated and calculated is contained in Section V.E, entitled, "THE PLAN OF REORGANIZATION – Description of Allocation of Plan Value, New Common Stock and Subscription Rights among Holders of U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, and European Term Loan Claims."

### a. *The Stockholders Agreement.*

Pursuant to Section 7.8.2 of the Plan, as a condition to its receipt of shares of New Common Stock under the Plan, any Entity that, together with its Affiliates, would own nine percent (9.0%) or more of the New Common Stock to be issued on the Effective Date, must execute and agree to be bound by the Stockholders Agreement. All other Creditors that receive New Common Stock under the Plan will be deemed to be party to and, accordingly, bound by terms thereof. The form of the Stockholders Agreement will be Exhibit "1.1.176" to the Plan and will be included in the Plan Supplement. Reference should be made to the Plan Supplement

for the detailed provisions of the Stockholders Agreement. The description set forth below is only a summary of the expected material terms of the Stockholders Agreement and is qualified in its entirety by the actual terms thereof, which will be set forth in the Plan Supplement.

The relevant terms of the Stockholders Agreement are expected to be as follows:

As of the Effective Date, the HoldCo Board will consist of five (5) members, of which one member will be the Chief Executive Officer of HoldCo and the remaining members will be appointed by Oaktree. The names of such additional members will be set forth in the Plan Supplement. Holders of a majority of the outstanding shares of New Common Stock will have the right to effect a merger or other business combination of HoldCo or a sale, lease, transfer or other disposition of all of New Common Stock or all or substantially all of the assets of HoldCo, in each case to an unaffiliated third party, without the approval of other holders of New Common Stock. Holders of New Common Stock will have the right to participate in sales of New Common Stock by Oaktree on a proportionate basis other than sales to Apollo. If HoldCo proposes to issue any additional equity securities and Oaktree is participating in such equity offering, then all other shareholders will have a preemptive right to proportionately participate in such equity offering on the same terms as the proposed issuance to Oaktree. Prior to an initial public offering of HoldCo, holders of New Common Stock may not transfer their shares of New Common Stock if, at any time, the combined number of stockholders of New Common Stock of record equals or exceeds 450, unless such transfer is being made (i) to an existing stockholder of HoldCo, (ii) with the prior written consent of HoldCo, or (iii) to a single transferee of record and 100% of their shares of New Common Stock are being transferred.

**b.** ***The Registration Rights Agreement.***

On the Effective Date, as provided for in the Transaction Agreements, HoldCo will enter into a Registration Rights Agreement with the Backstop Parties. The form of the Registration Rights Agreement will be Exhibit "1.1.151" to the Plan and will be included in the Plan Supplement. Reference should be made to the Plan Supplement for the detailed provisions of the Registration Rights Agreement. The description set forth below is only a summary of the expected material terms of the Registration Rights Agreement and is qualified in its entirety by the actual terms thereof, which will be set forth in the Plan Supplement.

The relevant terms of the Registration Rights Agreement are expected to be as follows:

HoldCo, Oaktree, and other holders of at least 10% of the outstanding shares of New Common Stock (the "***Other Investors***" and, together with Oaktree, the "***Investors***") will be parties to a registration rights agreement. Under the agreement, Oaktree has the right to request HoldCo to effect three demand registrations. At any time following an initial public offering of HoldCo (an "***IPO***"), Apollo has the right to request HoldCo to effect two demand registrations and Sankaty has the right to request HoldCo to effect one demand registration. Each Other Investor has the right to request HoldCo to effect one demand registration at any time following the one-year anniversary of IPO. Subject to customary exceptions, whenever HoldCo proposes to register any of its New Common Stock other than on a Form S-8 or Form S-4, HoldCo will provide notice to each Investor and any holder of registrable securities of HoldCo will be granted

piggyback registration rights. In the event of any underwritten offering, the underwriter may exclude shares from registration and the underwriting, and the shares will be given priority as follows: (i) to HoldCo for securities it proposes to register, (ii) to each holder requesting piggyback registration on a *pari passu* basis with each other and (iii) to any other securities to be registered on behalf of any other holder.

After HoldCo is eligible to register any securities on Form S-3, each Investor and any Person to whom any Investor transfers shares of New Common Stock (together with the Investors so long as they hold registrable securities of HoldCo, a "***Holder***"), so long as such Holder holds at least 10% of the outstanding shares of New Common Stock, will have the right to demand HoldCo to effect any number of registrations on Form S-3, and such registrations will not be counted as a demand registration. The Holder requesting a demand registration or registration on Form S-3 may choose to distribute its securities in an underwritten offering by notifying HoldCo of such intent as a part of its request. The underwriter may limit the size of the offering and exclude shares from the registration and underwriting, and the shares that will be included will be given priority as follows: (i) to the Holders requesting inclusion of their securities on a *pari passu* basis with each other and (ii) to other holders of securities of HoldCo. Subject to customary exceptions, in the case of an underwritten offering, if so requested by the managing underwriter, each Holder will not for a period of up to 180 days from the effectiveness of the registration statement effect any public sale of its New Common Stock or any other registrable securities, except for those securities included in such registration. HoldCo and each Holder will provide customary indemnification.

## 3. The IntermediateCo Notes.

Immediately prior to or on the Effective Date, IntermediateCo will issue the IntermediateCo Notes and contribute the IntermediateCo Notes to the OpCos. The OpCos, in turn, will distribute the IntermediateCo Notes to Aleris as part of the consideration paid to Aleris under the Acquisition Agreement. On the Effective Date, pursuant to the Plan, the IntermediateCo Notes will be distributed on behalf of Aleris to the Rights Offering Participants and the Backstop Parties, pursuant to the Rights Offering and the Equity Commitment Agreement and subject to the indenture governing the IntermediateCo Notes (the "***IntermediateCo Note Indenture***"), substantially in the form included in the Plan Supplement as Exhibit "1.1.113." The summary below describes the anticipated principal terms of the IntermediateCo Notes. It does not purport to be a complete description of the terms and conditions thereof, and certain terms and conditions of the IntermediateCo Notes have not yet been determined.

| | |
|---|---|
| *Principal Amounts:* | $45,000,000. |
| *Maturity:* | Ten years. |
| *Issue Price:* | 100% of the principal amount on the Effective Date. |
| *Interest:* | Interest rate will be equal to 6% per annum, at the discretion of IntermediateCo's board of directors, in cash or by accretion to the face value of the IntermediateCo Notes, |

semiannually in arrears on March 31 and September 30 of each year, beginning on March 31, 2011. Stated interest will be treated as Original Issue Discount for tax purposes due to the ability to defer payment.

*Exchange Rights:*   At the holder's option, after the third anniversary of the Effective Date, exchangeable for New Common Stock on a per share dollar exchange ratio to be determined at the time of issuance based upon 100% of the Plan Value Share Price, subject to adjustment for dilution.

*Anti-Dilution Provisions:*   Exchange ratio will be adjusted to provide anti-dilution protection for recapitalizations, below-market issuances, subdivisions or combinations.

*Fundamental Change:*   Notwithstanding anything to the contrary contained herein, after the date that occurs six (6) months after the Effective Date, the holder shall have the right to exchange the IntermediateCo Notes for New Common Stock immediately prior to an initial public offering (an "***IPO***") of HoldCo at face value plus any accrued but unpaid interest divided by the IPO price or upon the occurrence of a fundamental change (as defined in the IntermediateCo Notes Indenture) of HoldCo.

*Optional Redemption:*   On or after the third anniversary of the Effective Date upon not less than 30 nor more than 60 days' notice, at the following redemption prices (expressed as a percentage of the principal amount) plus accrued and unpaid interest, if any, to the applicable redemption date (subject to the right of the holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the twelve-month period beginning on the date of the anniversary of the issuance of the IntermediateCo Notes of the years indicated below:

| **Year** | **Percentage** |
|---|---|
| 2013..................................................... | 102% |
| 2014..................................................... | 101% |
| 2015 and thereafter............................... | 100% |

On or after the later of the six month anniversary of the Effective Date and January 1, 2011, and only upon the occurrence of a fundamental change of HoldCo, at the following redemption prices (expressed as a percentage of the principal amount) plus accrued and unpaid interest, if

any, to the applicable redemption date (subject to the right of the holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the twelve-month period beginning on the date of the anniversary of the issuance of the IntermediateCo Notes of the years indicated below:

| Year | Percentage |
|------|-----------|
| 2011 ..................................................... | 104% |
| 2012 and thereafter .............................. | 103% |

| | |
|---|---|
| *Covenants:* | None. |
| *Events of Default:* | ➢ Default due to non-payment of the Notes upon maturity |
| | ➢ Customary default due to bankruptcy or receivership |
| *Registration Rights:* | New Common Stock that may be issued upon exchange of the IntermediateCo Notes will be offered rights, if any, pursuant to the Registration Rights Agreement. |
| *Transfer Restrictions:* | *See* Section IX, entitled, "EXEMPTIONS FROM SECURITIES ACT REGISTRATION." |
| *Ranking:* | IntermediateCo shall have the full and absolute discretion to subordinate the debt represented by the IntermediateCo Notes to any debt or other borrowing of money designated by IntermediateCo to be senior in ranking. |
| *Governing Law:* | New York. |

### 4. The IntermediateCo Preferred Stock.

Pursuant to the Plan, immediately prior to or on the Effective Date, IntermediateCo will issue the IntermediateCo Preferred Stock. Pursuant to the terms of the Equity Commitment Agreement, the Backstop Parties will purchase the IntermediateCo Preferred Stock from IntermediateCo and shall pay to IntermediateCo, by wire transfer in immediately available funds on the Effective Date, Cash in an amount equal to $5 million. The IntermediateCo Preferred Stock will have a liquidation preference of $5 million. New Common Stock that may be issued upon exchange of the IntermediateCo Preferred Stock will be offered customary registration rights pursuant to the Registration Rights Agreement discussed in Section V.H.2.b, entitled, "THE PLAN OF REORGANIZATION – Securities to be Distributed under the Plan – The Registration Rights Agreement." The summary below describes the anticipated terms of the IntermediateCo Preferred Stock. The certificate of designation for the IntermediateCo Preferred Stock will be included in the Plan Supplement. The discussion herein does not purport to be a complete description of the terms of the IntermediateCo Preferred Stock, certain terms of which have not yet been determined.

| | |
|---|---|
| *Liquidation Preference:* | $5 million (in the aggregate), plus accrued and unpaid dividends, to be paid upon the liquidation of IntermediateCo prior to any payment on the common stock of IntermediateCo. |
| *Dividends:* | Payable at 8% per annum multiplied by the liquidation preference, compounded semiannually on each dividend payment date. IntermediateCo's board of directors may declare and pay dividends; if undeclared, dividends will accumulate to the extent they are not paid on the dividend payment date for the semiannual period to which they relate. |
| *Voting Rights:* | Holders of the IntermediateCo Preferred Stock will have the right to elect one director if IntermediateCo fails to pay in full and in Cash six consecutive semiannual dividends or the mandatory redemption payment. At such time, IntermediateCo's board of directors must be comprised of at least five members. |
| *Amendments and Waivers:* | The affirmative vote of the holders of 80% of the IntermediateCo Preferred Stock is necessary for amendments of the IntermediateCo Preferred Stock that (i) change the stated redemption date of the IntermediateCo Preferred Stock; (ii) reduce the liquidation preference of, or dividend rate on, the IntermediateCo Preferred Stock; (iii) adversely affect the right to exchange the IntermediateCo Preferred Stock, or (iv) reduce the percentage of outstanding IntermediateCo Preferred Stock necessary to amend the terms thereof or to grant waivers. |
| *Registration Rights:* | New Common Stock that may be issued upon exchange of the IntermediateCo Preferred Stock will be offered customary registration rights. |
| *Redemption:* | Subject to mandatory redemption on the fifth anniversary of the Effective Date at a redemption price equal to the liquidation preference, plus any accrued and unpaid dividends. There will be no optional redemption rights. |
| *Holder's Option to Exchange:* | At the holder's option, at any time prior to redemption but after the third anniversary of the Effective Date, the IntermediateCo Preferred Stock will be exchangeable into New Common Stock on a per share dollar exchange ratio to be determined at the time of issuance based upon |

110% of the Plan Value Share Price.

Notwithstanding anything to the contrary contained herein, after the first anniversary of the Effective Date, the holder shall have the right to exchange the IntermediateCo Preferred Stock into New Common Stock under the following circumstances:

> ➢ immediately prior to an IPO *or*

> ➢ upon the occurrence of a Fundamental Change (as defined in the IntermediateCo Note Indenture) of HoldCo.

*Anti-Dilution Provisions:*    Exchange ratio will be adjusted to provide anti-dilution protection for recapitalizations, below-market issuances, or subdivisions or combinations.

*Transfer Restrictions:*    Any transfer restrictions will be described in the Plan Supplement.

# I.    Modification, Revocation, or Withdrawal of the Plan.

## 1.    Modification of the Plan.

Pursuant to Section 4.1 of the Plan, the Debtors, with the consent of a Majority in Interest, may alter, amend, or modify the Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date so long as the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code. After the Confirmation Date and prior to the Effective Date, the Debtors may only alter, amend, or modify the Plan in accordance with section 1127(b) of the Bankruptcy Code and with the consent of a Majority in Interest.

## 2.    Revocation or Withdrawal.

### a.    *Right to Revoke.*

Pursuant to Section 4.2.1 of the Plan, the Debtors may revoke or withdraw the Plan prior to the Confirmation Date, subject to the terms of the Equity Commitment Agreement and the Plan Support Agreements.

### b.    *Effect of Withdrawal or Revocation.*

Pursuant to Section 4.2.2 of the Plan, if the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein or in the Plan shall be deemed to constitute a waiver or release of any claims or defenses or any admission or statement against interest by the Debtors in any further proceedings involving any Debtor.

3. **Amendment of Plan Documents.**

Pursuant to Section 4.3 of the Plan, from and after the Effective Date, the authority to amend, modify, or supplement the exhibits and schedules to the Plan and any documents attached to such exhibits and schedules shall be as provided in such exhibits and schedules and their respective attachments.

**J.    Treatment of Disputed Claims.**

1. **Objections to Claims; Prosecution of Disputed Claims.**

Pursuant to Section 5.1 of the Plan, the Reorganized Debtors will object to the allowance of Claims filed with the Bankruptcy Court with respect to which the Reorganized Debtors dispute liability in whole or in part.  All objections that are filed and prosecuted by the Reorganized Debtors as provided herein will be litigated to Final Order by the Reorganized Debtors or compromised and settled in accordance with the Claims Settlement Guidelines.

2. **Amendment to the Claims Settlement Guidelines.**

Pursuant to Section 5.2 of the Plan, the Confirmation Order shall approve the amendment to the Claims Settlement Guidelines as set forth in Exhibit "1.1.49" of the Plan. Such amendment will maintain the same threshold levels of approval described in Section IV.C.5.c, entitled, "THE CHAPTER 11 CASES – Significant Events During the Chapter 11 Cases – Claims Issues – Claims Settlement Guidelines," but will replace the Creditors' Committee with a representative designated by the Creditors' Committee.

Unless otherwise provided herein or extended by order of the Bankruptcy Court, all objections by the Reorganized Debtors to Claims will be served and filed no later than ninety (90) days after the Effective Date.

3. **Distributions on Account of Disputed Claims.**

Section 5.3 of the Plan provides that notwithstanding Section 3.2 of the Plan, and subject to Section 3.2.4(b)(iii) of the Plan, a Distribution will only be made by the Reorganized Debtors to the holder of a Disputed Claim when, and to the extent that, such Disputed Claim becomes Allowed.  No Distribution will be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof in the manner prescribed by Section 5.1 of the Plan.

No interest will be paid on account of Disputed Claims that later become Allowed except to the extent that payment of interest is required under section 506(b) of the Bankruptcy Code.

## K.    Implementation of the Plan.

### 1.    The Rights Offering and Equity Commitment Agreement.

#### a.    *The Equity Commitment Agreement.*

On February 5, 2010, the Debtors and the Backstop Parties entered into the Equity Commitment Agreement, a copy of which is annexed to the Plan as Exhibit "1.1.85," pursuant to which the Backstop Parties have agreed to underwrite a rights offering in an amount up to $690 million (the "***Maximum Rights Offering Amount***").    The $690 million Maximum Rights Offering amount is comprised of the $45 million of proceeds from the issuance of the IntermediateCo Notes, plus up to $645 million raised from the distribution of New Common Stock in the Rights Offering.

Subject to the terms and conditions in the Equity Commitment Agreement, each of the Backstop Parties has agreed to subscribe for, in accordance with the Plan, and purchase on the Effective Date, at the Subscription Purchase Price, (i) such Backstop Party's Subscription Units and (ii) a number of Rights Offering Residual Units calculated by multiplying (x) such Backstop Party's Backstop Percentage (as defined in the Equity Commitment Agreement) and (y) the aggregate number of Rights Offering Residual Units.    Subject to the foregoing, each Backstop Party shall, or shall cause its affiliates to, elect to receive and exercise all of the Subscription Rights offered to such Backstop Party or affiliate.    Without limiting and subject to Apollo's obligations in the Plan Support Agreement if signed by Apollo, Apollo may, at its option, elect to withdraw all or a portion of its commitment under the Equity Commitment Agreement and/or withdraw the election on any Ballot of Apollo or any of its affiliates to receive U.S. Roll-Up Stock, ADH Roll-Up Stock, or, as applicable, ADH Term Loan Stock, and the Subscription Rights in respect of its U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims and/or European Term Loan Claims, respectively and elect cash in lieu thereof, in each case by written notice to Aleris and Oaktree no later than the date that is ten (10) days prior to the Effective Date.

In addition, without affecting the rights and obligations of the other parties under the Equity Commitment Agreement (i) Sankaty, if Sankaty has executed and delivered a Plan Support Agreement and such Plan Support Agreement has terminated in accordance with Section 9 thereof, or (ii) Oaktree, if Sankaty's Plan Support Agreement is terminated pursuant to section 9(b)(iii) of the Plan Support Agreement or the Termination Event (as defined in the Plan Support Agreement) set forth in section 9(a)(x) has occurred due to a breach of the Plan Support Agreement by Sankaty (regardless of whether the Plan Support Agreement is terminated) may terminate Sankaty's rights and obligations under the Equity Commitment Agreement, in which case (w) Sankaty shall not be required to purchase the Sankaty Residual Units (as defined in the Equity Commitment Agreement), (x) Sankaty shall no longer be entitled to a portion of the Structuring and Arrangement Fee or the Termination Fee, (y) Sankaty shall no longer be a Backstop Party for purposes of the Equity Commitment Agreement and the Plan and (z) Sankaty's Subscription Units shall be subject to the Minimum Ownership Cutback under Section 7 of the Plan.

The Backstop Parties shall pay to the Rights Offering Agent, by wire transfer in immediately available funds on or prior to the Effective Date, Cash in an amount equal to the aggregate Subscription Purchase Price attributable to such amount of Rights Offering Units as provided in the Equity Commitment Agreement. The Rights Offering Agent shall deposit such payment into the same escrow account into which the Subscription Purchase Price payments of Rights Offering Participants were deposited. Aleris and the Rights Offering Agent shall give the Backstop Parties by electronic facsimile transmission certification (the "***Purchase Notice***") by an executive officer of Aleris of (i) the number of such Backstop Party's Subscription Units as of such date and the aggregate Subscription Purchase Price therefor, (ii) such Backstop Party's Rights Offering Residual Units and the aggregate Subscription Purchase Price therefor and (iii) the percentage of New Common Stock to be issued under the Plan that such Units represent (after giving effect to the Rights Offering and purchases under the Equity Commitment Agreement, but subject to dilution for certain events) within two (2) Business Days after the completion of the calculations determined in accordance with the procedures set forth in Section 7.1.1 of the Plan. In addition, the Rights Offering Agent shall notify the Backstop Parties, on each Friday following the commencement of the Rights Offering and on each Business Day during the five (5) Business Days prior to the Subscription Expiration Date (and any extensions thereto), or more frequently if reasonably requested by the Backstop Parties, of the aggregate number of Subscription Rights known by the Rights Offering Agent to have been exercised pursuant to the Rights Offering as of the close of business on the preceding Business Day or the most recent practicable time before such request, as the case may be. Aleris agrees to provide written notice to the Backstop Parties of the anticipated occurrence of the Effective Date at least fourteen (14) days prior to the occurrence of the Effective Date and to provide as much notice as is practicable of any anticipated delay beyond the projected Effective Date described in Aleris' initial notice to the Backstop Parties.

On the Effective Date, each Backstop Party will purchase only such number of Subscription Units and Rights Offering Residual Units as are listed in the Purchase Notice, without prejudice to the rights of such Backstop Party to seek later an upward or downward adjustment if the number of such Backstop Party's Subscription Units or Rights Offering Residual Units set forth in such Purchase Notice is inaccurate. Delivery of the Subscription Units and Rights Offering Residual Units will be made to the accounts of the respective Backstop Parties (or to such other accounts as the Backstop Parties may designate) on the Effective Date against payment of the aggregate Subscription Purchase Price for the Subscription Units and Rights Offering Residual Units by wire transfer of immediately available funds to the Rights Offering Agent. All Subscription Units and Rights Offering Residual Units will be delivered with any and all issue, stamp, transfer or similar taxes or duties payable in connection with such delivery duly paid by Aleris to the extent required under the Confirmation Order or applicable law.

(1)     Structuring and Arrangement Fee.

In consideration for their agreement to backstop the Rights Offering, each Backstop Party (or such affiliate as may be designated by such Backstop Party) will, as set forth in the Equity Commitment Agreement, receive the Structuring and Arrangement Fee. The Structuring and Arrangement Fee will be allocated to each Backstop Party (or, in each case, their designated affiliates) in proportion to the backstop amount provided by such Backstop Party,

respectively.  The Structuring and Arrangement Fee will be an amount of Cash equal to $24.15 million (three and one-half percent (3.5%) of the Maximum Rights Offering Amount). The Debtors have also agreed to pay certain expenses of the Backstop Parties.  The Structuring and Arrangement Fee is payable to the Backstop Parties on the Effective Date.

(2)     Termination Fee.

Under the Equity Commitment Agreement, a "Termination Fee" equal to the Structuring and Arrangement Fee minus $5 million is payable by Aleris to the Backstop Parties (or such affiliates as such Backstop Parties may designate) upon the occurrence of certain termination events, including certain breaches of the Equity Commitment Agreement or the Plan Support Agreements by Aleris, and termination due to the fiduciary duties of the board of directors of Aleris.

(3)     Additional Terms and Conditions of<br/>the Equity Commitment Agreement

In addition, the obligations of the Backstop Parties under the Equity Commitment Agreement are subject to the satisfaction of certain conditions (unless waived in writing by the Requisite Investors (as defined in the Equity Commitment Agreement)), including, among others, the following:

➢ the representations and warranties of Aleris contained in the Equity Commitment Agreement must be true and correct in all material respects as of the Effective Date, except to the extent that any failure of such representations and warranties, individually or in the aggregate, to be so true and correct has not had, and would not reasonably be expected to have, a Material Adverse Effect (as defined in the Equity Commitment Agreement);

➢ Aleris shall have complied in all material respects with all covenants and agreements in the Equity Commitment Agreement and Sections 2 (Effectuating the Restructuring) and 4 (Company Responsibilities) of the Plan Support Agreements;

➢ the Plan Support Agreements, if entered into by Oaktree and Apollo, shall not have been terminated pursuant to Section 9 (Termination) of the Plan Support Agreements;

➢ the Restructuring Transactions and the Plan shall be consummated substantially simultaneously with the transactions contemplated by the Equity Commitment Agreement and on the terms and conditions set forth in the Equity Commitment Agreement and the Plan Support Agreements;

➢ the U.S. Plan Value is no less than $120,000,000;

➢ Aleris shall have obtained the Exit ABL Facility on terms reasonably acceptable to Oaktree with a commitment in an amount not less than $500,000,000;

> the Pro Forma Liquidity (as defined in the Equity Commitment Agreement) shall be no less than $233,000,000;

> the roll-up rights of Oaktree and Apollo under the DIP Term Credit Agreement shall not have been rescinded or modified in any way without the consent of Oaktree and Apollo;

> HoldCo shall have entered into employment arrangements with senior executives as described and on the terms and conditions as set forth in Section VI.A.3 entitled, "MANAGEMENT OF HOLDCO AND THE REORGANIZED DEBTORS – Board of Directors and Management – Management Contracts" herein.

> all governmental approvals and consents required by the Plan shall have been obtained and be in full force and effect; and all applicable mandatory waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

> the absence of a Material Adverse Effect (as defined in the Equity Commitment Agreement) since the date thereof; and

> the Underlying EBITDA (as defined in the Equity Commitment Agreement) shall meet a certain threshold.

Aleris reserves the right at any time prior to the Subscription Expiration Date to terminate the Rights Offering if consummation is prohibited by law or applicable regulation.

(4)     Termination of the Equity Commitment Agreement.

The Equity Commitment Agreement may be terminated by (i) Aleris or (ii) Oaktree or Apollo (each, a "***Minimum Backstop Party***") (if such Minimum Backstop Party has signed its Plan Support Agreement) if the Plan Support Agreements shall not have been entered into by Aleris and the Minimum Backstop Parties within four (4) Business Days after the date of the Disclosure Statement Order; provided that such right to terminate shall be waived if it is not exercised within six (6) Business Days after the date of the Disclosure Statement Order.

Pursuant to the Equity Commitment Agreement, any party may terminate the Equity Commitment Agreement, upon the occurrence of any of the following events (among others):

> at any time after April 1, 2010, if the Bankruptcy Court has not entered the Equity Commitment Agreement Order;

> at any time after April 15, 2010, if the Equity Commitment Order has not become a Final Order;

- at any time after the Bankruptcy Court shall have stated in writing that it will not approve Aleris entering into the Equity Commitment Agreement or will not approve any provision thereof (including certain fees and expenses); or

- at any time after (i) June 30, 2010 or (ii) if the Confirmation Order approving the Plan has been entered by June 30, 2010, but has not become a Final Order by such date and all other conditions in the Equity Commitment Agreement are satisfied or capable of being satisfied by June 30, 2010, the earlier of (x) October 31, 2010, and (y) the maturity date (whether the scheduled maturity date or the maturity date pursuant to an acceleration) of any lending facilities under any DIP Credit Agreement, as such date may be extended.

Pursuant to the Equity Commitment Agreement, the Requisite Investors (as defined in the Equity Commitment Agreement) may terminate the Equity Commitment Agreement, upon the occurrence of any of the following events (among others):

- if any Plan Support Agreement is terminated;

- Aleris files, supports or endorses a plan or reorganization other than the Plan;

- Aleris withdraws the Plan or publicly announces its intention not to support the Plan; or

- the Board of Directors of Aleris has determined that continued pursuit of the Plan is inconsistent with its fiduciary duties.

(5)     The Plan Support Agreements.

The form of Plan Support Agreement is attached as Exhibit "B" to the Equity Commitment Agreement. As discussed above, the Equity Commitment Agreement is terminable by Aleris or a Minimum Backstop Party (if such Minimum Backstop Party signed the Plan Support Agreement) if the Plan Support Agreements have not been entered into by Aleris and the Minimum Backstop Parties within four (4) Business Days after the date of the Disclosure Statement Order; *provided* that such right to terminate shall be waived if it is not exercised within six (6) Business Days after the date of the Disclosure Statement Order.

The Debtors have advised the Backstop Parties that they do not intend to solicit acceptances on the Plan until and unless they have received such executed Plan Support Agreements.

**b.     *The IntermediateCo Preferred Stock.***

Pursuant to the Equity Commitment Agreement, the Backstop Parties have also agreed to purchase the IntermediateCo Preferred Stock for $5 million.

## 2. Calculation of Plan Value.

Before the Effective Date, but within the later of (i) five (5) Business Days after the Confirmation Date and (ii) ten (10) Business Days after the first day of the month in which the Confirmation Date shall occur, the Debtors, in consultation with, and subject to approval of, a Majority in Interest, will calculate the Plan Value, the U.S. Plan Deductions, the ADH Plan Deductions, the Rights Offering Value, the Closing Liquidity Adjustment, the ADH Liquidity Adjustment, the U.S. Liquidity Adjustment, and the Determination Date Net Working Capital (and all definitions related to any of the foregoing).

If the Effective Date is more than forty-five (45) days after the initial Determination Date, the Debtors, in consultation with, and subject to approval of, a Majority in Interest, will recalculate, based upon the new Determination Date, the Plan Value, the U.S. Plan Deductions, the ADH Plan Deductions, the Rights Offering Value, the Closing Liquidity Adjustment, the ADH Liquidity Adjustment, the U.S. Liquidity Adjustment, and the Determination Date Net Working Capital (and all definitions related to any of the foregoing) on the fifth (5th) Business Day before the Effective Date.

Any value (i) determined as of the Determination Date and (ii) denominated in a currency that is not U.S. dollars will be converted to U.S. dollars based upon the applicable exchange rate as of the Determination Date. Any other value (i) used in the calculation of the ADH Plan Deductions or U.S. Plan Deductions, (ii) determined as of a date other than the Determination Date, and (iii) denominated in a currency that is not U.S. dollars will be converted to U.S. dollars based upon the applicable exchange rate as of one (1) Business Day before the date on which such calculation occurs.

The Bankruptcy Court will resolve any dispute between the Debtors and the Majority in Interest regarding any such calculations.

## 3. Issuance of Subscription Rights in the Rights Offering.

Any holder of a U.S. Roll-Up Term Loan Claim, European Roll-Up Term Loan Claim, or European Term Loan Claim that is either an "accredited investor" (as such term is defined under Regulation D of the Securities Act) or not a "U.S. person" (as such term is defined under Regulation S of the Securities Act) (each a "***Rights Offering Eligible Creditor***") may receive and exercise rights to subscribe for units in the Rights Offering if such holder did not elect to take the Cash payment of the U.S. Plan Value, ADH Roll-Up Value or ADH Term Loan Value, as applicable. The Plan refers to these rights as the U.S. Subscription Rights (for holders of U.S. Roll-Up Term Loan Claims), ADH Roll-Up Subscription Rights (for holders of European Roll-Up Term Loan Claims), and ADH Term Loan Subscription Rights (for holders of European Term Loan Claims), and all these rights are collectively referred to here as "***Subscription Rights***." Any entity that is a Rights Offering Eligible Creditor, does not elect to receive the Cash payment, and does elect to participate in the Rights Offering, in accordance with the terms and conditions set forth in the Subscription Form and generally described herein, is referred to as a "***Rights Offering Participant***." Each portion of New Common Stock and IntermediateCo Notes to be issued and sold to Rights Offering Participants is called a "***Rights Offering Unit***." If you are a holder of a U.S. Roll-Up Term Loan Claim, European Roll-Up Term Loan Claim, or

European Term Loan Claim, a Subscription Form accompanies this Disclosure Statement. Full details are set forth in the Subscription Form, but a summary of the procedures in connection with the Rights Offering is set forth below.

The estimate of the amount of New Common Stock that may be issued pursuant to the Rights Offering assumes that the Rights Offering Value will be the Maximum Rights Offering Amount (*i.e.*, $690 million) and that the Plan Value will be the minimum permissible Plan Value (*i.e.*, $221.7 million). To the extent these amounts change, the relative percentage of New Common Stock sold pursuant to the Rights Offering, compared against the amount of New Common Stock distributable under the Plan to holders of U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, and European Term Loan Claims that do not elect to receive Cash payments, could change.

The Debtors shall send to each holder of an Allowed U.S. Roll-Up Term Loan Claim, an Allowed European Roll-Up Term Loan Claim or an Allowed European Term Loan Claim a Ballot, on which each holder of such Claims may elect to receive, at its option:

    **a.**    (i) its Pro Rata Share of U.S. Roll-Up Stock, ADH Roll-Up Stock, or ADH Term Loan Stock, as applicable, and (ii) its Pro Rata Share of U.S. Subscription Rights, ADH Roll-Up Subscription Rights or ADH Term Loan Subscription Rights, as applicable, or

    **b.**    Cash in the amount of its Pro Rata Share of the U.S. Plan Value, the amount set forth in section 3.3.2(c)(ii) of the Plan, or ADH Term Loan Value, as applicable.

If the holder of an Allowed U.S. Roll-Up Term Loan Claim elects option (a) (i.e., its Pro Rata Share of U.S. Roll-Up Stock and its Pro Rata Share of U.S. Subscription Rights), such holder may elect to exercise up to its Pro Rata Share of the U.S. Subscription Rights.

If the holder of an Allowed European Roll-Up Term Loan Claim elects option (a) (i.e., its Pro Rata Share of ADH Roll-Up Stock and its Pro Rata Share of ADH Roll-Up Subscription Rights), such holder may elect to exercise up to its Pro Rata Share of the ADH Roll-Up Subscription Rights.

If the holder of an Allowed European Term Loan Claim elects option (a) (i.e., its Pro Rata Share of ADH Term Loan Stock and its Pro Rata Share of ADH Term Loan Subscription Rights), such holder may elect to exercise up to its Pro Rata Share of the ADH Term Loan Subscription Rights.

If a holder of Allowed U.S. Roll-Up Term Loan Claims, Allowed European Roll-Up Term Loan Claims and Allowed European Term Loan Claims elects option (a), such holder (now a Rights Offering Participant) may also exercise its Subscription Rights via the Subscription Form enclosed with its Ballot.

The number of units of shares of New Common Stock and principal amount of IntermediateCo Notes with respect to which Aleris will accept subscriptions is subject to a reduction (the "***Minimum Ownership Cutback***") in order to effectuate the 9019 Settlement and

provide Oaktree and Apollo, collectively, with a minimum ownership of the New Common Stock outstanding on the Effective Date equal to the Minimum Oaktree/Apollo Equity Threshold. Any shares of New Common Stock and IntermediateCo Notes excluded from the Subscription Rights due to a Minimum Ownership Cutback shall instead be considered part of the Rights Offering Residual Units. The Minimum Ownership Cutback will be made pro rata among the Rights Offering Participants other than the Backstop Parties. Notwithstanding the foregoing, the Debtors will not reduce the number of units distributable to Rights Offering Participants (except for the Backstop Parties) by more than the Maximum Third-Party Reduction.

As set forth in Section 7.1.8 of the Plan, any New Common Stock and IntermediateCo Notes distributed in accordance with this Rights Offering shall be distributed upon the Effective Date or as soon thereafter as is reasonably practicable; provided, that such issuances to the Backstop Parties shall be made on the Effective Date.

### c. *Rights Offering Procedures.*

(1) Subscription Period

The Rights Offering shall commence when the Ballots and Subscription Forms are first transmitted/mailed to holders of Allowed U.S. Roll-Up Claims, Allowed European Roll-Up Term Loan Claims, and Allowed European Term Loan Claims, which shall be no later than the Solicitation Date.

Each Rights Offering Eligible Creditor (other than a Backstop Party) intending to participate in the Rights Offering must affirmatively elect to exercise its Subscription Rights on or prior to the Subscription Expiration Date in accordance with the Plan and the Subscription Form.

(2) Exercise of Subscription Rights

**Only Rights Offering Eligible Creditors are allowed to exercise Subscription Rights for Rights Offering Units.** Even if you received a Subscription Form, you may only participate in the Rights Offering if (i) you do not elect to receive a Cash payment *and* (ii) you are a Rights Offering Eligible Creditor.

In order to exercise the Subscription Rights, each Rights Offering Eligible Creditor (other than a Backstop Party) must return a duly completed Subscription Form to the Rights Offering Agent so that such form and payment, in Cash, of the aggregate Subscription Purchase Price are *actually received* by the Rights Offering Agent on or before April 23, 2010 (the "*Subscription Expiration Date*"). If the Rights Offering Agent for any reason does not receive from a given Rights Offering Eligible Creditor (other than a Backstop Party) a duly completed Subscription Form and payment, in Cash, of the aggregate Subscription Purchase Price on or prior to the Subscription Expiration Date, then such Rights Offering Eligible Creditor shall be deemed to have forever and irrevocably relinquished and waived its right to participate in the Rights Offering. If a Rights Offering Eligible Creditor returns a Ballot and elects treatment under clause 3.2.3(c)(i) of the Plan or clause 3.3.3(c)(i) of the Plan, as applicable, but

fails to timely exercise its Subscription Rights, it will be deemed to have elected to receive New Common Stock and Subscription Rights, but have elected not to exercise its Subscription Rights.

*__The Subscription Expiration Date is before the Voting Deadline; therefore, Rights Offering Eligible Creditors that wish to participate in the Rights Offering CANNOT wait until the Voting Deadline to return their completed Subscription Forms.__*

(3)     Payment for Units Issuable Upon Exercise of Subscription Rights.

Each Rights Offering Participant, except for the Backstop Parties, will be required to pay, so that it is *__actually received__* by the Rights Offering Agent on or prior to the Subscription Expiration Date, the Subscription Purchase Price for each unit for which such Rights Offering Participant subscribes, consisting of a share of New Common Stock and the principal amount of IntermediateCo Notes applicable to such share (such Subscription Purchase Price, the "*__Preliminary Subscription Purchase Price__*" and such units, the "*__Preliminary Subscription Units__*"). For purposes of determining such Rights Offering Participant's aggregate Preliminary Subscription Purchase Price and Preliminary Subscription Units, the Rights Offering Value will be deemed the Maximum Rights Offering Amount.

If the Rights Offering Agent, for any reason, does not receive from a Rights Offering Participant (other than a Backstop Party) full payment of its aggregate Preliminary Subscription Purchase Price on or prior to the Subscription Expiration Date, then such Rights Offering Participant will be deemed to have forever and irrevocably relinquished and waived its right to participate in the Rights Offering. Any such unexercised Subscription Rights will be treated as Rights Offering Residual Units and will be acquired by the Backstop Parties.

As set forth in Section 7.1.1 of the Plan, the Debtors, in consultation with, and subject to the approval of, a Majority in Interest, will determine the Rights Offering Value, the Subscription Purchase Price and, after giving effect to the Minimum Ownership Cutback, the number of Rights Offering Units each Rights Offering Participant is entitled to receive (such Subscription Purchase Price, the "*__Final Subscription Purchase Price__*" and such units, the "*__Final Subscription Units__*"). If the Final Subscription Purchase Price and/or the number of Final Subscription Units are less than the Preliminary Subscription Purchase Price and/or the number of Preliminary Subscription Units respectively, then, promptly following the Effective Date, the Rights Offering Agent shall refund to each Rights Offering Participant (except for the Backstop Parties) the appropriate excess payment (if any) without interest. For U.S. federal income tax purposes, the aggregate Final Subscription Purchase Price paid by each Rights Offering Participant will be allocated to the IntermediateCo Notes received by such Rights Offering Participant in an amount equal to their stated principal amount with the remaining Final Subscription Purchase Price allocated to the New Common Stock received by such participant.

The Rights Offering Agent will hold any payments received for the exercise of Subscription Rights prior to the Effective Date in escrow until the Effective Date. In the event that the conditions to the Effective Date are not met or waived, such payments shall be returned to the applicable Rights Offering Participant without interest. Each Rights Offering Participant may exercise all or any portion of such participant's Subscription Rights pursuant to the

Subscription Form. Except as set forth in Section 7.1.5 of the Plan, the valid exercise of Subscription Rights cannot be revoked.

If any Entity (other than a Backstop Party) exercises such Subscription Rights after the Subscription Expiration Date, such exercise will be null and void, and the Debtors are not obligated to honor any such purported exercise regardless of when the documents relating to such exercise were sent.

(4) Rights Offering Residual Units.

After the Subscription Expiration Date, unexercised Subscription Rights shall be treated as Rights Offering Residual Units and shall be purchased by the Backstop Parties pursuant to the Equity Commitment Agreement.

(5) Subscription Notification.

On the Effective Date, the Rights Offering Agent will notify each Rights Offering Participant of its respective allocation of Rights Offering Units, and in the case of the Backstop Parties, the Rights Offering Agent will notify each Backstop Party on or before the third (3rd) Business Day prior to the Effective Date of its portion of Rights Offering Residual Units that such Backstop Party is obligated to purchase pursuant to the Equity Commitment Agreement.

In the event there is a Minimum Ownership Cutback or the Rights Offering Value is less than the Maximum Rights Offering Amount, then any excess portion of the payment made by the Rights Offering Participant will be returned without interest promptly following the Effective Date.

(6) Disputes in the Exercise of Subscription Rights.

All questions concerning the timeliness, viability, form, and eligibility of any exercise of Subscription Rights shall be determined by the Debtors, with the consent of a Majority in Interest, whose good-faith determinations will be final and binding. The Debtors, in their reasonable discretion, may (i) waive any defect or irregularity, (ii) permit a defect or irregularity to be corrected within such times as the Debtors may determine, or (iii) reject the purported exercise of any Subscription Rights.

Aleris or the Rights Offering Agent may give notice to any Rights Offering Eligible Creditor regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such Rights Offering Eligible Creditor and may permit such defect or irregularity to be cured within such time as it may determine in good faith to be appropriate; provided, however, that Aleris and the Rights Offering Agent will not have any obligation to provide such notice, nor will they incur any liability for failure to give notification.

(7) Transfer Restrictions.

Subscription Rights will be provided to each Rights Offering Eligible Creditor as of the Voting Record Date. The Subscription Rights are not transferable. **RIGHTS OFFERING ELIGIBLE CREDITORS MAY NOT SELL, TRANSFER, ASSIGN, PLEDGE OR OTHERWISE DISPOSE OF**

**THE SUBSCRIPTION RIGHTS. ANY SUCH TRANSFER OR ATTEMPTED TRANSFER IS NULL AND VOID AND ALERIS AND THE RIGHTS OFFERING AGENT WILL NOT TREAT ANY PURPORTED TRANSFEREE AS THE HOLDER OF ANY SUBSCRIPTION RIGHTS.**

(8)     Revocation.

**ONCE A RIGHTS OFFERING ELIGIBLE CREDITOR EXERCISES ITS SUBSCRIPTION RIGHTS, SUCH EXERCISE CANNOT BE REVOKED, EXCEPT IF SUCH RIGHTS OFFERING ELIGIBLE CREDITOR ELECTS THE CASH PAYMENT OPTION ON ITS BALLOT. IF A RIGHTS OFFERING ELIGIBLE CREDITOR ELECTS THE CASH PAYMENT OPTION ON ITS BALLOT, THE RIGHTS OFFERING ELIGIBLE CREDITOR SHALL BE DEEMED TO HAVE RELINQUISHED, FOREVER AND IRREVOCABLY, ITS RIGHTS TO PARTICIPATE IN THE RIGHTS OFFERING AND THE RIGHTS OFFERING AGENT SHALL RETURN ANY AMOUNTS THAT SUCH RIGHTS OFFERING ELIGIBLE CREDITOR PAID FOR THE EXERCISE OF ITS SUBSCRIPTION RIGHTS WITHOUT INTEREST.**

Completion and return of the Subscription Form represents a binding and irrevocable commitment by the Creditor to participate in the Rights Offering and a representation that, among other things, such Creditor is a Rights Offering Eligible Creditor. If the Rights Offering Agent for any reason does not receive from a given Rights Offering Eligible Creditor a duly completed Subscription Form on or prior to the Subscription Expiration Date, then such Rights Offering Eligible Creditor shall be deemed to have forever and irrevocably relinquished and waived its right to participate in the Rights Offering.

(9)     Backstop of the Rights Offering.

Subject to the terms of the Equity Commitment Agreement, the Backstop Parties will purchase all, if any, Rights Offering Residual Units. Accordingly, the Backstop Parties shall pay to the Rights Offering Agent, by wire transfer in immediately available funds on or before the Effective Date, Cash in an amount equal to the Subscription Purchase Price multiplied by the number of units of Rights Offering Residual Units. The Rights Offering Agent shall deposit such funds into the escrow for the proceeds of the Rights Offering.

(10)     Key Dates for the Rights Offering

The relevant dates related to the Rights Offering are as follows:

| Event | Date |
|---|---|
| **Commencement of Rights Offering** | **March 26, 2010** |
| **Subscription Expiration Date** | **April 23, 2010** |
| **Voting Deadline** | **April 29, 2010** |

### d. *Distribution of the New Common Stock and IntermediateCo Notes.*

On, or as soon as practicable after the Effective Date, the Disbursing Agent will distribute the New Common Stock and IntermediateCo Notes purchased by the Rights Offering Participants and the Backstop Parties, pursuant to the Rights Offering, to such purchasers, subject to the terms of the Equity Commitment Agreement with respect to the Backstop Parties. To the extent a holder of a U.S. Roll-Up Term Loan Claim, European Roll-Up Term Loan Claim or European Term Loan Claim requires any regulatory approval to purchase such New Common Stock, the Debtors will not distribute any shares of New Common Stock to such holder unless and until all such regulatory approvals are received. The Debtors will not be required to refund any Subscription Purchase Price in the event that any Rights Offering Participant fails to receive any applicable regulatory approval (including any approval under the HSR Act).

### e. *No Interest.*

No interest shall be paid to Rights Offering Participants exercising Subscription Rights on account of amounts paid in connection with the exercise of the Subscription Rights.

### f. *Minimum Ownership Cutback.*

As part of the 9019 Settlement, Oaktree and Apollo must collectively hold a minimum percentage of the outstanding shares of New Common Stock, as of the Effective Date (the "***Minimum Oaktree/Apollo Equity Threshold***"), equal to 72.1% of the New Common Stock issued on the Effective Date. The Minimum Oaktree/Apollo Equity Threshold will be adjusted up or down to reflect any increase or decrease in the collective holdings by Oaktree and Apollo of European Roll-Up Term Loan Claims, U.S. Roll-Up Term Loan Claims and European Term Loan Claims.

To effect the Minimum Oaktree/Apollo Equity Threshold, the number of units consisting of shares of New Common Stock and principal amount of IntermediateCo Notes with respect to which Aleris will accept subscriptions is subject to reduction (the "***Minimum Ownership Cutback***") in order to effectuate the 9019 Settlement and provide Oaktree and Apollo, collectively, with a minimum ownership of the New Common Stock outstanding on the Effective Date equal to the Minimum Oaktree/Apollo Equity Threshold. The Minimum Ownership Cutback is limited by the "***Maximum Third-Party Reduction***," which provides that no party will have its Preliminary Subscription Units reduced pursuant to the Minimum Ownership Cutback by more than 90%. The calculation of the Minimum Oaktree/Apollo Equity Threshold is set forth in Section 1.1.122 of the Plan.

Any shares of New Common Stock and IntermediateCo Notes excluded from the Subscription Rights due to the Minimum Ownership Cutback will instead be considered part of the Rights Offering Residual Units. The exact amount of the Minimum Ownership Cutback will be determined by Aleris, and each Rights Offering Participant will be notified of its respective allocation of units pursuant to the Rights Offering on the Effective Date. The Minimum Ownership Cutback will be made pro rata among the Rights Offering Participants other than the Backstop Parties.

Based upon the Debtors' understanding of the current holdings of Apollo and Oaktree of U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, and European Term Loan Claims, the Debtors estimate that Oaktree and Apollo collectively would be entitled to receive an aggregate of approximately 55.1% of the New Common Stock pursuant to the Plan and the Rights Offering, and, therefore, would be entitled to purchase an additional 17% of the New Common Stock distributed under the Plan on the Effective Date pursuant to their Minimum Ownership Cutback rights. Such amount may increase or decrease pursuant to the Minimum Oaktree/Apollo Equity Threshold Adjustment if Oaktree or Apollo acquires or sells U.S. Roll-Up Term Loan Claims or European Roll-Up Term Loan Claims. Although Oaktree and Apollo are receiving the benefit of the Minimum Oaktree/Apollo Equity Threshold, Oaktree and Apollo as Backstop Parties, are underwriting an investment of approximately $690 million in the Debtors, and will still be required to pay the Final Subscription Purchase Price for any New Common Stock acquired as a result of the Minimum Oaktree/Apollo Equity Threshold, in each case subject to the terms of the Equity Commitment Agreement. In addition, under the 9019 Settlement, Oaktree and Apollo have agreed to restrictions on their ability to roll up their European Term Loan Claims, which has enabled the Debtors to propose a Plan that provides recoveries for other holders of European Term Loan Claims.

g.    *HSR Act Compliance.*

No Backstop Party will have any obligation to fund under the Equity Commitment Agreement, and no shares of New Common Stock to be distributed under the Plan to it or any other entity required to file a Premerger Notification and Report Form under the HSR Act, until the notification and waiting periods applicable under such Act to such entity shall have expired or been terminated. The Debtors are not required to refund any Subscription Purchase Price in the event that any Rights Offering Participant fails to receive any applicable regulatory approval (including any approval under the HSR Act).

h.    *Compliance with EU Competition Law.*

No Backstop Party will have any obligation to fund under the Equity Commitment Agreement, and no shares of New Common Stock will be distributed under the Plan to Oaktree, until the European Commission shall have (i) declared the acquisition of control by Oaktree over the assets of Aleris and the Dissolving U.S. Subsidiaries pursuant to the Plan, the Rights Offering, and the Transactions Agreements is compatible with the common market pursuant to Article 6(1)(b) of Council Regulation No. 139/2004 of January 20, 2004, on the control of concentrations between undertakings, either unconditionally or conditionally in terms (reasonably) satisfactory to the parties; or (ii) not issued a decision within the required deadlines with the consequence that the transactions contemplated by this Disclosure Statement are deemed compatible with the common market pursuant to Article 10(6) of the EC Merger Regulation.

i.    *Proceeds.*

On the Effective Date, the Debtors will use the proceeds generated from the exercise of the Subscription Rights and the Equity Commitment Agreement to pay (i) Cash payments required by the Plan, (ii) the Structuring and Arrangement Fee, and (iii)  the reasonable

outstanding fees and expenses of the Backstop Parties. Any remaining excess proceeds will be transferred to the OpCos as directed in the Acquisition Agreement. Such remaining excess proceeds may be used by the OpCos and their subsidiaries for general corporate purposes and to make other payments required by the Plan to the extent the obligations to make such payments are assumed by the OpCos or are otherwise the obligations of the Reorganized Debtors.

**j.** *No Recommendation Regarding Exercise of Subscription Rights.*

**THIS DISCLOSURE STATEMENT, AND THE MATERIALS ATTACHED HERETO OR SUBMITTED HEREWITH, DO NOT CONSTITUTE A RECOMMENDATION REGARDING WHETHER OR NOT A RIGHTS OFFERING ELIGIBLE CREDITOR SHOULD EXERCISE THE SUBSCRIPTION RIGHTS. THE DECISION TO EXERCISE OR NOT EXERCISE THE SUBSCRIPTION RIGHTS IS WITHIN THE SOLE DISCRETION OF EACH RIGHTS OFFERING ELIGIBLE CREDITOR AND SHOULD BE MADE ON THE BASIS OF SUCH RIGHTS OFFERING ELIGIBLE CREDITOR'S INDEPENDENT ASSESSMENT OF THE FACTS AND CIRCUMSTANCES. IN THAT REGARD, EACH RIGHTS OFFERING ELIGIBLE CREDITOR IS ENCOURAGED TO REVIEW CAREFULLY ALL OF THE MATERIALS INCLUDED HEREWITH AND ANY OTHER MATERIALS DEEMED RELEVANT BY SUCH RIGHTS OFFERING ELIGIBLE CREDITOR AND TO CONSULT WITH SUCH RIGHTS OFFERING ELIGIBLE CREDITOR'S OWN FINANCIAL AND LEGAL ADVISERS. EACH RIGHTS OFFERING ELIGIBLE CREDITOR IS ADVISED, HOWEVER, THAT IT WILL RECEIVE NO VALUE FOR THE SUBSCRIPTION RIGHTS IF THE SUBSCRIPTION RIGHTS ARE NOT EXERCISED PRIOR TO THE SUBSCRIPTION EXPIRATION DATE.**

**4.** **The 9019 Settlement.**

In connection with the New Money Term DIP Facility, Apollo and Oaktree, as the backstop lenders under the New Money Term DIP Facility, were the only prepetition lenders with an extended period of time to roll up their European Term Loans into claims against ADH. No other lenders have elected to roll up their European Term Loans into European Roll-Up Term Loan Claims. They also received the right to delay making such roll-up decision until January 1, 2010. The New Money Term DIP Facility contemplated that Deutsche Bank, as agent under the New Money Term DIP Facility, would enter into an intercreditor agreement to set forth the relative priorities of the European Roll-Up Term Loan Claims and the prepetition European Term Loan Claims. The Debtors, Apollo, and Oaktree believe that the intention of all parties was that, upon any roll-up by Apollo and Oaktree of the European Term Loans, such European Roll-Up Term Loan Claims would have priority in payment over the prepetition European Term Loan Claims. An intercreditor agreement reflecting the relative priorities of these claims, however, was never executed. Moreover, Apollo and Oaktree assert that, if they rolled up their U.S. prepetition term loans into U.S. Roll-Up Term Loan Claims, they would be entitled to assert a claim for accrued interest retroactively to the date on which all other creditors exercised their rollup rights (i.e., March 19, 2009).

To afford time to resolve these disputes in connection with the Plan, on December 29, 2009, January 29, 2010, and February 5, 2010 parties to DIP Term Credit Facility agreed to extend the period during which Oaktree and Apollo may elect to exercise their additional roll-up rights initially until January 29, 2010 (on December 29, 2009), February 15, 2010 (on January 29, 2010) and subsequently until August 13, 2010 (on February 5, 2010). If the Effective Date

has not occurred by such date, the U.S. Debtors, Apollo, and Oaktree may seek to extend such date further.

  To consensually resolve all outstanding disputes with respect to the European Term Loan Facility, the DIP Order, the DIP Term Credit Agreement, and the parties' respective rights under the same, the Plan embodies the 9019 Settlement on the following terms pursuant to Bankruptcy Rule 9019, effective as of the Effective Date:

> (1) In accordance with the DIP Order and sections 2.01(b)(ii) and 2.01(b)(iv) of the DIP Term Credit Agreement, upon the Effective Date, of their original allocation of roll-up rights ($267 million), Oaktree and Apollo will be deemed to have elected to roll up the following:
>
>> (A) $242.0 million principal amount of their U.S. Term Loan Claims into U.S. Roll-Up Term Loan Claims, and
>>
>> (B) $25.0 million principal amount of their European Term Loan Claims into European Roll-Up Term Loan Claims; *provided*, with respect to U.S. Term Loan Claims and European Term Loan Claims rolled-up into U.S. Roll-Up Term Loan Claims and European Roll-Up Term Loan Claims, respectively, on or after August 1, 2009, interest shall accrue on such U.S. Roll-Up Term Loan Claims and European Roll-Up Term Loan Claims as if Oaktree and Apollo had rolled-up such claims on August 1, 2009.
>
> (2) Upon the Effective Date, Oaktree and Apollo will each waive its rights to roll up any remaining European Term Loan Claims into the European Roll-Up Term Loan Claims.
>
> (3) Pursuant to the Plan, the Rights Offering and the Equity Commitment Agreement, Oaktree and Apollo will receive the right to subscribe for New Common Stock such that, if the rights are fully exercised, Oaktree and Apollo collectively will own at least the Minimum Oaktree/Apollo Equity Threshold of the New Common Stock issued and outstanding as of the Effective Date. This is the result of the Minimum Ownership Cutback discussed in Section V.K.3.f entitled, "THE PLAN OF REORGANIZATION – Implementation of the Plan – The Minimum Ownership Cutback."

For avoidance of doubt, for amounts rolled up prior to August 1, 2009, interest will continue to accrue as of the date of such roll-up election.

  Before giving effect to this 9019 Settlement, as of September 30, 2009, Oaktree had rolled up approximately $14 million in principal amount of its U.S. Term Loan Claims into U.S. Roll-Up Term Loan Claims, and Apollo had rolled up approximately $27.5 million in principal amount of its U.S. Term Loan Claims into U.S. Roll-Up Term Loan Claims.  In

accordance with the DIP Term Credit Agreement, any loans originally denominated in euros were converted to dollars at an exchange rate of $1.2805 dollars per euro. These amounts include loans acquired by Oaktree after the U.S. Debtors' Commencement Date.

Pursuant to Section 7.3 of the Plan, the Plan constitutes a motion to approve the 9019 Settlement. Subject to the occurrence of the Effective Date, entry of the Confirmation Order will constitute approval of such settlement pursuant to Bankruptcy Rule 9019 and a finding by the Bankruptcy Court that the 9019 Settlement is in the best interest of the Debtors and their respective estates. In the event that the Effective Date does not occur, the 9019 Settlement will be deemed to have been withdrawn without prejudice to the respective positions of the parties, including, but not limited to the ability of Oaktree and Apollo to elect to roll up into the U.S. Roll-Up Term Loans and the European Roll-Up Term Loans, and neither the fact of the proposed settlement nor the terms thereof shall be admissible in connection with the underlying dispute among the parties.

To reflect the expected roll up by Oaktree and Apollo under the 9019 Settlement, the Voting Procedures afford Oaktree and Apollo voting rights under the Plan that are consistent with the rights they would have if they already had rolled up their positions.

The Debtors believe that the 9019 Settlement appropriately balances the rights of the parties. Absent the 9019 Settlement, Oaktree and Apollo could have sought to roll up approximately $130.1 million and €19 million in European Term Loan Claims based on the terms set forth in the DIP Term Credit Agreement and would have asserted that such European Roll-Up Term Loan Claims have priority over the remaining European Term Loan Claims. If Oaktree and Apollo were successful in this argument, little, if any, value would remain for holders of the European Term Loan Claims. Instead, Oaktree and Apollo are only rolling up $25 million into the European Roll-up Term Loan Claims, thereby allowing value to flow to the holders of the European Term Loan Claims. Because rolling up into the U.S. Roll-Up Term Loan Claims does not adequately compensate Oaktree and Apollo for limiting their European Roll-Up Term Loan Claims, the parties agreed to the Minimum Oaktree/Apollo Equity Threshold.

Moreover, as discussed above in Section V.K.3.f entitled, "THE PLAN OF REORGANIZATION – Implementation of the Plan – The Minimum Ownership Cutback," although Oaktree and Apollo are receiving the benefit of the Minimum Oaktree/Apollo Equity Threshold, Oaktree and Apollo as Backstop Parties, are underwriting an investment of approximately $690 million in the Debtors' emergence and continued operation on terms that the Debtors believe are fair and reasonable, both to the Debtors, and to other creditors.

Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of such settlement pursuant to Bankruptcy Rule 9019 and a finding by the Bankruptcy Court that the 9019 Settlement is in the best interest of the Debtors and their respective estates.

5. **Additional Description of the 9019 Settlement.**

As described above in Section IV.C.1 entitled "THE CHAPTER 11 CASES – Significant Events During the Chapter 11 Cases – The DIP Credit Facilities – Collateral Securing the DIP Facilities," an intercreditor agreement governing the relative rights and priorities of the European Roll-Up Term Loan Claims and the European Term Loan Claims has not been signed. In the absence of such an intercreditor agreement, the relative rights and priorities of the claimholders in these classes are open to dispute. The Debtors have concluded, in the exercise of their sound business judgment, that a litigation over the merits of the relative priority of the European Term Loan Claims and the European Roll-Up Term Loan Claims would be complex, time-consuming, and costly. More importantly, however, the Debtors do not believe it is likely to yield an economic result for the European Term Loan lenders that is better than the treatment they are receiving under the Plan.

In addition, the Debtors, in the exercise of their sound business judgment, sought to limit the amount of claims that Oaktree and Apollo may roll up into European Roll-Up Term Loan Claims because these claims have an undisputed right to certain non-ADH collateral discussed below, and without limiting the amount of these claims, this value would be unavailable for distribution to creditors holding European Term Loan Claims.

The 9019 Settlement is one aspect of the Plan that was the subject of extensive negotiations among the Debtors, Apollo, and Oaktree to resolve these issues. As a result of the 9019 Settlement, one of the features of the Plan is the minimum ADH Plan Value. Although the Plan allocates the enterprise value between the Debtors' U.S. operations on the one hand and the Debtors' European operations on the other on the basis of a split of $712.5 million to the U.S. and $300 million to Europe, payments required to be made in connection with emergence are then subtracted from such value. In the Plan, these are defined as the U.S. Plan Deductions and the ADH Plan Deductions. Based upon the Debtors' estimates, after taking into account the ADH Plan Deductions, the value that remains attributable to all of the European operations is approximately $39.4 million. The Plan allocates all remaining value to ADH's Creditors (holders of European Roll-Up Term Loan Claims and European Term Loan Claims) notwithstanding that the operations of ADH and its subsidiaries are only a subset of the Company's European operations. Nevertheless, the Plan sets a floor for the European recovery of $75 million to the European Term Loan and $101.7 million for European Term Loan Holders and European Roll-Up Term Loan Holders combined. The difference reflects a value shift from the U.S. Debtors (and the U.S. Roll-Up Term Loan Claims) for the ultimate benefit of the holders of European Term Loan Claims that is funded by a deduction of the difference between the minimum ADH Plan Value and the actual ADH Plan Value from U.S. Plan Value.

In negotiating the minimum recovery for holders of European Term Loan Claims, the Debtors sought to balance providing a minimum recovery to holders of European Term Loan Claims while preserving value for holders of U.S. Roll-Up Term Loan Claims. *If the Plan, together with the 9019 Settlement that is part of the Plan, is not confirmed, there is no assurance that any alternative plan would provide such a recovery floor for the benefit of the holders of European Term Loan Claims.* In addition, because the non-debtor guarantee claims that ultimately secured the European Term Loan Claims have been released, and because the collateral that historically secured the European Term Loan Claims is owned by those

guarantors, the Debtors believe that there is no meaningful collateral securing the European Term Loan Claims available. Accordingly, there is little or no value available to holders of European Term Loan Claims absent the 9019 Settlement and the European Minimum Term Loan Recovery provided in the Plan.

In the event that the European Roll-Up Term Loan Claims were determined not to be senior with respect to the European Term Loan Claims with respect to the collateral securing the European Term Loan Claims, Apollo and Oaktree could still elect to roll up a portion of their European Term Loan Claims and obtain the benefit of other, non-ADH European collateral (in particular, German and Belgian mortgages and pledges over inventory and moveable assets), that does not secure the European Term Loan Claims, but would secure the European Roll-Up Term Loan Claims (in respect of the German mortgages), the German Tranche of U.S. DIP Loan Claims, and the Belgian tranche of the New Money DIP Term Facility. The value of the collateral supporting the European Roll-Up Term Loan Claims could be as high as $75 million. By limiting Oaktree and Apollo's right to roll up into European Roll-Up Term Loan Claims, the 9019 Settlement preserves value from these facilities that can be distributed to holders of European Term Loan Claims.

Thus, even if the other holders of European Term Loan Claims prevailed in determining that the European Roll-Up Term Loan Claims did not have priority over the European Term Loan Claims with respect to the collateral securing the European Term Loan Facility, Apollo and Oaktree could still roll up as much as $75 million into European Roll-Up Term Loan Claims — at least $50 million more than they are rolling up under the 9019 Settlement — and would be entitled to be paid 100% of that claim before value from those non-ADH operations could inure to the benefit of the holders of European Term Loan Claims. The effect of this, coupled with the lack of a floor for the ADH Plan Value, would be that *no value* — as opposed to the $75 million in value assumed under the Plan — would be available for the benefit of holders of European Term Loan Claims. Even taking into account that the European Term Loan Claims would be reduced by the $75 million in European Roll-Up Term Loan Claims, the recovery, *if the holders of European Term Loan Claims prevailed in their intercreditor dispute*, would be approximately 0%. The Debtors also note that enforcement of these security interests would seriously reduce the enterprise value of the Debtors' European operations, to the detriment of the holders of European Term Loan Claims. Accordingly, the rights of holders of European Roll-Up Term Loan Claims would have to be addressed and resolved before confirmation of the Plan to assure all Creditors receiving New Common Stock under the Plan of the stability of their investment in the Reorganized Debtors.

The only other potential benefit that Apollo and Oaktree are receiving under the 9019 Settlement is the Minimum Oaktree/Apollo Equity Threshold. Depending upon the subscription level of the Rights Offering, this may produce some or no economic benefit for Apollo and Oaktree. The Minimum Oaktree/Apollo Equity Threshold of 72.1% simply provides a minimum amount of New Common Stock that Oaktree and Apollo are entitled to purchase *on the same terms as all other participants in the Rights Offering.* In determining the Minimum Oaktree/Apollo Equity Threshold, the Debtors reviewed, based upon the collective holdings of Oaktree and Apollo, what percentage of the equity Oaktree and Apollo would have under the Plan if (i) all Rights Offering Eligible Participants elected to participate in the Rights Offering (55.1%), (ii) all Rights Offering Eligible Participants other than CLOs elected to participate in

the Rights Offering (65.6%), and (iii) no Rights Offering Eligible Participants, other than Oaktree, Apollo, and Sankaty, elected to participate in the Rights Offering (78.6%). Under these ranges, taking into account the New Common Stock distributed under the Plan, as well as the New Common Stock distributed in connection with the Rights Offering, Oaktree and Apollo would have a "natural ownership" of New Common Stock between 55.1% and 78.6%. In other words, the effect of the Minimum Oaktree/Apollo Equity Threshold would be that Oaktree and Apollo would be entitled to purchase an additional 17% of New Common Stock when all lenders participate in the Rights Offering, 6.5% of additional New Common Stock if all Rights Offering Eligible Participants other than CLOs elected to participate in the Rights Offering, and no additional New Common Stock if no Rights Offering Eligible Participants, other than Oaktree, Apollo, and Sankaty, elected to participate in the Rights Offering. Assuming that the New Common Stock is purchased at a 10% discount from value, this results in an incremental economic benefit inuring to the benefit of Oaktree and Apollo ranging from $0 million to $14 million.

Importantly, implementation of the Minimum Oaktree/Apollo Equity Threshold does not change the percentage recoveries to holders of European Term Loan Claims and U.S. Roll-Up Term Loan Claims, as the economic benefits of being eligible to participate in the Rights Offering and purchase New Common Stock at a discount are not factored in to the estimated recoveries under the Plan.

### 6. Corporate Action.

Pursuant to Section 7.4 of the Plan, on or as soon as practicable after the Effective Date, each Reorganized Debtor shall take such actions as may be or may become necessary to effectuate the Plan and any transactions contemplated thereby, all of which shall be authorized and approved in all respects, in each case without further action being required under applicable law, regulation, order, or rule (including, without limitation, any action by the holders of Equity Interests or directors of any Reorganized Debtor). Such authorization further includes, without limitation, authorization for each Reorganized Debtor to (i) engage in any transaction contemplated by the Plan, including, without limitation, transactions related to the Rights Offering, the Transaction Agreements, the Exit ABL Facility, and the transactions contemplated by Section 7.6 of the Plan, and (ii) file its Amended and Restated Organizational Documents with the Secretary of State for the state of in which such Reorganized Debtor is organized.

Because none of HoldCo, IntermediateCo, or any of the OpCos is a debtor in the Chapter 11 Cases, any actions of those Entities in connection with the Plan or the Transaction Agreements has been, and will be, authorized in accordance with such entities' respective organizational documents.

All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall occur in the order specified in Schedule "7.6.1."

On the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute and deliver the

agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the IntermediateCo Note Indenture, the Exit ABL Facility Documents, and any and all other agreements, documents, securities and instruments relating to the foregoing.

The authorizations and approvals contemplated by Section 7.6 of the Plan will be effective notwithstanding any requirements under non-bankruptcy law.

To the full extent permissible under section 1123(a)(5) of the Bankruptcy Code, each Reorganized Debtor, as applicable, is exempt from compliance with any applicable non-bankruptcy laws and regulations related to the transactions contemplated by the Plan.

## 7. Amendment of Organizational Documents.

Pursuant to Section 7.5 of the Plan, each of the Organizational Documents shall be amended or amended and restated as of the Effective Date in substantially the form of the Amended and Restated Organizational Documents attached as Exhibit "1.1.32" to the Plan, *inter alia*, to be consistent with the requirements of the Bankruptcy Code, including, without limitation, to prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of such Organizational Documents as permitted by applicable law.

## 8. The Restructuring Transactions.

### a. *Transfer of Assets/Merger/Dissolution/Consolidation.*

Pursuant to Section 7.6 of the Plan on, and as soon as reasonably practicable after the Effective Date, the Debtors, the Reorganized Debtors, and the OpCos shall engage in the transactions set forth on Schedule "7.6.1" to the Plan (the "***Restructuring Transactions***"). In addition, on the Effective Date or as soon as reasonably practicable thereafter and without the need for any further action, the Reorganized Debtors may take any of the following actions:

(1)     cause any or all of the Debtors or Reorganized Debtors to be merged into one or more of the Debtors or Reorganized Debtors, dissolved, or otherwise consolidated;

(2)     cause the transfer of any assets between or among the Debtors or Reorganized Debtors; ***or***

(3)     engage in any other transactions in furtherance of the Plan.

As described above, Aleris is the product of the merger of Commonwealth and IMCO. Since its formation, Aleris made several acquisitions, typically of the stock of different entities. One of the principal purposes of the Restructuring Transactions is to rationalize and streamline the Debtors' corporate structure along business lines without disrupting the Debtors' operations.

### b. *Dissolution of Aleris and the Dissolving U.S. Subsidiaries.*

The Plan provides for the dissolution of Aleris and the Dissolving U.S. Subsidiaries (Wabash Alloys, and Aleris Aluminum U.S. Sales Inc.) upon or following the Effective Date, and for certain authority of the current and future officers of Aleris and the Dissolving U.S. Subsidiaries to wind down the affairs of Aleris and each Dissolving U.S. Subsidiary. From and after the Effective Date, the existing directors of Aleris and the Dissolving U.S. Subsidiaries, and the then current officers of Aleris and the Dissolving U.S. Subsidiaries, shall continue to serve in such capacity as the directors and officers of Aleris and the Dissolving U.S. Subsidiaries through the earlier of the date the respective entity is dissolved in accordance with Section 7.6.2 of the Plan and the date such director or officer resigns, is terminated or otherwise is unable to serve; *provided*, *however*, that, in the event that any director or officer of Aleris or a Dissolving U.S. Subsidiary resigns, is terminated, or is unable to serve as a director or officer, the successor to such director or officer shall be selected in accordance with the organizational documents of Aleris or the applicable Dissolving U.S. Subsidiary in effect at such time.

Upon consummation of the Acquisition Agreement and the filing by or on behalf of Aleris or a Dissolving U.S. Subsidiary of a certification to that effect with the Bankruptcy Court, Aleris or the Dissolving U.S. Subsidiary, as applicable, shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of Aleris or the applicable Dissolving U.S. Subsidiary or payments to be made in connection therewith; *provided*, *however*, that Aleris and each Dissolving U.S. Subsidiary shall file with the Office of the Secretary of State for the State of Delaware a certificate of dissolution, which may be executed by an officer of such Debtor without need for approval by the Board of Directors or the holders of Equity Interests in Aleris or the applicable Dissolving U.S. Subsidiary. From and after the Effective Date, Aleris and each Dissolving U.S. Subsidiary shall not be required to file any document, or take any other action, or obtain any approval from the Board of Directors or holders of Equity Interests, to withdraw their business operation from any states in which the Debtors previously conducted their business operations.

To the extent that anything in Section 7.6.2 of the Plan is inconsistent or conflicts with any of the bylaws, organizational documents, and related corporate documents of either Aleris or any Dissolving U.S. Subsidiary, such organizational documents are deemed amended by the Plan to permit and authorize the Debtors to take the actions contemplated by Section 7.6.2 of the Plan.

### c. *Other Transactions.*

The Debtors routinely consider potential merger, acquisition, or investment opportunities in the ordinary course of their businesses, but the Debtors are not considering any transactions that bear on the Plan and have no other material arrangements under discussion.

### d. *Disposition of Certain Assets.*

The Debtors will identify in the Plan certain assets that are no longer useful to their operations and that they intend to sell, transfer, or otherwise dispose of. If the Debtors do

not dispose of theses assets during the Chapter 11 Cases, they intend to do so after the Effective Date. Pursuant to the Acquisition Agreement and Section 7.6.3 of the Plan, these assets will be transferred to an OpCo formed exclusively to hold such assets. The list of such assets will be set forth in Schedule "7.6.3" to the Plan. Any transfer or other disposition by such OpCo of such assets shall be deemed a transfer made pursuant to the Plan, and, therefore, will be exempt from transfer taxes pursuant to section 1145 of the Bankruptcy Code.

In accordance with Section 7.12 of the Plan, the closing of the Acquisition Agreement will occur on the Effective Date. Pursuant to the Acquisition Agreement, Aleris and each Dissolving U.S. Subsidiary will transfer all of the assets specified in the Acquisition Agreement to the OpCos designated in Schedule "2" to the Acquisition Agreement free and clear of any and all Claims, Equity Interests, Encumbrances, and other interests.

9. **The Exit ABL Facility.**

Pursuant to Section 7.7 of the Plan, the Reorganized Debtors are authorized to enter into the Exit ABL Facility and incur indebtedness thereunder on the Effective Date without the need for any further corporate action and without any further action or consent by any holder of Claims or Equity Interests.

The Debtors are negotiating with certain of the existing DIP ABL Credit Facility Lenders to provide for the Exit ABL Facility. The proceeds of the Exit ABL Facility will be used by the Debtors and certain of their Subsidiaries for (i) working capital, (ii) other general corporate purposes, (iii) capital expenditures, (iv) to issue new letters of credit in the ordinary course of business and (v) for the payment of fees and expenses incurred in connection with the new Exit ABL Facility.

The Exit ABL Facility will be in an amount of at least $500 million, to be made available in U.S. dollars, Canadian dollars, Euros and other currencies to be agreed and provide for a $75 million letter of credit facility. The Exit ABL Facility will contain customary affirmative, negative and financial covenants, events of default, mandatory prepayment requirements and other customary terms.

10. **Cancellation of Securities of the U.S. Debtors.**

Pursuant to Section 7.9 of the Plan, as of the Effective Date, all notes, agreements, and securities evidencing General Unsecured Claims, except for European Term Loan Claims, and the rights of the holders thereof thereunder shall be cancelled and deemed null and void and of no further force and effect, and the holders thereof shall have no rights, and such instruments shall evidence no rights, except the right to receive the Distributions provided herein.

As of the Effective Date, all Aleris Equity Interests, Cancelled U.S. Equity Interests, 2006 Senior Notes, 2007 Senior Notes, Senior Subordinated Notes, any outstanding industrial revenue bond (each an "***IRB***"), the U.S. Term Loan Facility, and any other Debt Claim will be deemed cancelled.

Notwithstanding any other provisions in the Plan, each Indenture or other agreement that governs the rights of a holder of a Debt Claim that is administered by an

Indenture Trustee shall continue in effect solely for the purposes of permitting the applicable Indenture Trustee thereunder (i) to make distributions to such holder pursuant to the terms of the applicable Indenture; (ii) maintain any rights and Charging Liens it may have for any unpaid fees, costs, expenses, and indemnification under such Indenture or other agreement, *provided, however,* such rights and Charging Liens are limited to the Distributions, if any, to such holders; and (iii) to be paid by such holders or reimbursed for such prepetition and postpetition fees, costs, expenses, and indemnification (to the extent not paid as an Administrative Expense or otherwise) from the Distributions, if any, to such holders (until payment in full of such fees, costs, expenses or indemnification) on the terms and conditions set forth by the respective Indenture, other agreement, or applicable law.

Nothing in the Plan is intended to affect the subordination rights among the 2006 Senior Notes, 2007 Senior Notes, Senior Subordinated Notes, any outstanding IRB, the U.S. Term Loan Facility, and any other Debt Claims, including, without limitation, any applicable Indenture Trustee's rights to exercise Charging Liens with respect to any Distributions.

Pursuant to Section 8.6.3 of the Plan, the Reorganized Debtors will pay the Indenture Trustees' Fees and Expenses, up to a maximum of one million dollars ($1,000,000) in the aggregate.

To the extent the Indenture Trustees' Fees and Expenses exceed one million dollars ($1,000,000) in the aggregate, the Indenture Trustees believe that they may exercise their Charging Liens on any recoveries provided to holders of each respective series of Debt Claims, and, in turn, the recovery to holders of such Debt Claims may be reduced accordingly.

The Indenture Trustee for the 2006 Senior Notes and 2007 Senior Notes have advised the Debtors that, as of March 10, 2010, the fees and expenses of the Indenture Trustee for the 2006 Senior Notes and 2007 Senior Notes total approximately $475,000. The Indenture Trustee for the Senior Subordinated Notes have advised the Debtors that its estimated fees for these chapter 11 cases will range from $125,000 to $150,000. If the Indenture Trustees are able to deduct their fees and expenses from the recoveries to holders of 2006 Senior Notes, 2007 Senior Notes, and Senior Subordinated Notes, the recoveries to holders of such Debt Claims will be reduced.

The Debtors do not take a position to the reasonableness of Indenture Trustees' fees and expenses and reserve the right to object to the same, although the Indenture Trustees have indicated to the Debtors their position that the Debtors have no standing to raise such objections.

The Indenture Trustee for the Senior Subordinated Notes has asserted that, in furtherance of the foregoing and in accordance with the applicable provisions of the Senior Subordinated Indenture, the Indenture Trustee under the Senior Subordinated Indenture may retain and may exercise its Charging Lien against Distributions initially intended for the holders of the Senior Subordinated Notes that, due to the subordination provisions in Section 506 of the Senior Subordinated Indenture, will be paid to the remaining holders of Allowed Debt Claims pursuant to section 3.2.5(d) of the Plan. The Indenture Trustee for the Senior Subordinated Notes has further asserted that it may retain and exercise its Charging Lien against such

Distributions regardless of whether or not it takes actual possession of such Distributions. The Indenture Trustee for the 2006 Senior Notes and the 2007 Senior Notes has indicated that it does not dispute either of these assertions of the Indenture Trustee for the Senior Subordinated Notes.

The Indenture Trustees for the 2006 Senior Notes, 2007 Senior Notes and the Senior Subordinated Notes also assert that the Debtors' proposed treatment of Indenture Trustee Fees and Expenses, which limits the Debtors' obligation to pay such fees and expenses to one million dollars ($1,000,000) in the aggregate, may result in the Indenture Trustees enforcing their Charging Liens to satisfy their respective Indenture Trustee Fees and Expenses in full, thereby reducing the amount of the recovery available for distribution to the holders of the 2006 Senior Notes and the 2007 Senior Notes under the Plan. The Indenture Trustee for the Senior Subordinated Notes further asserts that its exercise of its Charging Lien to satisfy its Indenture Trustee Fees and Expenses in full will reduce the amount of recovery available for distribution to other holders of Allowed Debt Claims as well.

The Debtors do not take a position as to the rights of the Indenture Trustees, including, among other things, the right of the Indenture Trustees to exercise their respective Charging Liens.

## 11.    The European Term Loan.

Pursuant to Section 7.10 of the Plan, upon the Effective Date, in exchange for consideration provided under the Plan, all holders of Allowed European Term Loan Claims shall be deemed to have assigned their respective Allowed European Term Loan Claims to the European Term Loan Acquisition Entity.

The European Term Loan Acquisition Entity will make any Distributions on account of European Term Loan Claims under the Plan of New Common Stock, ADH Term Loan Subscription Rights, and/or Cash. Specifically, Aleris will make a series of capital contributions and/or loans through its direct and indirect subsidiaries to European Term Loan Acquisition Entity. Using the proceeds of such capital contributions and/or loans, on the Effective Date or as soon thereafter as is reasonably practicable, the European Term Loan Acquisition Entity shall distribute the New Common Stock, the ADH Term Loan Subscription Rights, and/or Cash to the Disbursing Agent for distribution to the holders of the European Term Loan Claims as of the Distribution Record Date.

As set forth in Section 10.3.3 of the Plan, European Term Loan Claims are not subject to discharge, waiver, or release; instead, on the Effective Date, the terms and conditions of the European Term Loan shall be modified as set forth in Exhibit "7.10" of the Plan, the European Term Loan Claims shall be deemed transferred to the European Term Loan Acquisition Entity, the European Term Loan Acquisition Entity shall be deemed to have assumed all responsibilities of the Prepetition Term Loan Agent Bank thereunder with respect to the European Term Loan Facility, and the Prepetition Term Loan Agent Bank shall be released from all other responsibilities under the Prepetition Term Loan Agreements with respect to the European Term Facility.

Following assignment of the Allowed European Term Loan Claims to the European Term Loan Acquisition Entity, Deutsche Bank will, at the request of the European Term Loan Acquisition Entity, release all guaranties and collateral securing the Allowed European Term Loan Claims and thereafter will resign (without replacement) as administrative agent and collateral agent for the Prepetition Term Loan Agreements. Simultaneously with such assignment, compliance with the covenants set forth under the Prepetition Term Loan Agreements will be waived for a one-year period and the interest rate applicable to the prepetition term loans will be reduced to 1% for 2010. The European Term Loan Acquisition Entity, in its sole discretion, may continue to offer this reduced interest rate for 2011 and later years.

## 12. Effectuating Documents and Further Transactions.

Pursuant to Section 7.12 of the Plan, each of the officers of the Debtors and the Reorganized Debtors is authorized, in accordance with his or her authority under the resolutions of the Board of Directors, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, including, without limitation, the Exit ABL Facility, the Transaction Agreements, the Rights Offering, any other exhibit or schedule to the Plan, and any notes or securities issued by any of the Reorganized Debtors pursuant to the Plan.

## L. Distributions.

### 1. Disbursing Agent.

Pursuant to Section 8.1 of the Plan, all Distributions under the Plan, including distributions to holders of U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims and European Term Loan Claims, will be made by the Reorganized Debtors as Disbursing Agent or such other entity designated by the Reorganized Debtors as a Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety will be borne by the Reorganized Debtors.

### 2. Distribution Record Date for Distributions under the Plan.

Pursuant to Section 8.2 of the Plan, except as and to the extent otherwise required by customary procedures of DTC with respect to Debt Claims, as of the close of business on the Distribution Record Date, the various transfer and claims registers for each of the classes of Claims as maintained by the Debtors, their respective agents, or the Indenture Trustees shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims. The Debtors and the Reorganized Debtors shall have no obligation to recognize any transfer of the Claims occurring after the close of business on the Distribution Record Date. The Debtors, the Reorganized Debtors, the Disbursing Agent, and the Indenture Trustees shall be entitled to recognize and deal under the Plan only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

### 3. Time of Distributions under the Plan.

Distributions on account of U.S. Debtors Class 4 (Convenience Claims) and U.S. Debtors Class 5 (General Unsecured Claims other than Convenience Claims and Insured Claims) will be made on the Initial Distribution Date, which is a date selected by the Reorganized Debtors within fifteen (15) days after the Effective Date, or such later date as the Bankruptcy Court may establish upon request by the Reorganized Debtors, for cause shown. In no event, however, will the Initial Distribution Date be more than forty-five (45) days after the Effective Date. Additional distributions may be made to holders of Allowed Claims in U.S. Debtors Class 4 (Convenience Claims) and U.S. Debtors Class 5 (General Unsecured Claims other than Convenience Claims and Insured Claims) on subsequent Distribution Dates, which will occur on the first Business Day of the month commencing six (6) months after the Initial Distribution Date, and every six (6) months thereafter, until the Final Distribution Date when all Disputed Claims have become either Allowed Claims or Disallowed Claims. In addition, holders of Allowed Convenience Claims may be eligible for a subsequent distribution on the Final Distribution Date (or such earlier date as the Reorganized Debtors, in their sole discretion, may select) if the aggregate amount of Allowed Administrative Expenses under section 503(b)(9) of the Bankruptcy Code is less than $6.5 million, including any such expenses that have been paid by the Debtors prior to the Effective Date. Distributions on account of all other Allowed Claims will be made on the Effective Date or as soon as practicable thereafter, but in no event more than fifteen (15) days after the Effective Date.

Pursuant to Section 8.3 of the Plan, any Distribution to be made by the Debtors or the Reorganized Debtors pursuant to the Plan shall be deemed to have been timely made if made within ten (10) days after the time therefor specified in the Plan. Distributions with respect to U.S. Debtors Class 5 (General Unsecured Claims other than Convenience Claims and Insured Claims) shall only be made on a Distribution Date; *provided*, *however*, that if a Claim in U.S. Debtors Class 5 becomes Allowed subsequent to the Initial Distribution Date, the Disbursing Agent may, in its sole discretion, make a Distribution with respect to such Claim prior to the Distribution Date. Distributions to a Backstop Party under the Plan with respect to any U.S. Roll-Up Term Loan Claim, European Term Loan Claim, or European Roll-Up Term Loan Claim will be made on the Effective Date.

### 4. Single Distribution to Each Creditor.

Pursuant to Section 8.4 of the Plan, for purposes of treatment and Distribution under the Plan, except as expressly provided in the Plan, all Allowed Claims held by a Creditor within a class shall be aggregated and treated as a single Claim. At the written request of Aleris or the Disbursing Agent, any Creditor holding multiple Claims within a class shall provide to Aleris or the Disbursing Agent, as the case may be, a single address to which any Distributions shall be sent. At the written request of any Creditor holding any such multiple Claims made to the Disbursing Agent within thirty (30) days prior to a Distribution Date, such Creditor shall receive an itemized statement of the Allowed Claims for which the Distribution is being made.

5.     **Compliance with Tax Withholding and Reporting Requirements.**

Pursuant to Section 8.5 of the Plan, in connection with the Plan, the Debtors and the Disbursing Agent will comply with all withholding and reporting requirements imposed by all applicable federal, state, local, and foreign taxing authorities, and all Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution. Any party issuing any instrument or making any Distribution under the Plan has the right, but not the obligation, to withhold such Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations. The Disbursing Agent may require, as a condition to receipt of a Distribution, that the holder complete the appropriate Form W-8 or Form W-9. If the Disbursing Agent makes such a request, and the holder fails to complete or return a Form W-8 or Form W-9, as applicable, before the one-hundred eightieth (180th) day after the Disbursing Agent makes such a request, such Distribution shall be deemed an unclaimed Distribution.

6.     **Distributions Administered by the Indenture Trustees.**

a.     *Distributions.*

Pursuant to Section 8.6.1 of the Plan, distributions to holders of Debt Claims that are governed by an Indenture administered by an Indenture Trustee will be made on each Distribution Date through the facilities of DTC in accordance with the customary practices of the DTC, as and to the extent practicable, at the direction of the Indenture Trustee. On the initial Distribution Date, the distribution will be made by means of book-entry exchange through the facilities of DTC, and each Indenture Trustee will deliver instructions to DTC directing DTC to effect distributions on a pro rata basis as provided under the Plan with respect to the Debt Claims upon which such Indenture Trustee acts as trustee.

b.     *Enforcement of Subordination Provisions.*

Pursuant to Section 3.2.5(d) of the Plan, with respect to Senior Subordinated Note Claims, the Disbursing Agent shall enforce Section 506 of the Senior Subordinated Indenture whereby holders of Senior Subordinated Notes agreed to subordinate their Subordinated Note Claims to all, Senior Indebtedness (as defined in the Senior Subordinated Indenture), including, without limitation, the 2006 Senior Notes, the 2007 Senior Notes, the Prepetition ABL Facility, and the Prepetition Term Facility. Any Distribution on account of Senior Subordinated Note Claims shall, instead, be allocated among the holders of Debt Claims, each of which constitutes Senior Indebtedness.

c.     *Expiration of the Retention Period.*

The Retention Period is the period during which any Indenture Trustee shall retain monies or other property for distribution to holders of Debt Claims. The Retention Period is five (5) years from and after the Effective Date, or such shorter period as the Bankruptcy Court may set. Pursuant to Section 8.6.2 of the Plan, upon the expiration of the Retention Period, all monies

or other property held for distribution by any Indenture Trustee under any indenture governing any of the Claims shall be returned to the Reorganized Debtors by such Indenture Trustee free and clear of any claim or interest of any nature whatsoever, including, without express or implied limitation, escheat rights of any governmental unit under applicable law.

### d. *Payment of Indenture Trustees' Fees and Expenses.*

Pursuant to Section 8.6.3 of the Plan, the Reorganized Debtors will pay the Indenture Trustees' Fees and Expenses to the extent that an Indenture Trustee makes a written request for Indenture Trustees' Fees and Expenses within thirty (30) days after the Effective Date; *provided*, *however*, (i) the Reorganized Debtors shall only be liable for Indenture Trustees' Fees and Expenses up to an aggregate amount of one million dollars ($1,000,000) for all series of Debt Claims, and (ii) if aggregate asserted Indenture Trustees' Fees and Expenses exceed one million dollars ($1,000,000), the Reorganized Debtors may, absent an agreement among the Indenture Trustees, apply to the Bankruptcy Court for a reasonable allocation of the amount payable (not to exceed $1 million) by the Reorganized Debtors among the Indenture Trustees.

The Indenture Trustees do not need to apply to the Bankruptcy Court for approval of the Indenture Trustees' Fees and Expenses. Any dispute between the Reorganized Debtors and an Indenture Trustee regarding the reasonableness of any such fees and expenses shall be resolved by the Bankruptcy Court.

The Reorganized Debtors shall also compensate each Indenture Trustee for services rendered from and after the Effective Date up to an amount equal to ten-thousand dollars ($10,000) for each series of Debt Claims for which it acts as Indenture Trustee, including the reasonable compensation, disbursements, and expenses of the agents and legal counsel of such trustee in connection with the performance after the Effective Date of its duties under Section 8.6 of the Plan, and shall be indemnified by the Reorganized Debtors for any loss, liability, or expense incurred by it in connection with the performance of such duties to the same extent and in the same manner as provided in the related indenture.

For more information regarding potential Charging Liens held by Indenture Trustees *see* Section V.K.10, entitled, "THE PLAN OF REORGANIZATION—Implementation of the Plan—Cancellation of Securities of the U.S. Debtors."

### 7. Manner of Payment under the Plan.

Pursuant to Section 8.7 of the Plan, unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made by the Debtors or the Reorganized Debtors shall be made, at the election of the Debtors or the Reorganized Debtors (as the case may be), by check drawn on a domestic bank or by wire transfer from a domestic bank.

### 8. Fractional Shares or Other Distributions.

Pursuant to Section 8.8 of the Plan, notwithstanding anything to the contrary contained in the Plan or the Disclosure Statement, no fractional shares of New Common Stock will be distributed, and no Cash payments will be distributed in respect thereof. When any Distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the

issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (i) fractions of one-half (½) or greater shall be rounded to the next higher whole number, and (ii) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment thereof. The total number of authorized shares of New Common Stock to be distributed to holders of Allowed Claims will be adjusted as necessary to account for the foregoing rounding.

### 9. Distribution of Unclaimed Property.

Pursuant to Section 8.9 of the Plan, any Distribution under the Plan that is unclaimed after one hundred eighty (180) days following the date such property is distributed (including, without limitation, because the Distribution made to the last known address is returned as undeliverable or because a check evidencing a Distribution under the Plan is not cashed within such time), or that is not distributed by the Disbursing Agent because of the failure of a holder of an Allowed Claim to comply with certain withholding tax reporting requirements, shall be deemed not to have been made and shall be transferred to the OpCo specified in the Acquisition Agreement, free and clear of any claims or interests of any Entities, including, without express or implied limitation, any claims or interests of any governmental unit under escheat principles. The Debtors shall not be obligated to make any further Distributions on account of the Claim with respect to which such Distribution was made, and such Claim shall be treated as a Disallowed Claim. Nothing contained herein shall affect the discharge of the Claim with respect to which such Distribution was made, and the holder of such Claim shall be forever barred from enforcing such Claim against HoldCo, IntermediateCo, any OpCo, any of the Reorganized Debtors, or their respective assets, estate, properties, or interests in property.

### 10. Interest on Distributions.

#### a. *Allocation of Plan Distributions between Principal and Interest.*

Pursuant to Section 8.10.1 of the Plan, to the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount of the Claim (as determined for U.S. federal income tax purposes) first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

#### b. *Accrual of Interest.*

Pursuant to Section 8.10.2 of the Plan, no interest shall accrue or be paid with respect to any Distribution as a consequence of such Distribution not having been made on the Effective Date. Whenever any Distribution to be made under the Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

## M. Executory Contracts and Unexpired Leases

### 1. Assumption of Executory Contracts and Unexpired Leases

#### a. *Assumption of Contracts and Leases of the U.S. Debtors on Schedule "9.1."*

Pursuant to Section 9.1.1 of the Plan, any executory contracts or unexpired leases listed on Schedule "9.1" to the Plan shall be deemed to have been assumed by the Debtors as of the Effective Date, and the Plan shall constitute a motion to assume such executory contracts and unexpired leases.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of such assumptions pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the applicable Debtor and its estate.

#### b. *Cure Amounts.*

Pursuant to Section 9.1.2 of the Plan, with respect to each such executory contract or unexpired lease assumed by the Debtors, unless, prior to the Effective Date (i) the Bankruptcy Court determines otherwise pursuant to a Final Order or (ii) the parties to the executory contract or unexpired lease agree otherwise, the dollar amount required to cure any defaults of the Debtors existing as of the Confirmation Date shall be conclusively presumed to be the amount set forth in Schedule "9.1" to the Plan with respect to such executory contract or unexpired lease unless an objection to the proposed cure amount is filed by the Voting Deadline.  Subject to the occurrence of the Effective Date, any such cure amount shall be treated as an Allowed Administrative Expense under the Plan unless an objection is timely filed, and, upon payment of such Allowed Administrative Expense, all defaults of the Debtors existing as of the Confirmation Date with respect to such executory contract or unexpired lease shall be deemed to have been cured.

#### c. *Assignment of Assumed Aleris Contracts and Leases.*

Pursuant to Section 9.1.3 of the Plan, on the Effective Date, in furtherance of the obligations of the Reorganized Debtors under the Transaction Agreements, the executory contracts and unexpired leases set forth on Schedule "9.1" to the Plan, which either have been assumed during the course of the Chapter 11 Cases or are being assumed pursuant to Section 9.1.1 of the Plan, shall be assigned to the Entity identified on Schedule "9.1."

#### d. *Assumption of ADH Contracts and Leases.*

Pursuant to Section 9.1.4 of the Plan, any executory contracts or unexpired leases of ADH (whether or not such executory contracts or unexpired leases are listed on the Schedules of ADH) shall be deemed to have been assumed by ADH as of the Effective Date.  The Plan shall constitute a motion to assume such executory contracts and unexpired leases.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of such assumptions pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of ADH and its estate.  The parties to such executory contracts and unexpired leases shall not be required to assert any cure

claims in the Chapter 11 Cases, but may instead assert any claims or obligations owed by ADH in the ordinary course in a forum of competent jurisdiction.

### 2. Rejection of Executory Contracts and Unexpired Leases of the U.S. Debtors.

Pursuant to Section 9.2 of the Plan, any executory contracts or unexpired leases of the U.S. Debtors (whether or not such executory contracts or unexpired leases are listed on the Schedules of the U.S. Debtors) that either (i) are set forth on Schedule "9.2" to the Plan *or* (ii) (x) are not listed on Schedule "9.2" to the Plan, (y) have not been assumed by the Debtors with the approval of the Bankruptcy Court, and (iii) are not the subject of pending motions to assume at the Confirmation Date shall be deemed to have been rejected by the Debtors as of the Effective Date.

The Plan shall constitute a motion to reject such executory contracts and unexpired leases, and the Reorganized Debtors shall have no liability thereunder except as is specifically provided in the Plan. Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejected executory contract or unexpired lease is burdensome and that the rejection thereof is in the best interest of the applicable Debtor and its estate.

### 3. Claims Arising from Rejection, Termination, or Expiration.

Under the Bar Date Order, unscheduled claims that arose prior to the Commencement Date, including those that arose under executory contracts, must have been asserted in a proof of claim prior to the Bar Date on September 15, 2009. Pursuant to Section 9.3 of the Plan, Claims created by the rejection of executory contracts or unexpired leases (including, without limitation, the rejection provided in Section 9.2 of the Plan) or the expiration or termination of any executory contract or unexpired lease of any of the U.S. Debtors prior to the Confirmation Date, must be filed with the Bankruptcy Court and served on the Debtors no later than thirty (30) days after

> (1) in the case of an executory contract or unexpired lease that was terminated or expired by its terms prior to the Confirmation Date, the Confirmation Date,
>
> (2) in the case of an executory contract or unexpired lease rejected by the Debtors, the entry of the order of the Bankruptcy Court authorizing such rejection, or
>
> (3) in the case of an executory contract or unexpired lease that is deemed rejected pursuant to Section 9.2 of the Plan, the Confirmation Date.

Any Claims for which a rejection claim is not filed and served within the time provided herein will be forever barred from assertion and shall not be enforceable against HoldCo, IntermediateCo, any of the OpCos, the Reorganized Debtors, or any of their respective estates, assets, properties, or interests in property.

Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article V of the Plan.

**4.      Previously Scheduled Contracts.**

Pursuant to Section 9.4 of the Plan, Schedule "9.4" to the Plan sets forth a list of agreements that were listed on the Schedules of the U.S. Debtors as executory contracts, but which the U.S. Debtors believe should not be considered executory contracts (either because they were not executory contracts as of the Commencement Date or because they have expired or terminated in accordance with their terms prior to the Effective Date). If any party to an agreement listed on Schedule "9.4" believes that such agreement is an executory contract or unexpired lease that should be assumed or rejected in the Chapter 11 Cases, such party must file an objection to the characterization of its agreement by the Voting Deadline.

If any such agreements are determined to be executory contracts, the Debtors or the Reorganized Debtors, as the case may be, reserve the right to seek the assumption, assumption and assignment, or rejection of any such contract, and the time within which the Debtors or the Reorganized Debtors, as the case may be, may seek to assume, assume and assign, or reject any such agreements shall be tolled until twenty (20) Business Days after the date on which an order determining that any such agreement is an executory contract becomes a Final Order.

**5.      Insurance Policies and Agreements.**

The Debtors do not believe that the insurance policies issued to, or insurance agreements entered into by, the Debtors prior to the Commencement Date constitute executory contracts. Pursuant to the Transaction Agreements, Aleris is assigning any right, title, and interest it has in any insurance policy or insurance agreement to the OpCo identified in the Acquisition Agreement.

Pursuant to Section 9.5 of the Plan, to the extent that such insurance policies or agreements are determined to be executory contracts, then, notwithstanding anything contained in Section 9.1 or 9.2 of the Plan to the contrary, the Plan shall constitute a motion to assume such insurance policies and agreements and, in the case of Aleris, to assign such insurance policies and insurance agreements as set forth in Schedule II to the Acquisition Agreement. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors, their estates, and all parties in interest in these Chapter 11 Cases.

Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such insurance policy or agreement.

Nothing contained in the Plan, including this section, shall constitute a waiver of any claim, right, or Cause of Action that the Debtors or the Reorganized Debtors, as the case may be, may hold against the insurer under any policy of insurance or insurance agreement.

**6.**      **Indemnification and Reimbursement Obligations.**

Pursuant to Section 9.6 of the Plan, for purposes of the Plan, the obligations of the Debtors to indemnify and reimburse persons who are or were directors, officers, or employees of the Debtors on the Commencement Date or at any time thereafter against and for any obligations pursuant to their respective Organizational Documents, applicable non-bankruptcy law, or specific agreement, or any combination of the foregoing, shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged in accordance with section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Commencement Date.

**7.**      **Employee Compensation and Benefit Programs.**

**a.**      *Assumption of Employee Compensation and Benefit Programs.*

Except with respect to any benefit plans, policies, or programs (i) for which the Debtors have received approval of the Bankruptcy Court to reject or terminate on or before the Effective Date, (ii) that is being rejected pursuant to the Plan, or (iii) that is the subject of a pending motion to reject or terminate as of the Confirmation Date, all employment and severance policies, workers' compensation programs, and all compensation and benefit plans, policies and programs of the Debtors applicable to any employee, officer, or director that is in his or her position as of the Confirmation Date, including, without express or implied limitation, all savings plans; retirement and savings plans; health care plans; disability plans; employee assistance programs; severance benefit plans; incentive plans; and life, accidental death, and dismemberment insurance plans; and any other benefit plans, policies, or programs that the Debtors are required to continue pursuant to section 1113 or section 1114 of the Bankruptcy Code, shall be deemed to be, and shall be treated as though they are, executory contracts that are deemed assumed under the Plan, and the Debtors' obligations under such plans, policies, and programs shall be deemed assumed pursuant to section 365(a) of the Bankruptcy Code, survive confirmation of the Plan, remain unaffected thereby, and not be discharged in accordance with section 1141 of the Bankruptcy Code.

As reviewed *supra*, Section IV.C.7 entitled, "THE CHAPTER 11 CASES—Significant Events During the Chapter 11 Cases—Developments Regarding the Debtors' Proposed Termination of Pension Plans" at pp. 45-46, entry of the confirmation order (and the occurrence of the Confirmation Date) is subject to the termination of the certain pension plans, including the USW Plans, in accordance with 29 U.S.C. §§ 1341(c) or 1342(a). Because the USW Plans are maintained pursuant to the USW CBAs, the contractual obligation to maintain USW Plans must be modified in order for the conditions set forth in Section 10.1 to be met and the USW Plans to be terminated. If the Debtors were unable to reach a consensual agreement with the USW concerning the termination of the USW Plans, then they would be obligated seek to reject the USW CBAs pursuant to 11 U.S.C. § 1113 (which would also be necessary under 29 U.S.C. § 1341(c)). However, the Debtors have agreed to waive the right to utilize Section 1113

and have entered into a stipulation with the USW including such a waiver, as more fully described in Section IV.C.7 entitled, "THE CHAPTER 11 CASES—Significant Events During the Chapter 11 Cases—Developments Regarding the Debtors' Proposed Termination of Pension Plans" at pp. 45-46.

In order to achieve a termination of the Plans the Debtors will also be required to meet the applicable requirements of ERISA, 29 U.S.C. § 1341(c), which requires an evidentiary hearing before the Bankruptcy Court and a finding by that Court that unless the Plans are terminated, the Debtors will be unable to pay all their debts pursuant to a plan of reorganization and will be unable to continue in business outside of the Chapter 11 reorganization process.

*See supra*, Section IV.C.7 entitled, "THE CHAPTER 11 CASES—Significant Events During the Chapter 11 Cases—Developments Regarding the Debtors' Proposed Termination of Pension Plans" at pp. 45-46 for a fuller discussion of these issues.

The Debtors have agreed to assume and assign the USW CBAs, whether or not they are modified.

Any rights and obligations of Aleris under such plans, policies, and programs shall be assumed and/or assigned in accordance with the Transaction Agreements.

Any defaults existing under any of such plans, policies, and programs shall be cured promptly after they become known by the Reorganized Debtors.

**b.** ***The Wabash Alloys Multiemployer Pension Plans***

Pursuant to the Restructuring Transactions described herein and in the Plan, the assets of Wabash Alloys will be sold free and clear of liabilities, other than assumed liabilities, to Spec A Acquisition Co., one of the OpCos, and all of the outstanding equity interests of Wabash, which are currently owned by Alchem Aluminum Shelbyville Inc., will be cancelled. Contributions to multi-employer pension plans are an obligation of Wabash under certain collective bargaining agreements, which Wabash will reject, and will not assign to Spec A Acquisition Co. The effect of this transaction will be to cause a complete withdrawal by Wabash from such multi-employer plans as of the date of the rejection of the collective bargaining agreements. The multi-employer pension plans will have prepetition, General Unsecured Claims against Wabash, and such claims will receive treatment in U.S. Debtors Class 5 (General Unsecured Claims other than Convenience Claims and Insured Claims). The increase, if any, in the amount of the complete withdrawal liability for 2009 under such multi-employer pension plans attributable to post-petition contributions by Wabash for 2009 should receive administrative expense priority.

The administrative expense portion, if any, of the amount of complete withdrawal liability is a pro rata portion of any increase in complete withdrawal liability under the multiemployer plan attributable solely to the 2009 plan year. The Debtors believe such pro rata portion could reasonably be determined as follows: the increase (if any) in amount of withdrawal liability attributable solely for the 2009 plan year for a multiemployer plan, multiplied by a fraction the numerator of which is the amount of contributions to such plan made by the Debtors during the portion of the 2009 plan year after February 12, 2009, and the

denominator of which is the total amount of employer contributions during the 2009 plan year. In the case of a multiemployer plan for which there is no increase in the amount of withdrawal liability attributable solely to the 2009 plan year, there is no administrative expense portion of withdrawal liability.

### 8. Management Agreements.

Pursuant to Section 9.8 of the Plan, on the Effective Date, all employment contracts between the Debtors and any employee of the Debtors who was employed by Debtors as of the date immediately preceding the Effective Date (including, without limitation, any offer letters issued to any such employees to the extent such offer letters are not superseded by formal employment contracts) shall be deemed assumed by the Debtors; *provided*, *however*, that set forth in Schedule "9.8" to the Plan is a list of employees of the Debtors that will enter into, or have entered into, new employment contracts with HoldCo, the Debtors, or the Reorganized Debtors on or before the Effective Date and the material terms of such contracts, in which case any such new employment contract described on Schedule "9.8" to the Plan will supersede the existing contract with such employee. Any rights and obligations of Aleris under any such employment contracts shall be assumed and assigned as set forth in Schedule "2" to the Acquisition Agreement. For a discussion of certain management contracts *see* section VI.A.3, entitled, "MANAGEMENT OF HOLDCO AND THE REORGANIZED DEBTORS – Management Contracts."

## N. Confirmation of the Plan

### 1. Condition Precedent to Entry of the Confirmation Order.

Entry of the Confirmation Order (and the occurrence of the Confirmation Date) is subject to the termination of the Pension Plans in accordance with 29 U.S.C. § 1341(c). "*Pension Plans*" are collectively, the Commonwealth Aluminum Lewisport, LLC Hourly Employees Pension Plan, the Commonwealth Industries, Inc. Cash Balance Plan, the ALSCO Metals Corporation Cash Balance Plan, and the ALSCO Metals Corporation Retirement Plan for Bargained Employees.

*See supra*, Section IV.C.7 entitled, "THE CHAPTER 11 CASES—Significant Events During the Chapter 11 Cases—Developments Regarding the Debtors' Proposed Termination of Pension Plans" at pp. 45-46 for a fuller discussion of this condition precedent, the legal requirements for achieving this condition precedent, and the Debtors' waiver of the right to utilize section 1113.

The termination of the Pension Plans has been made a condition to the confirmation of the Plan of Reorganization filed by the Debtors, and the Debtors intend to seek a distress termination of the Pension Plans in accordance with the applicable statutory and regulatory requirements of ERISA, including the applicable requirements under 29 U.S.C. § 1341(c)(2)(B)(ii) and under 29 C.F.R. § 4041, Subpart C. In particular, the Debtors intend to apply to the Bankruptcy Court for a finding that, unless the Pension Plans are terminated, the Debtors will be unable to pay all their debts pursuant to a plan of reorganization and will be unable to continue in business outside of the Chapter 11 reorganization process. The

applicability of certain provisions of the statutory and regulatory requirements have been and may be subject to dispute or other disagreement by the Debtors.  If the Debtors fail to meet the applicable statutory and regulatory requirements for a distress termination of any of the Pension Plans, such Pension Plan will not be terminated.  There are no assurances that the Debtors will be able to meet the statutory and regulatory requirements for termination of all of the Pension Plans or, in the event one or more of the Pension Plans are not terminated that the Plan of Reorganization or any other plan of reorganization with respect to one or more of the Debtors will be confirmed.

If any of the Pension Plans is terminated in a distress termination pursuant to 29 U.S.C. § 1341(c)(2)(B)(ii) or a PBGC-initiated termination under 29 U.S.C. § 1342 while the Debtors are attempting to reorganize in Chapter 11, and the Debtors ultimately are the subject of a confirmed Chapter 11 plan of reorganization, then ERISA provides that the Reorganized Debtors will become liable to PBGC for termination premiums in the amount of $1,250 for each participant of the Pension Plans for three years. The termination premium liability does not exist against any Debtor until after the Chapter 11 plan is confirmed and such Debtor exits from bankruptcy. *See* 29 U.S.C. § 1306(a)(7)(B). Thus, under those circumstances, termination premiums are not a dischargeable claim or debt within the meaning of 11 U.S.C. §§ 101(5) and 1141.

## 2. Conditions Precedent to the Effective Date Under the Plan.

### a. *Occurrence of the Effective Date.*

Pursuant to Section 10.2.1 of the Plan, the "effective date of the plan," as used in section 1129 of the Bankruptcy Code, shall not occur, and the Plan shall be of no force and effect, until the Effective Date.  The occurrence of the Effective Date is subject to satisfaction of the following conditions precedent:

(1)     The Confirmation Order has been entered and is in full force and effect.

(2)     The Confirmation Order has become a Final Order.

(3)     All conditions to the obligations of the Backstop Parties in the Equity Commitment Agreement have been satisfied or waived.

(4)     The Reorganized Debtors (other than Reorganized Aleris) shall have received a commitment reasonably satisfactory to such Reorganized Debtors and a Majority in Interest for an Exit ABL Facility, and all conditions to closing under the Exit ABL Facility have been satisfied or waived.

(5)     The Rights Offering has been completed, including, among other things, the occurrence of the Subscription Expiration Date.

(6)     All required regulatory approvals from any government agencies, including, without limitation, the European Commission shall have

been obtained, and any applicable waiting period under the HSR Act shall have expired or been terminated.

(7) Each of the exhibits to the Plan shall be in form and substance reasonably satisfactory to the Reorganized Debtors and a Majority in Interest.

(8) The U.S. Plan Value is no less than $120 million.

**b.** *Waiver of Conditions Precedent.*

Pursuant to Section 10.2.2 of the Plan, notwithstanding the foregoing, the Debtors reserve the right to waive the occurrence of any of the foregoing conditions precedent to the Confirmation Date or the Effective Date or to modify any of such conditions precedent with the express consent of a Majority in Interest; *provided*, *however*, the Debtors may not waive the condition to the occurrence of the Effective Date set forth in Section 10.2.1(h) of the Plan (requiring that the U.S. Plan Value be no less than the U.S. Roll-Up Minimum Recovery) unless each holder of a U.S. Roll-Up Claim either (i) agrees to receive less value than its Pro Rata Share of the U.S. Roll-Up Minimum Recovery or (ii) receives value at least equal to its Pro Rata Share of the U.S. Roll-Up Minimum Recovery. Any such written waiver of a condition precedent set forth in this section may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan. Except as the Reorganized Debtors may otherwise specify, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

**c.** *Effect of Failure of Conditions to the Effective Date.*

Pursuant to Section 10.2.3 of the Plan, if the Debtors decide, in consultation with the Majority in Interest, that one of the foregoing conditions cannot be satisfied, and the Debtors do not waive the occurrence of such condition, then the Debtors, with the consent of a Majority in Interest shall file a notice of the failure of the Effective Date with the Bankruptcy Court, at which time the Plan and the Confirmation Order shall be deemed null and void.

**3.** **Effects of Confirmation**

**a.** *Vesting of Assets.*

Pursuant to Section 10.3.1 of the Plan, except as otherwise provided in the Plan, on the Effective Date, title to all assets and properties and interests in property dealt with by the Plan shall vest in the Reorganized Debtors free and clear of all Claims, Equity Interests, Encumbrances, and other interests, and the Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtors arising prior to the Effective Date, except as may be otherwise provided in the Plan.

### b. **Binding Effect.**

Pursuant to Section 10.3.2 of the Plan, except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted or rejected the Plan.

### c. **Discharge of Debtors.**

Pursuant to Section 10.3.3 of the Plan, the rights afforded in the Plan and the treatment of all Claims and Equity Interests therein will be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued thereon from and after the Commencement Date, against the Debtors, or their estates, assets, properties, or interests in property; *provided*, *however*, ADH shall not receive a discharge and release of Allowed European Term Loan Claims, and such claims shall survive ADH's chapter 11 case.

Except as otherwise provided in the Plan, on the Effective Date, all Claims against the Debtors and Equity Interests in Aleris and the Dissolving U.S. Subsidiaries shall be satisfied, discharged, and released in full.  The Reorganized Debtors shall not be responsible for any obligations of the Debtors except those expressly assumed by the Reorganized Debtors in the Plan.  All Entities shall be precluded and forever barred from asserting against the Debtors, the Reorganized Debtors, their successors or assigns, or their assets, properties, or interests in property any other or further Claims based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date.

### d. **Release of Certain Parties.**

*Pursuant to Section 10.3.4 of the Plan, on the Effective Date, the Debtors and the Reorganized Debtors shall be deemed to unconditionally and irrevocably release (i) each person who is or was a director or officer of the Debtors on the Commencement Date or any time thereafter and (ii) the Backstop Parties and their Affiliates and all of their respective directors and officers from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity or person would have been legally entitled to assert (whether individually or collectively) or that any holder of a Claim or Equity Interest or other Entity would have been able to assert on behalf of the Debtors, relating to any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan, except that (a) no such (i) director or officer of the Debtors or (ii) Backstop Party, Affiliate thereof, or director or officer thereof shall be released from any act or omission that constitutes gross negligence, willful misconduct, or fraud as determined by Final Order of a court of competent jurisdiction, and (b) the foregoing release shall not apply to any express contractual or financial obligations owed to the Debtors or the*

*Reorganized Debtors or any right or obligation arising under or that is part of the Plan or an agreement entered into pursuant to, in connection with or contemplated by, the Plan.*

*The above release is being granted only by the Debtors and the Reorganized Debtors, which may grant such releases in conjunction with the Plan process. The Plan does not contemplate any third-party releases.*

Unless each Pension Plan is terminated prior to confirmation, nothing in the Debtors' bankruptcy proceedings, Confirmation Order, Joint Plan of Reorganization, the Bankruptcy Code (and section 1141 thereof), or any other document filed in the Debtors' bankruptcy cases shall in any way be construed to discharge, release, limit, or relieve the Debtors, the Reorganized Debtors, or any other party, in any capacity, from any liability or responsibility to PBGC with respect to the Pension Plans or other defined benefit pension plans covered by Title IV that are not terminated or to any such plans under any law, governmental policy, or regulatory provision. PBGC and such Pension Plans or other pension plans shall not be enjoined or precluded from enforcing such liability or responsibility by any of the provisions of the Plan of Reorganization, Confirmation Order, Bankruptcy Code, or any other document filed in any Debtors' bankruptcy case.

The Indenture Trustees for the 2006 Senior Notes, 2007 Senior Notes and the Senior Subordinated Notes assert that Indenture Trustees typically are included in the release and exculpation provisions of plans of reorganization involving public debt and, therefore, they maintain that they should be included in the release granted to certain parties under section 10.3.4 of the Plan. The Debtors disagree with the Indenture Trustees' position.

    **e.**    ***Exculpation.***

*Pursuant to Section 10.3.5 of the Plan, none of the Debtors, the Reorganized Debtors, HoldCo, IntermediateCo, any of the OpCos, any of the Backstop Parties and their Affiliates, any of the members of the Creditors' Committee, or any of their respective officers, directors, employees, attorneys, agents, or advisers shall have or incur any liability to any Entity for any act or omission in connection with or arising out of the Chapter 11 Cases, including, without limitation, the commencement of these Chapter 11 Cases, the DIP Credit Agreement, the negotiation of the Plan, pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for gross negligence or willful misconduct, and in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the Plan.*

The Plan exculpates the Debtors, the Reorganized Debtors, HoldCo, IntermediateCo, any of the OpCos, any of the Backstop Parties, their respective Affiliates, any of the members of the Creditors' Committee, or any of their respective officers, directors, employees, attorneys, agents, or advisers from matters specifically related to the Plan and the Chapter 11 Cases because each party made significant contributions during the chapter 11 cases, including without limitation, the plan negotiation process and pursuit of confirmation of the Plan. Such exculpation is only effective if the Plan is confirmed and becomes effective. In order to confirm the Plan, the Bankruptcy Court will need to determine, among other things, that the Plan

was proposed in good faith and otherwise complies with the Bankruptcy Code. The Debtors believe that exculpation of actions relating to the plan process is appropriately, commonly provided and consistent with applicable law.

The Indenture Trustees for the 2006 Senior Notes, 2007 Senior Notes and the Senior Subordinated Notes assert that Indenture Trustees typically are included in the release and exculpation provisions of plans of reorganization involving public debt and, therefore, they maintain that they should be included in the exculpation of certain parties granted under section 10.3.5 of the Plan. The Debtors disagree with the Indenture Trustees' position.

### f.     *Reservation of Claims Including Avoidance Actions.*

Pursuant to Section 10.3.6 of the Plan, any rights, claims, or causes of action accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any statute or legal theory, including, without express or implied limitation, any avoidance or recovery actions under sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code and (except as provided herein) any rights to, claims or causes of action for recovery under any policies of insurance issued to or on behalf of the Debtors shall remain assets of the Debtors' estates and, on the Effective Date, shall be transferred to the Reorganized Debtors. The Reorganized Debtors shall be deemed the appointed representatives to, and may, pursue, litigate, and compromise and settle any such rights, claims, or causes of action, as appropriate, in accordance with what is in the best interests of and for the benefit of the Reorganized Debtors; *provided*, *however*, that, upon the occurrence of the Effective Date, the Debtors shall be deemed to have released any right to pursue an avoidance or recovery action under section 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code against any Creditor that continued to supply goods or services to any of the Debtors during the pendency of the Chapter 11 Cases.

### g.     *Term of Injunctions or Stays.*

(1)     Injunction Related to Discharged
        Claims and Cancelled Interests.

Pursuant to Section 10.3.7(a) of the Plan, except as otherwise expressly provided in the Plan, and except with respect to enforcement of the Plan, all Entities who have held, hold, or may hold Claims against or Equity Interests in any Debtor are permanently enjoined, from and after the Effective Date, from:

(A)     commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against any Reorganized Debtor;

(B)     enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against any Reorganized Debtor with respect to any such Claim or Equity Interest;

(C)     creating, perfecting, or enforcing any encumbrance of any kind against any Reorganized Debtor, or against property

of any Reorganized Debtor, as applicable, with respect to any such Claim or Equity Interest; and

(D)     asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from any Reorganized Debtor, or against the property or interests in property of any Reorganized Debtor, as applicable, with respect to any such Claim or Equity Interest.

As referenced above, the Indenture Trustees for the 2006 Senior Notes, 2007 Senior Notes and the Senior Subordinated Notes assert that Indenture Trustees typically are included in the release and exculpation provisions of plans of reorganization involving public debt and, therefore, they maintain that they should be included in and expressly protected by the injunction granted under section 10.3.7(a) of the Plan. The Debtors disagree with the Indenture Trustees' position.

(2)     Continuation of Existing Injunctions and Stays.

Pursuant to Section 10.3.7(b) of the Plan, unless otherwise ordered by the Bankruptcy Court or provided by the Plan, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

(3)     Injunction Against Worthless Stock Deductions.

**PURSUANT TO SECTION 10.2.7(C) OF THE PLAN, UNLESS OTHERWISE ORDERED BY THE BANKRUPTCY COURT, ON OR AFTER THE CONFIRMATION DATE, ANY PERSON OR GROUP OF PERSONS CONSTITUTING A "FIFTY PERCENT SHAREHOLDER" OF ALERIS WITHIN THE MEANING OF SECTION 382(G)(4)(D) OF THE TAX CODE SHALL BE ENJOINED FROM CLAIMING A WORTHLESS STOCK DEDUCTION WITH RESPECT TO ANY ALERIS EQUITY INTERESTS HELD BY SUCH PERSON(S) (OR OTHERWISE TREATING SUCH EQUITY INTERESTS AS WORTHLESS FOR U.S. FEDERAL INCOME TAX PURPOSES) FOR ANY TAXABLE YEAR OF SUCH PERSON(S) ENDING PRIOR TO THE EFFECTIVE DATE.**

## O.     Retention of Jurisdiction.

Pursuant to Article XI of the Plan and sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (i) arising under the Bankruptcy Code, (ii) arising in or related to the Chapter 11 Cases or the Plan, or (iii) to perform any of the following actions:

(1)     to hear and determine any and all motions or applications pending on the Confirmation Date (or thereafter if a contract listed on Schedule "9.4" of the Plan is thereafter determined to be executory, and the Debtors are required to assume or reject it) for the assumption and/or assignment or rejection of executory contracts or unexpired leases to which a Debtor is a party or with respect to which a Debtor may be liable, and to hear and determine

any and all Claims resulting therefrom or from the expiration or termination prior to the Confirmation Date of any executory contract or unexpired lease;

(2) to determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by any of the Reorganized Debtors after the Effective Date, including, without express or implied limitation, any claims to avoid any preferences, fraudulent transfers, or other avoidable transfers, or otherwise to recover assets for the benefit of the Debtors' estates;

(3) to hear and determine any objections to the allowance of Claims arising prior to the Effective Date, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow or disallow any Disputed Claim in whole or in part;

(4) to issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

(5) to consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without express or implied limitation, the Confirmation Order;

(6) to hear and determine all applications for allowances of compensation and reimbursement of expenses of professionals under sections 330 and 331 of the Bankruptcy Code and any other fees and expenses authorized to be paid or reimbursed under the Plan;

(7) to hear and determine all controversies, suits, and disputes that may relate to, affect, or arise in connection with the Plan (and all exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

(8) to the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or Cause of Action by or against the Debtors' estates;

(9) to determine such other matters that may be set forth in the Plan, the Confirmation Order, or that may arise in connection with the Plan or the Confirmation Order;

(10) to hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which the Debtors may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any request for expedited determination under section 505(b) of the Bankruptcy Code);

(11) to hear and determine matters concerning the exemption to comply with any applicable non-bankruptcy laws and regulations, in accordance with, among other things, section 1123(a)(5) of the Bankruptcy Code, relating to transactions contemplated by the Plan; and

(12) to enter an order or final decree closing these Chapter 11 Cases.

## P. Miscellaneous Provisions of the Plan.

### 1. Payment of Statutory Fees.

Pursuant to Section 12.1 of the Plan, all fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing on confirmation of the Plan, shall be paid by the Debtors on or before the Effective Date. Notwithstanding Section 6.4 of the Plan, the Debtors shall pay all statutory fees on a per-Debtor basis.

### 2. Third Party Agreements.

Pursuant to Section 12.3 of the Plan, the Distributions to the various classes of Claims hereunder shall not affect the right of any Entity to levy, garnish, attach, or employ any other legal process with respect to such Distributions by reason of any claimed subordination rights or otherwise. All of such rights and any agreements relating thereto shall remain in full force and effect.

### 3. Dissolution of Creditors' Committee.

Pursuant to Section 12.4 of the Plan, on the Effective Date, the Creditors' Committee shall thereupon be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with these Chapter 11 Cases. Except for the limited purpose of presenting final applications for fee and expenses, the Creditors' Committee shall be deemed dissolved.

### 4. Notices.

Pursuant to Section 12.5 of the Plan, any notices, requests, and demands required or permitted to be provided under the Plan, in order to be effective, shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually received at the following addresses:

| If to the Debtors: | Aleris International, Inc |
|---|---|
| | 25825 Science Park Dr., Suite 400 |
| | Beachwood, Ohio 44122 |
| | Attn:   Christopher R. Clegg, Esq. |

*and*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:   Stephen Karotkin, Esq.
        Debra A. Dandeneau, Esq.

and

Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn:   Paul N. Heath, Esq.
        L. Katherine Good, Esq.
        Andrew C. Irgens, Esq.

| If to the Creditors' Committee: | Reed Smith LLP |
|---|---|
| | 2500 One Liberty Place |
| | 1650 Market Street |
| | Philadelphia, Pennsylvania 19103 |
| | Attn:   Claudia Z. Springer, Esq. |
| | Derek J. Baker, Esq. |

Reed Smith LLP
Reed Smith Centre
225 Seventh Avenue
Pittsburgh, Pennsylvania 15222
Attn:   Paul M. Singer, Esq.

Reed Smith LLP
1202 N. Market Street, Suite 1500
Wilmington, Delaware 19801
Attn:   Kurt F. Gwynne, Esq.
        Mark W. Eckard, Esq.

If to the Backstop Parties:　　　　　　Paul, Weiss, Rifkind, Wharton & Garrison LLP
　　　　　　　　　　　　　　　　　　1285 Avenue of the Americas
　　　　　　　　　　　　　　　　　　New York, New York 10019
　　　　　　　　　　　　　　　　　　Attn:　Alan W. Kornberg, Esq.
　　　　　　　　　　　　　　　　　　　　　Kenneth M. Schneider, Esq.
　　　　　　　　　　　　　　　　　　Wachtell, Lipton, Rosen, & Katz
　　　　　　　　　　　　　　　　　　51 West 52nd Street
　　　　　　　　　　　　　　　　　　New York, New York 10019
　　　　　　　　　　　　　　　　　　Attn:　Philip Mindlin, Esq.
　　　　　　　　　　　　　　　　　　　　　Andrew J. Nussbaum, Esq.
　　　　　　　　　　　　　　　　　　　　　Gregory E. Pessin, Esq.

**5.　　Inconsistency.**

Pursuant to Section 12.7 of the Plan, in the event of any inconsistency among the Plan, the Disclosure Statement, and any exhibit or any schedule to the Disclosure Statement, the Plan governs.  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order governs.

**6.　　Severability.**

Pursuant to Section 12.8 of the Plan, at the option of the Debtors, acting with the consent of a Majority in Interest, any provision of the Plan, the Confirmation Order, or any of the exhibits to the Plan that is prohibited, unenforceable, or invalid shall, as to any jurisdiction in which such provision is prohibited, unenforceable, or invalidated, be ineffective to the extent of such prohibition, unenforceability, or invalidation without invalidating the remaining provisions of the Plan, the Confirmation Order, and the exhibits to the Plan or affecting the validity or enforceability of such provisions in any other jurisdiction.

**7.　　Governing Law.**

Pursuant to Section 12.9 of the Plan, unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Delaware, without giving effect to the conflict of laws principles thereof, shall govern the construction of the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise expressly provided in such agreements, documents, or instruments.

**8.　　Exemption from Transfer Taxes.**

Pursuant to section 1146(a) of the Bankruptcy Code, and in accordance with Section 12.10.1 of the Plan, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without express or implied limitation, any liens granted in connection with Exit ABL Facility and the sale, transfer, or other disposition of assets held by OpCo for disposition, as described in Section 7.6 of the

Plan shall not be subject to any sales and use, stamp, real estate transfer, mortgage recording, or other similar tax.

**9.      Supplemental Plan Documents.**

Pursuant to Section 1.3 of the Plan, any exhibit to the Plan that is not annexed to the Plan annexed hereto shall be contained in a separate exhibit volume or plan supplement, which will be filed with the Clerk of the Bankruptcy Court no later than April 13, 2010 (which is the earlier of (i) thirty (30) days prior to the commencement of the hearing on confirmation of the Plan and (ii) fifteen (15) days prior to the Voting Deadline).

Such exhibits may be inspected in the office of the Clerk of the Bankruptcy Court during normal hours of operation of the Bankruptcy Court.  Such exhibits shall also be available for download from the following website:  **www.kccllc.net/aleris**.  Holders of Claim and Equity Interests also may obtain a copy of the exhibit volume, once filed, from the Debtors by written request sent to the following address:

Aleris Ballot Processing
c/o Kurtzman Carson Consultants LLC
2335 Alaska Ave.
El Segundo, CA 90245

# VI.

## MANAGEMENT OF HOLDCO AND THE REORGANIZED DEBTORS

In accordance with the Acquisition Agreement, the indirect and direct parents of each of the Reorganized Debtors will be HoldCo and IntermediateCo. The management, control, and operation of HoldCo and IntermediateCo are the responsibility of their respective boards of directors and officers, subject to, and in accordance with, HoldCo's Certificate of Incorporation and Bylaws. On the Effective Date, the management, control, and operation of each Reorganized Debtor shall be the responsibility of its respective board of directors, officers, and/or managing members, subject to and in accordance with, its respective Amended and Restated Organizational Documents.

**A.     Board of Directors and Management.**

**1.     Composition of Management and the Board of Directors.**

**a.     *Current Board of Directors of Aleris.***

The current members of the Board of Directors of Aleris are as follows:

➢ Steven J. Demetriou, Chairman of the Board and Chief Executive Officer

➢ Dale V. Kesler, Retired Partner of professional accounting firm Arthur Andersen LLP

➢ Paul E. Lego, President of Intelligent Enterprises, a private consulting firm; Retired Chairman of the Board of Directors and Chief Executive Officer of Westinghouse Electric Corporation

➢ J. Steven Whisler, Retired Chairman and Chief Executive Officer of Phelps Dodge Corporation

**b.     *Boards of Directors of HoldCo and the Reorganized Debtors.***

The members of the HoldCo Board and the boards of the Reorganized Debtors on the Effective Date shall be disclosed in the Plan Supplement. Pursuant to the Equity Commitment Agreement, the HoldCo Board will consist of five (5) members, one of whom shall be the current Chairman and Chief Executive Officer of Aleris, and the remainder of whom will be individuals selected by Oaktree and named in the Plan Supplement.

**c.     *Officers of HoldCo and the Reorganized Debtors.***

Pursuant to Section 7.11.1 of the Plan, the current officers of Aleris will, on the Effective Date, become the officers of HoldCo with comparable titles and responsibilities. Such officers will serve in accordance with applicable non-bankruptcy law, any employment agreements with HoldCo, IntermediateCo, or the Reorganized Debtors, and any Amended and

Restated Organizational Documents. The senior officers of Aleris and of the Reorganized Debtors are, and will be, as follows:

**Steven J. Demetriou, Chairman and Chief Executive Officer.** Mr. Demetriou, age 51, became Chairman of the Board and Chief Executive Officer of Aleris following the merger of Commonwealth Industries Inc. and IMCO Recycling. Mr. Demetriou had served as President and Chief Executive Officer of Commonwealth from June 2004 and served as an outside Director of Commonwealth from 2002 until the merger. Mr. Demetriou was President and Chief Executive Officer of Noveon, Inc., a global producer of advanced specialty chemicals, from 2001 until June 2004. Prior to that, from 1999 to 2001, he was Executive Vice President of IMC Global Inc., a producer of crop nutrients and animal feed ingredients. Mr. Demetriou also served in a number of leadership positions with Cytec Industries Inc., a specialty chemicals and materials company, from 1997 to 1999. From 1981 to 1997, he held various positions with Exxon Corporation. Mr. Demetriou is a Director of OM Group, Inc., Foster Wheeler, Ltd., and Kraton Polymers LLC and serves on the Board of Advisors for Resilience Capital Partners, a private equity investment group. In addition, Mr. Demetriou serves on the Board of Directors of United Way of Northeastern Ohio, the Cuyahoga Community College Foundation, and the Aluminum Association where he is also Chairman.

**Sean M. Stack, Executive Vice President and Chief Financial Officer.** Mr. Stack, age 43, was named Executive Vice President and Chief Financial Officer of Aleris in 2009. Prior to this position, he held the position of Executive Vice President, Corporate Development and Strategy since 2008. Prior to that role, he held the position of Executive Vice President and Chief Financial Officer since 2007. He also served as Executive Vice President and President, Europe since the acquisition of the Corus Business through 2007. Prior to that time, Mr. Stack was Senior Vice President, Treasurer and Corporate Development of Aleris since Aleris' acquisition of Commonwealth, and prior to that, he was Vice President and Treasurer of Commonwealth. Prior to joining Commonwealth in 2004, he had served as Vice President and Treasurer of Noveon, Inc., beginning in 2001. Prior to joining Noveon, Mr. Stack served as Vice President and Treasurer for Specialty Foods Corporation from 1996 to 2000. Mr. Stack joined Specialty Foods as Assistant Treasurer in 1996. Prior to that, he was a vice president at ABN AMRO Bank in commercial and investment banking.

**Christopher R. Clegg, Executive Vice President, General Counsel and Secretary.** Mr. Clegg, age 52, has served as the Executive Vice President, General Counsel and Secretary of Aleris since 2007. From 2004 to 2007, he was the Company's Senior Vice President, General Counsel and Secretary. He joined Commonwealth in 2004 as Vice President, General Counsel and Secretary, and upon the merger with IMCO was named Senior Vice President, General Counsel and Secretary of Aleris. Before joining Commonwealth in 2004, he had served as Senior Vice President, General Counsel and Secretary of Noveon, Inc. since 2001. Previously, Mr. Clegg had served as Vice President-Legal for the Performance Materials Segment of BF Goodrich Company from 1999 to 2001. Before assuming that position, Mr. Clegg served as Senior Corporate Counsel for Goodrich Aerospace since 1991. Prior to joining Goodrich, Mr. Clegg was a corporate lawyer in private practice with the law firms of Squire, Sanders & Dempsey in Cleveland, Ohio and Perkins Coie in Seattle, Washington.

**Scott A. McKinley, Senior Vice President and Controller.** Mr. McKinley, age 48, was elected as Senior Vice President and Controller of Aleris in 2008. Mr. McKinley served as Senior Vice President and Treasurer from 2006 through 2008. From 2004 until 2006, Mr. McKinley served as Vice President and Chief Financial Officer for Lubrizol Corporation's Specialty Chemicals Segment. Prior to that, he was the Vice President and Controller of Noveon, Inc. Mr. McKinley also previously held the position of Director, Financial Planning and Analysis for BF Goodrich Performance Materials and spent the first 15 years of his career at the General Electric Company.

**Roeland Baan, Executive Vice President and CEO, Aleris Europe.** Mr. Baan, age 53, joined the Company as Executive Vice President and CEO, Aleris Europe in 2008. From 2004-2007, Mr. Baan worked for Mittal Steel Company N.V. where he most recently served as Executive Vice President and Chief Executive Officer, Mittal Steel Europe and served on Arcelor Mittal's Management Committee. Prior to joining Mittal, Mr. Baan served as the Senior Vice President of SHV Gas BV, a member of SHV NV, a privately held international conglomerate with activities in retail, energy and venture capital activities. From 1998 to 2001 Mr. Baan served as Chief Executive Officer Thyssen Sonnenberg Recycling GMBH (TSR), a metals recycling company with 55 production sites in five countries.

**K. Alan Dick, Executive Vice President and President, Rolled Products North America.** Mr. Dick, age 46, became Executive Vice President and President, Rolled Products North America in 2009. Prior to his present position, Mr. Dick held a variety of roles with increasing responsibility with Aleris including Senior Vice President and General Manager, Rolled Products North America beginning at the end of 2007, Senior Vice President, Global Metals Procurement beginning in 2007 and Vice President, Metals Sourcing beginning in 2004. Prior to 2004, Mr. Dick was the Director, Raw Material Purchasing for Commonwealth Industries, Inc. and had held a number of positions in the Commonwealth supply chain function since 1998. Prior to joining Commonwealth, Mr. Dick was Vice President and General Manager--Pacific Region for Ideal Metals. He began his career with Pechiney SA in Canada where he held several positions including Vice President and General Manager.

**Terrance J. Hogan, Senior Vice President and General Manager, Recycling and Specification Alloys Americas.** Mr. Hogan, age 54, has served as Senior Vice President and General Manager, Recycling and Specification Alloys Americas since 2008. Prior to that he served as Vice President and General Manager, Aluminum Recycling since joining Aleris in 2005 as a part of the acquisition of Alumitech, Inc. and its subsidiaries. Mr. Hogan was Alumitech Inc.'s president for ten years until the acquisition by Aleris. He is a member of the Aluminum Association Casting and Recycling Division.

**Thomas W. Weidenkopf, Executive Vice President Human Resources and Communications.** Mr. Weidenkopf, age 51, has served as the Company's Chief Human Resources Officer since 2008. Prior to joining Aleris, Mr. Weidenkopf served as the Senior Vice President, Human Resources and Communications for Honeywell International where he was responsible for leading global human resources strategy and programs for the company's 120,000 employees in more than 100 countries. During his 13-year career at Honeywell, Mr. Weidenkopf also served as the human resources leader for the company's aerospace business and

was responsible for staffing and executive development across the corporation. His career also includes human resource leadership roles at PepsiCo and General Electric.

> **2.** **Long-Term Equity Incentive Program.**

On or after the Effective Date, HoldCo will implement the Long-Term Equity Incentive Program, the key terms of which are described below.

| | |
|---|---|
| Eligibility for participation | ➢ Senior executives, including Steven J. Demetriou, Roeland Baan, Sean M. Stack, Christopher R. Clegg, Thomas W. Weidenkopf, and K. Alan Dick. |
| | ➢ A number of other management employees |
| | ➢ Outside directors |
| Type of awards available under plan | ➢ Nonqualified stock options, with 10-year option term |
| | ➢ Restricted stock units (each an "***RSU***") or restricted shares of New Common Stock |
| | ➢ Performance-contingent awards (in the form of stock options or RSUs) |
| | ➢ Stock Appreciation Rights ("***SARs***") |
| | ➢ Other stock-based awards |
| Total equity pool | ➢ Total reserve equal to 9% of New Common Stock outstanding on the Effective Date, including common underlying IntermediateCo convertible preferred stock and debt (the "***Management Reserve***"), comprised of the following: |
| |     ○ 1% RSUs |
| |     ○ 4% time-vested stock options with exercise price equal to the Plan Value Share Price |
| |     ○ 1% time-vested stock options with exercise price equal to 1.5x the Plan Value Share Price |
| |     ○ 1% time-vested stock options with exercise price equal to 2.0x the Plan Value Share Price; and |
| |     ○ 2% held in reserve. |

| | |
|---|---|
| Individual initial grant composition | ➢ Initial grants comprised of stock options and RSUs. |
| Timing | ➢ Grants (other than grants of the 2% reserve pool) to be made as of the Effective Date for the senior executives and shortly following the Effective Date for the other management employees. |
| Option exercise price | ➢ Stock option grants are awarded in three groups: |
| |     o 4% with exercise price equal to the Plan Value Share Price; |
| |     o 1% with exercise price equal to 1.5x the Plan Value Share Price; and |
| |     o 1% with exercise price equal to 2.0x the Plan Value Share Price. |
| Vesting period | ➢ Stock options |
| |     o All time-based vesting |
| |     o Vest ratably over four years in equal quarterly installments |
| | ➢ RSUs |
| |     o Vest ratably over four years in equal quarterly installments |
| **Acceleration and period to exercise** | |
| In the event of a voluntary resignation (without "good reason") | ➢ No acceleration |
| | ➢ Vested stock options exercisable for 90 days from date of termination |
| In the event of termination for "cause" | ➢ No acceleration |
| | ➢ All vested stock options expire on date of termination. |
| In the event of termination by the company without "cause" or by the executive for "good reason" | ➢ Acceleration: 50% of unvested stock options and RSUs for Mr. Demetriou, and 33% for the other executives, fully vest |
| | ➢ Exercisability of stock options: 6 months to exercise |

| | |
|---|---|
| In the event of termination due to the executive's death or disability | ➤ No acceleration |
| | ➤ Exercisability of stock options: 1 year to exercise |
| In the event of a Change in Control (as defined in Long-Term Equity Incentive Program) | ➤ Acceleration: Vesting of unvested stock options and RSUs shall accelerate, as needed, to assure a minimum vested percentage equal to the combined reduction in Oaktree and Apollo's percentage of ownership interest since the Effective Date. A compensation committee for HoldCo's board will have discretion to vest any remaining unvested stock options and RSUs on the Change in Control. |
| In the event of termination by the company without "cause" or by the executive for "good reason," in each case, in anticipation of or within 12 months following a Change in Control | ➤ Acceleration: All unvested stock options and RSUs shall fully vest. |
| | ➤ Exercisability of stock options: 6 months to exercise |
| Adjustment | ➤ The Long-Term Equity Incentive Program will contain typical compensatory option anti-dilution and adjustment provisions. In the event of a change in capitalization, equitable adjustments will be made to the number and class of shares subject to outstanding awards, and the exercise price of any outstanding stock options. |
| | ➤ A "change in capitalization" generally includes any increase or reduction in the number of shares effected without consideration (*e.g.*, a share split, reverse split, or stock dividend) and any recapitalization, merger, consolidation, reorganization, spin-off, split-up, extraordinary cash dividend, etc. |
| Treatment in event of a Change in Control | ➤ In the event of a Change in Control or certain reorganizations, the Board of Directors (or appropriate committee) may provide, with respect to any or all awards, for the award to be (i) assumed or substituted or (ii) cancelled for cash in a cash transaction and/or the same consideration as other shareholders in the transaction, or (iii) in the case of options, cancelled for the "in the money" value of such options (underwater options may be cancelled for no consideration). |
| | ➤ Determination of treatment for any or all awards may be set forth in award agreements, in the change in control |

transaction documents, or otherwise.

| | |
|---|---|
| Shareholder rights | ➢ Shares will be subject to a shareholders' agreement, including customary company call rights. RSUs will provide for cash to be paid for the value of any dividend on unvested RSUs. |
| Clawback/forfeiture | ➢ The agreements governing the awards under the Long-Term Equity Incentive Program will contain a clawback provision with respect to the violation of certain restrictive covenants. |
| Miscellaneous | ➢ Cashless exercise of stock options (both for the exercise price and for required tax withholding) |
| | ➢ Net settlement of RSUs to pay required tax withholding, except that Steven J. Demetriou and Sean M. Stack will pay required tax withholding with cash or a personal loan from the company; *provided*, *however*, that any RSUs that vest in connection with a termination of employment will be net settled. |
| | ➢ For purposes of cashless exercise, net settlement, tax withholding, call rights and grants of bonus stock, the value of shares will be determined on the same basis as for Oaktree and Apollo (and thus not discounted for illiquidity, minority status, etc.). |

The above terms describe the initial awards to be made to the senior executives. The Long-Term Equity Incentive Program will be administered by the Board of Directors of HoldCo, or a committee thereof, which shall determine the terms of other equity awards.

**3.** **Management Contracts.**

Upon the Effective Date, IntermediateCo and, for certain purposes, HoldCo will enter into employment agreements (the "***New Executive Agreements***") with Steven J. Demetriou, Roeland Baan, Sean M. Stack, Christopher R. Clegg, Thomas W. Weidenkopf, and K. Alan Dick, with each executive continuing to serve in his role as previously set forth herein. In each case, a New Executive Agreement will supersede any existing employment agreement or arrangement.

The New Executive Agreements provide that Messrs. Demetriou, Baan, Stack, Clegg, Weidenkopf, and Dick will initially receive annual base salaries at their existing levels of $1,000,000, CHF 950,070, $400,000, $350,000, $375,000, $360,000 respectively, and will be eligible to participate in (i) retirement plans applicable to senior executives and (ii) health,

welfare, and other employee benefit plans and perquisites on the same basis and terms as are currently applicable with respect to the executive.

The executives will be eligible to participate in an annual incentive plan pursuant to which each executive may earn an annual bonus based on achievement of annual performance objectives set forth in the plan, with a target annual bonus of 100% of base salary up to a maximum bonus of 200% of base salary for Mr. Demetriou, a target annual bonus of 75% of base salary up to a maximum bonus of 150% of base salary for Messrs. Baan, Stack, Clegg, Weidenkopf and Dick. For Messrs Demetriou and Stack, 50% of their annual bonuses (determined on an after tax basis) earned for 2010 and 2011 performance will be paid in New Common Stock valued on the bonus payment date. The New Executive Agreements also require Messrs. Demetriou and Stack to purchase New Common Stock after the Effective Date at the Plan Value Share Price in an amount equal to $500,000 to $1 Million for Mr. Demetriou and $150,000 to $250,000 for Mr. Stack.

The New Executive Agreements also provide that the executives will be granted, as of the Effective Date, stock options to purchase shares of New Common Stock at an exercise price equal to or greater than the Plan Value Share Price and RSUs, in each case vesting 6.25% each quarter (so that the stock option and RSUs will be vested in full after four years). These options and RSUs will be granted from seven ninths (7/9) of the Management Reserve (the "***Initial Grants***") (with the remaining two ninths (2/9) of the Management Reserve being reserved for future grants). Mr. Demetriou will receive 25% of the pool of RSUs reserved for Initial Grants and 25% of the pool of stock options reserved for Initial Grants. The portion of the pool of Initial Grants to be awarded to the other executives will be determined by the initial members of the HoldCo Board, including Mr. Demetriou.

Each New Executive Agreement has a three year initial term, with automatic one-year extensions thereafter unless a notice of non-extension is delivered by IntermediateCo (one year prior to the end of the then-scheduled term for Mr. Demetriou and six months prior to the end of the then-scheduled term for Messrs Baan, Stack, Clegg, Weidenkopf, and Dick) or by the executive 90 days prior to the end of the initial term. The New Executive Agreements will contain non-competition and non-solicitation provisions that apply during employment and extend for two years (for Mr. Demetriou) and 18 months (for Messrs. Baan, Stack, Clegg, Weidenkopf, and Dick) following any termination of employment. During the term of the executives' employment and thereafter, they will be subject to standard confidentiality and non-disparagement provisions.

Prior to the end of the then-applicable term, an executive's employment may be terminated at any time by either party, subject to certain notice provisions and severance obligations in the event of termination under certain circumstances. If Mr. Demetriou's employment is terminated without cause or if he resigns for good reason (as will be defined in his New Executive Agreement), he will be entitled to cash severance equal to (i) two times the sum of his base salary and target bonus, if the termination occurs during the first year of the initial term, or (ii) if the termination occurs after the first year of the initial term his base salary and annual bonus for the remainder of the term, but in no event less than one times his base salary and annual bonus (for this purpose, the annual bonus will be based on Mr. Demetriou's average earned bonuses for the prior two years, and Mr. Demetriou will be deemed to have

earned an annual bonus for years 2009 and 2010 equal to the amount of his target bonus on the Effective Date). The New Executive Agreements for the other executives provide that, if the executive's employment is terminated without cause or if he resigns for good reason, he will be entitled to cash severance equal to one and one-half times the sum of his base salary and annual bonus (for this purpose, the annual bonus will be based on the executive's average earned bonuses for the prior two years, and the executive will be deemed to have earned an annual bonus for years 2008, 2009 and 2010 equal to the amount of his target bonus on the Effective Date). Cash severance will be paid in installments over two years for Mr. Demetriou and over 18 months for the other executives. In the event IntermediateCo elects to not renew a New Employment Agreement, the executive will be entitled to receive cash severance equal to one times the executive's annual base salary and annual bonus (determined in the same manner described above), to be paid in installments over one year. In addition to the cash severance described above, Messrs. Demetriou, Baan, Stack, Clegg, Weidenkopf, and Dick will each receive continued welfare benefits during the period of time that he is receiving his severance installments.

All post-termination payments are conditioned upon the execution by the executive of a release of all claims against the Company and are subject to clawback if the executive materially breaches the restrictive covenants.

## VII.

## REORGANIZATION VALUE

### A.    Going Concern Valuation.

The Debtors have been advised by Moelis, the Debtors' financial adviser, with respect to the estimated enterprise value of HoldCo on a going concern basis.  Solely for purposes of the Plan, the analysis performed by Moelis indicates that the estimated enterprise value of HoldCo, excluding cash in excess of cash required to maintain appropriate liquidity, is within the range of $925 million to $1,195 billion (with a mid-point estimate of approximately $1 billion, the "enterprise value" provided in the Plan) as of an assumed Effective Date of June 1, 2010.

The analysis performed by Moelis further indicates an enterprise value range for the Americas (as described in Exhibit "C" to the Disclosure Statement) of $660 million to $830 million and an enterprise value range for Europe (as described in Exhibit "C" to the Disclosure Statement) of $265 million to $365 million.

THE ESTIMATED RANGE OF ENTERPRISE VALUES ASSUMES AN EFFECTIVE DATE OF JUNE 1, 2010 AND IS BASED ON WORK PERFORMED BY MOELIS USING INFORMATION CONCERNING THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO MOELIS AS OF DECEMBER 4, 2009. NEITHER MOELIS NOR THE DEBTORS HAVE UPDATED THE ESTIMATED RANGE OF ENTERPRISE VALUES TO REFLECT INFORMATION AVAILABLE TO THE DEBTORS OR MOELIS SUBSEQUENT TO DECEMBER 4, 2009.

The foregoing estimate of the enterprise value of HoldCo is based on a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, the implementation of the Reorganized Debtors' business plan, the achievement of the forecasts reflected in the Projections, continuity of a qualified management team, market conditions through the period covered by the Projections, and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein.

The valuation assumptions are not a prediction or reflection of post-Confirmation trading prices of the New Common Stock.  Such securities may trade at substantially lower or higher prices because of a number of factors, including, but not limited to, those discussed in Section VIII.B, entitled, "RISK FACTORS – Risk Factors that May Affect the Value of Securities to be Issued under the Plan and/or Recoveries under the Plan."  The trading prices of securities distributed under a plan of reorganization are subject to many unforeseeable circumstances and therefore cannot be predicted.

In preparing its analysis of the estimated enterprise value of HoldCo, Moelis, among other analyses: (i) reviewed certain historical financial information of the Debtors for recent years and interim periods, including the most current financial results through October 31, 2009; (ii) reviewed certain internal financial and operating data of the Debtors, including financial projections prepared and provided by management relating to their business and their prospects; (iii) met with certain members of senior management of the Debtors to discuss the

Debtors' operations and future prospects; (iv) reviewed publicly available financial data and considered the market value of public companies that Moelis deemed generally comparable to the operating business of the Debtors; (v) considered certain economic and industry information relevant to HoldCo and the Reorganized Debtors; and (vi) conducted such other studies, analysis, inquiries, and investigations as it deemed appropriate.

ALTHOUGH MOELIS CONDUCTED A REVIEW AND ANALYSIS OF THE DEBTORS' BUSINESS, OPERATING ASSETS AND LIABILITIES AND THE REORGANIZED DEBTORS' BUSINESS PLANS, IT ASSUMED AND RELIED ON THE ACCURACY AND COMPLETENESS OF ALL FINANCIAL AND OTHER INFORMATION FURNISHED TO IT BY THE DEBTORS AND PUBLICLY AVAILABLE INFORMATION. IN ADDITION, MOELIS DID NOT INDEPENDENTLY VERIFY MANAGEMENT'S PROJECTIONS IN CONNECTION WITH SUCH ESTIMATES OF THE ENTERPRISE VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH.

THE ESTIMATED RANGE OF ENTERPRISE VALUES DESCRIBED HEREIN DOES NOT PURPORT TO BE AN APPRAISAL OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE.

THE ANALYSIS OF THE DEBTORS' ENTERPRISE VALUE PREPARED BY MOELIS REPRESENTS THE HYPOTHETICAL RANGE OF VALUES AND IS BASED ON THE ASSUMPTIONS CONTAINED HEREIN. THE ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF A PLAN OF REORGANIZATION AND THE DETERMINATION OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF ENTERPRISE VALUES OF HOLDCO THROUGH THE APPLICATION OF VARIOUS GENERALLY ACCEPTED VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES, OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT, AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF ENTERPRISE VALUES OF THE COMPANY SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, MOELIS, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.

AS REVIEWED *SUPRA*, SECTION IV.C.7 ENTITLED, "THE CHAPTER 11 CASES— SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES—DEVELOPMENTS REGARDING THE DEBTORS' PROPOSED TERMINATION OF PENSION PLANS" AT PP. 45-46, ENTRY OF THE CONFIRMATION ORDER (AND THE OCCURRENCE OF THE CONFIRMATION DATE) IS SUBJECT TO THE TERMINATION OF THE CERTAIN PENSION PLANS, INCLUDING THE USW PLANS, IN ACCORDANCE WITH 29 U.S.C. §§ 1341(C) OR 1342(A). BECAUSE THE USW PLANS ARE MAINTAINED PURSUANT

TO THE USW CBAS, THE CONTRACTUAL OBLIGATION TO MAINTAIN USW PLANS MUST BE MODIFIED IN ORDER FOR THE CONDITIONS SET FORTH IN SECTION 10.1 TO BE MET AND THE USW PLANS TO BE TERMINATED. *SEE SUPRA*, SECTION IV.C.7 ENTITLED, "THE CHAPTER 11 CASES—SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES—DEVELOPMENTS REGARDING THE DEBTORS' PROPOSED TERMINATION OF PENSION PLANS" AT PP. 45-46, FOR A FULLER DISCUSSION OF THIS CONDITION PRECEDENT, THE LEGAL REQUIREMENTS FOR ACHIEVING THIS CONDITION PRECEDENT, AND THE DEBTORS' WAIVER OF THE RIGHT TO UTILIZE SECTION 1113.

## B. Valuation Methodology.

Moelis performed a variety of analyses and considered a variety of factors in preparing its estimated range of the Company enterprise values. Moelis primarily relied on two principal methodologies to estimate the value of HoldCo, based on the financial projections contained in Exhibit "C" to this Disclosure Statement, which were prepared by Aleris management: (i) a calculation of the present value of the unlevered free cash flows reflected in the Company's Projections, including calculating the terminal value of the business based upon a range of exit multiples applied to EBITDA, perpetuity growth rates and weighted average cost of capital ("***WACC***"), and (ii) a comparison of financial data of the Company with similar data for other publicly held companies in businesses similar to the Company.

The following summary does not purport to be a complete description of the analyses undertaken and factors reviewed to support Moelis's conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, as well as the application of those analyses and factors under the particular circumstances. As a result, the process involved in preparing a valuation is not readily summarized. Moelis's valuation must be considered as a whole, and selecting just one methodology or portions of the analyses, without considering the analyses as a whole, could create a misleading or incomplete conclusion as to the enterprise value of HoldCo.

### 1. Discounted Cash Flow Analysis.

The discounted cash flow ("***DCF***") valuation methodology relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by an estimated WACC. In the DCF analysis, Moelis employed a WACC range of 10.5% to 12.5% in the Americas and a WACC range of 11.5% to 13.5% in Europe to discount the expected future free cash flows. The expected future cash flows have two components: the present value of the projected unlevered free cash flows for a determined period and the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the projections). Moelis's discounted cash flow valuation is based on the projection of the Company's operating results as contained in the Projections.

This approach relies on the Company's ability to project future cash flows with some degree of accuracy. Because the Company's projections reflect significant assumptions made by Aleris' management concerning anticipated results, the assumptions and judgments used in the Projections may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized. Moelis cannot and does not

make any representations or warranties as to the accuracy or completeness of the Company's projections.

**2.      Comparable Companies Analysis.**

The comparable company analysis involved identifying a group of publicly traded companies whose businesses are similar to those of the Company and then calculating ratios of enterprise value to EBITDA of these companies based upon the public market value of such companies' securities. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of business, business risks, growth prospects, business maturity, market presence, and size and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation. However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value. The ranges of ratios derived were then applied to the Company's projected financial results to derive a range of implied values.

While Moelis evaluated prior mergers and acquisitions transactions in order to determine their relevance to a valuation of the Company, Moelis did not rely on a precedent transaction analysis in formulating its estimate for the going concern valuation of HoldCo.

THE RANGE OF REORGANIZATION VALUES DETERMINED BY MOELIS IS AN ESTIMATE AND DOES NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS.

# VIII.

## RISK FACTORS

Holders of claims against the Debtors should read and consider carefully the factors set forth below, as well as the other information set forth in this disclosure statement (and the documents delivered together herewith and/or referred to herein by reference), prior to voting to accept or reject the plan. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the plan and its implementation.

## A.     Certain Bankruptcy Considerations.

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes. Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing. Even if the Bankruptcy Court enters the Confirmation Order, if any of the conditions precedent described in Section 10.2.1 of the Plan have not been satisfied or waived (to the extent possible) by the Debtors and the Majority in Interest (as provided for in the Plan) and the Plan cannot be consummated, as of the Effective Date, then the Confirmation Order will be null and void.

The Plan provides for no distribution to U.S. Debtors Class 8 (Aleris Equity Interests) and U.S. Debtors Class 9 (Cancelled U.S. Equity Interests). The Bankruptcy Code conclusively deems these classes to have rejected the Plan. Notwithstanding that these classes are deemed to have rejected the Plan, the Bankruptcy Court may confirm the Plan if at least one impaired Class votes to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class). Thus, for the Plan to be confirmed with respect to the U.S. Debtors, at least one of U.S. Debtors Class 3, 4, 5, or 7 must vote to accept the Plan excluding the votes of any insiders. For the Plan to be confirmed with respect to ADH, ADH Class 2 or 3 must vote to accept the Plan excluding the votes of any insiders. As to each impaired Class that has not accepted the Plan, the Plan may be confirmed if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to these classes. The Debtors believe that the Plan satisfies these requirements. For more information, *see* Section XII.C, entitled, "CONFIRMATION AND CONSUMMATION PROCEDURE – Confirmation Procedure."

## B.     Risk Factors that May Affect the Value of Securities to Be Distributed Under the Plan and/or Recoveries under the Plan.

### 1.     Overall Risks to Recovery by Holders of Claims.

The ultimate recoveries under the Plan to holders of Claims (other than holders whose entire Distribution is paid in Cash) depend upon the realizable value of the New Common Stock and the IntermediateCo Notes, which are subject to a number of material risks, including,

but not limited to, those specified below. The factors below assume that the Plan is confirmed and that the Effective Date occurs on or about June 1, 2010. Prior to voting on the Plan, each holder of a Claim should consider carefully the risk factors specified or referred to below, including the exhibits included in the Plan Supplement, as well as all of the information contained in the Plan.

### 2. Variances from Projections.

The Projections for the Reorganized Debtors included herein are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Factors that could cause actual results to differ materially include, but are not limited to, the Reorganized Debtors' ability to operate their business consistent with the Projections, comply with the covenants of their financing agreements, comply with the terms of their existing contracts and leases, and respond to adverse regulatory actions taken by the federal and state governments. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the Projections may affect the actual financial results of the Reorganized Debtors. Although the Debtors believe that the Projections are reasonably attainable, variations between the actual financial results and those projected will occur, and these variances may be material.

### 3. Unforeseen Events.

Future performance of the Reorganized Debtors is, to a certain extent, subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond their control. While no assurance can be provided, based upon the current level of operations and anticipated increases in revenues and cash flows described in the Projections, the Debtors believe that cash flow from operations and available cash will be adequate to fund the Plan and meet their future liquidity needs.

### 4. Value of Consideration to Be Distributed under the Plan.

In estimating the value of distributions under the Plan, the Debtors have assumed that (i) Cash has a value equal to its face amount; (ii) the IntermediateCo Notes have a value equal to their face amount; and (iii) after giving effect to the Rights Offering, the New Common Stock will have an aggregate value of approximately $795 million. *See* Section V.H, entitled, "THE PLAN OF REORGANIZATION – Securities to be Distributed under the Plan," for a more complete description of the securities being distributed under the Plan and their estimated values. There is no assurance that such assumed values can be obtained.

### 5. Absence of a Public Market for the IntermediateCo Preferred Stock, IntermediateCo Notes, and New Common Stock.

The IntermediateCo Preferred Stock, IntermediateCo Notes, and New Common Stock are newly issued securities for which there is no established trading market, and there can be no assurance that a trading market for these securities will develop. In addition, there is no public market for the IntermediateCo Preferred Stock, IntermediateCo Notes, or New Common Stock, nor will there be one following the issuance of these securities. Accordingly, no assurance can be given as to the ability of holders of these securities to sell such securities or the

price that holders may obtain for such securities. Neither HoldCo nor IntermediateCo will be required to, nor do they intend to, file periodic reports with the SEC upon emergence.

**C.      Risk Factors that Could Negatively Affect the Reorganized Debtors' Business.**

**1.      The difficult conditions in the capital, credit, commodities, automobile, and housing markets and in the overall economy could materially adversely affect the financial positions and results of operations of the Reorganized Debtors, and these conditions may not improve in the near future.**

The financial position and results of operations of the Reorganized Debtors could be materially adversely affected by the difficult conditions and significant volatility in the capital, credit, commodities, automobile, and housing markets and in the overall economy. These factors, combined with declining business and consumer confidence, and increased unemployment, precipitated an economic slowdown and a recession. The difficult conditions in these markets and the overall economy affect the business of the Reorganized Debtors in a number of ways. For example:

➢ As a result of recent volatility in commodity prices, the Debtors have significantly increased the price for certain products and may have to further increase prices in the future. Any delays in implementing price increases or a failure to achieve market acceptance of future price increases could materially adversely affect the financial position and results of operations of the Reorganized Debtors. Increases in the Reorganized Debtors' cost of raw materials and energy could cause their cost of goods sold to increase, thereby reducing operating results and limiting the Reorganized Debtors' operating flexibility.

➢ Although the Reorganized Debtors believe they will have sufficient liquidity under the Exit ABL Facility to run their business, under extreme market conditions there can be no assurance that funds would be available or sufficient, and in such a case, the Reorganized Debtors may not be able to successfully obtain additional financing on favorable terms, or at all.

➢ Market conditions could cause the counterparties to the derivative financial instruments that the Reorganized Debtors use to hedge their exposure to fluctuations in the prices of certain commodities, principally aluminum, to experience financial difficulties and, as a result, the Reorganized Debtors' efforts to hedge these exposures could prove unsuccessful, and, furthermore, their ability to engage in additional hedging activities may decrease or become even more costly as a result of these conditions. The Reorganized Debtors may be unable to manage effectively their exposure to commodity price fluctuations, and their hedging activities may affect profitability in a changing metals price environment and subject their earnings to great volatility from period to period.

> ➤ Market conditions could result in the Reorganized Debtors' largest customers experiencing financial difficulties and/or electing to limit spending, which in turn could result in decreased sales and earnings for the Reorganized Debtors. If the Reorganized Debtors were to lose order volumes from any of their largest customers, the Reorganized Debtors' sales volumes, revenues, and cash flows could be reduced.

The Debtors do not know if market conditions or the state of the overall economy will improve in the near future.

## 2. If the Reorganized Debtors fail to implement their business strategies, their financial condition and results of operations could be adversely affected.

The Reorganized Debtors' future financial performance and success depend in large part on their ability to successfully implement their business strategy. The Reorganized Debtors cannot assure that they will be able to successfully implement their business strategy or be able to continue improving their operating results. In particular, the Reorganized Debtors cannot assure that they will be able to achieve all operating cost savings targeted through focused productivity improvements and capacity optimization, further enhancements of the business and product mix, expansion in selected regions, opportunistic pursuit of strategic acquisitions, and management of key commodity exposures.

Furthermore, the Reorganized Debtors cannot assure that they will be successful in their growth efforts or that they will be able to manage effectively expanded or acquired operations. Their ability to achieve the expansion and acquisition objectives and to effectively manage their growth effectively depends upon a number of factors, including the following:

> ➤ the ability to introduce new products and end-use applications;

> ➤ the ability to identify appropriate acquisition targets and to negotiate acceptable terms for their acquisition;

> ➤ the ability to integrate new businesses into the operations; and

> ➤ the availability of capital on acceptable terms.

Implementation of the business strategy could be affected by a number of factors beyond the Reorganized Debtors' control, such as increased competition, legal and regulatory developments, general economic conditions, or an increase in operating costs. Any failure to successfully implement the business strategy could adversely affect the Reorganized Debtors' financial condition and results of operations. The Reorganized Debtors may, in addition, decide to alter or discontinue certain aspects of their business strategy at any time.

3. **The cyclical nature of the metals industry and the Reorganized Debtors' businesses, the end-use segments, and customers' industries could limit the operating flexibility of the Reorganized Debtors, which could negatively affect their financial condition and results of operations.**

The metals industry in general is cyclical in nature. It tends to reflect and be amplified by changes in general and local economic conditions. These conditions include the level of economic growth, financing availability, the availability of affordable energy sources, employment levels, interest rates, consumer confidence, and housing demand. Historically, in periods of recession or periods of minimal economic growth, metals companies have often tended to underperform other sectors. The Reorganized Debtors will be particularly sensitive to trends in the transportation and construction industries, which are both seasonal and highly cyclical in nature, and dependent upon general economic conditions. For example, during recessions or periods of low growth, the transportation and construction industries typically experience major cutbacks in production, resulting in decreased demand for aluminum. This leads to significant fluctuations in demand and pricing for products and services. Because the Reorganized Debtors generally will have high fixed costs, profitability is significantly affected by decreased processing volume. Accordingly, reduced demand and pricing pressures may significantly reduce the Reorganized Debtors' profitability and adversely affect the financial condition. Economic downturns in regional and global economies or a prolonged recession in the Reorganized Debtors' principal industry segments have had a negative impact on the Debtors' operations in the past and could have a negative impact on the future financial condition or results of operations. In addition, in recent years global economic and commodity trends have been increasingly correlated. Although the Reorganized Debtors will continue to seek to diversify their businesses on a geographic and industry end-use basis, they cannot assure that diversification will significantly mitigate the effect of cyclical downturns.

Changes in the market price of aluminum will affect the selling prices of the Reorganized Debtors' products. Market prices of aluminum are dependent upon supply and demand and a variety of factors over which the Reorganized Debtors have minimal or no control, including the following:

➢ regional and global economic conditions;

➢ availability and relative pricing of metal substitutes;

➢ labor costs;

➢ energy prices;

➢ environmental and conservation regulations;

➢ seasonal factors and weather; and

➢ import and export restrictions.

4.     **The loss of certain members of management of the Reorganized Debtors may have an adverse effect on their operating results.**

The success of the Reorganized Debtors will depend, in part, upon the efforts of their senior management and other key employees.  These individuals possess sales, marketing, engineering, manufacturing, financial, and administrative skills that are critical to the operation of the business. If the Reorganized Debtors lose or suffer an extended interruption in the services of one or more of their senior officers, their financial condition and results of operations may be negatively affected.  Moreover, the market for qualified individuals may be highly competitive, and the Reorganized Debtors may not be able to attract and retain qualified personnel to replace or succeed members of their senior management or other key employees, should the need arise.

5.     **Increases in the Reorganized Debtors' cost of raw materials and energy could cause their cost of goods sold to increase, thereby reducing operating results and limiting the Reorganized Debtors' operating flexibility.**

The operations of the Reorganized Debtors will require substantial amounts of raw materials and energy, consisting principally of primary-based aluminum, aluminum scrap, alloys and other materials, and natural gas.  Any substantial increases in the cost of raw materials or energy could cause the operating costs of the Reorganized Debtors to increase and negatively affect their financial condition and results of operations.

Aluminum scrap and primary aluminum metal prices are subject to significant cyclical price fluctuations.  Metallics (primary aluminum metal, aluminum scrap, and aluminum dross) will represent the largest component of the Reorganized Debtors' cost of sales.  The Reorganized Debtors will purchase aluminum primarily from aluminum scrap dealers and will meet their remaining aluminum requirements through the purchase of primary-based aluminum. They will have limited control over the price or availability of these supplies in the future.

The availability and price of aluminum scrap depend upon a number of factors outside the Reorganized Debtors' control, including general economic conditions, international demand for metallics, and internal recycling activities by primary aluminum producers. Increased regional and global demand for aluminum scrap can have the effect of increasing the prices that the Reorganized Debtors pay for these raw materials thereby increasing the cost of sales.  The Reorganized Debtors often will be unable to adjust the selling prices for their products to recover the increases in scrap prices.  If scrap and dross prices were to increase significantly without a commensurate increase in the market value of the primary metals, the Reorganized Debtors' future financial condition and results of operations could be affected by higher costs and lower profitability.  In addition, a significant decrease in the pricing spread between aluminum scrap and primary aluminum could make recycling less attractive compared to primary production, and thereby reduce customer demand for the recycling business.

After raw material and labor costs, utilities will represent the third largest component of the Reorganized Debtors' historical cost of sales.  The price of natural gas can be particularly volatile.  As a result, the Reorganized Debtors' natural gas costs may fluctuate dramatically, and they may not be able to reduce the effect of higher natural gas costs on their cost of sales.  If natural gas costs increase, the financial condition and results of operations of the

Reorganized Debtors may be adversely affected. Although the Reorganized Debtors will attempt to mitigate volatility in natural gas costs through the use of hedging and the inclusion of price escalators in certain of their long-term supply contracts, the Reorganized Debtors may be unable to eliminate the effects of such cost volatility. Furthermore, in an effort to offset the effect of increasing costs, the Reorganized Debtors may have also limited the potential benefit they could receive from declining costs.

6. **The Reorganized Debtors may be unable to manage effectively their exposure to commodity price fluctuations, and their hedging activities may affect profitability in a changing metals price environment and subject their earnings to greater volatility from period to period.**

Significant increases in the price of primary aluminum, aluminum scrap, or alloys and other materials would cause the Reorganized Debtors cost of sales to increase significantly and, if not offset by product price increases, would negatively affect the future financial condition and results of operations of the Reorganized Debtors. The Reorganized Debtors will be substantial consumers of raw materials and by far the largest input cost in producing the Reorganized Debtors' goods is the cost of metal. The cost of energy used by the Reorganized Debtors, however, also will be substantial. Customers will pay for the Reorganized Debtors' products based on the price of the metal contained in the products, plus a "rolling margin" or "conversion margin" fee (the "***Price Margin***"), or based on a fixed price. In general, the Reorganized Debtors will use this pricing mechanism to pass changes in the price of metal, and sometimes in the price of natural gas, through to their customers. In most market sectors and by industry convention, however, the Reorganized Debtors at times will offer their products on a fixed price basis as a service to the customer. This commitment to supply an aluminum-based product to a customer at a fixed price often extends months, but sometimes years, into the future. Such commitments require the Reorganized Debtors to purchase raw materials in the future, exposing the Reorganized Debtors to the risk that increased metal or natural gas prices will increase the cost of producing their goods, thereby reducing or eliminating the Price Margin they receive when they deliver the product.

Furthermore, the RPNA and Europe segments are exposed to variability in the market price of a premium differential (referred to as "***Midwest Premium***" in the United States and "***Duty Paid/Unpaid Rotterdam***" in Europe) charged by industry participants to deliver metal from the smelter to the manufacturing facility. This premium differential also fluctuates in relation to market and other conditions. The RPNA and Europe segments follow a pattern of increasing or decreasing their selling prices to customers in response to changes in the Midwest Premium and the Duty Paid/Unpaid Rotterdam.

Similarly, as the Reorganized Debtors will maintain large quantities of base inventory, significant decreases in the price of primary aluminum would reduce the realizable value of the inventory, negatively affecting the future financial condition and results of operations of the Reorganized Debtors. In addition, a drop in aluminum prices between the date of purchase and the final settlement date on derivative contracts used to control the risk of price fluctuations may require the Reorganized Debtors to post additional margin, which, in turn, can be a significant demand on liquidity.

The Reorganized Debtors will purchase LME forwards, futures and options contracts to reduce their exposure to changes in metal prices. Despite the use of LME forwards, futures and options contracts, the Reorganized Debtors will remain exposed to the variability in prices of scrap metal. While scrap metal is priced in relation to prevailing LME prices, it is also priced at a discount to LME metal (depending upon the quality of the material supplied). This discount is referred to in the industry as the "scrap spread" and fluctuates depending upon market conditions. In addition, the Reorganized Debtors will purchase forwards, futures or options contracts to reduce their exposure to changes in natural gas prices and will purchase other types of derivative products to reduce their exposure to other types of risks such as those resulting from currency fluctuations and variable interest rates. The Reorganized Debtors will not account for their LME forward, futures, or options contracts as hedges of the underlying risks. As a result, unrealized gains and loses of the Reorganized Debtors' metal derivative financial instruments must be reported in the Reorganized Debtors' consolidated results of operations. The inclusion of such unrealized gains and losses in earnings may produce significant period to period earnings volatility that will not necessarily be reflective of the underlying operating performance of the Reorganized Debtors.

7.  **If the Reorganized Debtors were to lose order volumes from any of their largest customers, their sales volumes, revenues, and cash flows could be reduced.**

The Reorganized Debtors' business is exposed to risks related to customer concentration. A loss of order volumes from, or a loss of industry share by, any major customer could negatively affect the financial condition and results of operations of the Reorganized Debtors by lowering sales volumes, increasing costs and lowering profitability. In addition, the Reorganized Debtors' strategy of having dedicated facilities and arrangements with certain customers subject the Reorganized Debtors to the inherent risk of increased dependence on a single or a few customers with respect to these particular facilities. In such cases, the loss of such a customer or the reduction of that customer's business at one or more of the facilities could negatively affect the financial condition and results of operations of the Reorganized Debtors, and the Reorganized Debtors may be unable to timely replace, or replace at all, lost order volumes. In addition, several of the Debtors' customers have become involved in bankruptcy or insolvency proceedings and have defaulted on their obligations in recent years.

8.  **The Reorganized Debtors will not have long-term contractual arrangements with a substantial number of their customers, and their sales volumes and revenues could be reduced if their customers switch suppliers.**

A significant portion of the Debtors' revenues are generated from customers who do not have long-term contractual arrangements with the Debtors. These customers will purchase products and services from the Reorganized Debtors on a purchase order basis and may choose not to purchase products and services in the future. Any significant loss of these customers or a significant reduction in their purchase orders could have a material negative impact on the sales volume and business of the Reorganized Debtors.

9. **The Reorganized Debtors may not be able to compete successfully in the industry segments they serve, and aluminum may become less competitive with alternative materials, which could result in a reduction of the Reorganized Debtors' share of industry sales, sales volumes, and selling prices.**

Aluminum competes with other materials such as steel, plastic and composite materials and glass for various applications. Higher aluminum prices tend to make aluminum products less competitive with these alternative materials. The Reorganized Debtors will compete in the production and sale of rolled aluminum products with a number of other aluminum rolling mills, including large, single-purpose sheet mills, continuous casters and other multi-purpose mills, some of which are larger and have greater financial and technical resources. The Reorganized Debtors will compete with other rolled products suppliers, principally multi-purpose mills, on the basis of quality, price, timeliness of delivery, technological innovation and customer service, and will also compete with other aluminum recyclers in segments that are highly fragmented and characterized by smaller, regional operators. The principal factors of competition in the aluminum recycling business include price, metal recovery rates, proximity to customers, customer service, molten metal delivery capability, environmental and safety regulatory compliance, and types of services offered. Additional competition could result in a reduced share of industry sales or reduced prices for the Reorganized Debtors' products and services, which could decrease revenues or reduce volumes, either of which could have a negative effect on the financial condition and results of operations of the Reorganized Debtors.

10. **A portion of the Reorganized Debtors' revenues will be derived from international operations, which will expose them to certain risks inherent in doing business abroad.**

The Company has aluminum recycling operations in Germany, the United Kingdom, Mexico, Canada, and Brazil, and magnesium recycling operations in Germany. The Company also has rolled products and extrusions operations in Germany, Canada, and China. The Reorganized Debtors may continue to explore opportunities to expand their international operations. The international operations generally will be subject to risks, including the following:

➢ changes in U.S. and international governmental regulations, trade restrictions and laws, including tax laws and regulations;

➢ currency exchange rate fluctuations;

➢ tariffs and other trade barriers;

➢ the potential for nationalization of enterprises;

➢ interest rate fluctuations;

➢ high rates of inflation;

➢ currency restrictions and limitations on repatriation of profits;

➢ divergent environmental laws and regulations; and

➢ political, economic and social instability.

The occurrence of any of these events could cause the Reorganized Debtors' costs to rise, limit growth opportunities or have a negative effect on their operations and their ability to plan for future periods and subject the Reorganized Debtors to risks not generally prevalent in the United States.

The financial condition and results of operations of some of the Reorganized Debtors' operating entities will be reported in various currencies and then translated into U.S. dollars at the applicable exchange rate for inclusion in the consolidated financial statements. As a result, appreciation of the U.S. dollar against these currencies will have a negative impact on reported revenues and operating profit while depreciation of the U.S. dollar against these currencies generally will have a positive effect on reported revenues and operating profit. In addition, a portion of the revenues generated by the Reorganized Debtors' international operations will be denominated in U.S. dollars, while the majority of costs incurred are denominated in local currencies. As a result, appreciation in the U.S. dollar generally will have a positive impact on earnings while depreciation of the U.S. dollar generally will have a negative impact on earnings. The Reorganized Debtors will seek to reduce the risks associated with currency exchange rate fluctuation by using derivative financial investments, but no assurances can be made that such activities will be successful.

11. **Current environmental liabilities, as well as the cost of compliance with and liabilities under health and safety laws, could increase operating costs and negatively affect the Reorganized Debtors' financial condition and results of operations.**

The Reorganized Debtors' operations will be subject to federal, state, local and foreign environmental laws and regulations, which govern, among other things, air emissions, wastewater discharges, the handling, storage, and disposal of hazardous substances and wastes, the remediation of contaminated sites, and employee health and safety. Future environmental regulations could impose stricter compliance requirements on the industries in which they operate. Additional pollution control equipment, process changes, or other environmental control measures may be needed at some of the facilities to meet future requirements.

Financial responsibility for contaminated property can be imposed on the Reorganized Debtors where current operations have had an environmental impact. Such liability can include the cost of investigating and remediating contaminated soil or ground water, fines and penalties sought by environmental authorities, and damages arising out of personal injury, contaminated property, and other toxic tort claims, as well as lost or impaired natural resources. Certain environmental laws impose strict, and in certain circumstances joint and several, liability for certain kinds of matters, such that a person can be held liable without regard to fault for all of the costs of a matter even though others were also involved or responsible. These costs of all such matters have not been material to net income (loss) for any accounting period of the Debtors since January 1, 2002. However, future remedial requirements at currently owned or operated properties or adjacent areas could result in significant liabilities.

Changes in environmental requirements or changes in their enforcement could materially increase the Reorganized Debtors' costs. For example, if salt cake, a by-product from some of the recycling operations, were to become classified as a hazardous waste in the United States, the costs to manage and dispose of it would increase and could result in significant increased expenditures.

**12.     The Reorganized Debtors could experience labor disputes that could disrupt their business.**

Approximately 45% of the Company's U.S. employees and substantially all of its non-U.S. employees, located primarily in Europe where union membership is common, are represented by unions or equivalent bodies and are covered by collective bargaining or similar agreements that are subject to periodic renegotiation. Although the Debtors believe that the Reorganized Debtors will be able to successfully negotiate new collective bargaining agreements when the current agreements expire, these negotiations may not prove successful, may result in a significant increase in the cost of labor, or may break down and result in the disruption of operations.

Labor negotiations may not conclude successfully, and, in that case, work stoppages or labor disturbances may occur. Any such stoppages or disturbances may have a negative impact on the financial condition and results of operations of the Reorganized Debtors by limiting plant production, sales volumes and profitability.

As reviewed *supra*, Section IV.C.7 entitled, "THE CHAPTER 11 CASES—Significant Events During the Chapter 11 Cases—Developments Regarding the Debtors' Proposed Termination of Pension Plans" at pp. 45-46, entry of the confirmation order (and the occurrence of the Confirmation Date) is subject to the termination of the certain pension plans, including the USW Plans, in accordance with 29 U.S.C. §§ 1341(c) or 1342(a). Because the USW Plans are maintained pursuant to the USW CBAs, the contractual obligation to maintain USW Plans must be modified in order for the conditions set forth in Section 10.1 to be met and the USW Plans to be terminated. *See supra*, Section IV.C.7 entitled, "THE CHAPTER 11 CASES—Significant Events During the Chapter 11 Cases—Developments Regarding the Debtors' Proposed Termination of Pension Plans" at pp. 45-46, for a fuller discussion of this condition precedent, the legal requirements for achieving this condition precedent, and the Debtors' waiver of the right to utilize section 1113.

**13.     The U.S. Debtors may be unable to terminate the Pension Plans prior to the expected entry of the Confirmation Order.**

The U.S. Debtors may be unable to terminate the Pension Plans prior to the expected entry of the Confirmation Order. A condition to entry of the Confirmation Order is that the Pension Plans be terminated in accordance with 29 U.S.C. § 1341(c) or 1342. As described elsewhere in this Disclosure Statement, such termination is subject to a number of conditions. Accordingly, if the Pension Plans are not terminated and such condition is not waived in accordance with the terms of the Plan, the failure to have the Pension Plans terminated by the time the Bankruptcy Court is prepared to enter the Confirmation Order may delay or inhibit the confirmation of the Plan and the occurrence of the Effective Date.

**14.** **The Reorganized Debtors will need to generate sufficient cash to service their debt. Their ability to generate cash depends on many factors beyond the Reorganized Debtors' control, and any failure to meet their debt services obligations could harm the business, financial condition, and results of operations of the Reorganized Debtors.**

The Reorganized Debtors' ability to satisfy their debt obligations will primarily depend upon their future operating performance. As a result, prevailing economic conditions and financial, business, and other factors, many of which are beyond the Reorganized Debtors' control, will affect their ability to make payments to satisfy their debt obligations.

If the Reorganized Debtors do not generate sufficient cash flow from operations to satisfy their debt service obligations, they may have to undertake alternative financing plans, such as refinancing or restructuring their debt, selling assets, reducing or delaying capital investments, or seeking to raise additional capital. Their ability to restructure or refinance their debt will depend on the condition of the capital markets and the financial condition of the Reorganized Debtors at such time. Any refinancing could be at higher interest rates and may require the Reorganized Debtors to comply with more onerous covenants, which could further restrict their business operations. The terms of existing or future debt instruments may restrict the Reorganized Debtors from adopting some of these alternatives, which in turn could exacerbate the effects of any failure to generate sufficient cash flow to satisfy their debt obligations. In addition, any failure to make payments of interest and principal on outstanding debt on a timely basis would likely result in a reduction of the credit rating of the Reorganized Debtors, which could harm their ability to incur additional indebtedness on acceptable terms.

The Reorganized Debtors' inability to generate sufficient cash flow to satisfy their debt obligations, or to refinance their obligations on commercially reasonable terms or at all, would have an adverse affect, which could be material, on their business, financial condition, and results of operations and may restrict current and future operations of the Reorganized Debtors, particularly their ability to respond to business changes or to take certain actions.

**15.** **The Reorganized Debtors' Exit ABL Facility may restrict current and future operations of the Reorganized Debtors, particularly their ability to respond to business changes or to take certain actions.**

The credit agreement governing the Reorganized Debtors' Exit ABL Facility is likely to contain a number of restrictive covenants that impose significant operating and financial restrictions, including restrictions on the ability to take actions that may be in the best long term interest of the Reorganized Debtors. The credit agreement governing the Exit ABL Facility is likely to include covenants that, among other things, restrict the ability of the Reorganized Debtors to do the following:

➢ incur additional indebtedness;

➢ pay dividends on capital stock and make other restricted payments;

➢ make investments and acquisitions;

➢ engage in transactions with affiliates;

➢ sell assets;

➢ merge; and

➢ create liens.

A breach of any of the restrictive covenants in the Exit ABL Facility would result in a default thereunder.  If such default occurs, the lenders under the Exit ABL Facility may elect to declare all outstanding borrowings under the Exit ABL Facility, together with accrued and unpaid interest and other fees, to be immediately due and payable or enforce their security interests.   The lenders will also have the right in these circumstances to terminate any commitments they have to provide further borrowings.

The operating and financial restrictions and covenants in the Exit ABL Facility and any other future financing agreements may adversely affect the ability of the Reorganized Debtors to finance future operations or capital needs or to engage in other business activities.

# IX.

## EXEMPTIONS FROM SECURITIES ACT REGISTRATION

### A.     Transfer and Securities Laws Restrictions.

#### 1.     New Securities and the Rights Offering.

Pursuant to the Contribution Agreement, HoldCo will issue New Common Stock and will contribute the New Common Stock to IntermediateCo, and IntermediateCo will issue the IntermediateCo Preferred Stock and IntermediateCo Notes and contribute the New Common Stock, IntermediateCo Notes, and cash proceeds received upon the sale of the IntermediateCo Preferred Stock to the OpCos.  Pursuant to the Acquisition Agreement, the OpCos will transfer the New Common Stock, IntermediateCo Notes, and a portion of the cash proceeds received upon the sale of the IntermediateCo Preferred Stock to Aleris, in exchange for substantially all of the assets of Aleris and the Dissolving U.S. Subsidiaries.  Aleris, in turn, will distribute the New Common Stock and IntermediateCo Notes pursuant to the Rights Offering and the Plan. IntermediateCo will sell the IntermediateCo Preferred Stock to the Backstop Parties pursuant to the Equity Commitment Agreement.  Pursuant to the Rights Offering, holders of Allowed U.S Roll-Up Term Loan Claims, Allowed European Roll-Up Term Loan Claims, or Allowed European Term Loan Claims that elect to receive, and are eligible to exercise, Subscription Rights to purchase New Common Stock and IntermediateCo Notes will receive New Common Stock and IntermediateCo Notes.

#### 2.     Transfer and Securities Laws Restrictions.

##### a.     *The Subscription Rights.*

The Subscription Rights are being offered only to those holders of the Allowed U.S. Roll-Up Term Loan Claims, the Allowed European Roll-Up Term Loan Claims, and the Allowed European Term Loan Claims who are either (i) "accredited investors" as defined in Regulation D under the Securities Act or (ii) not "U.S. persons" as defined in Regulation S under the Securities Act.

These definitions are included with the Subscription Form that accompanies this Disclosure Statement if you are a holder of U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, or European Term Loan Claims.

##### b.     *Issuance and Resale of the New Common Stock.*

*The following securities are being issued under section 1145 of the Bankruptcy Code:*

> ➢  New Common Stock distributed to holders of U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, and European Term Loan Claims (other than New Common Stock distributed to Rights Offering Participants pursuant to the Rights Offering).

As described in detail below, such securities will be "freely-tradable."

*The following securities are being issued under Regulation D and Regulation S of the Securities Act:*

> ➢ All New Common Stock distributed to Rights Offering Participants pursuant to the Rights Offering (other than New Common Stock distributed to the Backstop Parties pursuant to the Equity Commitment Agreement) and

> ➢ All IntermediateCo Notes distributed to Rights Offering Participants pursuant to the Rights Offering (other than IntermediateCo Notes distributed to the Backstop Parties pursuant to the Equity Commitment Agreement).

These securities will be "restricted securities" and cannot be sold absent registration under the Securities Act or pursuant to an exemption therefrom.

*The following securities are being issued under Section 4(2) of the Securities Act:*

> ➢ All New Common Stock distributed to the Backstop Parties pursuant to the Equity Commitment Agreement,

> ➢ All IntermediateCo Notes distributed to the Backstop Parties pursuant to the Equity Commitment Agreement, and

> ➢ All IntermediateCo Preferred Stock issued to the Backstop Parties pursuant to the Equity Commitment Agreement.

These securities will be "restricted securities" and cannot be sold absent registration under the Securities Act or pursuant to an exemption therefrom.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale, under a chapter 11 plan of reorganization, of a security of a debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to a debtor under a plan, if such securities are offered or sold in exchange for a claim against, or equity interest in, such debtor or affiliate. In reliance upon this exemption, the New Common Stock distributed under the Plan (other than pursuant to the Rights Offering or Equity Commitment Agreement), (the "*1145 Securities*") to be distributed to holders of claims against the Debtors generally will be exempt from the registration requirements of the Securities Act, and state and local securities laws. Accordingly, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. Recipients of new securities distributed under the Plan, however, are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who (i) purchases a claim with a view to distribution of any security to be

received in exchange for the claim other than in ordinary trading transactions, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (iv) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities.

Notwithstanding the foregoing, control person underwriters, as referred to in clause (iv) above, may be able to sell securities without registration pursuant to the resale limitations of Rule 144 under the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements and certain other conditions. Parties who believe they may be underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144 or other applicable exemptions.

To the extent that persons receive shares of New Common Stock pursuant to the Rights Offering or persons deemed to be "underwriters" receive 1145 Securities pursuant to the Plan (collectively, the "***Restricted Holders***"), resales by Restricted Holders would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Restricted Holders may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 of the Securities Act.

Under certain circumstances, holders of 1145 Securities deemed to be "underwriters" or holders of the New Common Stock received pursuant to the Rights Offering or the Equity Commitment Agreement may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available, and in compliance with applicable state and foreign securities laws. Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold in any three-month period, the requirement that the securities be sold in a "brokers' transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the SEC. The Debtors cannot assure, however, that adequate current public information will exist with respect to any issuer of 1145 Securities or New Common Stock issued pursuant to the Rights Offering or the Equity Commitment Agreement and therefore, that the safe harbor provisions of Rule 144 of the Securities Act will be available.

**c.** *Legends.*

Certificates evidencing shares of New Common Stock received by Rights Offering Participants (including the Backstop Parties) pursuant to the Rights Offering, IntermediateCo Notes and shares of the IntermediateCo Preferred Stock and certificates evidencing such Securities received by holders of at least 10% of the outstanding voting stock of HoldCo will bear a legend substantially in the form below:

[THIS NOTE] [THESE SHARES OF COMMON STOCK] [THESE SHARES OF PREFERRED STOCK] HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND SAID LAWS OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS THEREOF.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

### d.    *Listing; No SEC Filings.*

Upon the consummation of the Plan, the New Common Stock, IntermediateCo Notes, and IntermediateCo Preferred Stock will not be publicly traded or listed on any nationally recognized market or exchange. Neither HoldCo nor IntermediateCo will be required to, nor do they intend to, file periodic reports with the SEC.

# X.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Claims. This discussion does not address the U.S. federal income tax consequences to holders of Claims who are unimpaired or otherwise entitled to payment in full in Cash under the Plan, to holders of Insured Claims, or to holders of Claims who are deemed to reject the Plan. *See* Section XI, entitled, "GERMAN INCOME TAX CONSEQUENCES OF THE PLAN," for a discussion of the Plan with respect to ADH and certain holders of Claims against ADH.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "***Tax Code***"), Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("***IRS***") and other applicable authorities, all as in effect on the date of this Disclosure Statement, and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and are subject to significant uncertainties. The Debtors have not requested, and do not expect to request, a ruling from the IRS or any other tax authority with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or such other authorities. Thus, no assurance can be given that the IRS or such other authorities would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion under this heading does not address foreign, state or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, mutual funds, small business investment companies, regulated investment companies, banks and certain other financial institutions, insurance companies, tax-exempt organizations, holders that are, or hold Claims through, pass-through entities, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction). If a partnership (or other entity taxed as a partnership) holds a Claim, the tax treatment of a partner in the partnership generally will depend upon the status of the partner and upon the activities of the partnership. Moreover, the following discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the exchange consideration in the secondary market.

This discussion also assumes that the U.S. Roll-Up Term Loan Claims, European Roll-Up Term Loan Claims, European Term Loan Claims, New Common Stock, Subscription Rights and IntermediateCo Notes are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code, and that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

As used in this section of the Disclosure Statement, the term "***U.S. Holder***" means a beneficial owner that is for U.S. federal income tax purposes one of the following:

> ➢ an individual who is a citizen or resident of the United States;

> ➢ a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

> ➢ an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

> ➢ a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

Non-U.S. Holders are subject to special U.S. federal income tax provisions, some of which are discussed below.

**The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of Claims.**

> *__IRS Circular 230 Notice__: To ensure compliance with IRS Circular 230, holders of Claims and Interests are hereby notified that: (i) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims and Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (ii) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (iii) holders of Claims and Interests should seek advice based on their particular circumstances from an independent tax adviser.*

**A.      Consequences to the U.S. Debtors.**

For U.S. federal income tax purposes, the U.S. Debtors are members of an affiliated group of corporations, of which Aurora is the common parent (the "*Aleris Group*"), and file a single consolidated U.S. federal income tax return, or are disregarded or pass-through entities for U.S. federal income tax purposes wholly or substantially owned by members of the Aleris Group.  The Aleris Group has reported net operating loss ("*NOL*") carryforwards of approximately $80.3 million for U.S. federal income tax purposes as of the end of 2008 and expects to report operating losses for its taxable year ended December 31, 2009.  The amount of any such NOL carryforwards and losses remains subject to audit and adjustment by the IRS.

As discussed below, it is anticipated that any losses and credits of the Aleris Group will be either utilized or eliminated in connection with the implementation of the Plan, whether on account of attribute reduction resulting from the cancellation of debt ("**COD**"), or as a result of the implementation of the transactions contemplated by the Plan and the Acquisition Agreement (including the Restructuring Transactions). In addition, the tax basis of the assets held by certain of the Reorganized U.S. Debtors may be reduced in connection with the implementation of the Plan.

## 1. Implementation of the Plan and Acquisition Agreement.

Pursuant to the Plan and the Acquisition Agreement, and in accordance with the Restructuring Transactions, approximately eight corporations (the OpCos, each of which is an indirect subsidiary of HoldCo) will acquire, in the aggregate, all or substantially all of the assets of Aleris and the Dissolving U.S. Subsidiaries (the "***Asset Acquisition***"). Each OpCo will acquire the assets relating, directly or indirectly, to a separate business division or other segment of the operations of the Aleris Group. HoldCo and its U.S. subsidiaries, including the OpCos (collectively, the "***HoldCo Group***"), intend to file a U.S. consolidated federal income tax return. The consideration for the acquisition of the assets by the OpCos will be New Common Stock and IntermediateCo Notes.

The Debtors believe that, for U.S. federal income tax purposes, the Asset Acquisition should be treated as – and the discussion herein assumes treatment as – a taxable transaction, such that the OpCos would obtain a new cost basis in the assets acquired (or deemed acquired) from Aleris and the Dissolving U.S. Subsidiaries and, where applicable, Aleris's other subsidiaries for U.S. federal income tax purposes, based on the fair market value of such assets acquired on the Effective Date. The OpCos would not succeed to any tax attributes of Aleris or the Dissolving U.S. Subsidiaries, although any corporate subsidiary generally would retain its tax attributes, subject to any required reductions on account of COD and any applicable limitations (as discussed below), unless the HoldCo Group properly elects to treat the acquisition of the subsidiary as a taxable acquisition of its underlying assets under section 338 of the Tax Code.

So treated, the Aleris Group generally would recognize gain or loss upon the transfer in an amount equal to the difference between the fair market value of the consideration received for U.S. federal income tax purposes and the tax basis of such assets (including any assets deemed transferred, such as by reason of the transfer of the membership interests in a wholly-owned limited liability company that is disregarded for U.S. federal income tax purposes, or pursuant to an election under section 338 of the Tax Code). Based upon the projected enterprise value, and due to the substantial tax basis in the assets being transferred (in the aggregate, projected to be upwards of approximately $2.1 billion as of September 30, 2009), the Debtors believe that no significant U.S. federal, state or local income tax liability, if any, should be incurred upon the transfer. However, the fair market value of the property may vary from current estimates and, in any event, the amount of gain or loss and resulting tax liability will remain subject to audit and adjustment by the IRS or other applicable taxing authority.

Although the Debtors expect the Asset Acquisition to be treated as a taxable transaction, there is no assurance that the IRS would not take a contrary position. Were the transfer of assets to the OpCos determined to constitute a tax-free reorganization, the HoldCo

Group would carry over the tax attributes of Aleris and its subsidiaries (including tax basis in assets), subject to the required attribute reduction attributable to the substantial COD incurred and other applicable limitations (as discussed below).  The required attribute reduction would be expected to leave the HoldCo Group with little or no NOL carryforwards and with a significantly diminished tax basis in its assets (with the result that the HoldCo Group could have increased taxable income over time, as such assets are sold or would otherwise be depreciated or amortized).

**2.      Cancellation of Debt.**

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes – such as NOL carryforwards, net capital loss carryforwards, current year NOLs, capital losses, tax credits and tax basis in assets – by the amount of any COD incurred pursuant to a confirmed chapter 11 plan.  The COD incurred is generally the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefore, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the cancelled debt would have given rise to a tax deduction).  Where the borrower joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the borrower and other members of the group also be reduced.  To the extent the amount of COD exceeds the tax attributes available for reduction, the remaining COD generally is excluded without further tax cost to the debtor.

Alternatively, the American Recovery and Reinvestment Act of 2009 permits a debtor to elect to defer the inclusion of COD income resulting from its chapter 11 plan (thereby preserving the current use of its tax attributes, subject to applicable limitations), with the amount of COD income becoming includible in its income ratably over a five-taxable year period beginning in the fourth taxable year after the COD income arises (if the chapter 11 plan is consummated in 2010).

As a result of the discharge of Claims pursuant to the Plan, the U.S. Debtors will incur substantial COD.  The extent of such COD and resulting tax attribute reduction will depend, in principal part, on the value of the New Common Stock and IntermediateCo Notes distributed.  Based on the projected enterprise value of the Reorganized Debtors (*see* Section VII.A, entitled, REORGANIZATION VALUE – Going Concern Valuation"), it is estimated that the Debtors will incur approximately $1.9 billion of COD.  However, any reduction in tax attributes attributable to such COD does not occur until the end of the taxable year in which the COD is incurred.  Accordingly, the Debtors do not expect the attribute reduction resulting from the discharge of debt under the Plan to affect the U.S. federal income tax treatment of the Asset Acquisition to the Aleris Group (as described above).  Any NOLs or other tax attributes of Aleris (including those resulting from the Asset Acquisition), and of any subsidiary Debtor that is treated as selling its assets for U.S. federal income tax purposes in connection with the implementation of the Plan, will be eliminated by reason of the attribute reduction or upon the actual or deemed liquidation of such Debtor for U.S. federal income tax purposes.  In contrast, the tax attributes of any corporate Debtor that is acquired by an OpCo but is not treated as having sold its assets will be subject to reduction in respect of the COD incurred by it and the Aleris

Group (a "**Non-Selling Debtor**"), with the result that any NOL carryforwards of such Debtor may be eliminated and its tax basis in its assets may be significantly reduced.

### 3. Limitations on NOL Carryforwards and Other Tax Attributes.

Following the Effective Date, any Non-Selling Debtor may be subject to the provisions of section 382 of the Tax Code. Under section 382, any remaining NOL carryforwards and certain other tax attributes (including current year NOLs) allocable to periods prior to the Effective Date (collectively, "**Pre-change Losses**") may be limited as a result of the change in ownership of the Debtor pursuant to the Plan. These limitations apply in addition to, and not in lieu of, the attribute reduction that may result from the potential COD arising in connection with the Plan.

Under section 382, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its Pre-change Losses that may be utilized to offset future taxable income is subject to an annual limitation. A loss corporation generally undergoes an ownership change if the percentage of stock of the corporation owned by one or more 5% shareholders has increased by more than 50 percentage points over a three-year period (with certain groups of less-than-5% shareholders treated as a single shareholder for this purpose). Pursuant to the Plan, an ownership change of each Non-Selling Debtor will occur pursuant to the Plan.

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change would be subject is equal to the product of (i) the fair market value of the stock of the corporation *immediately before* the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (4.14% for ownership changes occurring in February 2010, for example). This annual limitation sometimes may be increased in the event the corporation has an overall "built-in" gain in its assets at the time of the ownership change. For a corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the stock value generally is determined *immediately after* (rather than before) the ownership change after giving effect to the surrender of creditors' claims, but subject to certain adjustments (which can result in a reduced stock value); in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-change Losses (absent any increases due to recognized net built-in gains).

Accordingly, the impact of an ownership change on any Non-Selling Debtors depends upon, among other things, the amount of Pre-change Losses remaining after any reduction of attributes due to the COD, the value of both the stock and assets of the applicable

Debtor at or about the Effective Date, the continuation of their respective businesses, and the amount and timing of future taxable income.

Among the Pre-change Losses to which section 382 applies, section 382 can operate to limit the deduction of "built-in" losses recognized subsequent to the date of the ownership change. If a loss corporation has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of built-in income, gain, loss and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as Pre-change Losses and similarly will be subject to the annual limitation. In general, a loss corporation's net unrealized built-in loss will be deemed to be zero unless such loss exceeds the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. Whether a Non-Selling Debtor will be subject to the limitation for "built-in" losses will depend upon the respective value of the Debtor's assets immediately before the Effective Date.

An exception to the foregoing annual limitation rules generally applies where qualified (so-called "old and cold") creditors of a debtor receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. However, the Debtors do not believe that they will qualify for this exception.

## B.     Consequences to U.S. Holders of Certain Claims.

Pursuant to the Plan, and in satisfaction of their respective Claims, holders of Allowed U.S. Roll-Up Term Loan Claims (U.S. Debtors Class 3), Allowed European Roll-Up Term Loan Claims (ADH Class 2), and European Term Loan Claims (ADH Class 3) will receive, at their election, either (a) New Common Stock and Subscription Rights or (b) Cash, and holders of Allowed Convenience Claims (U.S. Debtors Class 4) and Allowed General Unsecured Claims (U.S. Debtors Class 5) will receive Cash.

As discussed above (*see* Section X.A.1, entitled, "CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN – Consequences to the U.S. Debtors – Implementation of the Plan and Acquisition Agreement"), the discussion herein assumes that the Asset Acquisition will be treated as a taxable transfer by Aleris, with the result that any consideration received by creditors in respect of their Claims would be considered received in a taxable transaction in which the creditors generally recognize gain or loss. Were the Asset Acquisition not a taxable transfer by Aleris, the U.S. federal income tax consequences of the Plan to holders of Allowed U.S. Roll-Up Term Loan Claims receiving New Common Stock and Subscription Rights could vary from that described below.

### 1.     Gain or Loss.

In general, a U.S. Holder of such an Allowed Claim will recognize gain or loss upon implementation of the Plan in an amount equal to the difference between (i) the "amount realized" by the U.S. Holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest, and excluding any portion required to be treated as imputed interest, as described below) and (ii) the U.S. Holder's adjusted tax basis in its Claim (other than any Claim for

accrued but unpaid interest). For a discussion of the tax consequences of any Claims for accrued but unpaid interest, *see* Section X.B.2, entitled, "CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN – Consequences to U.S. Holders of Certain Claims – Distributions in Respect of Accrued Interest," below. The "amount realized" by a U.S. Holder should equal the sum of the amount of any Cash, and the fair market value of any New Common Stock and Subscription Rights (*see* Section X.B.3, entitled, "CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN – Consequences to U.S. Holders of Certain Claims – Tax Treatment of Subscription Rights"), received in satisfaction of such U.S. Holder's Claim.

As and when any Disputed General Unsecured Claims become disallowed, U.S. Holders of previously Allowed General Unsecured Claims in U.S. Debtors Class 5 will become entitled to additional Cash. Furthermore, under certain circumstances, holders of Allowed Convenience Claims may be eligible for additional Cash. As to any subsequent distributions, the imputed interest provisions of the Tax Code may apply to treat a portion of such amounts as imputed interest. It is also possible that any loss, or a portion of any gain, realized by a U.S. Holder of an Allowed General Unsecured Claim in U.S. Debtors Class 5 may be deferred until all Disputed General Unsecured Claims are resolved. U.S. Holders are urged to consult their tax advisers regarding the possible applicability of, and the ability to elect out of, the installment method with respect to any gain recognized.

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder and how long it has been held, whether the Claim was acquired at market discount, and whether and to what extent the U.S. Holder previously had claimed a bad debt deduction.

A U.S. Holder's tax basis in any New Common Stock and Subscription Rights received will equal the fair market value of such stock and rights. The holding period for any New Common Stock and Subscription Rights received generally will begin the day following the issuance of such stock and rights.

## 2. Distributions in Respect of Accrued Interest.

In general, to the extent that any consideration received by a U.S. Holder of an Allowed Claim (whether in cash, stock or other property) is received in satisfaction of interest or original issue discount ("**OID**") that accrued during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income). Conversely, a U.S. Holder generally recognizes a deductible loss to the extent any accrued interest or amortized OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a U.S. Holder of a Claim in an otherwise tax-free exchange could not claim a current deduction with respect to any unpaid OID. Accordingly, it is also unclear whether, by analogy, a U.S. Holder of a Claim in a fully taxable exchange would be viewed by the IRS as required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that consideration received in respect of an Allowed Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest (in contrast, for example, to a pro rata allocation of a portion of the exchange consideration received between principal and interest, or an allocation first to accrued but unpaid interest). There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.

### 3. Tax Treatment of Subscription Rights.

The characterization of the Subscription Rights and their subsequent exercise for U.S. federal income tax purposes – as simply the exercise of options to acquire the underlying stock and notes or, alternatively, as an integrated transaction pursuant to which the underlying stock and notes are acquired directly in partial satisfaction of a U.S. Holder's Claim – is uncertain. Regardless of the characterization, however, a U.S. Holder of Subscription Rights generally will not recognize any gain or loss upon the exercise of such Subscription Rights (beyond the gain or loss recognized in respect of its Claim, as described above).

A U.S. Holder's aggregate tax basis in the New Common Stock and IntermediateCo Note received upon exercise of a Subscription Right should be equal to the sum of (i) the amount paid for the New Common Stock and IntermediateCo Notes and (ii) the U.S. Holder's tax basis, if any, in the Subscription Rights (or underlying stock and notes) due to the receipt of such interest in partial satisfaction of its Allowed Claim. The IntermediateCo Notes are intended to have a fair market value approximately equal to their stated principal amount. Accordingly, pursuant to the Plan and the terms of the Subscription Rights, the exercise price will be allocated to the IntermediateCo Notes in an amount equal to their stated principal amount, with the remainder allocated to the New Common Stock. The Debtors believe that a U.S. Holder's tax basis in its respective notes and stock received should be determined consistent with this allocation. A U.S. Holder will commence a new holding period with respect to the New Common Stock and IntermediateCo Notes acquired.

Upon the lapse or disposition of a Subscription Right, the U.S. Holder generally would recognize gain or loss equal to the difference between the amount received (zero in the case of a lapse) and its tax basis in the Subscription Right (if any). In general, such gain or loss would be a capital gain or loss, long-term or short-term, depending upon whether the requisite holding period was satisfied.

### 4. Ownership and Disposition of the IntermediateCo Notes.

#### a. *Stated Interest and Original Issue Discount.*

The IntermediateCo Notes will be issued with OID in an amount equal to the excess of the "stated redemption price at maturity" of the notes over their "issue price." For purposes of the foregoing, the general rule is that the stated redemption price at maturity of a debt instrument is the sum of all payments provided by the debt instrument other than payments of qualified stated interest. None of the stated interest payments on the IntermediateCo Notes will constitute qualified stated interest, due to the ability to defer the payment of such interest

until the maturity of the notes. Thus, cash interest on the IntermediateCo Notes will be included in the stated redemption price at maturity and taxed as part of OID.

The "issue price" of the IntermediateCo Notes principally depends on whether, at any time during the 60-day period ending 30 days after the exchange date, such notes are traded on an "established market." If the IntermediateCo Notes are treated for this purpose as traded on an established market, the issue price of the IntermediateCo Notes will equal the fair market value of such notes, as of the Effective Date. In such event, an IntermediateCo Note will be treated as issued with additional OID to the extent that its issue price is less than its principal amount. As indicated in the preceding section, the IntermediateCo Notes are intended to have a fair market value approximately equal to their stated principal amount. Consistent therewith, the terms of the Subscription Rights provide for an allocation of the exercise price to the IntermediateCo Notes in an amount equal to their stated principal amount. Accordingly, whether or not the IntermediateCo Notes are traded on an established market, the Debtors expect that the "issue price" of the note will be their stated principal amount. In general, the Debtors' determination of issue price will be binding on all holders (subject to examination by the IRS), other than a holder that explicitly discloses its inconsistent treatment in a statement attached to its timely filed tax return for the taxable year in which the holder acquires the IntermediateCo Notes.

Pursuant to applicable Treasury regulations, an "established market" need not be a formal market. It is sufficient that the notes appear on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations or actual prices of recent sales transactions. Also, under certain circumstances, notes are considered to be publicly traded when price quotations for such notes are readily available from dealers, brokers or traders. There can be no assurance that the IntermediateCo Notes will not be traded on an "established market" on or after the Effective Date. If the IntermediateCo Notes are traded on an established market and, contrary to the Debtors' expectation, the fair market value of such notes is less than their stated principal amount, then such notes could have additional OID and, depending on the value, such OID could be substantial.

A U.S. Holder generally must include OID in gross income as it accrues over the term of the notes using the "constant yield method" without regard to its regular method of accounting for U.S. federal income tax purposes, and in advance of the receipt of cash payments attributable to that income. However, a U.S. Holder generally will not be required to include separately in income cash interest payments paid or accrued on the notes. Any OID that a U.S. Holder includes in income will increase its tax basis in the notes, and any cash interest payments will reduce its tax basis in the notes by the amount of the payments.

Any OID on the IntermediateCo Notes generally will be amortizable by IntermediateCo utilizing the constant yield method and deductible as interest as it accrues, unless the IntermediateCo Notes are treated as applicable high yield discount obligations ("***AHYDOs***") within the meaning of the Tax Code. Based on the expected issue price of the IntermediateCo Notes, the Debtors do not expect that the IntermediateCo Notes will be subject to the AHYDO rules; however, there can be no assurance that the IRS will not take a contrary position (in which event the deduction could be deferred and a portion possibly disallowed).

The income of a corporate holder of the IntermediateCo Notes with respect to any portion of the OID for which a deduction is disallowed generally would be treated as a dividend for purposes of the dividends-received-deduction to the extent IntermediateCo has sufficient "earnings and profits" such that a similar distribution in respect of stock would have been treated as a dividend for U.S. federal income tax purposes. Presumably, a corporate holder's entitlement to a dividends-received-deduction would be subject to the normal holding period and taxable income requirements and other limitations applicable to dividends-received-deductions.

### b. *Possible Acquisition at a Market Discount.*

If the IntermediateCo Notes are not traded on an established market, such that their issue price is equal to their stated principal amount irrespective of the fair market value of the notes, it is possible (although contrary to the Debtors' expectations) that the IntermediateCo Notes can have a fair market value significantly less than the stated principal amount. In such event, the notes will have been acquired at a market discount, and the holder will be subject to the market discount rules of the Tax Code (unless the discount is less than a *de minimis* amount).

Under the market discount rules, a holder is required to treat any principal payment on, or any gain recognized on the sale, exchange, retirement or other disposition of, an IntermediateCo Note as ordinary income to the extent of the market discount that is treated as having accrued on such note at the time of such payment or disposition and has not yet previously been included in income. A holder can be required to defer the deduction of a portion of the interest expense on any indebtedness incurred or maintained to purchase or to carry a market discount note, unless an election is made to include all market discount in income as it accrues. Such an election would apply to all bonds acquired by the holder on or after the first day of the first taxable year to which such election applies, and may not be revoked without the consent of the IRS.

Any market discount will be considered to accrue on a straight-line basis during the period from the date of acquisition of such IntermediateCo Notes to the maturity date of such notes, unless the holder irrevocably elects to compute the accrual on a constant yield basis. This election can be made on a note-by-note basis.

### c. *Sale, Exchange or Other Disposition of the IntermediateCo Notes (including Conversion).*

Any gain or loss recognized by a U.S. Holder on a sale, exchange or other disposition of the IntermediateCo Notes (including the conversion of the notes into New Common Stock) generally should be capital gain or loss in an amount equal to the difference, if any, between the amount realized by the U.S. Holder and the U.S. Holder's adjusted tax basis in the notes immediately before the sale, exchange, conversion or other disposition (increased for any OID accrued through the date of disposition, which OID would be includible as ordinary income, less any cash payments of stated interest). Any such gain or loss generally should be long-term capital gain or loss if the U.S. Holder's holding period in its interests is more than one year at that time.

A U.S. Holder's tax basis in any New Common Stock received upon a conversion of the IntermediateCo Notes generally should equal the fair market value of such stock, and the holding period for any New Common Stock received generally will begin the day following the issuance of such stock.

## 5. Information Reporting and Backup Withholding.

Payments of interest or dividends (including accruals of OID) and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of stock and notes, may be subject to "backup withholding" (currently at a rate of 28%) if a recipient of those payments fails to furnish to the payor certain identifying information or to make certain certifications. Backup withholding is not an additional tax. Any amounts deducted and withheld should generally be allowed as a credit against that recipient's U.S. federal income tax, if any, provided that appropriate proof is provided to the IRS under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments that is required to supply information but does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. U.S. Holders should consult their tax advisers regarding their qualification for exemption from backup withholding and information reporting, and the procedures for obtaining such an exemption.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. U.S. Holders are urged to consult their tax advisers regarding these regulations and whether the exchanges contemplated by the Plan would require disclosure on the U.S. Holders' tax returns.

## C. Consequences to Non-U.S. Holders of Certain Claims.

### 1. Exchanges under the Plan.

#### a. *Consequences of Exchange.*

Subject to the discussion below with respect to accrued interest, a non-U.S. Holder generally will not be subject to U.S. federal income or withholding tax on any gain realized in an exchange of Allowed Claims pursuant to the Plan, unless (i) the holder is an individual who was present in the United States for 183 days or more during the taxable year, such holder has a "tax home" in the United States and certain other conditions are met, or (ii) such gain is effectively connected with such non-U.S. Holder's conduct of a trade or business within the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States). If the first exception applies, to the extent that any gain is taxable (*i.e.*, not deferred under the rules applicable to tax-free exchanges), the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable

income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of the Claims. If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

### b. *Accrued Interest.*

Payments to a non-U.S. Holder that are attributable to accrued interest (including OID and any imputed interest) generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, an IRS Form W-8BEN, IRS Form W-8EXP or, in either case, a successor form) establishing that the non-U.S. Holder is not a U.S. person, unless

(1)     the non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of Aleris stock that are entitled to vote,

(2)     the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the issuer (each, within the meaning of the Tax Code),

(3)     the non-U.S. Holder is a bank which acquired the Allowed Claim by making a loan in the ordinary course of its trade or business, or

(4)     such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (and if an income tax treaty applies, such interest is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) (in which case, provided the non-U.S. Holder provides a properly-executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the interest or OID at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

A non-U.S. Holder that does not qualify for exemption from withholding tax under the foregoing paragraph generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax

treaty) on payments that are attributable to accrued interest (including OID). For purposes of providing a properly-executed IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8EXP (or, in each case, a successor form), special procedures are provided under applicable Treasury regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

The Plan provides that consideration received in respect of a Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest (in contrast, for example, to a pro rata allocation of a portion of the exchange consideration received between principal and interest, or an allocation first to accrued but unpaid interest). There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. You are urged to consult your own tax adviser regarding the allocation of consideration and the deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

Payments of accrued market discount are not treated as interest for purposes of applicable U.S. withholding tax rules.

### c.  *Treaty Benefits.*

To claim the benefits of a treaty, a non-U.S. Holder must provide a properly-executed IRS Form W-8BEN or IRS Form W-8EXP (or, in either case, a successor form) prior to the payment.

### 2.  **Tax Treatment of Subscription Rights.**

The rules described above in Section X.B.3, entitled, "CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN – Consequences to U.S. Holders of Certain Claims – Tax Treatment of Subscription Rights," generally apply with respect to the Subscription Rights to a non-U.S. Holder, except that any reference to stock ownership in such Section should be to stock ownership in HoldCo. However, on lapse or disposition of a Subscription Right any gain or loss would not be subject to U.S. federal income tax unless (i) such gain or loss is effectively connected with such non-U.S. Holder's conduct of a trade or business within the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States), or (ii) HoldCo is or has been a United States real property holding corporation ("*USRPHC*") (within the meaning of the Tax Code) at any time during such holder's holding period. The Debtors do not expect HoldCo to be regarded as a USRPHC during the period the Subscription Rights are exercisable.

### 3.  **Ownership and Disposition of New Common Stock.**

### a.  *Dividends.*

Any distributions made on New Common Stock (including any constructive distributions thereon) constitute dividends for U.S. federal income tax purposes to the extent of HoldCo's current or accumulated earnings and profits as determined under U.S. federal income

tax principles. Except as described below, dividends paid on New Common Stock held by a non-U.S. Holder that are not effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate or exemption from tax, if applicable). A non-U.S. Holder generally will be required to satisfy certain IRS certification requirements (including obtaining and furnishing an IRS tax identification number) in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or IRS Form W-8EXP (or, in either case, a successor form) upon which the non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid on New Common Stock held by a non-U.S. Holder that are effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

**b.**     *Sale or Exchange.*

A non-U.S. Holder generally will not be subject to U.S. federal income or withholding tax on gain realized on the sale or exchange of New Common Stock received pursuant to the Plan unless (i) such holder is an individual who was present in the United States for 183 days or more during the taxable year, has a "tax home" in the United States and certain other conditions are met, (ii) such gain is effectively connected with such non-U.S. Holder's conduct of a trade or business within the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) or (iii) HoldCo is or has been a USRPHC at any time within the shorter of the five-year period preceding such disposition or such holder's holding period.

If the first exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of the New Common Stock. If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

The Debtors believe that HoldCo will not be a USRPHC for U.S. federal income tax purposes immediately after the Effective Date. Although the Debtors consider it unlikely based on HoldCo's current business plans and operations, HoldCo may become a USRPHC in the future. If HoldCo were to become a USRPHC, a non-U.S. Holder might be subject to U.S.

federal income tax (but not the branch profits tax) with respect to gain realized on the disposition of New Common Stock.

**4.**      **Ownership and Disposition of the IntermediateCo Notes.**

     **a.**      *Stated Interest and Original Issue Discount.*

     The rules described above under Section X.C.1.b, entitled, "CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN – Consequences to Non-U.S. Holders of Certain Claims – Exchanges under the Plan – Accrued Interest," generally apply with respect to interest or OID on the IntermediateCo Notes paid to a non-U.S. Holder.

     **b.**      *Sale, Exchange or Other Disposition of the IntermediateCo Notes (including Conversion).*

     The rules described above under Section X.C.1.a, entitled, "CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN – Consequences to Non-U.S. Holders of Certain Claims – Exchanges under the Plan – Consequences of Exchange," generally apply with respect to any gain realized on the sale, exchange or other taxable disposition (including a cash redemption or a conversion of the IntermediateCo Notes into New Common Stock) of the IntermediateCo Notes by a non-U.S. Holder. However, on the sale, exchange or other disposition of an IntermediateCo Note, any gain or loss would not be subject to U.S. federal income tax unless (i) such gain or loss is effectively connected with such non-U.S. Holder's conduct of a trade or business within the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) or (ii) HoldCo is or has been a USRPHC at any time within the shorter of the five-year period preceding such disposition or such holder's holding period.

     A non-U.S. Holder's tax basis in any New Common Stock received upon the conversion of the IntermediateCo Notes will equal the fair market value of such stock at the time of the conversion, and the holding period for any New Common Stock received generally will begin the day following the issuance of such stock.

**5.**      **Information Reporting and Backup Withholding.**

     A non-U.S. Holder generally will not be subject to backup withholding with respect to payments of interest (including accruals of OID) or dividends and any other reportable payments, including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the consideration received in exchange for Allowed Claims pursuant to the Plan, as long as (i) the payor or broker does not have actual knowledge or reason to know that the holder is a U.S. person, and (ii) the holder has furnished to the payor or broker a valid IRS Form W-8BEN or IRS Form W-8EXP (or, in either case, a successor form) certifying, under penalties of perjury, its status as a non-U.S. person or otherwise establishes an exemption.

     Any amounts withheld under the backup withholding rules from a payment to a non-U.S. Holder will be allowed as a credit against such holder's U.S. federal income tax liability, if any, or will otherwise be refundable, provided that the requisite procedures are

followed and the proper information is filed with the IRS on a timely basis. You should consult your own tax adviser regarding your qualification for exemption from backup withholding and the procedure for obtaining such an exemption, if applicable.

In addition to the foregoing, HoldCo Group generally must report to a non-U.S. Holder and to the IRS the amount of interest (including OID) and dividends paid to each non-U.S. Holder during each calendar year and the amount of tax, if any, withheld from such payments. Copies of the information returns reporting such amounts and withholding may be made available by the IRS to the tax authorities in the country in which a non-U.S. Holder is a resident under the provision of an applicable income tax treaty or other agreement.

a.    *Pending Legislation.*

Under Section 501 of the Tax Extenders Act of 2009, which was enacted by the House of Representatives, but not the Senate, payments to certain foreign entities may be subject to a 30% withholding tax unless such persons comply with certain information gathering and reporting requirements. Consult your tax adviser concerning the potential application of this legislation to your particular circumstances.

**The foregoing summary has been provided for informational purposes only. All holders of Claims receiving a distribution under the Plan are urged to consult their tax advisers concerning the U.S. federal, state, local and foreign tax consequences applicable to them under the Plan.**

# XI.

## GERMAN INCOME TAX CONSEQUENCES OF THE PLAN.

The following discussion summarizes certain German income tax consequences of the implementation of the Plan to ADH. *See* Section X.B, entitled, "CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN – Consequences to U.S. Holders of Certain Claims" and Section X.C entitled, "CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN – Consequences to Non-U.S. Holders of Certain Claims" for a discussion summarizing certain U.S. federal income tax consequences of the implementation of the Plan to certain holders of Claims.

The discussion of the German income tax consequences below is based on the German tax code in effect on the date of this Disclosure Statement, which is subject to change or differing interpretations (possibly with retroactive effect). The German income tax consequences of the contemplated transactions are complex and are subject to significant uncertainties. The Debtors have not requested and do not expect to request a ruling from any tax authority with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon such authorities. Thus, no assurance can be given that the German tax authorities would not assert, or that a court would not sustain, a different position from any discussed herein.

The following summary of certain German income tax consequences to ADH is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances.

Holders of Claims and Interests are hereby notified that: (i) any discussion of German tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims and Interests for the purpose of avoiding penalties that may be imposed on them; (ii) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (iii) holders of Claims and Interests should seek advice based on their particular circumstances from an independent tax advisor.

## A.      Elimination of Tax Carryforwards.

For German income tax purposes, ADH and certain of its Non-Debtor German subsidiaries form a fiscal unity of corporations, of which ADH is the common parent (the "***ADH Tax Group***"). ADH as the parent of the ADH Tax Group has no NOL carryforwards for German income tax purposes as of the end of 2008, but is expected to report operating losses for its taxable year ended December 31, 2009. Additionally, ADH as the parent of the ADH Tax Group has an interest expense limitation ("***IEL***") carryforward of approximately €18.4 million for German income tax purposes as of the end of 2008 and expects to report IEL carryforward for its taxable year ended December 31, 2009. The IEL results from recent German tax legislation effective January 1, 2008 which generally limits the deduction of interest expense for German income tax purposes to 30% of taxable earnings before deductions for interest, taxes,

depreciation and amortization. The amount of any such NOL and IEL carryforwards and other losses remains subject to audit and adjustment by the German tax authorities.

It is anticipated that the carryforwards discussed above and a portion of any 2010 operating losses will be forfeited as a result of the indirect change-in-ownership in the U.S. upon emergence from bankruptcy. German tax law requires the reduction of these tax attributes as a result of a greater than 50% direct or indirect change-in-ownership.

**B.      Transfer of Allowed European Roll-Up Term Loan Claims and Allowed European Term Loan Claims.**

Upon the Effective Date, the Plan will effectuate the transfer of all Allowed European Roll-Up Term Loan Claims and all Allowed European Term Loan Claims to the European Term Loan Acquisition Entity (the "*Assignments*"), after which certain terms and conditions of the loan may be modified (*e.g.*, interest rate). In consideration for the Assignments, the holders of the Allowed European Roll-Up Term Loan Claims and Allowed European Term Loan Claims will receive either (i) a combination of New Common Stock and their respective Subscription Rights, or (ii) Cash. As a result of the Assignments, the Allowed European Roll-Up Term Loan Claims and the Allowed European Term Loan Claims will continue to be outstanding claims against ADH held by the European Term Loan Acquisition Entity; such claims will not be cancelled or discharged.

The Debtors believe that, for German income tax purposes, the Assignments should be respected as acquisitions by the European Term Loan Acquisition Entity and, thus, should not be a taxable event to ADH (even though the European Term Loan Acquisition Entity is indirectly related to ADH through common ownership). The acquisition of debt below its face value by a person related to a debtor company has been dealt with in German tax court decisions in the past. Accordingly, the Debtors believe that there should not be a deemed dividend leading to increased income to ADH in the amount of the difference between the face value and the purchase price of the debt plus any withholding tax. Similarly the Debtors believe that the Assignments should not be considered deemed waivers of the European Roll-Up Term Loan Claims and the European Term Loan Claims, which could otherwise result in taxable waiver income to ADH up to the face value of the debt.

**C.      Participation in Chapter 11 Process.**

For German tax purposes, a transaction with an affiliate can result in a deemed dividend unless the transaction is considered to be at arm's length. ADH's determination to file for Chapter 11 under joint administration and participate in the Chapter 11 plan was based on its separate evaluation of the overall net benefits of the process to ADH. As such, ADH's decision to participate in the Chapter 11 process should itself not result in the imposition of a deemed dividend.

There is no assurance that the German fiscal authorities and/or the German tax courts will not take a contrary position to those espoused above. The foregoing summary has been provided for informational purposes only. All holders of Claims receiving a distribution

under the Plan are urged to consult their tax advisors concerning the German tax consequences applicable to them under the Plan.

# XII.

## CONFIRMATION AND CONSUMMATION PROCEDURE

### A.    Plan Support Agreements.

Upon execution of the Plan Support Agreement by a Backstop Party, such Backstop Party will agree, among other things, subject to the terms and conditions stated therein, to timely vote or cause to be voted all of the claims held by such Backstop Party to accept the Plan, and not to consent to, or otherwise directly or indirectly seek, solicit, support or vote in favor of any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring of Aleris that could reasonably be expected to prevent, delay or impede the restructuring or reorganization of Aleris in accordance with the Plan.  The Plan Support Agreements further provide for a prohibition against the sale, assignment, transfer or other disposition of, directly or indirectly (each such disposition, for the avoidance of doubt not including a pledge or collateral assignment or other grant of a security interest until the occurrence of a transfer pursuant to enforcement thereof), all or any of such party's claims (including any voting rights associated with such claims), unless the transferee agrees in an enforceable writing to assume and be bound by the Plan Support Agreement, and to assume the rights and obligations of such party under the Plan Support Agreement and promptly delivers such writing to Aleris.

A "*Termination Event*" occurs pursuant to the Plan Support Agreement upon the occurrence of any of the following events (among others):

➢ the Board of Directors of Aleris determines that continued pursuit of the Plan is inconsistent with its fiduciary duties;

➢ a Confirmation Order is not entered by the Bankruptcy Court on or before the one hundred and twentieth (120th) day following the date the Plan was filed with the Bankruptcy Court;

➢ the Effective Date shall not have occurred on or before the Termination Date (as defined in the Equity Commitment Agreement);

➢ any party has breached any material provision of the Plan Support Agreements or the Equity Commitment Agreement, the waiver of which breach of the Equity Commitment Agreement would be a Subject Change (as defined in the Equity Commitment Agreement), and any such breach has not been duly waived or cured after a period of five (5) days;

➢ Aleris shall (i) withdraw the Plan or (ii) publicly announce its intention not to support the Plan; or

➢ the release of the guarantee claims against certain of the Debtors' affiliates pursuant to the *Release* dated February 5, 2010 shall cease to be in full force and effect.

**B.      Substantive Consolidation for Voting and Distribution Purposes.**

**1.      Deemed Substantive Consolidation.**

Pursuant to Section 6.4.1 of the Plan, for administrative convenience, the U.S. Debtors' estates will be substantively consolidated for voting, confirmation, and distribution purposes only.  The Debtors' estates are not being substantively consolidated for any other purpose.  Absent the substantive consolidation provided herein, no recovery would be available to Creditors in U.S. Debtors Class 4 (Convenience Claims) and U.S. Debtors Class 5 (General Unsecured Claims other than Convenience Claims and Insured Claims).  The funding of the recoveries to these Creditors essentially is coming from collateral that would otherwise be available to be distributed to holders of U.S. Roll-Up Term Loan Claims, which, after satisfaction of the DIP ABL Facility and the DIP New Money Term Loan Facility, have liens on substantially all the assets of the U.S. Debtors and superpriority Administrative Expenses against each of the U.S. Debtors.  These Creditors have no obligation to make funds available to the holders of General Unsecured Claims and Convenience Claims.  Substantive consolidation is a means of funding a recovery to such Creditors efficiently and does not prejudice the economic interests of any Creditor.  Hundreds of trade claims in the Chapter 11 Cases were filed solely against Aleris even thought they appear to relate to multiple Debtors or to a Debtor completely different from Aleris.  *See e.g., Debtors' Twenty-First Omnibus Objection (Non-Substantive) to Certain Filed Claims as Having Been Filed Against One or More Wrong Debtors* (Docket No. 1604).  In the absence of substantive consolidation, the Debtors would be required to review each and every claim to determine the appropriate Debtor to which such claim would be allocated.  In addition, the cost of administering the Plan also would increase.   Accordingly, if the Debtors proposed a chapter 11 plan that did not provide for substantive consolidated, (*i.e.*, a debtor-by-debtor basis), there can be no assurance that the distributions to creditors would remain the same as provided in the current Plan and may significantly decrease given the additional cost associated with, among other things, determining the proper Debtor entities.  Based upon the foregoing, the U.S. Debtors believe that the substantive consolidation under the Plan will be consensual as it relates to the only parties adversely affected by it, and no creditor will be prejudiced by the deemed substantive consolidation.

Entry of the Confirmation Order shall constitute approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the limited consolidation of the U.S. Debtors' chapter 11 cases.

On and after the Effective Date:

(1)      All guarantees by any of the U.S. Debtors of the obligations of any other U.S. Debtor arising prior to the Effective Date shall be deemed eliminated so that any Claim against any U.S. Debtor and any guarantee thereof executed by any other U.S. Debtor and any joint and several liability of any of the U.S. Debtors shall be deemed to be one obligation of the deemed consolidated U.S. Debtors, and

(2)     Each and every General Unsecured Claim and the U.S. Roll-Up Term Loan Claims filed or to be filed in the Chapter 11 Cases against one or more of the U.S. Debtors shall be deemed filed against the consolidated U.S. Debtors and shall be deemed one Claim against and an obligation of the deemed consolidated U.S. Debtors.

The substantive consolidation shall not affect the following:

(1)     The mutuality requirements imposed by section 553 of the Bankruptcy Code in connection with any setoff rights asserted by a Creditor;

(2)     The allowance or treatment of U.S. Affiliate Claims;

(3)     The legal and organizational structure of the Reorganized U.S. Debtors;

(4)     Pre- and post-Commencement Date liens, guarantees, and security interests that are required to be maintained in connection with the following:

    (A)     Executory contracts that were entered into during the U.S. Debtors' chapter 11 cases or that have been or will be assumed pursuant to section 365 of the Bankruptcy Code;

    (B)     The Plan;

    (C)     The DIP Credit Agreements; or

    (D)     The Exit ABL Facility; or

(5)     Distributions out of any insurance policies or distributions out of proceeds of such policies; or

(6)     the payment of any fee payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing on confirmation of the Plan, on a per-Debtor basis.

**2.     Reservation of Rights.**

Pursuant to Section 6.4.2 of the Plan, notwithstanding Section 6.4.1 of the Plan, the U.S. Debtors reserve the right to deconsolidate any or all of the U.S. Debtors and tabulate votes on a debtor-by-debtor basis.

## C.     Confirmation Procedure.

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### 1.     Solicitation of Votes.

In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Claims in each of U.S. Debtors Classes 3 (U.S. Roll-Up Term Loan Claims), 4 (Convenience Claims), 5 (General Unsecured Claims other than Convenience Claims and Debt Claims), and 7 (Insured Claims) and the Claims in each of ADH Classes 2 (European Roll-Up Term Loan Claims) and 3 (European Term Loan Claims) are impaired, and the holders of Claims in each of such classes are entitled to vote to accept or reject the Plan in the manner and to the extent set forth in the Voting Procedures.  Detailed voting instructions are provided with the Ballot accompanying this Disclosure Statement and are set forth in the Voting Procedures annexed to this Disclosure Statement.  Pursuant to the Voting Procedures, any Creditor holding a Claim in an impaired Class under the Plan may vote on the Plan so long as such Claim has not been disallowed and is not the subject of an objection pending as of the "***Voting Record Date***" March 10, 2010, the date that is two (2) Business Days before the commencement of the hearing on the disclosure statement.  Nevertheless, if a Claim is the subject of such an objection, the holder thereof may vote if, prior to the Voting Deadline (April 29, 2010), such holder obtains an order of the Bankruptcy Court, or the Bankruptcy Court approves a stipulation between the Debtors and such holder, fully or partially allowing such Claim, whether for all purposes or for voting purposes only. ***You must file any motion seeking to allow a Claim for voting purposes no later than the fifteenth (15th) day after the later of (i) March 26, 2010 (the deadline for the Debtors to complete their mailing of  solicitation packages) and (ii) service of the notice of an objection, if any, to such Claim.***

Claims in each of U.S. Debtors Classes 1 (Priority Non-Tax Claims), 2 (Other U.S. Secured Claims), 6 (U.S. Affiliate Claims), and 10 (Other U.S. Equity Interests) and ADH Classes  1 (German Tranche of U.S. DIP Loan Claims), 4 (Other ADH Claims), and 5 (ADH Equity Interests) are unimpaired.  The holders of Allowed Claims and Equity Interests in each of such classes are conclusively presumed to have accepted the Plan, and the solicitation of acceptances with respect to each such Class is not required under section 1126(f) of the Bankruptcy Code.  If your Claim or Equity Interest is in one of these classes, you will not receive a Ballot.

U.S. Debtors Classes 8 (Aleris Equity Interests) and 9 (Cancelled U.S. Equity Interests) are impaired by the Plan, and the holders of Equity Interests in such Classes are presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.  If you hold a U.S. Debtors Class 8 or 9 Equity Interest, you will not receive a Ballot.

As to classes of claims entitled to vote on a plan, the Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the claims of that class that have timely voted to accept or reject a plan.  Please refer to the Voting Procedures for special rules concerning the calculation of the amount of Claims voting in a Class of Claims.

## 2. The Confirmation Hearing.

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. The Confirmation Hearing in respect of the Plan has been scheduled to commence on May 13, 2010, at 9:30 a.m., at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 6th Floor, Wilmington, Delaware 19801, Courtroom number 1. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court or the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

Any objection to confirmation must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection, and the amount and Class of the Claim or Equity Interest held by the objector. Any such objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court and the persons identified as the Notice Parties in the Disclosure Statement Order (attached as Exhibit "B" to this Disclosure Statement) on or before April 29, 2010, at 4:00 p.m., Wilmington, Delaware time. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

## 3. Confirmation.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of the Plan are that the Plan is (i) accepted by all impaired Classes of Claims and Equity Interests or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) feasible, and (iii) in the "best interests" of creditors and stockholders that are impaired under the Plan.

## 4. Acceptance.

U.S. Debtors Classes 3, 4, 5, and 7 and ADH Classes 2 and 3 are impaired under the Plan and are entitled to vote to accept or reject the Plan. U.S. Debtors Classes 1, 2, 6, and 10 and ADH Classes 1, 4, and 5 are unimpaired and are conclusively deemed to have voted to accept the Plan. U.S. Debtors Classes 8 and 9 are impaired by the Plan and are conclusively deemed to have voted to reject the Plan. Because the U.S. Debtors Classes 8 (Aleris Equity Interests) and 9 (Cancelled U.S. Equity Interests) are deemed to have rejected the Plan, the Debtors intend to seek confirmation of the Plan in accordance with section 1129(b) of the Bankruptcy Code. In the event that any impaired Class of Claims shall fail to accept the Plan in accordance with section 1129(a) of the Bankruptcy Code, the Debtors intend to (i) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Class, in which case the Plan itself shall constitute a motion for such relief, or (ii) amend the Plan in accordance with Section 4.1 of the Plan.

## 5. Unfair Discrimination and Fair and Equitable Tests.

To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, nonaccepting Class.

### a. *The Fair and Equitable Test*

The Bankruptcy Code provides the following non-exclusive definition of the phrase "fair and equitable" as it applies to secured creditors, unsecured creditors, and equity holders:

(1)     Secured Creditors.

With respect to any holder of a secured claim that rejects a plan, the Bankruptcy Code requires that either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale, and the treatment of such liens on proceeds is provided in clause (i) or (ii) of this subparagraph. Holders of substantial portions of U.S. Debtors Class 3 (U.S. Roll-Up Term Loan Claims) and ADH Classes 2 (European Roll-Up Term Loan Claims) and 3 (European Term Loan Claims) have agreed through the Plan Support Agreements to support the Plan. In the event, however, that any of these classes nonetheless votes to reject the Plan, this test would apply to the extent that the Claims in any such rejecting class are Secured Claims.

(2)     Unsecured Creditors.

With respect to any class of unsecured claims that rejects a plan, the Bankruptcy Code requires that either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the rejecting class of unsecured creditors will not receive or retain any property under the plan on account of such junior claim or interest. This test will be applicable if any of U.S. Debtors Classes 4 (Convenience Claims), 5 (General Unsecured Claims other than Convenience Claims and Debt Claims), or 7 (Insured Claims) votes to reject the Plan. Because U.S. Debtors Class 8 (Aleris Equity Interests) and U.S. Debtors Class 9 (Cancelled U.S. Equity Interests) are not receiving or retaining anything under the Plan, the Plan satisfies this test.

(3)     Equity Holders.

With respect to any class of equity interests that rejects a plan, the Bankruptcy Code requires that either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest, or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan on account of such junior interest. This test will be applicable to U.S. Debtors Class 8 (Aleris Equity Interests) and U.S. Debtors Class 9 (Cancelled U.S. Equity Interests), which are deemed to have rejected the Plan. Because no class is junior to U.S. Debtors Class 8 (Aleris Equity Interests) or U.S. Debtors Class 9 (Cancelled U.S. Equity Interests), the Plan satisfies this test.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

### 6. Unfair Discrimination Test.

For a plan to be approved even though a Class of Creditors rejects the Plan, the Plan must not "discriminate unfairly" against any impaired and non-accepting class. Discrimination may exist if there is a difference in treatment between a dissenting class and another class of the same priority that results in a materially lower recovery to the dissenting class or a materially greater risk in connection with the distribution to the dissenting class. None of the impaired classes under the Plan is receiving more than a 100% recovery under the Plan. No two classes in the Plan are similarly situated. Although the Claims in U.S. Debtors Class 5 (General Unsecured Claims) and U.S. Debtors Class 7 (Insured Claims) are General Unsecured Claims, the treatment of such Claims takes into account that, unlike the General Unsecured Claims, Insured Claims may be covered by insurance. In addition, Claimants that elect to treat their Claims as Insured Claims take the risk that such Claims may not be covered by insurance or that the deductibles relating to such Claims may exceed the Allowed Amount of such Claims. Moreover, holders of U.S. Debtors Class 5 General Unsecured Claims and U.S. Debtors Class 7 Insured Claims may both elect treatment in U.S. Debtors Class 4 Convenience Claims, and holders of U.S. Debtors Class 7 Insured Claims may elect treatment in U.S. Debtors Class 5. In light of the foregoing, the Debtors believe that, if any of the U.S. Debtors Class 5 (General Unsecured Claims other than Convenience Claims or Insured Claims) or Class 8 (Insured Claims) votes to reject the Plan, the different treatment of the General Unsecured Claims under the Plan satisfies the requirement that the Plan not unfairly discriminate against the rejecting class.

### 7. Feasibility.

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared projections of their financial performance for the period from 2009 through 2014 (the "***Projection Period***"). These Projections, and the assumptions on which they are based, are included in the Projected Financial Information for the Reorganized Debtors included in the Financial Appendix annexed hereto as Exhibit "C." Based upon the Projections, the Debtors believe that the Reorganized Debtors will be able to make all payments required pursuant to the Plan, and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization. The Debtors further believe that the Reorganized Debtors will be able to repay or refinance the Exit ABL Facility and any and all of the secured indebtedness outstanding as of the Effective Date under the Plan at or prior to the maturity of such indebtedness.

The Projections consist of the following:

➢ a Projected Pro Forma Consolidated Balance Sheet of the Reorganized Debtors as of September 30, 2009 (which reflects the projected accounting effects of consummation of the Plan and the application of "fresh start" accounting principles), and for each of the years ending December 31, 2010 through December 31, 2014;

➢ a Projected Consolidated Income Statement for the Reorganized Debtors for the each of the years ending December 31, 2010 through December 31, 2014; and

➢ a Projected Consolidated Statements of Cash Flows for the Reorganized Debtors for the years ending December 31, 2010 through December 31, 2014.

The Projections are based upon the assumption that the Plan will be confirmed and, for projection purposes, that the Effective Date and the initial distributions take place as of June 1, 2010. Although the Projected Financial Information is based upon a June 1, 2010 Effective Date, the Debtors believe that an actual Effective Date as late as October 31, 2010 would not have any material adverse effect on the Projections.

The Debtors have prepared the Projections based upon certain assumptions that they believe to be reasonable under the circumstances. Those assumptions considered to be significant are described in the Projections. The Projections have not been examined or compiled by independent accountants. Many of the assumptions on which the Projections are based are subject to significant uncertainties. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the Projection Period may vary from the projected results, and the variations may be material. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Projected Financial Information is based in evaluating the Plan.

## 8. Best Interests Test.

With respect to each impaired class of Claims and Equity Interests, confirmation of the Plan requires that each holder of a Claim or Equity Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test." To determine what holders of Claims and Equity Interests of each impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The cash amount that would be available for satisfaction of Claims and Equity Interests would consist of the proceeds from the disposition of the assets of the Debtors. Any cash generated would first be paid to holders of Claims secured by the assets sold, in the order of priority of their respective security interests. A chart showing the relative priorities of claims asserted under the Prepetition ABL Agreements, the Prepetition Term Loan

Agreements, the DIP ABL Credit Facility, and the DIP Term Credit Facility can be found at section IV.C.1.d, entitled, "THE CHAPTER 11 CASES – Significant Events During the Chapter 11 Cases – The DIP Credit Facilities – Collateral Securing the DIP Facilities."

The Debtors do not believe that any proceeds would be available to satisfy General Unsecured Claims after distributing the proceeds to holders of Other U.S. Secured Claims (U.S. Debtors Class 2), U.S. Roll-Up Term Loan Claims (U.S. Debtors Class 3), German Tranche of U.S. DIP Loan Claims (ADH Class 1), and European Roll-Up Term Loan Claims (ADH Class 2).

Moreover, before any proceeds could be distributed to holders of General Unsecured Claims, the Debtors would have to fund the costs of liquidating their assets. The Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases. The foregoing types of claims and other claims that may arise in a liquidation case or result from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors, as debtors in possession, during the Chapter 11 Cases, such as compensation for attorneys, financial advisers, and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition Claims.

To determine if the Plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of the liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the foregoing Claims, is then compared with the value of the property offered to such classes of Claims and Equity Interests under the Plan.

After considering the effects that chapter 7 liquidation would have on the ultimate proceeds available for distribution to Creditors in the Chapter 11 Cases, including (i) the increased costs and expenses of liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisers to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under a chapter 7 case and the "forced sale" atmosphere that would prevail, (iii) the substantial increases in Claims that would be satisfied on a priority basis or on a parity with Creditors in the Chapter 11 Cases, and (iv) the inability of the non-Debtor affiliates of the Debtors to continue their operations as going concerns following the conversion of the Chapter 11 Cases to Chapter 7 Cases, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim or Equity Interest that rejects the Plan with a recovery that is not less than such holder would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

The Debtors also believe that the value of any distributions to each class of Allowed Claims in a chapter 7 case, including to all Allowed Secured Claims, would be less than the value of distributions under the Plan because such distributions in a chapter 7 case would not occur for a substantial period of time. It is likely that distribution of the proceeds of the liquidation could be delayed a number of years after the completion of such liquidations in order

to resolve claims and prepare for distributions.  In the likely event litigation was necessary to resolve claims asserted in the chapter 7 case, the delay could be prolonged.

The Debtors' liquidation analysis is attached hereto as Exhibit "E" (the "***Liquidation Analysis***").  The information set forth in Exhibit "E" provides a summary of the liquidation values of the Debtors' assets assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates.  Reference should be made to the Liquidation Analysis for a complete discussion and presentation of the Liquidation Analysis.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although considered reasonable by the Debtors' management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors' management.  The Liquidation Analysis is also based upon assumptions with regard to liquidation decisions that are subject to change.  Accordingly, the values reflected may not be realized if the Debtors were, in fact, to undergo such a liquidation.

**D.      Consummation.**

The Plan will be consummated on the Effective Date.  For a more detailed discussion of the conditions precedent to consummation of the Plan and the impact of the failure to meet such conditions, *see* Section V.N.1, entitled, "THE PLAN OF REORGANIZATION – Confirmation of the Plan – Conditions Precedent to the Effective Date under the Plan."

The Plan is to be implemented pursuant to the provisions of the Bankruptcy Code.

# XIII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the Debtors' alternatives include (i) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, (ii) liquidation under chapter 7 of the Bankruptcy Code, and (iii) the preparation and presentation of an alternative plan of reorganization.

### A.     Sale Under Section 363 of the Bankruptcy Code.

If the Plan is not confirmed, the Debtors could request from the Bankruptcy Court, after notice and a hearing, authorization to sell their businesses, either on a going-concern basis or by selling their assets, under section 363 of the Bankruptcy Code.  Holders of Secured Claims would be entitled to bid on any property to which their security interest is attached, and to offset their Claims against the purchase price of the property.  In addition, the security interests in the Debtors' assets held by holders of Secured Claims would attach to the proceeds of any sale of the Debtors' assets.  After these Claims are satisfied, the remaining funds could be used to pay holders of General Unsecured Claims.  The Debtors do not believe a sale of their assets and/or businesses under section 363 of the Bankruptcy Code would yield a higher recovery for holders of secured Claims, and do not believe that such a sale would yield any recovery for holders of General Unsecured Claims.

### B.     Liquidation Under Chapter 7.

If no chapter 11 plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the Debtors' assets.  A discussion of the effect that a chapter 7 liquidation would have on the recovery of holders of Claims is set forth in Section XII.C.8, entitled, "CONFIRMATION AND CONSUMMATION PROCEDURE – Confirmation – Best Interests Test."  The Debtors believe that liquidation under chapter 7 would result in (i) smaller distributions being made to Creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee; (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations; and (iii) the failure to realize the greater, going concern value of all of the Debtors' assets.

### C.     Alternative Plan of Reorganization.

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization.  Such a plan might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of their assets.  During the negotiations prior to the filing of the Plan, the Debtors explored various alternatives to the Plan.

The Debtors believe that the Plan enables them to emerge from chapter 11 successfully and expeditiously, allows them to preserve their businesses, and allows Creditors to realize the highest recoveries under the circumstances. In a liquidation under chapter 11 of the Bankruptcy Code, the Debtors' assets would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed. Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation. Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to Creditors than the Plan because the Plan provides a greater return to Creditors than a liquidation of any kind. In any liquidation, Creditors will be paid their distribution in Cash, whereas, under the Plan, some Creditors will receive a part of their distribution in New Common Stock and rights to participate in the Rights Offering.

# XIV.

## CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims.  In addition, other alternatives would involve significant delay, uncertainty, and substantial additional administrative costs.  We urge holders of impaired Claims entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots to the address set forth thereon so that they will be received no later than 5:00 p.m., Wilmington, Delaware time, on April 29, 2010.

Dated: March 19, 2010

Respectfully submitted,

Aleris International, Inc.
Alchem Aluminum Shelbyville Inc.
Alchem Aluminum, Inc.
Aleris Aluminum Europe, Inc.
Aleris Aluminum U.S. Sales Inc.
Aleris Blanking and Rim Products, Inc.
Aleris Light Gauge Products, Inc.
Aleris Nevada Management, Inc.
Aleris Ohio Management, Inc.
Aleris, Inc.
Alsco Holdings, Inc.
Alsco Metals Corporation
Alumitech of Cleveland, Inc.
Alumitech of Wabash, Inc.
Alumitech of West Virginia, Inc.
Alumitech, Inc.
AWT Properties, Inc.
CA Lewisport, LLC
CI Holdings, LLC
Commonwealth Aluminum Concast, Inc.
Commonwealth Aluminum Lewisport, LLC
Commonwealth Aluminum Metals, LLC
Commonwealth Aluminum Sales Corporation
Commonwealth Aluminum Tube Enterprises, LLC
Commonwealth Aluminum, LLC
Commonwealth Industries, Inc.
ETS Schaefer Corporation
IMCO Indiana Partnership L.P.
IMCO International, Inc.
IMCO Investment Company
IMCO Management Partnership, L.P.
IMCO Recycling of California, Inc.

IMCO Recycling of Idaho Inc.
IMCO Recycling of Illinois Inc.
IMCO Recycling of Indiana Inc.
IMCO Recycling of Michigan L.L.C.
IMCO Recycling of Ohio Inc.
IMCO Recycling of Utah Inc.
IMCO Recycling Services Company
IMSAMET, Inc.
Rock Creek Aluminum, Inc.
Silver Fox Holding Company
Wabash Alloys, L.L.C.
Aleris Deutschland Holding, GmbH

By: _____
Name: Sean M. Stack
Title: Executive Vice President and Chief Financial Officer of
Aleris International, Inc., President of the other U.S.
Debtors, and Managing Director of ADH

*1145 Securities* ....................................... 165
*2006 Senior Notes* ................................... 25
*2007 Senior Notes* ................................... 25
*503(b)(9) Claimants* ............................... 39
*ABL Collateral* ....................................... 21
*ADH* ........................................................ 2
*ADH Equity Interests* .............................. 78
*ADH Liquidity Adjustment* ...................... 79
*ADH Plan Deductions* ............................. 78
*ADH Plan Value* ...................................... 79
*ADH Tax Group* ..................................... 184
*ADH Term Value* .................................... 79
*Administrative Bar Date* ......................... 49
*Administrative Bar Date Order* ............... 49
*Administrative Expense* ........................... 49
*AHYDOs* ................................................ 176
*Aleris* ....................................................... 1
*Aleris Canada* .......................................... 34
*Aleris Duffel* ............................................ 34
*Aleris Equity Interest* .............................. 70
*Aleris Group* .......................................... 169
*Apollo* ...................................................... 1
*Asset Acquisition* ................................... 170
*Assignment* ............................................ 185
*Aurora* ..................................................... 7
*Backstop Parties* ...................................... 1
*Backstop Term Lenders* ........................... 36
*Bankruptcy Code* ..................................... 1
*Bankruptcy Court* ..................................... 1
*Bar Date* ................................................. 40
*Bar Date Notice* ...................................... 40
*Bar Date Order* ....................................... 40
*Canadian Borrowers* ............................... 34
*Chapter 11 Cases* .................................... 31
*Claims Settlement Guidelines* ................. 42
*Claims Settlement Order* ......................... 42
*Closing Liquidity Adjustment* ................. 79
*COD* ...................................................... 170
*Commonwealth* ........................................ 14
*Company* ................................................... 1
*Confirmation Hearing* ............................... 1
*Consent Decree* ....................................... 45
*Convenience Claim* .................................. 60
*Corus* ....................................................... 14
*Corus Business* ........................................ 14

*Creditor* ..................................................... 1
*Creditors' Committee* ................................ 2
*Critical Vendors* ...................................... 39
*DCF* ....................................................... 149
*Debt Claim* .............................................. 63
*Debt Securities* ......................................... 3
*Debtors* ..................................................... 1
*Determination Date* ................................. 79
*Deutsche Bank* ........................................ 21
*DIP ABL Claim* ....................................... 52
*DIP ABL Credit Facility* .......................... 34
*DIP Lenders* ............................................ 33
*DIP Order* ............................................... 33
*DIP Term Credit Facility* ......................... 35
*Disclosure Statement Order* ...................... 1
*Dollar for Dollar Portion* ........................ 36
*Duty Paid/Unpaid Rotterdam* ............... 157
*Effective Date* ......................................... 12
*European Borrower* ................................. 34
*European    DIP    Term    Loan    Intercreditor Agreement* ...................... 39
*European Roll-Up Term Loan Claim* ..... 72
*European Term Loan Claim* ..................... 74
*European Term Loan Facility* ................. 22
*European    Term    Loan    Minimum    Recovery* .............................................. 79
*Exclusive Periods* .................................... 40
*Exit ABL Facility* ...................................... 8
*Final Subscription Purchase Price* ....... 100
*Final Subscription Units* ....................... 100
*First Tier Claims* ..................................... 42
*German  Tranche  of  U.S.  DIP  Loan    Claim* .................................................... 72
*Government Parties* ................................. 45
*HoldCo Board* .......................................... 84
*HoldCo Group* ........................................ 170
*Holder* ..................................................... 86
*IEL* ........................................................ 184
*IMCO* ...................................................... 14
*Initial Distribution Date* ......................... 13
*Insured Claim* .......................................... 68
*Interim DIP Order* ................................... 33
*IntermediateCo Note Indenture* ............... 86
*IntermediateCo Notes* ............................... 8
*IPO* .......................................................... 87

*IRB* ......................................................... 113
*IRS* ......................................................... 168
*KCC* .......................................................... 2
*Liquidation Analysis* ............................. 196
*LME* .......................................................... 19
*Majority in Interest* ................................. 12
*Material Margin* ....................................... 26
*Maximum Rights Offering Amount* ........ 92
*Midwest Premium* .................................. 157
*New Common Stock* .................................. 7
*New Money Term DIP Claim* ................... 52
*New Money Term DIP Facility* ............... 35
*NOL* ........................................................ 169
*Non-Rights Offering Common Stock* ...... 78
*Non-Selling Debtor* ................................ 172
*Notes* ........................................................ 25
*Oaktree* ...................................................... 1
*OID* ........................................................ 174
*OpCos* ........................................................ 7
*Other ADH Claim* ..................................... 76
*Other Investors* ........................................ 85
*Other U.S. Equity Interest* ...................... 71
*Other U.S. Secured Claim* ........................ 57
*Plan* ............................................................ 1
*Plan Supplement* ........................................ 2
*Plan Value* ................................................ 78
*Plan Value Share Price* ............................ 79
*Pre-change Losses* ................................. 172
*Preliminary Subscription Purchase Price* .................................................... 100
*Preliminary Subscription Units* ............. 100
*Prepetition ABL Agreements* ................... 21
*Prepetition ABL Facility* .......................... 14
*Prepetition ABL Lenders* .......................... 21
*Prepetition Canadian ABL Sub-Facility* .................................................. 21
*Prepetition Intercreditor Agreement* ....... 23
*Prepetition Term Facility* ......................... 22
*Prepetition Term Lenders* ......................... 22
*Prepetition Term Loan Agent Bank* ........ 22
*Prepetition Term Loan Agreements* ......... 22
*Price Margin* .......................................... 157
*Priority Non-Tax Claim* ............................ 56
*Projected Financial Information* ................ 1

*Projection Period* ................................... 193
*Reorganized Debtors* ................................. 7
*Restricted Holders* ................................ 166
*Restructuring Transactions* ................... 111
*Rights Offering Eligible Creditor* ........... 97
*Rights Offering Participant* ...................... 97
*Rights Offering Share Price* ..................... 81
*Rights Offering Shares* ............................. 81
*Rights Offering Unit* ................................ 97
*Roll-Up Record Date* ................................ 36
*RPNA* ....................................................... 15
*RSAA* ....................................................... 15
*Schedules* ................................................. 40
*SEC* ............................................................ 2
*Second Amendment* .................................. 36
*Second Tier Claims* .................................. 42
*Senior Indebtedness* ................................. 65
*Senior Note Claims* .................................. 65
*Senior Subordinated Notes* ...................... 25
*Senior Unsecured Facility* ....................... 14
*Settlement Summary* ................................ 43
*Spec Alloys* .............................................. 34
*Specified Administrative Expenses* ........ 49
*Subscription Expiration Date* ................... 99
*Subscription Rights* .................................. 97
*Tax Code* ................................................ 168
*Term Collateral* ....................................... 21
*TPG* .......................................................... 14
*U.S. Affiliate Claim* ................................. 67
*U.S. Debtors' Commencement Date* ........ 28
*U.S. Holder* ............................................ 168
*U.S. Liquidity Adjustment* ....................... 79
*U.S. Plan Deductions* ............................... 78
*U.S. Plan Value* ........................................ 79
*U.S. Roll-Up Stock* .................................. 80
*U.S. Roll-Up Term Loan Claim* ............... 53
*U.S. Tax Claim* ......................................... 54
*U.S. Term Loan Facility* ........................... 22
*U.S. Trustee* ............................................. 32
*USRPHC* ................................................ 180
*Voting Deadline* ......................................... 3
*Voting Procedures* ...................................... 1
*Voting Record Date* ................................ 190
*WACC* .................................................... 149